**No. 26-1703**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

DORCAS INTERNATIONAL INSTITUTE
OF RHODE ISLAND, et al.,

Plaintiffs-Appellees,

v.

MARKWAYNE MULLIN, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Rhode Island
District Court Case No. 1:26-cv-00132-JJM-PAS

**DEFENDANTS-APPELLANTS' AMENDED OPENING BRIEF**

AUGUST FLENTJE
Deputy Director

MARIE V. ROBINSON
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

TYLER J. BECKER
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000

# TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**STATEMENT OF JURISDICTION** .......... 3

**STATEMENT OF THE ISSUES** .......... 3

**STATEMENT OF THE CASE** .......... 3

**SUMMARY OF THE ARGUMENT** .......... 8

**STANDARD OF REVIEW** .......... 9

**ARGUMENT** .......... 9

**I. The Challenged Policies Are Not Reviewable..** .......... 9

**A. None Of The Challenged Policies Are Final, Or Ripe For Judicial Review** .......... 10

1. The Comprehensive Re-Review Policy Is Not Final Or Ripe For Review.. .......... 11

2. The Country-Specific Factors Policy Is Also Not Final Or Ripe For Review .......... 14

**B. Plaintiffs' Claims Are Not Reviewable Under The APA** .......... 16

**C. The Challenged Policies Are Not Subject To Judicial Review Under The INA.** .......... 21

1. Judicial Review of Discretionary Benefits Applications, Including Adjustment of Status, Is Barred by 8 U.S.C. §1252(a)(2)(B)(i) .......... 21

2. 8 U.S.C. §1252(a)(2)(B)(ii) Also Bars Judicial Review... .......... 27

**D. The Challenge to the Global Asylum Hold Policy Is Moot** .......... 31

**II. The District Court's Decision Fails On The Merits. ....... 35**

**A. The Comprehensive Re-Review Policy Is Not Contrary To Law.. 36**

**B. The District Court's Analysis Of The Country Specific Factors Policy Is Also Flawed ....... 38**

**C. The Benefits Hold Policy Is Not Contrary To Law ....... 42**

**D. The Challenged Policies Are Not Arbitrary or Capricious. ....... 45**

**CONCLUSION ....... 50**

**CERTIFICATE OF COMPLIANCE ....... 51**

**CERTIFICATE OF SERVICE ....... 52**

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs v. Gardner*,
387 U.S. 136 (1967) .......... 13

*Abuzeid v. Mayorkas*,
62 F.4th 578 (D.C. Cir. 2023) .......... 23

*Anversa v. Partners Healthcare Sys., Inc.*,
835 F.3d 167 (1st Cir. 2016) .......... 48

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1503 (9th Cir. 2014) .......... 28, 31

*Aronov v. Napolitano*,
562 F.3d 84 (1st Cir. 2009) .......... 48

*Atieh v. Riordan*,
797 F.3d 135 (1st Cir. 2015) .......... 47

*Bennett v. Spear,*
520 U.S. 154 (1997) .......... 10, 11, 12, 13

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 12, 13

*Bouarfa v. Mayorkas*,
604 U.S. 13 (2024) .......... 27, 28

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 10

*Britkovyy v. Mayorkas*,
60 F.4th 1024 (7th Cir. 2023) .......... 23

*Brown v. Gen. Servs. Admin.*,
425 U.S. 820 (1976) .......... 20

*Bruno Project Rescue Inc. v. CDC*,
182 F.4th 1 (1st Cir. 2026) .......... 9

*I.N.S. v. Cardoza-Fonseca*,
480 U.S. 443 (1987) .......... 19

*Cedar Coal Co. v. United Mine Workers of Am.*,
560 F.2d 1153 (4th Cir. 1977) .......... 34

*Cheejati v. Blinken*,
106 F.4th 388 (5th Cir. 2024) .......... 28

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) .......... 16

*City of Fall River v. FERC*,
507 F.3d 1 (1st Cir. 2007) .......... 13

*Clark v. K-Mart Corp.*,
979 F.2d 965 (3d Cir. 1992) .......... 34

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 34 (2020) .......... 41, 42, 48

*Doe v. Trump*,
2026 WL 1170971 & n.16 (D. Mass. Apr. 30, 2026) .......... 40

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) .......... 47

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980) .......... 11, 14

*Geda v. USCIS*,
126 F.4th 835 (3d Cir. 2025) .......... 28

*Glob. Tower Assets, LLC v. Town of Rome*,
810 F.3d 77 (1st Cir. 2016) .......... 10

*Gupta v. Jaddou*,
118 F.4th 483 (1st Cir. 2024) .......... 24, 27

*Haley v. Pataki*,
60 F.3d 137 (2d Cir. 1995)....34

*Harisiades v. Shaughnessy,*
342 U.S. 580 (1952) .... 21

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024).... 12

*Harris v. University of Massachussets Lowell*,
43 F.4th 187 (1st Cir. 2022)....32, 33

*Heckler v. Chaney*,
470 U.S. 830 (1985) ....16, 17, 18

*INS v. Aguirre-Aguirre*,
526 U.S. 415 (1999) .... 16

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993) .... 37

*INS v. Orlando Ventura*,
537 U.S. 12 (2002) .... 17

*INS v. St. Cyr*,
533 U.S. 289 (2001) .... 30

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014).... 36

*Jama v. Dep't of Homeland Sec.*,
760 F.3d 490 (6th Cir. 2014) .... 15

*Kale v. Alfonso-Royals*,
139 F.4th 329 (4th Cir. 2025) .... 28

*Kanapuram v. USCIS*,
131 F.4th 1302 (11th Cir. 2025).... 28

*Kucana v. Holder*,
558 U.S. 248 (2010) ........................................ 30

*Levinsky's Inc., v. Wal-Mart Stores, Inc.*,
127 F.3d 122 (1st Cir. 1997) ........................................ 47

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 891 (1990) ........................................ 14

*Manguriu v. Lynch*,
794 F.3d 119 (1st Cir. 2015)........................................34

*Margolin v. NAIJ*,
146 S. Ct. 1285 (2026) ........................................ 38, 39

*Massachusetts v. EPA,*
549 U.S. 497 (2007) ........................................ 32

*Mathews v. Diaz*,
426 U.S. 81 (1976) ........................................ 31

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991) ........................................ 23, 25

*Mijangos v. Bondi*,
167 F.4th 539 (1st Cir. 2026)........................................ 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 46

*Mullin v. Doe*,
609 U.S.----, 146 S. Ct. 2121 (2026)........................................ 8, 19, 23, 24, 26, 27, 29

*Nakka v. USCIS*,
111 F.4th 995 (9th Cir. 2024) ........................................ 23

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ........................................ 11

*Nat'l TPS All. v. Noem*,
150 F.4th 1000 (9th Cir. 2025) ........................................ 37

*Norton v. Southern Utah Wilderness Alliance et al.*,
542 U.S. 55 (2004) ........ 11

*Patel v. Garland*,
596 U.S. 328 (2022) ........ 8, 22, 24, 26

*R.I. Dep't of Envtl. Mgt. v. United States*,
304 F.3d 31 (1st Cir. 2002) ........ 11

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008) ........ 41

*Reno* v. *American-Arab Anti-Discrimination Committee*,
525 U. S. 471 (1999) ........ 48

*Reno v. Catholic Soc. Servcs., Inc.*,
509 U.S. 57 (1993) ........ 12, 14

*Redfern v. Napolitano*,
727 F.3d 77 (1st Cir. 2013) ........ 34

*Riva v. Massachusetts*,
61 F.3d 1003 (1st Cir. 1995) ........ 14

*River St. Donuts LLC v. Napolitano*,
558 F.3d 111 (1st Cir. 2009) ........ 49

*Romer v. Evans*,
517 U.S. 620 (1996) ........ 49

*Rusaki v. Pistole*,
775 F.3d 61 (1st Cir. 2014) ........ 34

*Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*,
976 F.2d 58 (1992) ........ 47

*SEC v. Chenery Corp.*,
332 U. S. 194 (1947) ........ 46

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016) .......... 10

*Thigulla v. Jaddou*,
94 F.4th 770 (8th Cir. 2024) .......... 28

*Trump v. California*,
609 U.S.----, ---S.Ct.----, 2026 WL 2473573 (2026) .......... 11, 13, 14, 15

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 9, 15, 16, 39, 40, 41, 42, 48, 49

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) .......... 9

*United States v. Bisceglia*,
420 U.S. 141 (1975) .......... 12

*United States v. Brown*,
631 F.3d 573 (1st Cir. 2011) .......... 34

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......... 38, 39, 40

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990) .......... 38

*Viana Guedes v. Mayorkas*,
123 F.4th 68 (1st Cir. 2024) .......... 22, 24, 27

*Watson v. United States*,
37 F.4th 22 (1st Cir. 2022) .......... 34

*W.R. Grace & Co.-Conn. v. EPA*,
959 F.2d 360 (1st Cir. 1992) .......... 13

*Zhu v. Gonzales*,
411 F.3d 292 (D.C. Cir. 2005) .......... 27

## FEDERAL STATUTES


5 U.S.C. § 701 ........ 18

5 U.S.C. § 701(a)(1) ........ 18

5 U.S.C. § 701(a)(2) ........ 16, 18, 21

5 U.S.C. § 704 ........ 10, 11

5 U.S.C. § 706 ........ 7

6 U.S.C. § 111(b)(1)(A) ........ 44

8 U.S.C. § 1103(g)(2) ........ 29

8 U.S.C. § 1103(g)(3) ........ 29, 31

8 U.S.C. § 1152(a)(1)(A) ........ 39, 40

8 U.S.C. § 1152(a)(2)(B)(ii) ........ 31

8 U.S.C. § 1158(a) ........ 19

8 U.S.C. § 1158(d)(7) ........ 42

8 U.S.C. § 1160(e)(1) ........ 25

8 U.S.C. § 1160(3)(A) ........ 25

8 U.S.C. § 1182(a)(3) ........ 41, 43

8 U.S.C. § 1182(f) ........ 4

8 U.S.C. §1182(h) ........ 21

8 U.S.C. § 1182(i) ........ 21

8 U.S.C. § 1184(p)(6) ........ 31

8 U.S.C. § 1252(a)(2)(B) ........ 17, 21, 23, 27

8 U.S.C. § 1252(a)(2)(B)(i) ....................21, 22, 23, 24, 25, 26

8 U.S.C. § 1252(a)(2)(B)(ii) ....................28, 29, 30

8 U.S.C. § 1254a(a)(1).................... 24

8 U.S.C. § 1254a(b)(5)(A) .................... 24

8 U.S.C. § 1255....................24, 28, 40

8 U.S.C. § 1255(a) ....................23, 27, 29

8 U.S.C. § 1324a....................29, 40

8 U.S.C. § 1324a(a)(1).................... 28

8 U.S.C. § 1324a(b)(l)(C)(ii) ....................29, 31

8 U.S.C. § 1324a(h)(l) ....................29, 31

8 U.S.C. § 1324a(h)(3) ....................28, 40

8 U.S.C. § 1571(b).................... 43

28 U.S.C. § 1291 .................... 3

28 U.S.C. § 1291(a)(1) .................... 3

## FEDERAL REGULATIONS

8 C.F.R. § 245.2.................... 29

8 C.F.R. §274a.12.................... 29

8 C.F.R. §274a.12(a) .................... 29

8 C.F.R. §274a.12(a)(c).................... 43

8 C.F.R. §274a.12(b) .......... 29, 43

8 C.F.R. §274a.12(c) .......... 29

8 C.F.R. §274a.13(b) .......... 43

8 C.F.R. §274a.13(c) .......... 43

## FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. App. P. 28(a)(8) .......... 39

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. of Civ. P. 54(b) .......... 3, 8

## FEDERAL RULES OF EVIDENCE

Fed. R. of Evid. 201(b)(2) .......... 34

## EXECUTIVE ORDER AND PROCLAMATIONS

Exec. Order 14161 .......... 3

Proclamation No. 10949 .......... 4, 5, 6, 7

Proclamation No. 10998 .......... 6, 7

## MISCELLANEOUS

Miriam Webster's Thesaurus, "*With Respect To Synonyms: 21 Similar Words*," *available at* https://www.merriam-webster.com/thesaurus/with%20respect%20to (last visited Sep. 10, 2026). .......... 26

## INTRODUCTION

The Constitution and Acts of Congress confer on the Government broad authority to prohibit or restrict the entry of aliens into the United States, and substantial discretion to adjudicate immigration benefits and to scrutinize applicants and evaluate anti-terrorism, public safety, and national security concerns. Exercising that authority, the President ordered an inter-agency review of processes by which aliens are vetted for entry. That review identified significant and pervasive deficiencies in particular countries that implicated national security and terrorism concerns. Ultimately, the President issued two Presidential Proclamations which restricted the entry into the United States of individuals from thirty-nine of the countries identified in that worldwide review.

Following well-publicized acts of violence committed by aliens in the United States, the United States Citizenship and Immigration Services ("USCIS") issued the Challenged Policies at issue here. The Challenged Policies described how USCIS staff would interpret existing authority to adjudicate cases to address the national security and terrorism vetting concerns and lapses described in the inter-agency review. Specifically, the Comprehensive Re-Review Policy required that USCIS review benefits provided since January 2021 that were provided to aliens from the thirty-nine countries at issue in the inter-agency review; the Benefits Hold Policy paused the final determination of immigration benefit applications from those countries while adjudication otherwise continued; the Country-Specific Factors Policy required the

consideration of the significant vetting issues in adjudication of such applications for aliens from nineteen of the most high-risk countries; and the Global Asylum Hold Policy temporarily paused the adjudication of asylum applications. Thus, the Challenged Policies further critical national security interests.

The district court vacated the Challenged Policies. The district court rejected the Government's threshold arguments, including that the Challenged Policies were not final or ripe, and that the jurisdictional bars in Immigration and Nationality Act ("INA") and the Administrative Procedures Act ("APA") barred its review. Moreover, the district court held that the challenges to the Global Asylum Hold Policy were not moot, notwithstanding that this policy was rescinded. On the merits, the district court held that the Department of Homeland Security ("DHS")—the agency entrusted by Congress and the Executive with protecting the United States from terrorism and with adjudicating immigration benefits—was prohibited from adopting country-specific adjudication policies or pausing benefits adjudication to address potential national security and terrorism concerns.

This case rests on a remarkable premise: that a federal court could prevent an agency from issuing the very policy guidance that provides government personnel with the guardrails necessary to ensure consistent, non-arbitrary, and individualized decision-making consistent with federal law. And the consequences of the district court's reasoning are staggering. Even a temporary pause of a few days from issuance of adjudication decisions for immigration benefits for Saudi nationals after the September

11, 2001 terrorist attacks would be contrary to law under the district court's reasoning. This Court should vacate the district court's decision.

## STATEMENT OF JURISDICTION

On June 11, 2026, the district court granted the Government's motion for final judgment under FRCP 54(b). Appendix("A")136-41. The Government timely appealed on June 12, 2026. *See* A192-93. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court's finding that it had jurisdiction over the Challenged Policies was in error.

Notwithstanding jurisdictional barriers to review, whether the Challenged Policies are a lawful exercise of agency authority.

## STATEMENT OF THE CASE

On January 20, 2025, the President issued Executive Order 14161, which directed the Secretary of State to enhance vetting and screening of all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks. *See* A229-31. The order required officials, including the Secretary of Homeland Security, to within sixty days submit an inter-agency report "identify[ing] countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full

suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. § 1182(f))." A229.

Nearly six months later, Presidential Proclamation 10949 reported on that worldwide inter-agency review—conducted by the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence—concerning foreign countries' vetting practices. *See* A200-08.[1] That review identified a range of significant deficiencies. For example, the review highlighted the presence or influence of terrorist organizations in many of the countries, and that some of these countries sponsored terrorism. *See id.* It also described conditions in particular countries that suggested heightened security risks, including limited governmental control over parts of its territory, and deficiencies in governmental capacity, including limitations in issuing reliable national identity documents and conducting effective vetting and screening of nationals. *See id.* Furthermore, the review discussed specific governmental policies that implicated U.S. national security and foreign policy concerns, such as whether governments limited or outright refused to share law enforcement and national security information with the United States, and countries' limitations or refusals to accept individuals subject to removal, coupled with patterns of visa overstays from citizens of those countries. *See id.* Section 1(h) of this Proclamation did not disclose further details to avoid "caus[ing] serious damage to the

[1] This Proclamation is cited in each of these three Challenged Policies. *See* A209-14 (PA-2025-26); A221-28 (PM-602-0192); A267-71 (PM-602-0194).

national security of the United States" and because "many such details are classified." A202. Plaintiffs have never contested these deficiencies.

On June 4, 2025, after receiving the inter-agency review, the President issued Presidential Proclamation 10949, which restricted the entry into the United States of individuals from nineteen countries that the Secretary of State had identified as "deficient with regards to screening and vetting." *See* A200-08.

In October 2025, USCIS invoked the preceding factual findings to inform potential enhancements to its guidance to officers regarding adjudication of discretionary benefit requests under the INA. *See* A209-12. On November 27, 2025, USCIS issued a policy alert concerning all pending and later-filed applications for immigration benefits by which it will "consider[ ] any relevant country-specific factors such as those identified in PP 10949 as significant negative factors" and "not limited to insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the" 19 countries identified in Proclamation No. 10949. *See* A213-14 (Policy Alert 2025-26). That policy, coupled with the later additions discussed *supra*, is hereinafter referred to as "the Country-Specific Factors Policy."

One day before the preceding USCIS policy alert, as part of a thwarted terrorist attack involving Afghan nationals, two National Guard members were shot, and one died. *See* A236-37. This—as well as the pre-existing findings in Proclamation No. 10949—led USCIS to issue a policy memorandum on December 2, 2025. *See* A221-24 (Policy Memorandum 602-0192). That statement announced USCIS' intention to

conduct "a comprehensive re-review, potential interview, and re-interview of all aliens from [the 19] high-risk countries of concern who entered the United States on or after January 20, 2021[.]" *See id.* And, USCIS issued a temporary hold on benefits to nationals of those countries to "ensure[] USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States." *See id.* USCIS re-affirmed the INA's directive to conduct these investigations and reviews on a "case-by-case basis." A221; *see* A238-60 (USCIS Policy Manual Part 1, Ch.8, Discretionary Analysis).

In issuing this policy memorandum, USCIS "weighed" any potential resultant "delay to the adjudication of some pending applications" against the "urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible." A223; *see also* A228. The USCIS "determined that the burden of processing delays that will fall on some applicants is necessary and appropriate" given USCIS's "obligation to protect and preserve national security." A223.

Shortly thereafter, on December 16, 2025, the President issued Presidential Proclamation 10998, which expanded the list of countries with documented deficiencies to 39, based on factfinding that overlapped with Proclamation No. 10949. *See* A278-90. Section 7 of the Proclamation instructed the Secretary of State to submit reports to the President every 180 days in consultation with the Secretary of Homeland Security, recommending whether restrictions should be continued, modified, or terminated based on evolving vetting assessments. *See* A288-89. On January 1, 2026, USCIS

expanded the adjudication hold to the 39 additional countries collectively identified in Proclamation Nos. 10949 and 10998, called for a review of all vetting policies and practices for applicants from the same countries, forecasted a review of all benefits awarded to nationals from the same countries since January 2021, and clarified that the adjudication hold applied only to USCIS's final decisionmaking on an application and not to any intermediate processing or investigation. *See* A267-71 (Policy Memorandum 602-0194). On March 30, 2026, USCIS announced that it had established an internal process for lifting holds on applications and had resumed processing asylum applications for individuals from non-high risk countries, thereby withdrawing the Global Asylum Hold Policy. *See* A297-98.

Plaintiffs—all various immigration and labor organizations—filed this action in the district court. Plaintiffs sought to vacate USCIS's policy statements under 5 U.S.C. § 706, enjoin the government from enforcing the Challenged Policies, and to declare them unlawful under the APA. The Government opposed.

On June 5, 2026, the district court granted in part Plaintiffs' motion for summary judgment. *See* A1-135. Foremost, the district court concluded that the Challenged Policies were final and ripe for review, that it had jurisdiction to review all the challenged policies under the APA, and that the INA's judicial review bars did not apply. *See* A21-85. The district court acknowledged USCIS's statement that it had resumed processing of asylum applications not from high-risk countries, but nevertheless assumed that the Global Asylum Hold Policy had not been withdrawn. A91-95. On the merits, the

district court ruled that the challenged policies were contrary to law, and arbitrary and capricious under the APA. *See* A85-127. On June 11, 2026, the district court granted the Government's motion for final judgment under FRCP 54(b).[2] A136-41.

## SUMMARY OF THE ARGUMENT

As a threshold matter, Plaintiffs' statutory challenges to the Challenged Policies are not justiciable. Three of the Challenged Policies—the Comprehensive Re-Review Policy, the Country-Specific Factors Policy, and the Benefits Hold Policy—are neither final nor ripe for review, while the fourth, the Global Asylum Review Policy, is not in place and so challenges to it are moot. Additionally, because the agency's actions are committed to its discretion by law, the APA does not provide for judicial review. Multiple provisions of the INA confer sweeping authority on the Executive to restrict the entry of aliens and endow the government with broad and unreviewable discretionary authority to grant, deny, review, or rescind immigration benefits. The district court's conclusions to the contrary cannot be squared with the Supreme Court's reasoning and holdings in *Patel v. Garland*, 596 U.S. 328 (2022) and *Mullin v. Doe*, 609 U.S.----, 146 S. Ct. 2121 (2026).

[2] On June 19, 2026, the Government filed a motion to stay the district court's decision pending appeal, which the district court denied. A142-69. The Government filed a motion to stay the district court's decision with this Court, *see* Case No. 26-1703, ECF 20. This Court granted in part the motion for stay as pertained to the Comprehensive Re-Review Policy, but denied the stay of the Country-Specific Factors and Benefits Hold Policies. *See* Case No. 26-1703, ECF 29.

Additionally, the district court erred because Plaintiffs' arguments fail on the merits. The Challenged Policies are not contrary to law, or arbitrary and capricious. The district court's reasoning that the Challenged Policies are pretextual is contrary to basic waiver and party presentation principles, since Plaintiffs never raised those arguments below. That rationale is also at odds with the administrative record and the agency's express statements in issuing the Challenged Polices, and it runs directly afoul of the Supreme Court's reasoning in *Trump v. Hawaii*, 585 U.S. 667 (2018). The Court should reverse the district court's decision.

## STANDARD OF REVIEW

The district court's grant of summary judgment under the Administrative Procedure Act is a question of law reviewed *de novo*. *See Bruno Project Rescue Inc. v. CDC*, 182 F.4th 1, 7 (1st Cir. 2026). This Court also reviews *de novo* "the question of whether a claim is justiciable under the APA." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 16 (1st Cir. 2020).

## ARGUMENT

### I. The Challenged Policies Are Not Reviewable.

The Challenged Policies are neither final nor ripe for judicial review, are not reviewable under the APA, and are in fact barred from judicial review by the INA. The Global Asylum Hold Policy was and is moot, and therefore not justiciable. The district court erred in holding otherwise.

### A. None Of The Challenged Policies Are Final, Or Ripe For Judicial Review.

Agency action is subject to judicial review *only* when it is made reviewable by statute or is a "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. A "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. In enacting the APA, "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

In *Bennett v. Spear*, the Supreme Court distilled two conditions for finality. 520 U.S. 154, 177-78 (1997). First, "the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78. Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* An agency action "must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016); *see also Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 83, 83 n.2 (1st Cir. 2016) (recounting the two prongs of the *Bennett* test). "The APA's finality requirement allows the agency an opportunity to apply its expertise and correct its mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in 'piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been

unnecessary.'" *R.I. Dep't of Envtl. Mgt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980)). Plaintiffs have not plausibly alleged "final agency action," 5 U.S.C. § 704, and the district court did not meaningfully address that requirement, *see* A1-135.

Plaintiffs' claims are also not ripe for review. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (cleaned up). Much like finality, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. California*, 609 U.S.----, ---S.Ct.----, 2026 WL 2473573, at *4 (2026) (cleaned up).

### *1. The Comprehensive Re-Review Policy Is Not Final Or Ripe For Review.*

The Comprehensive Re-Review Policy does not satisfy either prong of the test established in *Bennett v. Spear*. It does not mark the "consummation of the agency's decisionmaking process." *See* 520 U.S. at 178 (cleaned up); *cf. Norton v. Southern Utah Wilderness Alliance, et al.,* 542 U.S. 55, 64 (2004) (a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take.") (emphasis in original). Rather, the Comprehensive Re-Review Policy is an internal procedural directive directing agency personnel how to prioritize reviewing

various immigration benefits that have been granted since January 2021. Thus, the policy is at most a "preliminary investigative step" and "interlocutory" in nature and does not constitute final agency action. *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *United States v. Bisceglia*, 420 U.S. 141, 146 (1975) ("The purpose of the IRS' summons power is not to accuse, but to inquire . . . .") (cleaned up). Second, the Comprehensive Re-Review Policy is not agency action from "which rights or obligations have been determined, or from which legal consequences will flow." *See Bennett*, 520 U.S. at 178 (cleaned up); *see also Reno v. Catholic Soc. Servcs., Inc.*, 509 U.S. 57-59 (1993) (noting that a challenge to a policy fails on ripeness grounds "unless the effects of the administrative action have been felt in a concrete way by the challenging parties[.]") (cleaned up).

The district court barely addressed final agency action with respect to this policy. *See* A1-135. Indeed, the district court does not appear to have considered the first prong at all. *See* A62-64. Moreover, the district court barely addressed the second prong of the analysis. *See* A1-135. Instead, the district court simply reasoned that because the memoranda at issue direct USCIS staff to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in [the Travel Ban] who entered the United States on or after January 20, 2021," the action is final. A56. In support, the district court relied on *Biden v. Texas*, 597 U.S. 785, 808-09 (2022). A55. But, that case involved DHS memoranda that immediately bound DHS officials by terminating the Migrant Protection Protocols program, thereby producing legal

consequences, *see* 597 U.S. at 804-06. It also represented the consummation of the agency's decision-making process. *See id.* at 804-09. That is not the case here. Neither the district court nor the Plaintiffs plausibly identified any present pertinent obligations or legal consequences that "flow[ed]" from the Comprehensive Re-Review Policy, as required by *Bennett*, 520 U.S. at 178. *See* A1-135. Though the district court briefly noted that one of the organizational Plaintiffs asserted harm from having to re-open closed files and devote time to clients who already received their benefits, A65, that alleged harm would only occur if benefits were ultimately revoked—assuming that occurred at all. That hypothetical injury is insufficient. *See California,* 2026 WL 2473573, at *2 ("The true source of any injury . . . would be the downstream action that the Secretary *might* take in the future to implement [the policy] . . . . Emphasis on might. . . . The Secretary's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction.").

Ripeness and finality substantially overlap, *see W.R. Grace & Co.-Conn. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992); A61 n.26, and Plaintiffs' challenges to the Comprehensive Re-Review Policy are similarly not ripe for review. *Contra* A51-65. "In determining whether a case is ripe for review, [courts] must examine 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *City of Fall River v. FERC*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967)). The plaintiffs here have not—and likely cannot—identify any particular benefit that has been revoked as a consequence of the

Comprehensive Re-Review Policy. Nor do they contend that such revocation is certain to occur generally, let alone in any particular case, and thus they cannot establish that revocation of any benefit "is inevitable (or nearly so)." *See Riva v. Massachusetts*, 61 F.3d 1003, 1010 (1st Cir. 1995). The policy simply "ha[s] no legal force or practical effect" until such revocation occurs. *FTC v. Standard Oil of Calif.*, 449 U.S. 232, 243 (1980).

As discussed above, the Comprehensive Re-Review Policy does not regulate primary conduct, but rather announces guidelines and for the re-review of particular applications by USCIS staff. *See Reno*, 509 U.S. at 57-59. At most, the Comprehensive Re-Review Policy potentially "limit[s] access to a benefit created by the [INA] but not automatically bestowed on eligible aliens[]" unless and until the agency is satisfied that they qualify. *See id.* at 57-58; *see also Lujan*, 497 U.S. at 891 (holding a controversy concerning a regulation is not ordinarily ripe for review under the APA until the regulation has been applied to the claimant's situation by some concrete action). Any legal consequences as a result of the Comprehensive Re-Review Policy would come from USCIS's decision *after* re-review to reverse an immigration benefit—if that occurs at all. *See California*, 2026 WL 2473573, at *1-*4; *Lujan*, 497 U.S. at 891. As a result, the Comprehensive Re-Review Policy is not reviewable.

### *2. The Country-Specific Factors Policy Is Also Not Final Or Ripe For Review.*

Just like the Comprehensive Re-Review Policy, the Country-Specific Factors Policy is not final or ripe for review. *See supra* pp. 10-14. It does not reflect the

consummation of any agency action in any individual case. Rather, the Country-Specific Factors Policy is solely internal USCIS operational guidance that provides adjudicators guidelines into whether particular applications are subject to additional review, given the national security and public safety concerns identified by the President. *See supra* pp. 1-7. "Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time." *See Trump v. New York*, 592 U.S. 125, 131 (2020) (cleaned up); *accord Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014).

Nor is the Country-Specific Factors Policy ripe for review. The district court assumed that any final determination on a particular applicant would be based on or driven by any of the Challenged Policies, including the Country-Specific Factors policy. *See* A63 ("But Plaintiffs need not wait for an adverse adjudication to pursue their claims; indeed, that Plaintiffs have filed applications with USCIS that have not been adjudicated *because of* the agency's self-imposed hold is sufficient."). That assumption at odds with the agency's statements in implementing the Country-Specific Factors, *see* A209-14, and opposed to the independent adjudicatory factors that USCIS utilizes in assessing applications. *See*, *e.g.*, A210-14, 238-60. Furthermore, the district court plainly assumes both a hypothetical, adverse decision in the future against some unidentified person, and that this hypothetical decision will be driven solely by the Country-Specific Factors Policy. *See* A63. That underscores that the Country-Specific Factor Policy is not ripe for review. *See California*, 2026 WL 2473573, at *4.

**B. Plaintiffs' Claims Are Not Reviewable Under The APA.**

The APA does not permit review of action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Heckler*, 470 U.S. at 830. A long line of Supreme Court precedent precludes or substantially limits federal courts from reviewing non-constitutional disputes arising from matters of foreign policy and national security and in the context of immigration. *See*, *e.g.*, *Hawaii*, 585 U.S. at 704 ("[O]ur inquiry into matters of entry and national security is highly constrained."); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations.") (cleaned up). The district court's decision fails to grapple with the nature of the challenged agency actions. These Challenged Policies do not operate independently of immigration-benefit adjudications. Rather, they govern how USCIS exercises discretionary authority when determining whether previously granted benefits warrant reconsideration, and which benefits may warrant additional scrutiny based on relevant conditions in the applicant's country of origin. Indeed, the district court even recognized that the Country-Specific Factors Policy directs adjudicators to consider identified country conditions and vetting concerns when exercising discretion in individual cases, *see* A21. Furthermore, the Supreme Court has explained that there can be no judicial review of agency action where "statutes [granting agency discretion] are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410

(1971). Indeed, the Supreme Court has urged courts to "remand a case to an agency for decision of a matter that statutes place primarily in agency hands," emphasizing that principle's "obvious importance in the immigration context." *INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002).

The district court did not identify any law that would guide its analysis as to the review or re-review of applications. *See generally* A1-135. That is not surprising, because the agency's decision whether to re-review applications to ensure they were not granted in error plainly falls within the jurisdictional bar at 8 U.S.C. § 1252(a)(2)(B), and the district court erred in concluding otherwise. Moreover, where processing delays stem from ongoing security vetting—which the Challenged Policies anticipated—there is no discrete, legally required action that a court may compel under the APA. The agency's decision to grant, deny, or reconsider relief applications in the exercise of discretion is exempt from judicial review because there are no meaningful standards against which to judge the agency's exercise of discretion. *See Heckler*, 470 U.S. at 830. The district court's ruling to the contrary fails. *See* A44-51.

Significantly, the district court's analysis finding that there was sufficient law to apply does not sufficiently grapple with the nature of the Challenged Policies. *See* A28-51. The district court relied on its conclusion that there was sufficient law to evaluate what it characterized as USCIS's "halt" of applications. A44-51. But, the Comprehensive Re-Review Policy, in particular, does not "halt" applications; it instead governs USCIS's re-review of specific applications that were previously granted. *See*

A221-24, 238-60, 267, 273-77. And, contrary to the district court's assessment, the Comprehensive Re-Review Policy does not bar individualized review. *Contra* A31-39. Nothing in the documents suggest that the Comprehensive Re-Review would not involve individualized assessments and determinations. *See* A221-24, 273-77. To the contrary, the December Memorandum required that "all aliens meeting these criteria undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." A221; *see* A226; *see also* A14 n. 10 (district court opinion, quoting same). On its face, that directive plainly envisions a continuing and individualized assessment of applications. *Contra* A28-39.

Similarly, the Country-Specific Factors Policy delineated how USCIS will interpret its existing authority to conduct adjudications and consider certain country-specific facts and circumstances when making discretionary determinations for immigration benefit requests filed by applicants from those 19 countries. *See* A226-28. *Contra* A44-51. Again, as discussed in detail above, the APA expressly precludes review of actions "committed to agency discretion by law[,]" 5 U.S.C. §701(a)(2); *see Heckler*, 470 U.S. at 830, and claims brought under § 706 are subject to the threshold limitations set forth in § 701. *See* 5 U.S.C. §§ 701(a)(1), (2). The district court recognized that the Country-Specific Factors Policy directs adjudicators to consider identified country conditions and vetting concerns when exercising discretion in individual cases. A21. Again, Congress expressed a clear intent to preclude judicial review of USCIS's

discretionary decisions, and the broad language of § 1252(a)(2)(B) expressly strips judicial review of the agency's discretionary denials. *See infra* pp. 21-31. So too did Congress preclude review of the discretionary analysis and adjudication of applications regardless of the asylee's country of origin. *See* ECF 21 at 23-24; see also 8 U.S.C. § 1158(a); *Cardoza-Fonseca*, 480 U.S. at 443. Thus, Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. The Country-Specific Factors Policy's clarification to adjudicators of pertinent factors falls well within that discretion, and the Court lacked jurisdiction to review it.

Like the County-Specific Factors Policy and the Comprehensive Re-Review Policy, the Benefits Hold Policy is not reviewable. The purpose of the Benefits Hold Policy was to ensure that dangerous individuals did not enter while the Government was establishing adequate standards, and to reduce investigative burdens on agencies during that process. As discussed above, that was one of the reasons for strengthening our nation's immigration laws and vetting procedures in the first place. *See supra* pp. 1-7. Congress by statute has expressed a clear intent to preclude judicial review of USCIS's discretionary decisions, which encompasses the process leading up to that final decision—including a hold on issuing final decisions to address security concerns. *Supra* pp. 1-7, *infra* pp. 21-31; *Doe*, 146 S. Ct. at 2133-37. Similar reasoning precludes review of the Benefits Hold Policy as applied to asylum, the grant of which is committed to agency discretion by law and is not reviewable under the APA. And, while the Benefits Hold Policy temporarily paused final decisions on all pending immigration-benefits

applications for individuals from 39 countries, the processing of those applications continued. A267 n.2. *Contra* A44-51, 61.

Plaintiffs cannot evade Congress's jurisdictional limitations through artful pleading. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833 (1976). The relevant inquiry is not the level of generality at which Plaintiffs choose to frame their claims, but the nature of the agency action being challenged. The Challenged Policies arose from antiterrorism, public safety, and national security concerns sufficiently documented in the administrative record concerning specified countries. *See generally* A194-299. Specifically, USCIS's December 2025 and January 2026 policy memoranda identified two exceptional and recent security incidents involving alien individuals vetted under then-existing procedures, who nevertheless planned or executed terrorist attacks. A222. The same is true of the November 2025 policy alert, which implemented a Presidential Proclamation identifying material deficiencies in certain countries' identity-management and information-sharing practices—deficiencies the President determined undermine the United States' ability to verify individuals' identities and assess security risks, thereby threatening national security and counterterrorism operations. *See* A226-28; *see also* A200-08, 229-31, 267-96.

The Challenged Policies were intended to address those vetting lapses and material deficiencies. *See* A194-301; *supra* pp. 1-7. Because the Challenged Policies rest on sensitive, predictive judgments about risk, intelligence gaps, and foreign government cooperation, those findings are "largely immune from judicial inquiry or interference."

*See Harisiades v. Shaughnessy,* 342 U.S. 580, 588-89 (1952). Plaintiffs cannot circumvent that limitation by recasting their challenge as a facial attack on agency guidance rather than a challenge to the exercise of the agency's discretionary adjudicatory authority itself. The USCIS's actions are committed to agency discretion by law under 5 U.S.C. § 701(a)(2), and Plaintiffs' statutory challenges to the Challenged Policies are not reviewable under the APA. *Contra* A42-85.

### C. The Challenged Policies Are Not Subject To Judicial Review Under The INA.

8 U.S.C. § 1252(a)(2)(B) generally bars review of the discretionary immigration benefits applications, and the district court erred in holding otherwise.

#### *1. Judicial Review of Discretionary Benefits Applications, Including Adjustment of Status, Is Barred by 8 U.S.C. § 1252(a)(2)(B)(i).*

Under 8 U.S.C. § 1252(a)(2)(B)(i), certain applications are specifically barred from review. That statute provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title. . .

Thus, 8 U.S.C. § 1252(a)(2)(B)(i) bars judicial review of adjustment of status under § 1255, among other benefits.

The Supreme Court's recent decision in *Patel,* 596 U.S. at 328-47, buttresses this conclusion. After analyzing § 1252(a)(2)(B)(i), *id.* at 336-38, the Supreme Court held that federal courts lack jurisdiction over all judgments related to the denial of adjustment of status, and that § 1252(a)(2)(B)(i)'s jurisdictional bar "does not restrict itself to certain kinds of decisions." *Id.* at 338. In reaching that conclusion, the Supreme Court focused on the plain language in § 1252(a)(2)(B)(i), noting that "any" has an "expansive meaning" and the use of the word "regarding" similarly "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id.* at 338-39 (cleaned up). The Supreme Court explained that meant that "any judgment" not only includes the ultimate discretionary determination about whether to grant or deny relief, but also "*any* judgment *regarding* the granting of relief." *Id.* at 338-39 (emphasis in original). Thus, 8 U.S.C. § 1252(a)(2)(B)(i) "prohibits review of any judgment *relating to* the granting of relief. That plainly includes factual findings." *See id.* at 339 (emphasis in original).

Though *Patel* expressly declined to address whether § 1252(a)(2)(B)(i)'s plain language bars judicial review of USCIS's decision to deny adjustment of status applications under § 1255, *id.* at 345-46, this Court subsequently held that it did. *See Viana Guedes v. Mayorkas*, 123 F.4th 68, 69-72 (1st Cir. 2024). In *Viana Guedes*, the appellants attempted to challenge the USCIS's denial of their applications for adjustment of status, and the alleged revocation of Viana Guedes's I-140 petition and National Interest Waiver. *See id.* at 69. The district court dismissed the action for lack

of subject matter jurisdiction, and the Court affirmed. *See id.* at 69-70 ("Because 8 U.S.C. § 1252(a)(2)(B) and *Patel v. Garland* [] preclude judicial review of all these asserted claims . . ."). In reaching that determination, this Court joined other Circuits that have considered this issue. *See*, *e.g.*, *Nakka v. USCIS*, 111 F.4th 995, 1014-16 (9th Cir. 2024); *Abuzeid v. Mayorkas*, 62 F.4th 578, 585 (D.C. Cir. 2023); *Britkovyy v. Mayorkas*, 60 F.4th 1024, 1032 (7th Cir. 2023).[3]

That conclusion is further reinforced by *Gupta*, where this Court held that 8 U.S.C. § 1255(a) does not address how or when the Secretary must adjudicate adjustment applications once filed, but instead leaves the timing and procedural sequencing of adjudication to the agency's discretion under its implementing regulations. 118 F.4th at 483-85; *see Viana Guedes*, 123 F.4th at 71 ("Were there any doubt, the Supreme Court in *Patel* stated, albeit in dicta, that section 1252's jurisdictional

[3] In *Nakka*, the Ninth Circuit "ultimately agree[d] with [its] sister circuits the 8 U.S.C. §1252(a)(2)(B)(i) strips district courts of jurisdiction to hear a plaintiff's APA claims when that claim challenges an agency's individualized denial of an application for adjustment of status." 111 F.4th at 1015. However, the Ninth Circuit reasoned that section 1252(a)(2)(B)(i) does not categorically preclude district court jurisdiction over facial challenges to generally applicable agency policies that are independent of the denial of an individual application for discretionary relief. *Id.* at 1003-04. *See* Op. at 9 (emphasizing same). But, in reaching that determination, the Ninth Circuit relied on *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991), and cautioned against reading the terms "relate to" and "regarding" broadly. *See* 111 F.4th at 1003-1015. *Nakka* did not have the benefit of the Supreme Court's decision in *Doe*, 146 S. Ct. at 2134-37. As discussed further below, in *Doe* the Supreme Court distinguished *McNary*, and relied on *Patel* to find that a similar statute should be read broadly. *See id.* at 2134-37. *See infra* pp. 25-26.

bar expressly extends . . . to judgements made outside of removal proceedings.") (cleaned up). 8 U.S.C. § 1252(a)(2)(B)(i) does not state that it only covers only "an" application, "a" judgment, "a single act" or "a grant" of relief. Instead, it prohibits judicial review of "*any* judgment *regarding*" or "*relating to* the granting of relief[]" under § 1255 and the other enumerated provisions, and the Supreme Court in *Patel* underscored that this provision should be read broadly. *See* 596 U.S. at 338-39 (emphases in original).

The Supreme Court's recent decision in *Doe*, 146 S. Ct. at 2134-37, is also instructive. There, the Supreme Court held that the temporary protected status ("TPS") statute barred judicial review. *See id.* Foremost and repeatedly, the Supreme Court emphasized that the TPS statute is discretionary, *see id.*, which is also true for the adjustment of status statute. *Compare* 8 U.S.C. § 1254a(a)(1) ("[T]he Attorney General . . . *may* grant the alien temporary protected status. . .") (emphasis added) *with* 8 U.S.C. § 1255 ("The status of an alien . . . may be adjusted by the Attorney General, in his discretion . . ."). The Supreme Court noted that the bar on judicial review in 8 U.S.C. §1254a(b)(5)(A) is clear, and held that it must be interpreted broadly, just like the judicial review bar in 8 U.S.C. § 1252(a)(2)(B)(i). *See Doe*, 146 S. Ct. at 2133-34 (quoting and citing *Patel*, 596 U.S. at 339). *Compare* 8 U.S.C. § 1254a(b)(5)(A) (barring "judicial review of any determination of the [Secretary of DHS] with respect to the designation, or termination or extension of a designation, of a foreign state.") *with* 8 U.S.C. § 1252(a)(2)(B)(i) (barring judicial review of "any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title.").

Notwithstanding this precedent, the district court here concluded that the judicial review bar should be read narrowly. *See* A28 ("The most natural reading of [s]ection 1252(a)(2)(B)(i) is that it bars review only over a single act of granting or denying an individual application for relief, but that it does not preclude collateral actions challenging general policies and procedures."). The judicial review bar is not so limited. The district court and plaintiffs' assertions that *McNary* should govern here, *see* A31-39, similarly misapprehends the law. The statute in *McNary* involved a program regarding adjustment of status for Special Agricultural Workers ("SAW"), and the relevant provision prohibited judicial review "of a determination respecting an application for adjustment of status under this section," and judicial review "of such a denial." *See McNary*, 498 U.S. at 483-94 (discussing 8 U.S.C. § 1160(e)(1), (3)(A)). The review bar in *McNary* was thus facially limited, and it did not expressly preclude judicial review of other challenges. *See id.* at 492. So, when the plaintiffs in *McNary* brought an action alleging a pattern or practice of procedural due process violations by the then-Immigration and Naturalization Service in its administration of the SAW program, the Supreme Court held that federal court review of those challenges was not barred. *See id.* at 483-84 ("[G]iven the absence of clear congressional language mandating preclusion of federal jurisdiction" over that constitutional claim, "and the nature of respondents' requested relief," the district court "had jurisdiction to hear respondents' constitutional and statutory challenges to INS procedures."). That is not true here.

Notably, the lower courts in *Mullin v. Doe* and other cases involving the TPS statute, like the plaintiffs in those cases, relied heavily on *McNary*. *See* A31-39 (district court opinion, discussing same); *but see supra* fn. 3. The Supreme Court rejected those arguments, and particularly the argument that the TPS judicial review bar should be interpreted in such a way that the judicial review bar only encompassed the ultimate decision. *See Doe*, 146 S. Ct. at 2133-34 (quoting *Patel*, 596 U.S. at 339). The Supreme Court emphasized that the TPS statute's terms "with respect to" and "determination" could be interpreted as referring to "several different things," including the ultimate decision, but also to the "chain of events leading up to a decision[,]" and held that the broadest reading was applicable, given the context of the statute presented. *See* 146 S. Ct. at 2136-37. But, even if "determination" in § 1254a(b)(5)(A) was interpreted more narrowly and "referred only to that final decision," judicial review would still be prohibited because "all the preceding decisions would be 'with respect to' that decision." *Id.* at 2134. Significantly, "with respect to" is a synonym of "regarding," *see* 8 U.S.C. § 1252(a)(2)(B)(i). *See*, *e.g.*, Miriam Webster's Thesaurus, "With Respect To Synonyms: 21 Similar Words," *available at* https://www.merriam-webster.com/thesaurus/with%20respect%20to (last visited August 18, 2026). Thus, the review bar here is analogous to the one considered in *Doe*, not *McNary*. The district court erred in concluding otherwise.

### *2. 8 U.S.C. § 1252(a)(2)(B)(ii) Also Bars Judicial Review.*

While 8 U.S.C. § 1252(a)(2)(B)(i) prohibits judicial review of factual determinations regarding adjustment of status, subsection (ii) acts as a jurisdictional catch-all encompassing other discretionary applications. That subsection states that "no court shall have jurisdiction to review ... any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." *See id.* § (ii). In *Viana Guedes*, the Court held that 8 U.S.C. § 1252(a)(2)(B) and *Patel* barred review of the plaintiffs' claims regarding the denials of their applications for adjustment of status. 123 F.4th at 69-70. The Court noted that subsections (i) and (ii) render particular discretionary applications unreviewable "under substantially the same reasoning." *Id.* at 72 (citing *inter alia Bouarfa*, 604 U.S. at 13 -18); *see also Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) ("That the Attorney General has complete discretion with respect to the labor certification requirement is established by the terms of the waiver provision [8 U.S.C. § 1153(b)(2)(B)(i)].").

Likewise, in *Gupta*, the Court held that § 1255 is specified to be within the discretion of the Secretary by 8 U.S.C. § 1252(a)(2)(B). *See* 118 F.4th at 483. Significantly, the Court held that 8 U.S.C. § 1255(a) does not address how or when the Secretary of Homeland Security must adjudicate adjustment applications once filed but instead leaves the timing and procedural sequencing of adjudication to the agency's

discretion. *Id.* at 483-85. In reaching that conclusion, the Court emphasized the discretionary nature of the applications at issue. *See id.* Other Courts of Appeals have almost uniformly held that subsection (ii) bars judicial review over challenges to USCIS's visa retrogression policies, and that corollary challenges to the adjudication of adjustment of status applications—such as decisions to hold applications in abeyance or to require additional vetting—fall within § 1252(a)(2)(B)'s jurisdictional bar. *See Kale v. Alfonso-Royals*, 139 F.4th 329, 334-36 (4th Cir. 2025); *Kanapuram v. USCIS*, 131 F.4th 1302, 1306-08 (11th Cir. 2025); *Geda v. USCIS*, 126 F.4th 835, 844-45 (3d Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 394-96 (5th Cir. 2024); *Thigulla v. Jaddou*, 94 F.4th 770, 774-79 (8th Cir. 2024).

Adjustment of status is not the only discretionary application covered by the jurisdictional bar at 8 U.S.C. § 1252(a)(2)(B)(ii). *See Bouarfa*, 604 U.S. at 19 ("Where 8 U.S.C. § 1252(a)(2)(B)(ii) applies . . . it bars judicial review of the Secretary [of DHS's] revocation" of an approved visa petition). Congress has also given the Executive Branch broad discretion to determine when aliens may be authorized to work in the United States. *See*, *e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1503, 1062 (9th Cir. 2014); *see also, e.g.,* 8 U.S.C. § 1324a(a)(1) (generally making it unlawful to employ "unauthorized aliens"); 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien," for employment purposes, as an alien who is neither a lawful permanent resident nor "authorized to be ... employed by this chapter or by the Attorney General"). Congress left the determination of which applicants merit employment authorization to the

Attorney General's discretion, and the Attorney General has delegated that authority to the Secretary of Homeland Security. *See* 8 U.S.C. § 1324a(h)(l) (providing that Attorney General is responsible for certifying aliens' right to work in the United States); 8 U.S.C. § 1324a(b)(l)(C)(ii) (providing that a document is valid as evidence of employment authorization if "the Attorney General finds [it], by regulation, to be acceptable" for that purpose); *see also* 8 U.S.C. § 1103(g)(2) (authorizing Attorney General to "perform such other acts as the Attorney General determines to be necessary" to enforce the nation's immigration laws); 8 C.F.R. § 274a.12 (work authorization regulations).[4] As the district court even acknowledged, "the statutes governing [work authorization and adjustment of status] benefits use discretionary terms." A96 (citing U.S.C. §§ 1324a(h)(1), (3), 1255(a)). Thus, 8 U.S.C. § 1252(a)(2)(B)(ii)'s judicial review bar of "any other decision or action" specified by statute to be within the discretion of the DHS Secretary would apply to the provision of work authorization under 8 U.S.C. § 1324a. Yet the district court here determined that it could review collateral actions challenging general policies and procedures, even if review of the ultimate determination is barred. *See generally* A1-135. That is clearly wrong under the reasoning of *Doe*, 146 S. Ct. at 2121, discussed *supra* pp. 23-26.

[4] The regulations themselves make clear that the determination of whether to grant work authorization is discretionary, either explicitly, *see* 8 C.F.R. § 274a.12(c), or because the grant of work authorization is contingent on the grant of another discretionary benefit. *See* 8 C.F.R. § 274a.12(a), (b).

The district court's reliance on *Kucana*, 558 U.S. at 248-52, *see* A34-39, likewise misses the mark. In *Kucana*, the Supreme Court considered whether the statutory provision at 8 U.S.C. § 1252(a)(2)(B)(ii) deprived the federal courts of jurisdiction to review the Board of Immigration Appeals' denials of motions to reopen. *See* 558 U.S. at 236-53. The Supreme Court emphasized that with Section 1252(a)(2)(B)(i), Congress specifically and explicitly intentionally deprived the federal courts of jurisdiction over particular discretionary determinations. *See id.* at 241, 246-49. The Supreme Court found "significant the character of the decisions Congress enumerated in § 1252(a)(2)(B)(i), thereby insulating them from judicial review." *Id.* at 247. "[T]he determinations there listed are substantive decisions . . . made by the Executive in the immigration context as a matter of grace, things that involve whether aliens can stay in the country or not[,]" and include, among other things, "adjustment of status, §1255." *Id.* at 247-48. "Other decisions specified by statute 'to be in the discretion of the Attorney General,' and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind." *Id.* at 248. In contrast, the Supreme Court noted that "[a] court decision reversing the denial of a motion to reopen does not direct the Executive to afford the alien substantive relief; ordinarily, it touches and concerns only the question whether the alien's claims have been accorded a reasonable hearing." *Id.* Adjustment of status and the decision whether to grant employment authorization are forms of substantive relief, insofar as an individual applying has a "right to a ruling." *See INS v. St. Cyr*, 533 U.S. 289, 307-08 (2001) ("Eligibility that was governed by specific statutory

standards provided a right to a ruling on an applicant's eligibility, even though the actual granting of relief was not a matter of right under any circumstances, but rather is in all cases a matter of grace") (cleaned up); *see also Brewer*, 757 F.3d at 1062. Thus, while the district court determined that *Kucana* supports that the agency's policies were subject to review, *see* A34-35, that was in error.

The district court reasoned that because the source for conferring employment authorization sometimes arose from regulation, not statute, the jurisdictional bar at 8 U.S.C. § 1152(a)(2)(B)(ii) would not apply to employment authorization grants. *See* A35. But the fact that the statute states that the Attorney General *could* promulgate regulations to guide the agency in making a discretionary determination about whether to grant employment authorization does not override that the discretionary authority is itself statutory. *See* 8 U.S.C. §§ 1103(g)(3), 1324a(h)(l), (b)(1)(C)(ii). Indeed, as the district court seemingly acknowledged, A35, employment authorization is at times conferred by statute. *E.g.* 8 U.S.C. § 1184(p)(6). *Cf. Mathews*, 426 U.S. at 81 (noting that the "changing political and economic circumstances," make immigration policy determinations particularly appropriate for political—not judicial—maintenance and control). Taking the district court's analysis to its logical conclusion, certain employment authorization applications would be statutory and therefore generally barred from its review, while other employment authorization determinations would not. *See* A35. That cannot be what Congress intended.

**D. The Challenge to the Global Asylum Hold Policy Is Moot.**

Article III of the Constitution limits federal courts' jurisdiction to cases and controversies. *See Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). This Court has consistently held that "a suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *See*, *e.g.*, *Harris v. University of Mass. Lowell*, 43 F.4th 187, 191 (1st Cir. 2022). Any challenges to the Global Asylum Hold Policy are moot because the USCIS Director rescinded the Global Asylum Hold Policy on March 25, 2026, well before the district court's decision below. *See* A277-99; *see also* Motion to Supplement & Attachment. Thus, the Court can offer Plaintiff-Appellants no remedy because the remedy they would seek—vacatur of the Global Asylum Hold policy—has already been provided, and no issues remain for the Court's resolution.

The district court acknowledged USCIS's statement on its public-facing website that it had resumed processing certain applications, including those previously encompassed by the Global Asylum Hold Policy. *See* A91 n.32 (referencing A277-99). Yet, the district court nevertheless "assume[d]" that the Global Asylum Hold Policy remained in effect "given that the Global Asylum Hold Policy has not been lifted by the USCIS Director, through a subsequent memorandum[.]" A91 n.32. The district court did so even while acknowledging the website—which is in the summary judgment record. *See id.* (citing A277-79). The district court provided no other basis for its assumption that the Global Asylum Hold Policy remained in place beyond the fact that

the memorandum was not on the website, *see* A91-95. Given that mootness goes to federal courts' Article III power to adjudicate disputes, the Government submitted an unopposed motion to supplement, and included the March 25, 2026 memorandum from the USCIS Director, the result of which was the website post ending the hold on asylum applications for applicants from non-high risk countries. *See* Motion to Supplement; A277-79. While not formally ruling on the motion, this Court requested the Government submit an amended brief addressing whether the Government is requesting the Court to take judicial notice of the Director's memorandum. *See* J. Rikelman's September 15, 2026 Order.

At the outset, there is no case or controversy as to the mootness of the Global Asylum Hold Policy based on what is already in the record. Again, the USCIS's public-facing website stated that the Global Asylum Hold Policy was not in place as of March 2026, *see* A277-79. The district court seemingly doubted the veracity of the information provided on the USCIS's official government website, and concluded that the USCIS had not rescinded its policy because the district court judge was not personally aware of any internal memoranda to that effect. *See* A91-95. USCIS's statement on its website that it was no longer "holding" particular applications was a sufficient statement to the public of the status of its current policies. More was not required, and the district court erred in concluding otherwise.

Notwithstanding this, the Court should take judicial notice of the Director's March 25, 2026 Memorandum. A court can take judicial notice of facts not subject to

reasonable dispute where, *inter alia*, those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See*, *e.g.*, *Watson v. United States*, 37 F.4th 22, 28 (1st Cir. 2022) (quoting and citing the Federal Rules of Evidence 201(b)(2)). The Plaintiffs-Appellants did not oppose supplementation here, and there is no reasonable basis on which they could contest the veracity of the supplied Memorandum. *See* Motion to Supplement, pp. 1-2; *see Redfern v. Napolitano*, 727 F.3d 77, 83 (1st Cir. 2013) (where both parties agreed in substance to the facts in the government's Rule 28(j) letter, seeing "no difficulty" in taking judicial notice of those facts and finding the case moot). Though ordinarily this Court's jurisdiction is limited to the record before the district court, "[b]ecause mootness implicates a court's jurisdiction, the court can properly look to facts outside the record so long as those facts are relevant to a colorable claim of mootness." *Manguriu v. Lynch*, 794 F.3d 119, 121 (1st Cir. 2015) (citing *Haley v. Pataki*, 60 F.3d 137, 140 n.1 (2d Cir. 1995); *Clark v. K-Mart Corp.*, 979 F.2d 965, 967 (3d Cir. 1992); *Cedar Coal Co. v. United Mine Workers of Am.,* 560 F.2d 1153, 1166 (4th Cir. 1977)); *see Rusaki v. Pistole*, 775 F.3d 61, 67 (1st Cir. 2014) ("We have sometimes acknowledged such factual submissions, however, at least where they raise a question of mootness."); *United States v. Brown*, 631 F.3d 573, 580 (1st Cir. 2011) (considering mootness after the government informed the court by Rule 28(j) letter that defendant was out on supervised release). Because the Global Asylum Hold Policy was no longer in place, the Court should find any challenges to it moot, and vacate the decision below on the Global Asylum Hold Policy.

## II. The District Court's Decision Fails On The Merits.

The Challenged Policies are not arbitrary and capricious, or contrary to law. As discussed above, USCIS adopted the Challenged Policies to ensure that immigration benefits had not been and would not be granted before potentially significant national-security, public safety, and terrorism-related concerns were adequately investigated and resolved. *See supra* pp. 1-7. Those determinations did not arise in a vacuum. USCIS identified significant concerns regarding the availability, reliability, and completeness of vetting information from the designated countries. *See supra* pp. 1-7; A194-299. The agency further determined that existing adjudicatory procedures should be supplemented by enhanced vetting measures. *See supra* pp. 1-7; A194-299. That was well within the USCIS's discretionary authority. *See supra* pp. 1-7, 16-31; A194-299. *Contra* A1-135.

Precluding the government from ensuring that immigration decisions were made consistently and to protect national security as codified by Congress in the INA endangers the public and is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993). Under the district court's analysis, it is not clear USCIS would be able to instruct its staff to consider certain broader concerns or country-specific factors in reviewing or re-reviewing applications. A1-135. That could include, for example, interviewing or re-interviewing applicants from particular countries or regions where child marriage or female genital mutilation are common. Similarly, it is

not clear if the USCIS could issue general policies to address situations where applicants were discovered or suspected of being affiliated with gangs and terrorist groups. And, the district court's decision could forestall the USCIS from providing generally applicable guidance concerning country conditions in other contexts, such as a lack of documents provided during an emergency or unforeseen circumstance, the unavailability of documents from applicants whose countries are experiencing war, famine, or disease, or more generally when required documents are unavailable or cannot be provided in the context of asylum. Furthermore, it could preclude USCIS from evaluating patterns of fraud and make it more difficult for the USCIS to re-review applications in a comprehensive, uniform manner if there were patterns of document fraud or frivolous applications. It is far more efficient for the USCIS to be able to issue uniform guidance to its staff identifying particular applications that necessitate additional information, evaluation, or that ought to be re-reviewed. The district court's sweeping decision undermines the Executive Branch's broad constitutional and statutory authority over immigration.

### A. The Comprehensive Re-Review Policy Is Not Contrary To Law.

The Comprehensive Re-Review Policy falls well within the agency's statutory authority. As the district court acknowledged, both the D.C. Circuit and the Ninth Circuit have recognized the agency's inherent power to reconsider past agency decisions. A102-03 (citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1019 (9th Cir. 2025)).

Yet the district court concluded the Comprehensive Re-Review Policy was contrary to law because the D.C. and Ninth Circuit decisions include an exception that precludes re-review where "Congress has spoken" about the procedures for reconsidering past decisions. A103 (internal quotations omitted). The district court concluded that in the INA, Congress has permitted revocation or termination of immigration benefits only "on an individualized level and determine whether a particular person—not a large swath of people—lack eligibility for a benefit provided." A105. That analysis is fundamentally flawed.

Again, nothing in the Comprehensive Re-Review policy indicates that USCIS will not undertake an individualized assessment. *See supra* pp. 2, 18. *Contra* A31-39, 105. It does not follow that simply because an administrative agency makes an assessment, based on background information about fraud, national security concerns, and a potential lack of reliable information, that certain applications are more likely to necessitate rereview, that review of those applications will not be individualized. Nor does the Comprehensive Re-Review policy bar individualized review. *Contra* A31-39. To the contrary, the December Memorandum required that "all aliens meeting these criteria undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." *See* A14 n. 10 (quoting A221). That plainly envisions an individualized assessment of applications.

Therefore, the district court's theory that individualized review will not occur is simply wrong.

Once discretionary immigration benefits are granted, the consequences of those decisions may be difficult or impossible to fully unwind under normal circumstances. Here, the district court held that the agency could not reconsider them at all. *See* A12-14. Thus, under the district court's reasoning it is unclear how the agency could revisit and remedy particular actions more broadly, for example if any particular set or group of applications were granted in error, or if those applications generally perhaps should have been held pending the provision of additional documentation or information. The district court's order therefore places USCIS in an untenable position

### B. The District Court's Analysis Of The Country Specific Factors Policy Is Also Flawed.

As the Supreme Court has explained, "[i]n both civil and criminal cases," the courts "rely on the parties to frame the issues for decision" and the courts are "assign[ed] . . . the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (internal quotation omitted); *accord Margolin v. NAIJ*, 146 S. Ct. 1285, 1288 (2026). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See Mijangos v. Bondi*, 167 F.4th 539, 545 (1st Cir. 2026) (cleaned up); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (same).

Plaintiffs did not raise 8 U.S.C. § 1152(a)(1)(A) at all in their motion for summary judgment. Yet, in adjudicating Plaintiffs' summary judgment motion, the district court relied entirely on 8 U.S.C. § 1152(a)(1)(A). *See* A88-112. Specifically, the district court determined that the policy discriminated against applicants from those countries in violation of 8 U.S.C. § 1152(a)(1)(A), which bars "discriminat[ion] … in the issuance of an immigrant visa because of the person's … nationality." *See* A88-90, 108-12. The district court's reliance on that statute violated the party-presentation principle. *See*, *e.g.*, *Margolin*, 146 S. Ct. at 1288; *Sineneng-Smith*, 590 U.S. at 375-76. Plaintiffs' failure to raise the statute had a material impact here, because the Government would have been able to tell the district court that "[s]ection 1152(a)(1)(A) is expressly limited to the issuance of 'immigrant visa[s].'" *Hawaii*, 585 U.S. at 694 (quoting 8 U.S.C. § 1152(a)(1)(A)). In other words, the provision does not even apply.

In denying a stay, the district court concluded that it was sufficient that Plaintiffs cited 8 U.S.C. § 1152(a)(1)(A) "briefly" in their complaint, even though they failed to raise it in their summary-judgment briefing at all. *See* A152-54. Plaintiffs are represented by sophisticated immigration lawyers. That is plainly insufficient to present an entire merits-based argument at the summary judgment phase. *See* Fed. R. App. P. 28(a)(8) ("[T]he argument . . . must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). Though the district court noted that the party-presentation principle is "supple, not iron-clad[,]" A154 (quoting *Sineneng-Smith*, 590 U.S. at 376), the Supreme

Court there referred to "modest" interventions such as correcting a statute-of-limitations miscalculation or ordering supplemental briefing on jurisdictional issues. 590 U.S. at 376 & n.4. Presenting an entire legal theory not raised by the Defendants at summary judgment is not such an appropriate intervention. *See id.* Therefore, the district court's "contrary to law" analysis fails at the outset.

Regardless, the district court's conclusions applying § 1152(a)(1)(A) fail on the merits. Again, "[s]ection 1152(a)(1)(A) is expressly limited to the issuance of immigrant visas[.]" *See Hawaii*, 585 U.S. at 694 (cleaned up); *cf.* A98, 107, 110 (district court opinion, distinguishing between the issuance of visas in other contexts). In terms of the benefits at issue here, neither work authorization nor adjustment of status are the issuance of an immigrant *visa*. Visas are issued by consular officials at postings abroad. *See generally Hawaii*, 585 U.S. at 694-96. Adjustment of status is governed by a different statutory provision, 8 U.S.C. § 1255, and employment authorization is authorized under 8 U.S.C. § 1324a and implementing regulations, not the immigrant visa issuance process.[5] *See* 8 U.S.C. §§ 1152(a)(1)(A), 1255(a), 1324a(h)(3); 8 C.F.R. §§ 245.2, 274a.12.

---

[5] The district court asserted that § 1152(a)(1)(A) "bears on [Plaintiffs'] applications for adjustment of status and work authorization, because those applications depend on visa availability, but does not apply to applications for naturalization or asylum." A107 (internal quotations omitted). Yet for that proposition, the court relied on a different district court decision where there was apparently no dispute between the parties about whether 8 U.S.C. § 1152(a)(1)(A) applies to adjustment of status or work authorization. *See Doe v. Trump*, 2026 WL 1170971, at *16 & n.16 (D. Mass. Apr. 30, 2026). Again, the issue was not even raised by the Plaintiffs at summary judgment, so the Government had no opportunity to provide its views.

Congress' choice to include a specific prohibition in the visa process but not in other processes in the same statute must be respected – if anything, it suggests that nationality-based determinations are permitted, which is unsurprising given that much of immigration law is based upon nationality. *See Hawaii*, 585 U.S. at 694; *see also Reagents*, 591 U.S. at 34 (rejecting a similar equal protection-animus argument "[b]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program . . . . Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.").

Furthermore, the district court erred in concluding that the purpose of the Country Specific Factors Policy was facially discriminatory. *Contra* A111. "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive [and must be upheld] [s]o long as [they] are not wholly irrational[.]" *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (alterations in opinion). The administrative record specifies that as a result of the fact-finding conducted under 8 U.S.C. §1182(f), which described the country-specific concerns underpinning the Country-Specific Factors Policy, USCIS would use country-specific findings in assessing individual applications, but that the USCIS will not consider the applicant's nationality itself a significant negative factor. *See* A247. That is entirely appropriate. The district court's decision also overlooks that the USCIS frequently considers country conditions in relevant factors, *e.g.*, 8 U.S.C. § 1182(a)(3). If §1152(a)(1)(A) were interpreted to not

allow USCIS to employ considerations of public safety or national security in adjudicating adjustment of status or work authorization by country, § 1152(a)(1)(A) would override the well-understood ability of federal immigration authorities to consider country-based factors in all sorts of contexts. *See Hawaii*, 585 U.S. at 694, 706-10; *Reagents*, 591 U.S. at 34. That cannot be what Congress intended.

**C. The Benefits Hold Policy Is Not Contrary To Law.**

The district court reasoned based on various statutory and regulatory provisions, that adjudication was required within a certain timeframe, seemingly regardless of whether USCIS had sufficient information or not. *See* A47-51. For example, the Court noted that 8 U.S.C. § 1158(d)(5)(A)(iii) provides that asylum applications "shall be completed within 180 days" of filing in the absence of exceptional circumstances. A47. Even aside from whether obtaining requisite security information is an exceptional circumstance under that subsection, Congress has precluded any private rights stemming from this timing provision. 8 U.S.C. § 1158(d)(7). The INA does not require the adjudication of the benefits applications in a specified period of time (at least one that is reviewable here) and USCIS did not need clear congressional authorization to apply a hold on issuing its discretionary adjudicatory decisions.

Further, and as the district court acknowledged, the statutes governing adjustment of status and employment authorization themselves "use discretionary terms." A96. While the district court reasoned that "the relevant statutes and regulations" concerning adjustment of status and employment authorization contain

mandatory terms, *see* A96-97, those terms pertain to the fact that the *applicant* must apply for adjustment of status or employment authorization, 8 C.F.R. § 274a.12(a)(c), and thereafter the applicant "shall be notified" of the agency's decision, *see* 8 C.F.R. § 274a.13(b), (c). To state the obvious: a mandate on the *applicant* creates no obligations on the *government*. And a mandate to notify an applicant of a decision once made does not create a mandate on the government to make a decision within a particular timeframe. Moreover, as the district court acknowledged, a different statute, 8 U.S.C. § 1571(b), states that Congress believes that "the processing of an immigration benefit application *should*[,]" not must, "be completed not later than 180 days after the initial filing of the application[.]" *See* Op. 97. The district court erred in finding that the INA created an enforceable right to adjudication within a particular timeframe. *Contra* A96-97. Moreover, the district court's analysis fails because USCIS has not "categorically withheld adjudication of immigration benefits." *Contra* A100. Rather, USCIS has temporarily paused the final adjudications of certain specified applications, which is well within its discretionary authority. A221-28. While the district court concluded that the Benefits Hold Policy contravened Congress' intent that benefits adjudication should generally proceed, A100, that conclusion overlooks other salient factors, and particularly Congress' broader intent in enacting our country's immigration laws and ensuring no benefits are conferred without proper vetting. *See supra* pp. 1-7.

Although the district court did not use the words "major questions doctrine," its opinion indicates that it was looking for clear statutory authorization for the hold policy.

*See* A24-26, 100. For example, the district court stated agreement with the Plaintiffs that "[h]ad Congress intended to give USCIS that sweeping authority" to impose holds on adjudication decisions, "it surely would have said so." A100. The court made this assumption even though the grant of these benefits is discretionary. *See supra* pp.16-31. Significantly, it appears from the district court's opinion that adjudication holds are never permitted by the INA. If a one-week (or one day) hold on applications from a particular country or countries would never be permissible, regardless of the national security and foreign policy-related grounds at play, that is undoubtedly inconsistent with Congressional intent. *E.g.*, 6 U.S.C. § 111(b)(1)(A); *see supra* pp. 1-7, 16-31. Under the INA, Congress made the validity of an alien's admission to the United States a necessary and express prerequisite for nearly all immigration benefits. Among the substantive grounds that Congress commanded the Executive Branch to assess in considering the validity of any alien's admission are "[s]ecurity and related grounds" expressly set forth in 8 U.S.C. § 1182(a)(3) —including an alien's criminal history, *id.* §1182(a)(2); participation in terrorist activities, *id.* § 1182(a)(3)(B); and any "reasonable ground" for the Secretary of State "to believe" admission "would have potentially serious adverse foreign policy consequences for the United States," *id.* § 1182(a)(3)(C). These standards apply through the investigation and adjudication of applications for immigration benefits—processes that the INA and its regulations also command. These provisions thus impose affirmative duties to obtain and exchange security information—duties that cannot be fulfilled if applications are adjudicated before adequate information is

obtained. Thus, in the context of immigration benefits where Congress has granted explicit discretion to the Executive Branch, looking for clear statutory authorization to enact the holds is entirely the wrong exercise. Rather, the district court should have looked only for any limits on that discretion, not whether Congress explicitly authorized the Benefits Hold Policy.

**D. The Challenged Policies Are Not Arbitrary or Capricious.**

The district court concluded that the Challenged Policies are arbitrary and capricious because USCIS did not offer reasoned explanation, failed to considered reliance interests, and employed pretextual reasoning. A112-128. The district court erred with respect to each reason.

Turning first to the district court's assertion that the agency failed to reasonably explain its decision and failed to adequately consider reliance interests in issuing the Comprehensive Re-Review Policy, the Country-Specific Factors Policy, and the Benefits Hold Policy, *see* A112-20, those assertions fail. As discussed in detail above, the Challenged Policies delineate and address multiple agencies' specific findings of deficiencies in the quality and integrity of information provided from certain countries, which prevented USCIS from vetting the eligibility of individuals for immigration benefits, and accurately assessing the risk their nationals may pose to the United States. *See supra* pp. 1-7; *see generally* A209-14, 221-60, 299-301. Further, the Challenged Policies work together in concert. The Comprehensive Re-Review Policy ensures that individuals who were granted benefits have been adequately vetted for security and

eligibility concerns. The Country-Specific Factors Policy ensures that USCIS adjudicators are aware of particular country conditions when evaluating applications, so that additional information can be requested if needed. And, the Benefits Hold Policy ensured that adjudication could proceed, but benefits were held pending USCIS obtaining information necessary to ensure benefits were not granted in error. Thus, the Benefits Hold Policy and the Country Specific Factors Policy arguably ensure that the Comprehensive Re-Review Policy is not needed ad infinitum, and that USCIS is not overwhelmed with re-reviewing applications again in the future.

Although the district court disagreed with the sufficiency of those explanations, that disagreement does not alter the fact that the agency provided reasons for its actions in the administrative record. A113-27. *Cf. SEC v. Chenery Corp.,* 332 U. S. 194, 207 (1947) ("The wisdom" of those policy decisions "is none of our concern."). Such a policy disagreement does not establish an APA violation. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("Not having discussed the possibility [of a mandatory airbag standard], the agency submitted no reasons at all."). This is not a case where the agency utterly failed to explain itself in violation of *State Farm*; instead, the district court found USCIS's explanation *unpersuasive*. *See* A11-13, 113-27. The district court's consideration of extra-record, cherry-picked statements on social media, did not permit it to disregard the agency's stated rationale and invalidate the policies based on perceived deficiencies in the agency's explanation

rather than the absence of one. A11-13; *see FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025); *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015).

Second, and contrary to the district court's assertions, USCIS plainly *did* consider the reliance interests at stake here. *See, e.g.*, A223, 228, 270. Indeed, Plaintiffs seemingly conceded as much in briefing. *See* Trial Court Docket ECF 20-1 at 41 ("Although USCIS noted that the Challenged Policies 'may result in delay to the adjudication of some pending applications . . .'" and citing A223). "[A] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *See Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.,* 976 F.2d 58, 61 (1992) (cleaned up); *see also Levinsky's Inc., v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 134 (1st Cir. 1997) ("[A]n admission of counsel during trial is binding on the client" if, in context, it is "clear and unambiguous."). The agency reasonably determined that the national security interests at play here outweighed those reliance interests. While the district court determined that was insufficient, *see* A118-19, the agency's actual balancing of those reliance interests—and Plaintiffs' assertions that the agency erred in weighing the significance of them, Trial Court Docket ECF 21-1 at 41—belies the district court's conclusion that no such weighing occurred. *Contra* A112-20. And the reasonability of the agency's conclusions is underscored by the fact that Plaintiffs' reliance interests must also account for USCIS's longstanding regulations that already permit prolonged investigations, and a long string of case law that strips the courts of power to set

deadlines for action. *See*, *e.g.*, *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 179 (1st Cir. 2016); *Aronov v. Napolitano*, 562 F.3d 84, 95-98 (1st Cir. 2009).

The district court's determination that these policies were adopted due to anti-immigrant animus also must fail.[6] *See* A11-13, 120-28. In *Hawaii*, the Supreme Court rejected similar extra-record, allegations-of-animus that the district court relied on here. *See* 587 U.S. at 685-707; *but see* A120-28; A154-55. As in this case, the Plaintiffs in *Hawaii* argued that the Proclamation there was motivated by animus toward a particular group and cited the President's social media statements as evidence. *See* 585 U.S. at 681, 699-710. In rejecting that argument, the Supreme Court emphasized that the Proclamation at issue reflected an in-depth analysis of relevant conditions, including country conditions. *See id.* at 706-10. Here, too, the Presidential Proclamation and subsequent memoranda contain in-depth analyses and discussions of country conditions supporting the Challenged Policies, and rely on a worldwide review conducted by multiple government agencies. *See generally* A194-301. Indeed, these are the exact types of concerns the Supreme Court approved of in *Hawaii*, 585 U.S. at 706-10. Furthermore, the *Hawaii* Court observed that the standard of review is rational

[6] To the extent that the allegation that the Executive, motivated by animus, ended a program that disproportionately benefits certain ethnic groups is a selective enforcement claim, such a claim would be barred by *Reno* v. *American-Arab Anti-Discrimination Committee*, 525 U. S. 471, 488 (1999) (holding that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation"). However, the debate need not be resolved because, as detailed above, the allegations are insufficient. *See Regents*, 591 U.S. at 33-34 (same).

basis scrutiny, *i.e.*, that the animus claim could only succeed if it is "impossible to discern a relationship to legitimate state interest[,]" or that the policy is "inexplicable by anything but animus." 585 U.S. at 670 (citing *Romer v. Evans*, 517 U.S. 620, 632 (1996)). In terms of the Challenged Policies, it "cannot be said that it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus." *See Hawaii*, 585 U.S. at 706. Instead, the question is whether the Challenged Policies "plausibly related to the Government's stated objective to protect the country and improve vetting processes." *Id.* at 704-05. As discussed above, the policies challenged here do.

In its opinion denying a stay, the district court asserted that *Hawaii* is distinguishable because it considered only whether the entry policy violated the First Amendment's Establishment Clause and not the arbitrary-and-capricious standard under the APA. A155.[7] Arbitrary-and-capricious review of agency decisions "is highly deferential, and the agency's actions are presumed to be valid." *River St. Donuts LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). If the "agency's decision is supported by a rational basis," the court "must affirm." *Id.* *Hawaii* demonstrates how "rational basis scrutiny" operated when similar facts were present. Accordingly, the district court ought to have applied a rational basis standard here.

[7] The district court's assertion that the Government failed to raise the *Hawaii* standard at summary judgment, *see* A155, is odd, given that the court acknowledged that the Government raised the rational-basis standard for the pretext claim. A155-56.

Though the district court acknowledged that "[u]ltimately it was not [its] role to pass on the wisdom of the Government's policy choices[,]" because "[u]nder our constitutional system, those judgments are reserved for the political branches[,]" *see* A134, that is precisely what it did here, *see generally* A1-135. As such, the district court's decision cannot stand.

## CONCLUSION

For the foregoing reasons, the Court should vacate the district court's decision.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

TYLER BECKER
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 514-2000

AUGUST FLENTJE
Senior Counsel

/s/ Marie V. Robinson
MARIE V. ROBINSON
Trial Attorney
1st Circuit Bar No. 1198125
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

September 17, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), the Amended Opening Brief is proportionally spaced using Garamond 14-point typeface, has one (1) inch wide margins, and contains 12,716 words of text, exclusive of the portions exempted. Additionally, the undersigned certifies that the text of the electronic brief will be identical to the text in the paper copies that will be filed with the Court when requested. The virus detection program Microsoft Forefront Endpoint Protection has been run on this file and no viruses were detected.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Dated: September 17, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2026, I caused to be electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be adequately served by that system.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044