No. 26-1703

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND; REFUGEE DREAM CENTER; SERVICE EMPLOYEES INTERNATIONAL UNION; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; AFRICAN COMMUNITIES TOGETHER; VENEZUELAN ASSOCIATION OF MASSACHUSETTS; PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; AMERICAN GATEWAYS,

Plaintiffs-Appellees,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH EDLOW, in the official capacity as Director of the United States Citizenship and Immigration Services; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as Secretary of the Department of Homeland Security,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Rhode Island
District Court Case No. 1:26-cv-00132-JJM-PAS

---

# DEFENDANTS-APPELLANTS' CORRECTED OPENING BRIEF

---


JONATHAN D. GUYNN
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

TYLER J. BECKER
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave., NW
Washington, DC 20530

AUGUST FLENTJE
Deputy Director

MARIE V. ROBINSON
Trial Attorney
U.S. Department of Justice, Civil Div.
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 353-5667

# TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**STATEMENT OF JURISDICTION** .......... 3

**STATEMENT OF THE ISSUES** .......... 3

**STATEMENT OF THE CASE** .......... 3

**SUMMARY OF THE ARGUMENT** .......... 8

**STANDARD OF REVIEW** .......... 9

**ARGUMENT** .......... 9

**I. The Challenged Policies Are Not Reviewable..** .......... 9

**A. None Of The Challenged Policies Are Final, Or Ripe For Judicial Review** .......... 10

1. The Comprehensive Re-Review Policy Is Not Final Or Ripe For Review.. .......... 11

2. The Country-Specific Factors Policy Is Also Not Final Or Ripe For Review .......... 14

**B. Plaintiffs' Claims Are Not Reviewable Under The APA** .......... 16

**C. The Challenged Policies Are Not Subject To Judicial Review Under The INA.** .......... 21

1. Judicial Review of Discretionary Benefits Applications, Including Adjustment of Status, Is Barred by 8 U.S.C. §1252(a)(2)(B)(i) .......... 21

2. 8 U.S.C. §1252(a)(2)(B)(ii) Also Bars Judicial Review... .......... 27

**D. The Challenge to the Global Asylum Hold Policy Is Moot** .......... 31

**II. The District Court's Decision Fails On The Merits. ................................35**

**A. The Comprehensive Re-Review Policy Is Not Contrary To Law..36**

**B. The District Court's Analysis Of The Country Specific Factors Policy Is Also Flawed ...................................................................38**

**C. The Benefits Hold Policy Is Not Contrary To Law .......................42**

**D. The Challenged Policies Are Not Arbitrary or Capricious. ...........45**

**CONCLUSION...................................................................................................50**

**CERTIFICATE OF COMPLIANCE ............................................................. 51**

**ADDENDUM**

**CERTIFICATE OF SERVICE**

## TABLE OF AUTHORITIES

### CASES

*Abbott Labs v. Gardner*,
387 U.S. 136 (1967) .......... 13

*Abuzeid v. Mayorkas*,
62 F.4th 578 (D.C. Cir. 2023) .......... 23

*Anversa v. Partners Healthcare Sys., Inc.*,
835 F.3d 167 (1st Cir. 2016) .......... 48

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1503 (9th Cir. 2014) .......... 28, 31

*Aronov v. Napolitano*,
562 F.3d 84 (1st Cir. 2009) .......... 48

*Atieh v. Riordan*,
797 F.3d 135 (1st Cir. 2015) .......... 47

*Bennett v. Spear,*
520 U.S. 154 (1997) .......... 10, 11, 12, 13

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 12, 13

*Bouarfa v. Mayorkas*,
604 U.S. 13 (2024) .......... 27, 28

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 10

*Britkovvy v. Mayorkas*,
60 F.4th 1024 (7th Cir. 2023) .......... 23

*Brown v. Gen. Servs. Admin.*,
425 U.S. 820 (1976) .......... 20

*Bruno Project Rescue Inc. v. CDC*,
182 F.4th 1 (1st Cir. 2026) .......... 9

*I.N.S. v. Cardoza-Fonseca*,
480 U.S. 443 (1987) .......... 19

*Cedar Coal Co. v. United Mine Workers of Am.*,
560 F.2d 1153 (4th Cir. 1977) .......... 34

*Cheejati v. Blinken*,
106 F.4th 388 (5th Cir. 2024) .......... 28

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) .......... 16

*City of Fall River v. FERC*,
507 F.3d 1 (1st Cir. 2007) .......... 13

*Clark v. K-Mart Corp.*,
979 F.2d 965 (3d Cir. 1992) .......... 34

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 34 (2020) .......... 41, 42, 48

*Doe v. Trump*,
2026 WL 1170971 & n.16 (D. Mass. Apr. 30, 2026) .......... 40

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) .......... 47

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980) .......... 11, 14

*Geda v. USCIS*,
126 F.4th 835 (3d Cir. 2025) .......... 28

*Glob. Tower Assets, LLC v. Town of Rome*,
810 F.3d 77 (1st Cir. 2016) .......... 10

*Gupta v. Jaddou*,
118 F.4th 483 (1st Cir. 2024) .......... 24, 27

*Haley v. Pataki*,
60 F.3d 137 (2d Cir. 1995)....................................................................34

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) .................................................................................. 21

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024)...................................................................... 12

*Harris v. University of Massachussets Lowell*,
43 F.4th 187 (1st Cir. 2022)...............................................................32, 33

*Heckler v. Chaney*,
470 U.S. 830 (1985) ...........................................................................16, 17, 18

*INS v. Aguirre-Aguirre*,
526 U.S. 415 (1999) .................................................................................. 16

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993) ................................................................................ 37

*INS v. Orlando Ventura*,
537 U.S. 12 (2002) .................................................................................... 17

*INS v. St. Cyr*,
533 U.S. 289 (2001) .................................................................................. 30

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014)..................................................................... 36

*Jama v. Dep't of Homeland Sec.*,
760 F.3d 490 (6th Cir. 2014) ..................................................................... 15

*Kale v. Alfonso-Royals*,
139 F.4th 329 (4th Cir. 2025) .................................................................... 28

*Kanapuram v. USCIS*,
131 F.4th 1302 (11th Cir. 2025).................................................................. 28

*Kucana v. Holder*,
558 U.S. 248 (2010) .......... 30

*Levinsky's Inc., v. Wal-Mart Stores, Inc.*,
127 F.3d 122 (1st Cir. 1997) .......... 47

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 891 (1990) .......... 14

*Manguriu v. Lynch*,
794 F.3d 119 (1st Cir. 2015)..........34

*Margolin v. NAIJ*,
146 S. Ct. 1285 (2026) .......... 38, 39

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .......... 32

*Mathews v. Diaz*,
426 U.S. 81 (1976) .......... 31

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991) .......... 23, 25

*Mijangos v. Bondi*,
167 F.4th 539 (1st Cir. 2026) .......... 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 46

*Mullin v. Doe*,
609 U.S.----, 146 S. Ct. 2121 (2026) .......... 8, 19, 23, 24, 26, 27, 29

*Nakka v. USCIS*,
111 F.4th 995 (9th Cir. 2024) .......... 23

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) .......... 11

*Nat'l TPS All. v. Noem*,
150 F.4th 1000 (9th Cir. 2025) .......... 37

*Norton v. Southern Utah Wilderness Alliance et al.*,
542 U.S. 55 (2004) .......... 11

*Patel v. Garland*,
596 U.S. 328 (2022) .......... 8, 22, 24, 26

*R.I. Dep't of Envtl. Mgt. v. United States*,
304 F.3d 31 (1st Cir. 2002) .......... 11

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008) .......... 41

*Reno* v. *American-Arab Anti-Discrimination Committee*,
525 U. S. 471 (1999) .......... 48

*Reno v. Catholic Soc. Servcs., Inc.*,
509 U.S. 57 (1993) .......... 12, 14

*Redfern v. Napolitano*,
727 F.3d 77 (1st Cir. 2013) .......... 34

*Riva v. Massachusetts*,
61 F.3d 1003 (1st Cir. 1995) .......... 14

*River St. Donuts LLC v. Napolitano*,
558 F.3d 111 (1st Cir. 2009) .......... 49

*Romer v. Evans*,
517 U.S. 620 (1996) .......... 49

*Rusaki v. Pistole*,
775 F.3d 61 (1st Cir. 2014) .......... 34

*Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*,
976 F.2d 58 (1992) .......... 47

*SEC v. Chenery Corp.*,
332 U. S. 194 (1947) .......... 46

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016) ........................................................................ 10

*Thigulla v. Jaddou*,
94 F.4th 770 (8th Cir. 2024) ........................................................................ 28

*Trump v. California*,
609 U.S.----, ---S.Ct.----, 2026 WL 2473573 (2026) .................................. 11, 13, 14, 15

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................9, 15, 16, 39, 40, 41, 42, 48, 49

*Trump v. New York*,
529 U.S. 195 (2020)…………………………………………………………...15

*Union of Concerned Scientists v. Wheeler*,
954 F.3d 11 (1st Cir. 2020) ........................................................................ 9

*United States v. Bisceglia*,
420 U.S. 141 (1975) ........................................................................ 12

*United States v. Brown*,
631 F.3d 573 (1st Cir. 2011)………………………………………………...34

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........................................................................38, 39, 40

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990) ........................................................................ 38

*Viana Guedes v. Mayorkas*,
123 F.4th 68 (1st Cir. 2024)........................................................................22, 24, 27

*Watson v. United States*,
37 F.4th 22 (1st Cir. 2022)…………………………………………………….34

*W.R. Grace & Co.-Conn. v. EPA*,
959 F.2d 360 (1st Cir. 1992) ........................................................................ 13

*Zhu v. Gonzales*,
411 F.3d 292 (D.C. Cir. 2005) ........................................................................ 27

## FEDERAL STATUTES

5 U.S.C. § 701 .......... 18

5 U.S.C. § 701(a)(1) .......... 18

5 U.S.C. § 701(a)(2) .......... 16, 18, 21

5 U.S.C. § 704 .......... 10, 11

5 U.S.C. § 706 .......... 7

6 U.S.C. § 111(b)(1)(A) .......... 44

8 U.S.C. § 1103(g)(2) .......... 29

8 U.S.C. § 1103(g)(3) .......... 29, 31

8 U.S.C. § 1152(a)(1)(A) .......... 39, 40

8 U.S.C. § 1152(a)(2)(B)(ii) .......... 31

8 U.S.C. § 1158(a) .......... 19

8 U.S.C. § 1158(d)(7) .......... 42

8 U.S.C. § 1160(e)(1) .......... 25

8 U.S.C. § 1160(3)(A) .......... 25

8 U.S.C. § 1182(a)(3) .......... 41, 43

8 U.S.C. § 1182(f) .......... 4

8 U.S.C. §1182(h) .......... 21

8 U.S.C. § 1182(i) .......... 21

8 U.S.C. § 1184(p)(6) .......... 31

8 U.S.C. § 1252(a)(2)(B) .......... 17, 21, 23, 27

8 U.S.C. § 1252(a)(2)(B)(i) .......... 21, 22, 23, 24, 25, 26

8 U.S.C. § 1252(a)(2)(B)(ii) .......... 28, 29, 30

8 U.S.C. § 1254a(a)(1) .......... 24

8 U.S.C. § 1254a(b)(5)(A) .......... 24

8 U.S.C. § 1255 .......... 24, 28, 40

8 U.S.C. § 1255(a) .......... 23, 27, 29

8 U.S.C. § 1324a .......... 29, 40

8 U.S.C. § 1324a(a)(1) .......... 28

8 U.S.C. § 1324a(b)(l)(C)(ii) .......... 29, 31

8 U.S.C. § 1324a(h)(l) .......... 29, 31

8 U.S.C. § 1324a(h)(3) .......... 28, 40

8 U.S.C. § 1571(b) .......... 43

28 U.S.C. § 1291 .......... 3

28 U.S.C. § 1291(a)(1) .......... 3

## FEDERAL REGULATIONS

8 C.F.R. § 245.2 .......... 29

8 C.F.R. §274a.12 .......... 29

8 C.F.R. §274a.12(a) .......... 29

8 C.F.R. §274a.12(a)(c) .......... 43

8 C.F.R. §274a.12(b) .......... 29, 43

8 C.F.R. §274a.12(c) .......... 29

8 C.F.R. §274a.13(b) .......... 43

8 C.F.R. §274a.13(c) .......... 43

**FEDERAL RULES OF APPELLATE PROCEDURE**

Fed. R. App. P. 28(a)(8) .......... 39

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. of Civ. P. 54(b) .......... 3, 8

**FEDERAL RULES OF EVIDENCE**

Fed. R. of Evid. 201(b)(2) .......... 34

**EXECUTIVE ORDER AND PROCLAMATIONS**

Exec. Order 14161 .......... 3

Proclamation No. 10949 .......... 4, 5, 6, 7

Proclamation No. 10998 .......... 6, 7

**MISCELLANEOUS**

Miriam Webster's Thesaurus, "*With Respect To Synonyms: 21 Similar Words*," *available at* https://www.merriam-webster.com/thesaurus/with%20respect%20to (last visited Sep. 10, 2026). .......... 26

## INTRODUCTION

The Constitution and Acts of Congress confer on the Government broad authority to prohibit or restrict the entry of aliens into the United States, and substantial discretion to adjudicate immigration benefits and to scrutinize applicants and evaluate anti-terrorism, public safety, and national security concerns. Exercising that authority, the President ordered an inter-agency review of processes by which aliens are vetted for entry. That review identified significant and pervasive deficiencies in particular countries that implicated national security and terrorism concerns. Ultimately, the President issued two Presidential Proclamations which restricted the entry into the United States of individuals from thirty-nine of the countries identified in that worldwide review.

Following well-publicized acts of violence committed by aliens in the United States, the United States Citizenship and Immigration Services ("USCIS") issued the Challenged Policies at issue here. The Challenged Policies described how USCIS staff would interpret existing authority to adjudicate cases to address the national security and terrorism vetting concerns and lapses described in the inter-agency review. Specifically, the Comprehensive Re-Review Policy required that USCIS review benefits provided since January 2021 that were provided to aliens from the thirty-nine countries at issue in the inter-agency review; the Benefits Hold Policy paused the final determination of immigration benefit applications from those countries while adjudication otherwise continued; the Country-Specific Factors Policy required the

consideration of the significant vetting issues in adjudication of such applications for aliens from nineteen of the most high-risk countries; and the Global Asylum Hold Policy temporarily paused the adjudication of asylum applications. Thus, the Challenged Policies further critical national security interests.

The district court vacated the Challenged Policies. The district court rejected the Government's threshold arguments, including that the Challenged Policies were not final or ripe, and that the jurisdictional bars in Immigration and Nationality Act ("INA") and the Administrative Procedures Act ("APA") barred its review. Moreover, the district court held that the challenges to the Global Asylum Hold Policy were not moot, notwithstanding that this policy was rescinded. On the merits, the district court held that the Department of Homeland Security ("DHS")—the agency entrusted by Congress and the Executive with protecting the United States from terrorism and with adjudicating immigration benefits—was prohibited from adopting country-specific adjudication policies or pausing benefits adjudication to address potential national security and terrorism concerns.

This case rests on a remarkable premise: that a federal court could prevent an agency from issuing the very policy guidance that provides government personnel with the guardrails necessary to ensure consistent, non-arbitrary, and individualized decision-making consistent with federal law. And the consequences of the district court's reasoning are staggering. Even a temporary pause of a few days from issuance of adjudication decisions for immigration benefits for Saudi nationals after the September

11, 2001 terrorist attacks would be contrary to law under the district court's reasoning. This Court should vacate the district court's decision.

## STATEMENT OF JURISDICTION

On June 11, 2026, the district court granted the Government's motion for final judgment under FRCP 54(b). Appendix("A")136-41. The Government timely appealed on June 12, 2026. *See* A192-93. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court's finding that it had jurisdiction over the Challenged Policies was in error.

Notwithstanding jurisdictional barriers to review, whether the Challenged Policies are a lawful exercise of agency authority.

## STATEMENT OF THE CASE

On January 20, 2025, the President issued Executive Order 14161, which directed the Secretary of State to enhance vetting and screening of all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks. *See* A229-31. The order required officials, including the Secretary of Homeland Security, to within sixty days submit an inter-agency report "identify[ing] countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full

suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. § 1182(f))." A229.

Nearly six months later, Presidential Proclamation 10949 reported on that worldwide inter-agency review—conducted by the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence—concerning foreign countries' vetting practices. *See* A200-08.[1] That review identified a range of significant deficiencies. For example, the review highlighted the presence or influence of terrorist organizations in many of the countries, and that some of these countries sponsored terrorism. *See id.* It also described conditions in particular countries that suggested heightened security risks, including limited governmental control over parts of its territory, and deficiencies in governmental capacity, including limitations in issuing reliable national identity documents and conducting effective vetting and screening of nationals. *See id.* Furthermore, the review discussed specific governmental policies that implicated U.S. national security and foreign policy concerns, such as whether governments limited or outright refused to share law enforcement and national security information with the United States, and countries' limitations or refusals to accept individuals subject to removal, coupled with patterns of visa overstays from citizens of those countries. *See id.* Section 1(h) of this Proclamation did not disclose further details to avoid "caus[ing] serious damage to the

[1] This Proclamation is cited in each of these three Challenged Policies. *See* A209-14 (PA-2025-26); A221-28 (PM-602-0192); A267-71 (PM-602-0194).

national security of the United States" and because "many such details are classified." A202. Plaintiffs have never contested these deficiencies.

On June 4, 2025, after receiving the inter-agency review, the President issued Presidential Proclamation 10949, which restricted the entry into the United States of individuals from nineteen countries that the Secretary of State had identified as "deficient with regards to screening and vetting." *See* A200-08.

In October 2025, USCIS invoked the preceding factual findings to inform potential enhancements to its guidance to officers regarding adjudication of discretionary benefit requests under the INA. *See* A209-12. On November 27, 2025, USCIS issued a policy alert concerning all pending and later-filed applications for immigration benefits by which it will "consider[ ] any relevant country-specific factors such as those identified in PP 10949 as significant negative factors" and "not limited to insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the" 19 countries identified in Proclamation No. 10949. *See* A213-14 (Policy Alert 2025-26). That policy, coupled with the later additions discussed *supra*, is hereinafter referred to as "the Country-Specific Factors Policy."

One day before the preceding USCIS policy alert, as part of a thwarted terrorist attack involving Afghan nationals, two National Guard members were shot, and one died. *See* A236-37. This—as well as the pre-existing findings in Proclamation No. 10949—led USCIS to issue a policy memorandum on December 2, 2025. *See* A221-24 (Policy Memorandum 602-0192). That statement announced USCIS' intention to

conduct "a comprehensive re-review, potential interview, and re-interview of all aliens from [the 19] high-risk countries of concern who entered the United States on or after January 20, 2021[.]" *See id.* And, USCIS issued a temporary hold on benefits to nationals of those countries to "ensure[] USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States." *See id.* USCIS re-affirmed the INA's directive to conduct these investigations and reviews on a "case-by-case basis." A221; *see* A238-60 (USCIS Policy Manual Part 1, Ch.8, Discretionary Analysis).

In issuing this policy memorandum, USCIS "weighed" any potential resultant "delay to the adjudication of some pending applications" against the "urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible." A223; *see also* A228. The USCIS "determined that the burden of processing delays that will fall on some applicants is necessary and appropriate" given USCIS's "obligation to protect and preserve national security." A223.

Shortly thereafter, on December 16, 2025, the President issued Presidential Proclamation 10998, which expanded the list of countries with documented deficiencies to 39, based on factfinding that overlapped with Proclamation No. 10949. *See* A278-90. Section 7 of the Proclamation instructed the Secretary of State to submit reports to the President every 180 days in consultation with the Secretary of Homeland Security, recommending whether restrictions should be continued, modified, or terminated based on evolving vetting assessments. *See* A288-89. On January 1, 2026, USCIS

expanded the adjudication hold to the 39 additional countries collectively identified in Proclamation Nos. 10949 and 10998, called for a review of all vetting policies and practices for applicants from the same countries, forecasted a review of all benefits awarded to nationals from the same countries since January 2021, and clarified that the adjudication hold applied only to USCIS's final decisionmaking on an application and not to any intermediate processing or investigation. *See* A267-71 (Policy Memorandum 602-0194). On March 30, 2026, USCIS announced that it had established an internal process for lifting holds on applications and had resumed processing asylum applications for individuals from non-high risk countries, thereby withdrawing the Global Asylum Hold Policy. *See* A297-98.

Plaintiffs—all various immigration and labor organizations—filed this action in the district court. Plaintiffs sought to vacate USCIS's policy statements under 5 U.S.C. § 706, enjoin the government from enforcing the Challenged Policies, and to declare them unlawful under the APA. The Government opposed.

On June 5, 2026, the district court granted in part Plaintiffs' motion for summary judgment. *See* A1-135. Foremost, the district court concluded that the Challenged Policies were final and ripe for review, that it had jurisdiction to review all the challenged policies under the APA, and that the INA's judicial review bars did not apply. *See* A21-85. The district court acknowledged USCIS's statement that it had resumed processing of asylum applications not from high-risk countries, but nevertheless assumed that the Global Asylum Hold Policy had not been withdrawn. A91-95. On the merits, the

district court ruled that the challenged policies were contrary to law, and arbitrary and capricious under the APA. *See* A85-127. On June 11, 2026, the district court granted the Government's motion for final judgment under FRCP 54(b).[2] A136-41.

## SUMMARY OF THE ARGUMENT

As a threshold matter, Plaintiffs' statutory challenges to the Challenged Policies are not justiciable. Three of the Challenged Policies—the Comprehensive Re-Review Policy, the Country-Specific Factors Policy, and the Benefits Hold Policy—are neither final nor ripe for review, while the fourth, the Global Asylum Review Policy, is not in place and so challenges to it are moot. Additionally, because the agency's actions are committed to its discretion by law, the APA does not provide for judicial review. Multiple provisions of the INA confer sweeping authority on the Executive to restrict the entry of aliens and endow the government with broad and unreviewable discretionary authority to grant, deny, review, or rescind immigration benefits. The district court's conclusions to the contrary cannot be squared with the Supreme Court's reasoning and holdings in *Patel v. Garland*, 596 U.S. 328 (2022) and *Mullin v. Doe*, 609 U.S.----, 146 S. Ct. 2121 (2026).

---

[2] On June 19, 2026, the Government filed a motion to stay the district court's decision pending appeal, which the district court denied. A142-69. The Government filed a motion to stay the district court's decision with this Court, *see* Case No. 26-1703, ECF 20. This Court granted in part the motion for stay as pertained to the Comprehensive Re-Review Policy, but denied the stay of the Country-Specific Factors and Benefits Hold Policies. *See* Case No. 26-1703, ECF 29.

Additionally, the district court erred because Plaintiffs' arguments fail on the merits. The Challenged Policies are not contrary to law, or arbitrary and capricious. The district court's reasoning that the Challenged Policies are pretextual is contrary to basic waiver and party presentation principles, since Plaintiffs never raised those arguments below. That rationale is also at odds with the administrative record and the agency's express statements in issuing the Challenged Polices, and it runs directly afoul of the Supreme Court's reasoning in *Trump v. Hawaii*, 585 U.S. 667 (2018). The Court should reverse the district court's decision.

## STANDARD OF REVIEW

The district court's grant of summary judgment under the Administrative Procedure Act is a question of law reviewed *de novo*. *See Bruno Project Rescue Inc. v. CDC*, 182 F.4th 1, 7 (1st Cir. 2026). This Court also reviews *de novo* "the question of whether a claim is justiciable under the APA." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 16 (1st Cir. 2020).

## ARGUMENT

### I. The Challenged Policies Are Not Reviewable.

The Challenged Policies are neither final nor ripe for judicial review, are not reviewable under the APA, and are in fact barred from judicial review by the INA. The Global Asylum Hold Policy was and is moot, and therefore not justiciable. The district court erred in holding otherwise.

### A. None Of The Challenged Policies Are Final, Or Ripe For Judicial Review.

Agency action is subject to judicial review *only* when it is made reviewable by statute or is a "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. A "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. In enacting the APA, "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

In *Bennett v. Spear*, the Supreme Court distilled two conditions for finality. 520 U.S. 154, 177-78 (1997). First, "the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78. Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* An agency action "must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016); *see also Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 83, 83 n.2 (1st Cir. 2016) (recounting the two prongs of the *Bennett* test). "The APA's finality requirement allows the agency an opportunity to apply its expertise and correct its mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in 'piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been

unnecessary.'" *R.I. Dep't of Envtl. Mgt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980)). Plaintiffs have not plausibly alleged "final agency action," 5 U.S.C. § 704, and the district court did not meaningfully address that requirement, *see* A1-135.

Plaintiffs' claims are also not ripe for review. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (cleaned up). Much like finality, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. California*, 609 U.S.----, ---S.Ct.----, 2026 WL 2473573, at *4 (2026) (cleaned up).

### 1. *The Comprehensive Re-Review Policy Is Not Final Or Ripe For Review.*

The Comprehensive Re-Review Policy does not satisfy either prong of the test established in *Bennett v. Spear*. It does not mark the "consummation of the agency's decisionmaking process." *See* 520 U.S. at 178 (cleaned up); *cf. Norton v. Southern Utah Wilderness Alliance, et al.,* 542 U.S. 55, 64 (2004) (a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take.") (emphasis in original). Rather, the Comprehensive Re-Review Policy is an internal procedural directive directing agency personnel how to prioritize reviewing

various immigration benefits that have been granted since January 2021. Thus, the policy is at most a "preliminary investigative step" and "interlocutory" in nature and does not constitute final agency action. *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *United States v. Bisceglia*, 420 U.S. 141, 146 (1975) ("The purpose of the IRS' summons power is not to accuse, but to inquire . . . .") (cleaned up). Second, the Comprehensive Re-Review Policy is not agency action from "which rights or obligations have been determined, or from which legal consequences will flow." *See Bennett*, 520 U.S. at 178 (cleaned up); *see also Reno v. Catholic Soc. Servcs., Inc.*, 509 U.S. 57-59 (1993) (noting that a challenge to a policy fails on ripeness grounds "unless the effects of the administrative action have been felt in a concrete way by the challenging parties[.]") (cleaned up).

The district court barely addressed final agency action with respect to this policy. *See* A1-135. Indeed, the district court does not appear to have considered the first prong at all. *See* A62-64. Moreover, the district court barely addressed the second prong of the analysis. *See* A1-135. Instead, the district court simply reasoned that because the memoranda at issue direct USCIS staff to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in [the Travel Ban] who entered the United States on or after January 20, 2021," the action is final. A56. In support, the district court relied on *Biden v. Texas*, 597 U.S. 785, 808-09 (2022). A55. But, that case involved DHS memoranda that immediately bound DHS officials by terminating the Migrant Protection Protocols program, thereby producing legal

consequences, *see* 597 U.S. at 804-06. It also represented the consummation of the agency's decision-making process. *See id.* at 804-09. That is not the case here. Neither the district court nor the Plaintiffs plausibly identified any present pertinent obligations or legal consequences that "flow[ed]" from the Comprehensive Re-Review Policy, as required by *Bennett*, 520 U.S. at 178. *See* A1-135. Though the district court briefly noted that one of the organizational Plaintiffs asserted harm from having to re-open closed files and devote time to clients who already received their benefits, A65, that alleged harm would only occur if benefits were ultimately revoked—assuming that occurred at all. That hypothetical injury is insufficient. *See California,* 2026 WL 2473573, at *2 ("The true source of any injury . . . would be the downstream action that the Secretary *might* take in the future to implement [the policy] . . . . Emphasis on might. . . . The Secretary's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction.").

Ripeness and finality substantially overlap, *see W.R. Grace & Co.-Conn. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992); A61 n.26, and Plaintiffs' challenges to the Comprehensive Re-Review Policy are similarly not ripe for review. *Contra* A51-65. "In determining whether a case is ripe for review, [courts] must examine 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *City of Fall River v. FERC*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967)). The plaintiffs here have not—and likely cannot—identify any particular benefit that has been revoked as a consequence of the

Comprehensive Re-Review Policy. Nor do they contend that such revocation is certain to occur generally, let alone in any particular case, and thus they cannot establish that revocation of any benefit "is inevitable (or nearly so)." *See Riva v. Massachusetts*, 61 F.3d 1003, 1010 (1st Cir. 1995). The policy simply "ha[s] no legal force or practical effect" until such revocation occurs. *FTC v. Standard Oil of Calif.*, 449 U.S. 232, 243 (1980).

As discussed above, the Comprehensive Re-Review Policy does not regulate primary conduct, but rather announces guidelines and for the re-review of particular applications by USCIS staff. *See Reno*, 509 U.S. at 57-59. At most, the Comprehensive Re-Review Policy potentially "limit[s] access to a benefit created by the [INA] but not automatically bestowed on eligible aliens[]" unless and until the agency is satisfied that they qualify. *See id.* at 57-58; *see also Lujan*, 497 U.S. at 891 (holding a controversy concerning a regulation is not ordinarily ripe for review under the APA until the regulation has been applied to the claimant's situation by some concrete action). Any legal consequences as a result of the Comprehensive Re-Review Policy would come from USCIS's decision *after* re-review to reverse an immigration benefit—if that occurs at all. *See California*, 2026 WL 2473573, at *1-*4; *Lujan*, 497 U.S. at 891. As a result, the Comprehensive Re-Review Policy is not reviewable.

### *2. The Country-Specific Factors Policy Is Also Not Final Or Ripe For Review.*

Just like the Comprehensive Re-Review Policy, the Country-Specific Factors Policy is not final or ripe for review. *See supra* pp. 10-14. It does not reflect the

consummation of any agency action in any individual case. Rather, the Country-Specific Factors Policy is solely internal USCIS operational guidance that provides adjudicators guidelines into whether particular applications are subject to additional review, given the national security and public safety concerns identified by the President. *See supra* pp. 1-7. "Any prediction how the Executive Branch might eventually implement this general statement of policy is no more than conjecture at this time." *See Trump v. New York*, 592 U.S. 125, 131 (2020) (cleaned up); *accord Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 496 (6th Cir. 2014).

Nor is the Country-Specific Factors Policy ripe for review. The district court assumed that any final determination on a particular applicant would be based on or driven by any of the Challenged Policies, including the Country-Specific Factors policy. *See* A63 ("But Plaintiffs need not wait for an adverse adjudication to pursue their claims; indeed, that Plaintiffs have filed applications with USCIS that have not been adjudicated *because of* the agency's self-imposed hold is sufficient."). That assumption at odds with the agency's statements in implementing the Country-Specific Factors, *see* A209-14, and opposed to the independent adjudicatory factors that USCIS utilizes in assessing applications. *See*, *e.g.*, A210-14, 238-60. Furthermore, the district court plainly assumes both a hypothetical, adverse decision in the future against some unidentified person, and that this hypothetical decision will be driven solely by the Country-Specific Factors Policy. *See* A63. That underscores that the Country-Specific Factor Policy is not ripe for review. *See California*, 2026 WL 2473573, at *4.

**B. Plaintiffs' Claims Are Not Reviewable Under The APA.**

The APA does not permit review of action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Heckler*, 470 U.S. at 830. A long line of Supreme Court precedent precludes or substantially limits federal courts from reviewing non-constitutional disputes arising from matters of foreign policy and national security and in the context of immigration. *See*, *e.g.*, *Hawaii*, 585 U.S. at 704 ("[O]ur inquiry into matters of entry and national security is highly constrained."); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations.") (cleaned up). The district court's decision fails to grapple with the nature of the challenged agency actions. These Challenged Policies do not operate independently of immigration-benefit adjudications. Rather, they govern how USCIS exercises discretionary authority when determining whether previously granted benefits warrant reconsideration, and which benefits may warrant additional scrutiny based on relevant conditions in the applicant's country of origin. Indeed, the district court even recognized that the Country-Specific Factors Policy directs adjudicators to consider identified country conditions and vetting concerns when exercising discretion in individual cases, *see* A21. Furthermore, the Supreme Court has explained that there can be no judicial review of agency action where "statutes [granting agency discretion] are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410

(1971). Indeed, the Supreme Court has urged courts to "remand a case to an agency for decision of a matter that statutes place primarily in agency hands," emphasizing that principle's "obvious importance in the immigration context." *INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002).

The district court did not identify any law that would guide its analysis as to the review or re-review of applications. *See generally* A1-135. That is not surprising, because the agency's decision whether to re-review applications to ensure they were not granted in error plainly falls within the jurisdictional bar at 8 U.S.C. § 1252(a)(2)(B), and the district court erred in concluding otherwise. Moreover, where processing delays stem from ongoing security vetting—which the Challenged Policies anticipated—there is no discrete, legally required action that a court may compel under the APA. The agency's decision to grant, deny, or reconsider relief applications in the exercise of discretion is exempt from judicial review because there are no meaningful standards against which to judge the agency's exercise of discretion. *See Heckler*, 470 U.S. at 830. The district court's ruling to the contrary fails. *See* A44-51.

Significantly, the district court's analysis finding that there was sufficient law to apply does not sufficiently grapple with the nature of the Challenged Policies. *See* A28-51. The district court relied on its conclusion that there was sufficient law to evaluate what it characterized as USCIS's "halt" of applications. A44-51. But, the Comprehensive Re-Review Policy, in particular, does not "halt" applications; it instead governs USCIS's re-review of specific applications that were previously granted. *See*

A221-24, 238-60, 267, 273-77. And, contrary to the district court's assessment, the Comprehensive Re-Review Policy does not bar individualized review. *Contra* A31-39. Nothing in the documents suggest that the Comprehensive Re-Review would not involve individualized assessments and determinations. *See* A221-24, 273-77. To the contrary, the December Memorandum required that "all aliens meeting these criteria undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." A221; *see* A226; *see also* A14 n. 10 (district court opinion, quoting same). On its face, that directive plainly envisions a continuing and individualized assessment of applications. *Contra* A28-39.

Similarly, the Country-Specific Factors Policy delineated how USCIS will interpret its existing authority to conduct adjudications and consider certain country-specific facts and circumstances when making discretionary determinations for immigration benefit requests filed by applicants from those 19 countries. *See* A226-28. *Contra* A44-51. Again, as discussed in detail above, the APA expressly precludes review of actions "committed to agency discretion by law[,]" 5 U.S.C. §701(a)(2); *see Heckler*, 470 U.S. at 830, and claims brought under § 706 are subject to the threshold limitations set forth in § 701. *See* 5 U.S.C. §§ 701(a)(1), (2). The district court recognized that the Country-Specific Factors Policy directs adjudicators to consider identified country conditions and vetting concerns when exercising discretion in individual cases. A21. Again, Congress expressed a clear intent to preclude judicial review of USCIS's

discretionary decisions, and the broad language of § 1252(a)(2)(B) expressly strips judicial review of the agency's discretionary denials. *See infra* pp. 21-31. So too did Congress preclude review of the discretionary analysis and adjudication of applications regardless of the asylee's country of origin. *See* ECF 21 at 23-24; see also 8 U.S.C. § 1158(a); *Cardoza-Fonseca*, 480 U.S. at 443. Thus, Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. The Country-Specific Factors Policy's clarification to adjudicators of pertinent factors falls well within that discretion, and the Court lacked jurisdiction to review it.

Like the County-Specific Factors Policy and the Comprehensive Re-Review Policy, the Benefits Hold Policy is not reviewable. The purpose of the Benefits Hold Policy was to ensure that dangerous individuals did not enter while the Government was establishing adequate standards, and to reduce investigative burdens on agencies during that process. As discussed above, that was one of the reasons for strengthening our nation's immigration laws and vetting procedures in the first place. *See supra* pp. 1-7. Congress by statute has expressed a clear intent to preclude judicial review of USCIS's discretionary decisions, which encompasses the process leading up to that final decision—including a hold on issuing final decisions to address security concerns. *Supra* pp. 1-7, *infra* pp. 21-31; *Doe*, 146 S. Ct. at 2133-37. Similar reasoning precludes review of the Benefits Hold Policy as applied to asylum, the grant of which is committed to agency discretion by law and is not reviewable under the APA. And, while the Benefits Hold Policy temporarily paused final decisions on all pending immigration-benefits

applications for individuals from 39 countries, the processing of those applications continued. A267 n.2. *Contra* A44-51, 61.

Plaintiffs cannot evade Congress's jurisdictional limitations through artful pleading. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833 (1976). The relevant inquiry is not the level of generality at which Plaintiffs choose to frame their claims, but the nature of the agency action being challenged. The Challenged Policies arose from antiterrorism, public safety, and national security concerns sufficiently documented in the administrative record concerning specified countries. *See generally* A194-299. Specifically, USCIS's December 2025 and January 2026 policy memoranda identified two exceptional and recent security incidents involving alien individuals vetted under then-existing procedures, who nevertheless planned or executed terrorist attacks. A222. The same is true of the November 2025 policy alert, which implemented a Presidential Proclamation identifying material deficiencies in certain countries' identity-management and information-sharing practices—deficiencies the President determined undermine the United States' ability to verify individuals' identities and assess security risks, thereby threatening national security and counterterrorism operations. *See* A226-28; *see also* A200-08, 229-31, 267-96.

The Challenged Policies were intended to address those vetting lapses and material deficiencies. *See* A194-301; *supra* pp. 1-7. Because the Challenged Policies rest on sensitive, predictive judgments about risk, intelligence gaps, and foreign government cooperation, those findings are "largely immune from judicial inquiry or interference."

*See Harisiades v. Shaughnessy,* 342 U.S. 580, 588-89 (1952). Plaintiffs cannot circumvent that limitation by recasting their challenge as a facial attack on agency guidance rather than a challenge to the exercise of the agency's discretionary adjudicatory authority itself. The USCIS's actions are committed to agency discretion by law under 5 U.S.C. § 701(a)(2), and Plaintiffs' statutory challenges to the Challenged Policies are not reviewable under the APA. *Contra* A42-85.

### C. The Challenged Policies Are Not Subject To Judicial Review Under The INA.

8 U.S.C. § 1252(a)(2)(B) generally bars review of the discretionary immigration benefits applications, and the district court erred in holding otherwise.

#### *1. Judicial Review of Discretionary Benefits Applications, Including Adjustment of Status, Is Barred by 8 U.S.C. § 1252(a)(2)(B)(i).*

Under 8 U.S.C. § 1252(a)(2)(B)(i), certain applications are specifically barred from review. That statute provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title. . .

Thus, 8 U.S.C. § 1252(a)(2)(B)(i) bars judicial review of adjustment of status under § 1255, among other benefits.

The Supreme Court's recent decision in *Patel,* 596 U.S. at 328-47, buttresses this conclusion. After analyzing § 1252(a)(2)(B)(i), *id.* at 336-38, the Supreme Court held that federal courts lack jurisdiction over all judgments related to the denial of adjustment of status, and that § 1252(a)(2)(B)(i)'s jurisdictional bar "does not restrict itself to certain kinds of decisions." *Id.* at 338. In reaching that conclusion, the Supreme Court focused on the plain language in § 1252(a)(2)(B)(i), noting that "any" has an "expansive meaning" and the use of the word "regarding" similarly "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id.* at 338-39 (cleaned up). The Supreme Court explained that meant that "any judgment" not only includes the ultimate discretionary determination about whether to grant or deny relief, but also "*any* judgment *regarding* the granting of relief." *Id.* at 338-39 (emphasis in original). Thus, 8 U.S.C. § 1252(a)(2)(B)(i) "prohibits review of any judgment *relating to* the granting of relief. That plainly includes factual findings." *See id.* at 339 (emphasis in original).

Though *Patel* expressly declined to address whether § 1252(a)(2)(B)(i)'s plain language bars judicial review of USCIS's decision to deny adjustment of status applications under § 1255, *id.* at 345-46, this Court subsequently held that it did. *See Viana Guedes v. Mayorkas*, 123 F.4th 68, 69-72 (1st Cir. 2024). In *Viana Guedes*, the appellants attempted to challenge the USCIS's denial of their applications for adjustment of status, and the alleged revocation of Viana Guedes's I-140 petition and National Interest Waiver. *See id.* at 69. The district court dismissed the action for lack

of subject matter jurisdiction, and the Court affirmed. *See id.* at 69-70 ("Because 8 U.S.C. § 1252(a)(2)(B) and *Patel v. Garland* [] preclude judicial review of all these asserted claims . . ."). In reaching that determination, this Court joined other Circuits that have considered this issue. *See*, *e.g.*, *Nakka v. USCIS*, 111 F.4th 995, 1014-16 (9th Cir. 2024); *Abuzeid v. Mayorkas*, 62 F.4th 578, 585 (D.C. Cir. 2023); *Britkovvy v. Mayorkas*, 60 F.4th 1024, 1032 (7th Cir. 2023).[3]

That conclusion is further reinforced by *Gupta*, where this Court held that 8 U.S.C. § 1255(a) does not address how or when the Secretary must adjudicate adjustment applications once filed, but instead leaves the timing and procedural sequencing of adjudication to the agency's discretion under its implementing regulations. 118 F.4th at 483-85; *see Viana Guedes*, 123 F.4th at 71 ("Were there any doubt, the Supreme Court in *Patel* stated, albeit in dicta, that section 1252's jurisdictional

[3] In *Nakka*, the Ninth Circuit "ultimately agree[d] with [its] sister circuits the 8 U.S.C. §1252(a)(2)(B)(i) strips district courts of jurisdiction to hear a plaintiff's APA claims when that claim challenges an agency's individualized denial of an application for adjustment of status." 111 F.4th at 1015. However, the Ninth Circuit reasoned that section 1252(a)(2)(B)(i) does not categorically preclude district court jurisdiction over facial challenges to generally applicable agency policies that are independent of the denial of an individual application for discretionary relief. *Id.* at 1003-04. *See* Op. at 9 (emphasizing same). But, in reaching that determination, the Ninth Circuit relied on *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991), and cautioned against reading the terms "relate to" and "regarding" broadly. *See* 111 F.4th at 1003-1015. *Nakka* did not have the benefit of the Supreme Court's decision in *Doe*, 146 S. Ct. at 2134-37. As discussed further below, in *Doe* the Supreme Court distinguished *McNary*, and relied on *Patel* to find that a similar statute should be read broadly. *See id.* at 2134-37. *See infra* pp. 25-26.

bar expressly extends . . . to judgements made outside of removal proceedings.") (cleaned up). 8 U.S.C. § 1252(a)(2)(B)(i) does not state that it only covers only "an" application, "a" judgment, "a single act" or "a grant" of relief. Instead, it prohibits judicial review of "*any* judgment *regarding*" or "*relating to* the granting of relief[]" under § 1255 and the other enumerated provisions, and the Supreme Court in *Patel* underscored that this provision should be read broadly. *See* 596 U.S. at 338-39 (emphases in original).

The Supreme Court's recent decision in *Doe*, 146 S. Ct. at 2134-37, is also instructive. There, the Supreme Court held that the temporary protected status ("TPS") statute barred judicial review. *See id.* Foremost and repeatedly, the Supreme Court emphasized that the TPS statute is discretionary, *see id.*, which is also true for the adjustment of status statute. *Compare* 8 U.S.C. § 1254a(a)(1) ("[T]he Attorney General . . . *may* grant the alien temporary protected status. . .") (emphasis added) *with* 8 U.S.C. § 1255 ("The status of an alien . . . may be adjusted by the Attorney General, in his discretion . . ."). The Supreme Court noted that the bar on judicial review in 8 U.S.C. §1254a(b)(5)(A) is clear, and held that it must be interpreted broadly, just like the judicial review bar in 8 U.S.C. § 1252(a)(2)(B)(i). *See Doe*, 146 S. Ct. at 2133-34 (quoting and citing *Patel*, 596 U.S. at 339). *Compare* 8 U.S.C. § 1254a(b)(5)(A) (barring "judicial review of any determination of the [Secretary of DHS] with respect to the designation, or termination or extension of a designation, of a foreign state.") *with* 8 U.S.C. § 1252(a)(2)(B)(i) (barring judicial review of "any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title.").

Notwithstanding this precedent, the district court here concluded that the judicial review bar should be read narrowly. *See* A28 ("The most natural reading of [s]ection 1252(a)(2)(B)(i) is that it bars review only over a single act of granting or denying an individual application for relief, but that it does not preclude collateral actions challenging general policies and procedures."). The judicial review bar is not so limited. The district court and plaintiffs' assertions that *McNary* should govern here, *see* A31-39, similarly misapprehends the law. The statute in *McNary* involved a program regarding adjustment of status for Special Agricultural Workers ("SAW"), and the relevant provision prohibited judicial review "of a determination respecting an application for adjustment of status under this section," and judicial review "of such a denial." *See McNary*, 498 U.S. at 483-94 (discussing 8 U.S.C. § 1160(e)(1), (3)(A)). The review bar in *McNary* was thus facially limited, and it did not expressly preclude judicial review of other challenges. *See id.* at 492. So, when the plaintiffs in *McNary* brought an action alleging a pattern or practice of procedural due process violations by the then-Immigration and Naturalization Service in its administration of the SAW program, the Supreme Court held that federal court review of those challenges was not barred. *See id.* at 483-84 ("[G]iven the absence of clear congressional language mandating preclusion of federal jurisdiction" over that constitutional claim, "and the nature of respondents' requested relief," the district court "had jurisdiction to hear respondents' constitutional and statutory challenges to INS procedures."). That is not true here.

Notably, the lower courts in *Mullin v. Doe* and other cases involving the TPS statute, like the plaintiffs in those cases, relied heavily on *McNary*. *See* A31-39 (district court opinion, discussing same); *but see supra* fn. 3. The Supreme Court rejected those arguments, and particularly the argument that the TPS judicial review bar should be interpreted in such a way that the judicial review bar only encompassed the ultimate decision. *See Doe*, 146 S. Ct. at 2133-34 (quoting *Patel*, 596 U.S. at 339). The Supreme Court emphasized that the TPS statute's terms "with respect to" and "determination" could be interpreted as referring to "several different things," including the ultimate decision, but also to the "chain of events leading up to a decision[,]" and held that the broadest reading was applicable, given the context of the statute presented. *See* 146 S. Ct. at 2136-37. But, even if "determination" in § 1254a(b)(5)(A) was interpreted more narrowly and "referred only to that final decision," judicial review would still be prohibited because "all the preceding decisions would be 'with respect to' that decision." *Id.* at 2134. Significantly, "with respect to" is a synonym of "regarding," *see* 8 U.S.C. § 1252(a)(2)(B)(i). *See*, *e.g.*, Miriam Webster's Thesaurus, "With Respect To Synonyms: 21 Similar Words," *available at* https://www.merriam-webster.com/thesaurus/with%20respect%20to (last visited August 18, 2026). Thus, the review bar here is analogous to the one considered in *Doe*, not *McNary*. The district court erred in concluding otherwise.

### *2. 8 U.S.C. § 1252(a)(2)(B)(ii) Also Bars Judicial Review.*

While 8 U.S.C. § 1252(a)(2)(B)(i) prohibits judicial review of factual determinations regarding adjustment of status, subsection (ii) acts as a jurisdictional catch-all encompassing other discretionary applications. That subsection states that "no court shall have jurisdiction to review ... any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." *See id.* § (ii). In *Viana Guedes*, the Court held that 8 U.S.C. § 1252(a)(2)(B) and *Patel* barred review of the plaintiffs' claims regarding the denials of their applications for adjustment of status. 123 F.4th at 69-70. The Court noted that subsections (i) and (ii) render particular discretionary applications unreviewable "under substantially the same reasoning." *Id.* at 72 (citing *inter alia Bouarfa*, 604 U.S. at 13 -18); *see also Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005) ("That the Attorney General has complete discretion with respect to the labor certification requirement is established by the terms of the waiver provision [8 U.S.C. § 1153(b)(2)(B)(i)].").

Likewise, in *Gupta*, the Court held that § 1255 is specified to be within the discretion of the Secretary by 8 U.S.C. § 1252(a)(2)(B). *See* 118 F.4th at 483. Significantly, the Court held that 8 U.S.C. § 1255(a) does not address how or when the Secretary of Homeland Security must adjudicate adjustment applications once filed but instead leaves the timing and procedural sequencing of adjudication to the agency's

discretion. *Id.* at 483-85. In reaching that conclusion, the Court emphasized the discretionary nature of the applications at issue. *See id.* Other Courts of Appeals have almost uniformly held that subsection (ii) bars judicial review over challenges to USCIS's visa retrogression policies, and that corollary challenges to the adjudication of adjustment of status applications—such as decisions to hold applications in abeyance or to require additional vetting—fall within § 1252(a)(2)(B)'s jurisdictional bar. *See Kale v. Alfonso-Royals*, 139 F.4th 329, 334-36 (4th Cir. 2025); *Kanapuram v. USCIS*, 131 F.4th 1302, 1306-08 (11th Cir. 2025); *Geda v. USCIS*, 126 F.4th 835, 844-45 (3d Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 394-96 (5th Cir. 2024); *Thigulla v. Jaddou*, 94 F.4th 770, 774-79 (8th Cir. 2024).

Adjustment of status is not the only discretionary application covered by the jurisdictional bar at 8 U.S.C. § 1252(a)(2)(B)(ii). *See Bouarfa*, 604 U.S. at 19 ("Where 8 U.S.C. § 1252(a)(2)(B)(ii) applies . . . it bars judicial review of the Secretary [of DHS's] revocation" of an approved visa petition). Congress has also given the Executive Branch broad discretion to determine when aliens may be authorized to work in the United States. *See*, *e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1503, 1062 (9th Cir. 2014); *see also, e.g.,* 8 U.S.C. § 1324a(a)(1) (generally making it unlawful to employ "unauthorized aliens"); 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien," for employment purposes, as an alien who is neither a lawful permanent resident nor "authorized to be ... employed by this chapter or by the Attorney General"). Congress left the determination of which applicants merit employment authorization to the

Attorney General's discretion, and the Attorney General has delegated that authority to the Secretary of Homeland Security. *See* 8 U.S.C. § 1324a(h)(l) (providing that Attorney General is responsible for certifying aliens' right to work in the United States); 8 U.S.C. § 1324a(b)(l)(C)(ii) (providing that a document is valid as evidence of employment authorization if "the Attorney General finds [it], by regulation, to be acceptable" for that purpose); *see also* 8 U.S.C. § 1103(g)(2) (authorizing Attorney General to "perform such other acts as the Attorney General determines to be necessary" to enforce the nation's immigration laws); 8 C.F.R. § 274a.12 (work authorization regulations).[4] As the district court even acknowledged, "the statutes governing [work authorization and adjustment of status] benefits use discretionary terms." A96 (citing U.S.C. §§ 1324a(h)(1), (3), 1255(a)). Thus, 8 U.S.C. § 1252(a)(2)(B)(ii)'s judicial review bar of "any other decision or action" specified by statute to be within the discretion of the DHS Secretary would apply to the provision of work authorization under 8 U.S.C. § 1324a. Yet the district court here determined that it could review collateral actions challenging general policies and procedures, even if review of the ultimate determination is barred. *See generally* A1-135. That is clearly wrong under the reasoning of *Doe*, 146 S. Ct. at 2121, discussed *supra* pp. 23-26.

[4] The regulations themselves make clear that the determination of whether to grant work authorization is discretionary, either explicitly, *see* 8 C.F.R. § 274a.12(c), or because the grant of work authorization is contingent on the grant of another discretionary benefit. *See* 8 C.F.R. § 274a.12(a), (b).

The district court's reliance on *Kucana*, 558 U.S. at 248-52, *see* A34-39, likewise misses the mark. In *Kucana*, the Supreme Court considered whether the statutory provision at 8 U.S.C. § 1252(a)(2)(B)(ii) deprived the federal courts of jurisdiction to review the Board of Immigration Appeals' denials of motions to reopen. *See* 558 U.S. at 236-53. The Supreme Court emphasized that with Section 1252(a)(2)(B)(i), Congress specifically and explicitly intentionally deprived the federal courts of jurisdiction over particular discretionary determinations. *See id.* at 241, 246-49. The Supreme Court found "significant the character of the decisions Congress enumerated in § 1252(a)(2)(B)(i), thereby insulating them from judicial review." *Id.* at 247. "[T]he determinations there listed are substantive decisions . . . made by the Executive in the immigration context as a matter of grace, things that involve whether aliens can stay in the country or not[,]" and include, among other things, "adjustment of status, §1255." *Id.* at 247-48. "Other decisions specified by statute 'to be in the discretion of the Attorney General,' and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind." *Id.* at 248. In contrast, the Supreme Court noted that "[a] court decision reversing the denial of a motion to reopen does not direct the Executive to afford the alien substantive relief; ordinarily, it touches and concerns only the question whether the alien's claims have been accorded a reasonable hearing." *Id.* Adjustment of status and the decision whether to grant employment authorization are forms of substantive relief, insofar as an individual applying has a "right to a ruling." *See INS v. St. Cyr*, 533 U.S. 289, 307-08 (2001) ("Eligibility that was governed by specific statutory

standards provided a right to a ruling on an applicant's eligibility, even though the actual granting of relief was not a matter of right under any circumstances, but rather is in all cases a matter of grace") (cleaned up); *see also Brewer*, 757 F.3d at 1062. Thus, while the district court determined that *Kucana* supports that the agency's policies were subject to review, *see* A34-35, that was in error.

The district court reasoned that because the source for conferring employment authorization sometimes arose from regulation, not statute, the jurisdictional bar at 8 U.S.C. § 1152(a)(2)(B)(ii) would not apply to employment authorization grants. *See* A35. But the fact that the statute states that the Attorney General *could* promulgate regulations to guide the agency in making a discretionary determination about whether to grant employment authorization does not override that the discretionary authority is itself statutory. *See* 8 U.S.C. §§ 1103(g)(3), 1324a(h)(l), (b)(1)(C)(ii). Indeed, as the district court seemingly acknowledged, A35, employment authorization is at times conferred by statute. *E.g.* 8 U.S.C. § 1184(p)(6). *Cf. Mathews*, 426 U.S. at 81 (noting that the "changing political and economic circumstances," make immigration policy determinations particularly appropriate for political—not judicial—maintenance and control). Taking the district court's analysis to its logical conclusion, certain employment authorization applications would be statutory and therefore generally barred from its review, while other employment authorization determinations would not. *See* A35. That cannot be what Congress intended.

**D. The Challenge to the Global Asylum Hold Policy Is Moot.**

Article III of the Constitution limits federal courts' jurisdiction to cases and controversies. *See Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). This Court has consistently held that "a suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *See*, *e.g.*, *Harris v. University of Mass. Lowell*, 43 F.4th 187, 191 (1st Cir. 2022). Any challenges to the Global Asylum Hold Policy are moot because the USCIS Director rescinded the Global Asylum Hold Policy on March 25, 2026, well before the district court's decision below. *See* A277-99; *see also* Motion to Supplement & Attachment. Thus, the Court can offer Plaintiff-Appellants no remedy because the remedy they would seek—vacatur of the Global Asylum Hold policy—has already been provided, and no issues remain for the Court's resolution.

The district court acknowledged USCIS's statement on its public-facing website that it had resumed processing certain applications, including those previously encompassed by the Global Asylum Hold Policy. *See* A91 n.32 (referencing A277-99). Yet, the district court nevertheless "assume[d]" that the Global Asylum Hold Policy remained in effect "given that the Global Asylum Hold Policy has not been lifted by the USCIS Director, through a subsequent memorandum[.]" A91 n.32. The district court did so even while acknowledging the website—which is in the summary judgment record. *See id.* (citing A277-79). The district court provided no other basis for its assumption that the Global Asylum Hold Policy remained in place beyond the fact that

the memorandum was not on the website, *see* A91-95. Given that mootness goes to federal courts' Article III power to adjudicate disputes, the Government submitted an unopposed motion to supplement, and included the March 25, 2026 memorandum from the USCIS Director, the result of which was the website post ending the hold on asylum applications for applicants from non-high risk countries. *See* Motion to Supplement; A277-79. While not formally ruling on the motion, this Court requested the Government submit an amended brief addressing whether the Government is requesting the Court to take judicial notice of the Director's memorandum. *See* J. Rikelman's September 15, 2026 Order.

At the outset, there is no case or controversy as to the mootness of the Global Asylum Hold Policy based on what is already in the record. Again, the USCIS's public-facing website stated that the Global Asylum Hold Policy was not in place as of March 2026, *see* A277-79. The district court seemingly doubted the veracity of the information provided on the USCIS's official government website, and concluded that the USCIS had not rescinded its policy because the district court judge was not personally aware of any internal memoranda to that effect. *See* A91-95. USCIS's statement on its website that it was no longer "holding" particular applications was a sufficient statement to the public of the status of its current policies. More was not required, and the district court erred in concluding otherwise.

Notwithstanding this, the Court should take judicial notice of the Director's March 25, 2026 Memorandum. A court can take judicial notice of facts not subject to

reasonable dispute where, *inter alia*, those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See*, *e.g.*, *Watson v. United States*, 37 F.4th 22, 28 (1st Cir. 2022) (quoting and citing the Federal Rules of Evidence 201(b)(2)). The Plaintiffs-Appellants did not oppose supplementation here, and there is no reasonable basis on which they could contest the veracity of the supplied Memorandum. *See* Motion to Supplement, pp. 1-2; *see Redfern v. Napolitano*, 727 F.3d 77, 83 (1st Cir. 2013) (where both parties agreed in substance to the facts in the government's Rule 28(j) letter, seeing "no difficulty" in taking judicial notice of those facts and finding the case moot). Though ordinarily this Court's jurisdiction is limited to the record before the district court, "[b]ecause mootness implicates a court's jurisdiction, the court can properly look to facts outside the record so long as those facts are relevant to a colorable claim of mootness." *Manguriu v. Lynch*, 794 F.3d 119, 121 (1st Cir. 2015) (citing *Haley v. Pataki*, 60 F.3d 137, 140 n.1 (2d Cir. 1995); *Clark v. K-Mart Corp.*, 979 F.2d 965, 967 (3d Cir. 1992); *Cedar Coal Co. v. United Mine Workers of Am.,* 560 F.2d 1153, 1166 (4th Cir. 1977)); *see Rusaki v. Pistole*, 775 F.3d 61, 67 (1st Cir. 2014) ("We have sometimes acknowledged such factual submissions, however, at least where they raise a question of mootness."); *United States v. Brown*, 631 F.3d 573, 580 (1st Cir. 2011) (considering mootness after the government informed the court by Rule 28(j) letter that defendant was out on supervised release). Because the Global Asylum Hold Policy was no longer in place, the Court should find any challenges to it moot, and vacate the decision below on the Global Asylum Hold Policy.

## II. The District Court's Decision Fails On The Merits.

The Challenged Policies are not arbitrary and capricious, or contrary to law. As discussed above, USCIS adopted the Challenged Policies to ensure that immigration benefits had not been and would not be granted before potentially significant national-security, public safety, and terrorism-related concerns were adequately investigated and resolved. *See supra* pp. 1-7. Those determinations did not arise in a vacuum. USCIS identified significant concerns regarding the availability, reliability, and completeness of vetting information from the designated countries. *See supra* pp. 1-7; A194-299. The agency further determined that existing adjudicatory procedures should be supplemented by enhanced vetting measures. *See supra* pp. 1-7; A194-299. That was well within the USCIS's discretionary authority. *See supra* pp. 1-7, 16-31; A194-299. *Contra* A1-135.

Precluding the government from ensuring that immigration decisions were made consistently and to protect national security as codified by Congress in the INA endangers the public and is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993). Under the district court's analysis, it is not clear USCIS would be able to instruct its staff to consider certain broader concerns or country-specific factors in reviewing or re-reviewing applications. A1-135. That could include, for example, interviewing or re-interviewing applicants from particular countries or regions where child marriage or female genital mutilation are common. Similarly, it is

not clear if the USCIS could issue general policies to address situations where applicants were discovered or suspected of being affiliated with gangs and terrorist groups. And, the district court's decision could forestall the USCIS from providing generally applicable guidance concerning country conditions in other contexts, such as a lack of documents provided during an emergency or unforeseen circumstance, the unavailability of documents from applicants whose countries are experiencing war, famine, or disease, or more generally when required documents are unavailable or cannot be provided in the context of asylum. Furthermore, it could preclude USCIS from evaluating patterns of fraud and make it more difficult for the USCIS to re-review applications in a comprehensive, uniform manner if there were patterns of document fraud or frivolous applications. It is far more efficient for the USCIS to be able to issue uniform guidance to its staff identifying particular applications that necessitate additional information, evaluation, or that ought to be re-reviewed. The district court's sweeping decision undermines the Executive Branch's broad constitutional and statutory authority over immigration.

### A. The Comprehensive Re-Review Policy Is Not Contrary To Law.

The Comprehensive Re-Review Policy falls well within the agency's statutory authority. As the district court acknowledged, both the D.C. Circuit and the Ninth Circuit have recognized the agency's inherent power to reconsider past agency decisions. A102-03 (citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1019 (9th Cir. 2025)).

Yet the district court concluded the Comprehensive Re-Review Policy was contrary to law because the D.C. and Ninth Circuit decisions include an exception that precludes re-review where "Congress has spoken" about the procedures for reconsidering past decisions. A103 (internal quotations omitted). The district court concluded that in the INA, Congress has permitted revocation or termination of immigration benefits only "on an individualized level and determine whether a particular person—not a large swath of people—lack eligibility for a benefit provided." A105. That analysis is fundamentally flawed.

Again, nothing in the Comprehensive Re-Review policy indicates that USCIS will not undertake an individualized assessment. *See supra* pp. 2, 18. *Contra* A31-39, 105. It does not follow that simply because an administrative agency makes an assessment, based on background information about fraud, national security concerns, and a potential lack of reliable information, that certain applications are more likely to necessitate rereview, that review of those applications will not be individualized. Nor does the Comprehensive Re-Review policy bar individualized review. *Contra* A31-39. To the contrary, the December Memorandum required that "all aliens meeting these criteria undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." *See* A14 n. 10 (quoting A221). That plainly envisions an individualized assessment of applications.

Therefore, the district court's theory that individualized review will not occur is simply wrong.

Once discretionary immigration benefits are granted, the consequences of those decisions may be difficult or impossible to fully unwind under normal circumstances. Here, the district court held that the agency could not reconsider them at all. *See* A12-14. Thus, under the district court's reasoning it is unclear how the agency could revisit and remedy particular actions more broadly, for example if any particular set or group of applications were granted in error, or if those applications generally perhaps should have been held pending the provision of additional documentation or information. The district court's order therefore places USCIS in an untenable position

### B. The District Court's Analysis Of The Country Specific Factors Policy Is Also Flawed.

As the Supreme Court has explained, "[i]n both civil and criminal cases," the courts "rely on the parties to frame the issues for decision" and the courts are "assign[ed] . . . the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (internal quotation omitted); *accord Margolin v. NAIJ*, 146 S. Ct. 1285, 1288 (2026). "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See Mijangos v. Bondi*, 167 F.4th 539, 545 (1st Cir. 2026) (cleaned up); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (same).

Plaintiffs did not raise 8 U.S.C. § 1152(a)(1)(A) at all in their motion for summary judgment. Yet, in adjudicating Plaintiffs' summary judgment motion, the district court relied entirely on 8 U.S.C. § 1152(a)(1)(A). *See* A88-112. Specifically, the district court determined that the policy discriminated against applicants from those countries in violation of 8 U.S.C. § 1152(a)(1)(A), which bars "discriminat[ion] … in the issuance of an immigrant visa because of the person's … nationality." *See* A88-90, 108-12. The district court's reliance on that statute violated the party-presentation principle. *See*, *e.g.*, *Margolin*, 146 S. Ct. at 1288; *Sineneng-Smith*, 590 U.S. at 375-76. Plaintiffs' failure to raise the statute had a material impact here, because the Government would have been able to tell the district court that "[s]ection 1152(a)(1)(A) is expressly limited to the issuance of 'immigrant visa[s].'" *Hawaii*, 585 U.S. at 694 (quoting 8 U.S.C. § 1152(a)(1)(A)). In other words, the provision does not even apply.

In denying a stay, the district court concluded that it was sufficient that Plaintiffs cited 8 U.S.C. § 1152(a)(1)(A) "briefly" in their complaint, even though they failed to raise it in their summary-judgment briefing at all. *See* A152-54. Plaintiffs are represented by sophisticated immigration lawyers. That is plainly insufficient to present an entire merits-based argument at the summary judgment phase. *See* Fed. R. App. P. 28(a)(8) ("[T]he argument . . . must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). Though the district court noted that the party-presentation principle is "supple, not iron-clad[,]" A154 (quoting *Sineneng-Smith*, 590 U.S. at 376), the Supreme

Court there referred to "modest" interventions such as correcting a statute-of-limitations miscalculation or ordering supplemental briefing on jurisdictional issues. 590 U.S. at 376 & n.4. Presenting an entire legal theory not raised by the Defendants at summary judgment is not such an appropriate intervention. *See id.* Therefore, the district court's "contrary to law" analysis fails at the outset.

Regardless, the district court's conclusions applying § 1152(a)(1)(A) fail on the merits. Again, "[s]ection 1152(a)(1)(A) is expressly limited to the issuance of immigrant visas[.]" *See Hawaii*, 585 U.S. at 694 (cleaned up); *cf.* A98, 107, 110 (district court opinion, distinguishing between the issuance of visas in other contexts). In terms of the benefits at issue here, neither work authorization nor adjustment of status are the issuance of an immigrant *visa*. Visas are issued by consular officials at postings abroad. *See generally Hawaii*, 585 U.S. at 694-96. Adjustment of status is governed by a different statutory provision, 8 U.S.C. § 1255, and employment authorization is authorized under 8 U.S.C. § 1324a and implementing regulations, not the immigrant visa issuance process.[5] *See* 8 U.S.C. §§ 1152(a)(1)(A), 1255(a), 1324a(h)(3); 8 C.F.R. §§ 245.2, 274a.12.

[5] The district court asserted that § 1152(a)(1)(A) "bears on [Plaintiffs'] applications for adjustment of status and work authorization, because those applications depend on visa availability, but does not apply to applications for naturalization or asylum." A107 (internal quotations omitted). Yet for that proposition, the court relied on a different district court decision where there was apparently no dispute between the parties about whether 8 U.S.C. § 1152(a)(1)(A) applies to adjustment of status or work authorization. *See Doe v. Trump*, 2026 WL 1170971, at *16 & n.16 (D. Mass. Apr. 30, 2026). Again, the issue was not even raised by the Plaintiffs at summary judgment, so the Government had no opportunity to provide its views.

Congress' choice to include a specific prohibition in the visa process but not in other processes in the same statute must be respected – if anything, it suggests that nationality-based determinations are permitted, which is unsurprising given that much of immigration law is based upon nationality. *See Hawaii*, 585 U.S. at 694; *see also Reagents*, 591 U.S. at 34 (rejecting a similar equal protection-animus argument "[b]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program . . . . Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.").

Furthermore, the district court erred in concluding that the purpose of the Country Specific Factors Policy was facially discriminatory. *Contra* A111. "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive [and must be upheld] [s]o long as [they] are not wholly irrational[.]" *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (alterations in opinion). The administrative record specifies that as a result of the fact-finding conducted under 8 U.S.C. §1182(f), which described the country-specific concerns underpinning the Country-Specific Factors Policy, USCIS would use country-specific findings in assessing individual applications, but that the USCIS will not consider the applicant's nationality itself a significant negative factor. *See* A247. That is entirely appropriate. The district court's decision also overlooks that the USCIS frequently considers country conditions in relevant factors, *e.g.*, 8 U.S.C. § 1182(a)(3). If §1152(a)(1)(A) were interpreted to not

allow USCIS to employ considerations of public safety or national security in adjudicating adjustment of status or work authorization by country, § 1152(a)(1)(A) would override the well-understood ability of federal immigration authorities to consider country-based factors in all sorts of contexts. *See Hawaii*, 585 U.S. at 694, 706-10; *Reagents*, 591 U.S. at 34. That cannot be what Congress intended.

**C. The Benefits Hold Policy Is Not Contrary To Law.**

The district court reasoned based on various statutory and regulatory provisions, that adjudication was required within a certain timeframe, seemingly regardless of whether USCIS had sufficient information or not. *See* A47-51. For example, the Court noted that 8 U.S.C. § 1158(d)(5)(A)(iii) provides that asylum applications "shall be completed within 180 days" of filing in the absence of exceptional circumstances. A47. Even aside from whether obtaining requisite security information is an exceptional circumstance under that subsection, Congress has precluded any private rights stemming from this timing provision. 8 U.S.C. § 1158(d)(7). The INA does not require the adjudication of the benefits applications in a specified period of time (at least one that is reviewable here) and USCIS did not need clear congressional authorization to apply a hold on issuing its discretionary adjudicatory decisions.

Further, and as the district court acknowledged, the statutes governing adjustment of status and employment authorization themselves "use discretionary terms." A96. While the district court reasoned that "the relevant statutes and regulations" concerning adjustment of status and employment authorization contain

mandatory terms, *see* A96-97, those terms pertain to the fact that the *applicant* must apply for adjustment of status or employment authorization, 8 C.F.R. § 274a.12(a)(c), and thereafter the applicant "shall be notified" of the agency's decision, *see* 8 C.F.R. § 274a.13(b), (c). To state the obvious: a mandate on the *applicant* creates no obligations on the *government*. And a mandate to notify an applicant of a decision once made does not create a mandate on the government to make a decision within a particular timeframe. Moreover, as the district court acknowledged, a different statute, 8 U.S.C. § 1571(b), states that Congress believes that "the processing of an immigration benefit application *should*[,]" not must, "be completed not later than 180 days after the initial filing of the application[.]" *See* Op. 97. The district court erred in finding that the INA created an enforceable right to adjudication within a particular timeframe. *Contra* A96-97. Moreover, the district court's analysis fails because USCIS has not "categorically withheld adjudication of immigration benefits." *Contra* A100. Rather, USCIS has temporarily paused the final adjudications of certain specified applications, which is well within its discretionary authority. A221-28. While the district court concluded that the Benefits Hold Policy contravened Congress' intent that benefits adjudication should generally proceed, A100, that conclusion overlooks other salient factors, and particularly Congress' broader intent in enacting our country's immigration laws and ensuring no benefits are conferred without proper vetting. *See supra* pp. 1-7.

Although the district court did not use the words "major questions doctrine," its opinion indicates that it was looking for clear statutory authorization for the hold policy.

*See* A24-26, 100. For example, the district court stated agreement with the Plaintiffs that "[h]ad Congress intended to give USCIS that sweeping authority" to impose holds on adjudication decisions, "it surely would have said so." A100. The court made this assumption even though the grant of these benefits is discretionary. *See supra* pp.16-31. Significantly, it appears from the district court's opinion that adjudication holds are never permitted by the INA. If a one-week (or one day) hold on applications from a particular country or countries would never be permissible, regardless of the national security and foreign policy-related grounds at play, that is undoubtedly inconsistent with Congressional intent. *E.g.*, 6 U.S.C. § 111(b)(1)(A); *see supra* pp. 1-7, 16-31. Under the INA, Congress made the validity of an alien's admission to the United States a necessary and express prerequisite for nearly all immigration benefits. Among the substantive grounds that Congress commanded the Executive Branch to assess in considering the validity of any alien's admission are "[s]ecurity and related grounds" expressly set forth in 8 U.S.C. § 1182(a)(3) —including an alien's criminal history, *id.* §1182(a)(2); participation in terrorist activities, *id.* § 1182(a)(3)(B); and any "reasonable ground" for the Secretary of State "to believe" admission "would have potentially serious adverse foreign policy consequences for the United States," *id.* § 1182(a)(3)(C). These standards apply through the investigation and adjudication of applications for immigration benefits—processes that the INA and its regulations also command. These provisions thus impose affirmative duties to obtain and exchange security information—duties that cannot be fulfilled if applications are adjudicated before adequate information is

obtained. Thus, in the context of immigration benefits where Congress has granted explicit discretion to the Executive Branch, looking for clear statutory authorization to enact the holds is entirely the wrong exercise. Rather, the district court should have looked only for any limits on that discretion, not whether Congress explicitly authorized the Benefits Hold Policy.

**D. The Challenged Policies Are Not Arbitrary or Capricious.**

The district court concluded that the Challenged Policies are arbitrary and capricious because USCIS did not offer reasoned explanation, failed to considered reliance interests, and employed pretextual reasoning. A112-128. The district court erred with respect to each reason.

Turning first to the district court's assertion that the agency failed to reasonably explain its decision and failed to adequately consider reliance interests in issuing the Comprehensive Re-Review Policy, the Country-Specific Factors Policy, and the Benefits Hold Policy, *see* A112-20, those assertions fail. As discussed in detail above, the Challenged Policies delineate and address multiple agencies' specific findings of deficiencies in the quality and integrity of information provided from certain countries, which prevented USCIS from vetting the eligibility of individuals for immigration benefits, and accurately assessing the risk their nationals may pose to the United States. *See supra* pp. 1-7; *see generally* A209-14, 221-60, 299-301. Further, the Challenged Policies work together in concert. The Comprehensive Re-Review Policy ensures that individuals who were granted benefits have been adequately vetted for security and

eligibility concerns. The Country-Specific Factors Policy ensures that USCIS adjudicators are aware of particular country conditions when evaluating applications, so that additional information can be requested if needed. And, the Benefits Hold Policy ensured that adjudication could proceed, but benefits were held pending USCIS obtaining information necessary to ensure benefits were not granted in error. Thus, the Benefits Hold Policy and the Country Specific Factors Policy arguably ensure that the Comprehensive Re-Review Policy is not needed ad infinitum, and that USCIS is not overwhelmed with re-reviewing applications again in the future.

Although the district court disagreed with the sufficiency of those explanations, that disagreement does not alter the fact that the agency provided reasons for its actions in the administrative record. A113-27. *Cf. SEC v. Chenery Corp.,* 332 U. S. 194, 207 (1947) ("The wisdom" of those policy decisions "is none of our concern."). Such a policy disagreement does not establish an APA violation. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("Not having discussed the possibility [of a mandatory airbag standard], the agency submitted no reasons at all."). This is not a case where the agency utterly failed to explain itself in violation of *State Farm*; instead, the district court found USCIS's explanation *unpersuasive*. *See* A11-13, 113-27. The district court's consideration of extra-record, cherry-picked statements on social media, did not permit it to disregard the agency's stated rationale and invalidate the policies based on perceived deficiencies in the agency's explanation

rather than the absence of one. A11-13; *see FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025); *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015).

Second, and contrary to the district court's assertions, USCIS plainly *did* consider the reliance interests at stake here. *See, e.g.*, A223, 228, 270. Indeed, Plaintiffs seemingly conceded as much in briefing. *See* Trial Court Docket ECF 20-1 at 41 ("Although USCIS noted that the Challenged Policies 'may result in delay to the adjudication of some pending applications . . .'" and citing A223). "[A] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *See Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.,* 976 F.2d 58, 61 (1992) (cleaned up); *see also Levinsky's Inc., v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 134 (1st Cir. 1997) ("[A]n admission of counsel during trial is binding on the client" if, in context, it is "clear and unambiguous."). The agency reasonably determined that the national security interests at play here outweighed those reliance interests. While the district court determined that was insufficient, *see* A118-19, the agency's actual balancing of those reliance interests—and Plaintiffs' assertions that the agency erred in weighing the significance of them, Trial Court Docket ECF 21-1 at 41—belies the district court's conclusion that no such weighing occurred. *Contra* A112-20. And the reasonability of the agency's conclusions is underscored by the fact that Plaintiffs' reliance interests must also account for USCIS's longstanding regulations that already permit prolonged investigations, and a long string of case law that strips the courts of power to set

deadlines for action. *See*, *e.g.*, *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 179 (1st Cir. 2016); *Aronov v. Napolitano*, 562 F.3d 84, 95-98 (1st Cir. 2009).

The district court's determination that these policies were adopted due to anti-immigrant animus also must fail.[6] *See* A11-13, 120-28. In *Hawaii*, the Supreme Court rejected similar extra-record, allegations-of-animus that the district court relied on here. *See* 587 U.S. at 685-707; *but see* A120-28; A154-55. As in this case, the Plaintiffs in *Hawaii* argued that the Proclamation there was motivated by animus toward a particular group and cited the President's social media statements as evidence. *See* 585 U.S. at 681, 699-710. In rejecting that argument, the Supreme Court emphasized that the Proclamation at issue reflected an in-depth analysis of relevant conditions, including country conditions. *See id.* at 706-10. Here, too, the Presidential Proclamation and subsequent memoranda contain in-depth analyses and discussions of country conditions supporting the Challenged Policies, and rely on a worldwide review conducted by multiple government agencies. *See generally* A194-301. Indeed, these are the exact types of concerns the Supreme Court approved of in *Hawaii*, 585 U.S. at 706-10. Furthermore, the *Hawaii* Court observed that the standard of review is rational

[6] To the extent that the allegation that the Executive, motivated by animus, ended a program that disproportionately benefits certain ethnic groups is a selective enforcement claim, such a claim would be barred by *Reno* v. *American-Arab Anti-Discrimination Committee*, 525 U. S. 471, 488 (1999) (holding that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation"). However, the debate need not be resolved because, as detailed above, the allegations are insufficient. *See Regents*, 591 U.S. at 33-34 (same).

basis scrutiny, *i.e.*, that the animus claim could only succeed if it is "impossible to discern a relationship to legitimate state interest[,]" or that the policy is "inexplicable by anything but animus." 585 U.S. at 670 (citing *Romer v. Evans*, 517 U.S. 620, 632 (1996)). In terms of the Challenged Policies, it "cannot be said that it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus." *See Hawaii*, 585 U.S. at 706. Instead, the question is whether the Challenged Policies "plausibly related to the Government's stated objective to protect the country and improve vetting processes." *Id.* at 704-05. As discussed above, the policies challenged here do.

In its opinion denying a stay, the district court asserted that *Hawaii* is distinguishable because it considered only whether the entry policy violated the First Amendment's Establishment Clause and not the arbitrary-and-capricious standard under the APA. A155.[7] Arbitrary-and-capricious review of agency decisions "is highly deferential, and the agency's actions are presumed to be valid." *River St. Donuts LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). If the "agency's decision is supported by a rational basis," the court "must affirm." *Id.* *Hawaii* demonstrates how "rational basis scrutiny" operated when similar facts were present. Accordingly, the district court ought to have applied a rational basis standard here.

[7] The district court's assertion that the Government failed to raise the *Hawaii* standard at summary judgment, *see* A155, is odd, given that the court acknowledged that the Government raised the rational-basis standard for the pretext claim. A155-56.

Though the district court acknowledged that "[u]ltimately it was not [its] role to pass on the wisdom of the Government's policy choices[,]" because "[u]nder our constitutional system, those judgments are reserved for the political branches[,]" *see* A134, that is precisely what it did here, *see generally* A1-135. As such, the district court's decision cannot stand.

## CONCLUSION

For the foregoing reasons, the Court should vacate the district court's decision.

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

TYLER BECKER
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 514-2000

AUGUST FLENTJE
Senior Counsel

/s/ Marie V. Robinson
MARIE V. ROBINSON
Trial Attorney
1st Circuit Bar No. 1198125
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 353-5667

November 12, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), this Corrected Opening Brief is proportionally spaced using Garamond 14-point typeface, has one (1) inch wide margins, and contains 12,716 words of text, exclusive of the portions exempted. Additionally, the undersigned certifies that the text of the electronic brief will be identical to the text in the paper copies that will be filed with the Court when requested. The virus detection program Microsoft Forefront Endpoint Protection has been run on this file and no viruses were detected.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Dated: November 12, 2026

No. 26-1703

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND; REFUGEE DREAM CENTER; SERVICE EMPLOYEES INTERNATIONAL UNION; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; AFRICAN COMMUNITIES TOGETHER; VENEZUELAN ASSOCIATION OF MASSACHUSETTS; PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; AMERICAN GATEWAYS,

Plaintiffs-Appellees,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH EDLOW, in the official capacity as Director of the United States Citizenship and Immigration Services; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as Secretary of the Department of Homeland Security,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Rhode Island
District Court Case No. 1:26-cv-00132-JJM-PAS

**DEFENDANTS-APPELLANTS' CORRECTED ADDENDUM**

JONATHAN D. GUYNN
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

TYLER J. BECKER
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave., NW
Washington, DC 20530

AUGUST FLENTJE
Deputy Director

MARIE V. ROBINSON
Trial Attorney
U.S. Department of Justice, Civil Div.
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 353-5667

# TABLE OF CONTENTS

Document Name ............ Pages

District Court Opinion ............ 1-135

District Court Order and Opinion Granting the Motion for Final Judgment ............ 136-141

June 11, 2026 District Court Docket Entry of Final Judgment ............ 142

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND;

REFUGEE DREAM CENTER;

SERVICE EMPLOYEES INTERNATIONAL UNION;

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA;

AFRICAN COMMUNITIES TOGETHER;

VENEZUELAN ASSOCIATION OF MASSACHUSETTS;

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; and

AMERICAN GATEWAYS,

Plaintiffs,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;

JOSEPH EDLOW, *in his official capacity as Director of the United States Citizenship and Immigration Services*;

DEPARTMENT OF HOMELAND SECURITY; and

MARKWAYNE MULLIN,[1] *in his official capacity as Secretary of the Department of Homeland Security*,

Defendants.

No. 26-cv-132-JJM-PAS

[1] Pursuant to Fed. R. Civ. P. 25(d), Markwayne Mullin has been substituted for Kristi Noem as the Secretary of the Department of Homeland Security.

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

More than six months ago, the United States Citizenship and Immigration Services ("USCIS") enacted a series of policies that threw the lives of countless immigrants living in the United States into indeterminate legal limbo. The agency announced that it would be placing an indefinite pause on the adjudication of immigration benefit requests for individuals from thirty-nine African, Asian, Latin American, and Middle Eastern countries. Since then, individuals from these countries have been categorically barred from receiving final decisions on, among other things, their asylum, work permit, green card, and citizenship applications. And USCIS's hold on adjudications cannot be attributed to anything that these individuals did wrong; rather, it arises solely by the happenstance of their birth.

A coalition of nonprofits and unions representing individuals from the thirty-nine countries (collectively, the "Plaintiffs") have now sued USCIS, the Department of Homeland Security ("DHS"), as well as Joseph Edlow and Markwayne Mullin in their official capacities as the respective heads of their departments (collectively, "the Government"). *See* ECF No. 1. Plaintiffs challenge USCIS's new policies[2] under the Administrative Procedure Act ("APA") and the Fifth Amendment to the U.S.

---

[2] Plaintiffs also challenge USCIS's: hold on all applications for asylum and withholding of removal, regardless of the individual's country of origin; re-review of already approved applications for individuals from so-called "Travel Ban Countries" who entered the United States on or after January 20, 2021; and changes to its Policy Manual that now require agency personnel to consider "country-specific facts and circumstances" as significant negative factors when deciding whether to grant benefit requests to those from Travel Ban Countries.

Constitution. Now pending before the Court are the parties' respective Motions for Summary Judgment on Plaintiffs' APA claims, and the Government's Motion to Dismiss Plaintiffs' constitutional claims. *See* ECF Nos. 20, 21.

In ruling on these motions, the Court is reminded of a line often repeated in discussions around immigration policy: If people wish to immigrate to the United States, they ought to "follow the law" and "do things the right way." This case serves as a perfect example of immigrants doing just that. Plaintiffs and their members have observed the legal processes that Congress enacted by statute and USCIS promulgated by regulation so that they may one day obtain immigration benefits. They have, for example, filed the appropriate paperwork, paid the required filing fees, submitted to the requested biometrics collections, and attended the necessary in-person interviews. Even so, Plaintiffs and their members are stuck waiting, for months on end, for benefit requests that USCIS refuses to adjudicate.

But the rule of law has to apply to everyone equally and, as evident here, USCIS has neither "followed the law" nor "done things the right way." Indeed, the agency has violated the very immigration laws that Congress has charged it with administering, as well as the administrative laws that govern the agency's actions. In enacting its latest immigration policies, USCIS: claims statutory and regulatory authority that it does not possess; makes decisions without the reasoned explanations that it must provide; acts without regard for the reliance interests of applicants that it must consider; and justifies its actions with pretextual concerns of "national security" that mask anti-immigrant sentiments that it is forbidden from letting

influence its decision-making. In legal terms that means USCIS's actions are contrary to law and arbitrary and capricious.

Accordingly, as set forth below, each of the Challenged Policies that USCIS enacted—the Benefits Hold Policy, the Global Asylum Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are declared unlawful and are vacated and set aside.

## TABLE OF CONTENTS

I. BACKGROUND ........ 8
A. Statutory and Regulatory Framework ........ 8
B. Executive Branch Actions ........ 8
1. The President's Executive Order and Presidential Proclamations ........ 8
2. Events Leading Up to Policy Changes at USCIS ........ 10
3. The President and the DHS Secretary's Statements on Immigration ........ 11
4. USCIS Implements Several Policy Changes ........ 13
5. USCIS Posts Updates on Its New Policies ........ 16
C. Plaintiffs and Their Claims ........ 17
1. The Global Asylum Hold Policy ........ 19
2. The Benefits Hold Policy ........ 19
3. The Comprehensive Re-Review Policy ........ 20
4. The Country-Specific Factors Policy ........ 20
D. Procedural Background ........ 21
II. THE CROSS MOTIONS FOR SUMMARY JUDGMENT ........ 22
A. Standard of Review ........ 22
B. The Government's Jurisdictional, Justiciability, and Standing Challenges 23
1. National Security Concerns Do Not Shield USCIS from Judicial Review.. 23
2. The INA Does Not Strip the Court of Jurisdiction over Plaintiffs' Claims. 26
a. The Court Can Review Plaintiffs' Adjustment of Status and Employment Authorization Claims ........ 26
i. Section 1252(a)(2)(B)(i) Does Not Bar Review ........ 27
ii. Section 1252(a)(2)(B)(ii) Does Not Bar Review ........ 31
b. The Court Can Review Plaintiffs' Naturalization Claims ........ 39
3. USCIS's Actions Are Not Committed to Agency Discretion By Law ........ 42
a. Plaintiffs' Adjustment of Status Claims Are Not Committed to Agency Discretion By Law ........ 44

b. Plaintiffs' Employment Authorization Claims Are Not Committed to Agency Discretion By Law ... 46

c. Plaintiffs' Asylum and Withholding of Removal Claims Are Not Committed to Agency Discretion By Law ... 46

d. Plaintiffs' Naturalization Claims Are Not Committed to Agency Discretion By Law ... 49

4. USCIS's Actions Constitute Final Agency Action ... 51

a. Plaintiffs Have Satisfied the Consummation Prong ... 52

b. Plaintiffs Have Satisfied the Legal Consequences Prong ... 59

5. Plaintiffs' Claims Are Ripe for Review ... 61

a. Plaintiffs Have Satisfied the Fitness Prong ... 62

b. Plaintiffs Have Satisfied the Hardship Prong ... 64

6. Plaintiffs Have Standing to Bring Their Claims ... 66

a. Plaintiffs Have Organizational Standing ... 67

i. Plaintiffs Have Suffered Injury ... 67

ii. Plaintiffs' Injuries Are Fairly Traceable to USCIS ... 71

iii. Plaintiffs' Injuries Are Redressable ... 71

b. Plaintiffs Have Associational Standing ... 74

i. Plaintiffs Have Individual Standing ... 75

ii. Plaintiffs' Interests Are Germane to Their Organizational Purposes ... 83

iii. Individual Member Participation Is Not Necessary ... 84

C. The Merits ... 85

1. The Challenged Policies Are Contrary to Law ... 86

a. Section 1182(f) Does Not Authorize USCIS's Actions ... 87

b. The Global Asylum Hold Policy Is Contrary to Law ... 91

c. The Benefits Hold Policy Is Contrary to Law ... 94

d. The Comprehensive Re-Review Policy Is Contrary to Law ... 101

e. The Country-Specific Factors Policy Is Contrary to Law ... 106

2. The Challenged Policies Are Arbitrary and Capricious ... 112

a. USCIS Failed to Provide a Reasoned Explanation for Its Actions ... 113

b. USCIS Failed to Account for Reliance Interests ... 116

c. USCIS Provided Pretextual Reasons for Its Actions .... 120

3. A Summary of the Court's APA Rulings .... 127

D. Remedy .... 128

1. Plaintiffs Are Entitled to Vacatur .... 128

2. Plaintiffs Are Entitled to a Declaratory Judgment .... 129

3. Plaintiffs Are Not Entitled to a Permanent Injunction .... 129

III. THE MOTION TO DISMISS .... 132

IV. CONCLUSION .... 134

## I. BACKGROUND

### A. Statutory and Regulatory Framework

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, is a comprehensive statutory scheme that governs immigration law in the United States. Among other things, the INA authorizes DHS, through USCIS, to adjudicate a broad array of immigration benefit requests. Some of the most common forms of relief, which are the subject of this lawsuit, include: (1) asylum and withholding of removal; (2) adjustment of status to that of a lawful permanent resident (i.e., the ability to obtain a "green card"); (3) employment authorization (i.e., the ability to obtain a "work permit"); and (4) naturalization (i.e., the ability to become a U.S. citizen).

### B. Executive Branch Actions

#### 1. The President's Executive Order and Presidential Proclamations

On the first day of his second term in office, the President issued Executive Order 14161 ("Exec. Order No. 14161"), which directed the Secretary of State to enhance vetting and screening of "all aliens[3] who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025). Exec. Order No. 14161 also gave the Secretary of State, Attorney

---

[3] The statutory provisions of the INA use the term "alien," which means "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). When quoting statutes, caselaw, and agency documents, the Court will use the language in those statutes, cases, and documents. Otherwise, under the recent approach of the Supreme Court, this Court will "use[ ] the term 'noncitizen' as equivalent to the statutory term 'alien.'" *Barton v. Barr*, 590 U.S. 222, 226 n.2 (2020); *see also Patel v. Garland*, 596 U.S. 328 (2022).

General, Secretary of Homeland Security, and Director of National Intelligence sixty days to submit a report to the President, identifying countries to include in a new "Travel Ban."[4] *Id.* These Cabinet members were instructed to "identify[ ] countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f))." *Id.* at 8451.

After receiving the report, the President issued Presidential Proclamation 10949 ("Proclamation No. 10949"). *See* Proclamation No. 10949, 90 Fed. Reg. 24497 (June 4, 2025). Invoking his authority under 8 U.S.C. §§ 1182(f) and 1185(a), the President implemented a new Travel Ban and restricted the entry into the United States of individuals from nineteen countries that the Secretary of State had identified as "deficient with regards to screening and vetting." *Id.* at 24497.[5] The President subsequently issued a second proclamation, Presidential Proclamation 10998 ("Proclamation No. 10998"), which expanded the list of countries subject to the

---

[4] During his first term, the President imposed entry restrictions (i.e., a "travel ban") on individuals from Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen. *See* Proclamation No. 9645, 82 Fed. Reg. 45161, 45163 (Sept. 24, 2017). The President had also previously imposed entry restrictions on individuals from Chad, Iraq, and Sudan, *see* Exec. Order No. 13769, 82 Fed. Reg. 8977 (Jan. 27, 2017); Exec. Order No. 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017), but those restrictions were later lifted. Upon assuming office in 2021, President Joe Biden eliminated the remaining restrictions. *See* Proclamation No. 10141, 86 Fed. Reg. 7005 (Jan. 20, 2021).

[5] In Proclamation No. 10949, the President opted to "fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen." 90 Fed. Reg. at 24499. The President also decided to "partially restrict and limit the entry of nationals from the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela." *Id.*

Travel Ban to thirty-nine.[6] *See* Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025). These countries are referred to collectively as the "Travel Ban Countries."

**2. Events Leading Up to Policy Changes at USCIS**

Following the issuance of Exec. Order No. 14161 and Proclamation No. 10949, two incidents occurred that would lead to significant policy shifts at USCIS. First, on June 13, 2025, an Afghan national named Nasir Ahmad Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham ("ISIS"). *See* ECF No. 16-2 at CAR-000002.[7] According to the Department of Justice ("DOJ"), Mr. Tawhedi had planned to commit

---

[6] In Proclamation No. 10998, the President opted to "fully restrict and limit the entry of nationals of 7 additional countries: Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria," as well as "individuals using travel documents issued or endorsed by the Palestinian Authority (PA)." 90 Fed. Reg. at 59721. The President also decided to "partially restrict and limit the entry of nationals of the following 15 countries: Angola, Antigua and Barbuda, Benin, Cote d' Ivoire, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe." *Id.* at 59721–22.

Though it is unclear why, the President decided to change course on Laos and Sierra Leone, moving from partially restricting to fully restricting the entry of individuals from those two countries. *Contrast* Proclamation No. 10949, 90 Fed. Reg. at 24499 ("I have determined to partially restrict and limit the entry of nationals [from] . . . Laos [and] Sierra Leone[.]"), *with* Proclamation No. 10998, 90 Fed. Reg. at 59721 ("I have determined to fully restrict and limit the entry of nationals [from] . . . Laos [and] . . . Sierra Leone[.]"). He also loosened certain entry restrictions on individuals coming from Turkmenistan. *See* Proclamation No. 10998, 90 Fed. Reg. at 59721, 59726.

[7] The administrative record cites a DOJ press release issued on June 13, 2025. *See* ECF No. 16-2 at CAR-000007 n.8 (citing Press Release, U.S. Dep't of Justice, Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States (June 13, 2025), https://www.justice.gov/opa/pr/afghan-national-pleads-guilty-plotting-election-day-terror-attack-united-states [https://perma.cc/4EBL-7YCU]).

a terrorist attack in the United States during Election Day on November 5, 2024 (the "2024 Election Day Attack"). *Id.*

Second, on November 26, 2025, an Afghan national named Rahmanullah Lakanwal is alleged to have shot two National Guard members stationed in Washington, D.C (the "2025 Washington, D.C. Shooting"). *Id.* According to DHS, Mr. Lakanwal "is suspected of planning and executing a terrorist attack in Washington, DC against [the] two National Guard members, one who was killed and another who remains critically injured." *Id.*[8]

**3. The President and the DHS Secretary's Statements on Immigration**

On November 27, 2025, the day after the 2025 Washington, D.C. Shooting, the President took to social media to issue the following statement on immigration:

> A very Happy Thanksgiving salutation to all of our Great American Citizens and Patriots who have been so nice in allowing our Country to be divided, disrupted, carved up, murdered, beaten, mugged, and laughed at, along with certain other foolish countries throughout the World, for being "Politically Correct," and just plain STUPID, when it comes to Immigration. The official United States Foreign population stands at 53 million people (Census), most of which are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels. They and their children are supported through massive payments from Patriotic American Citizens who, because of their beautiful hearts, do not want to openly complain or cause trouble in any way, shape, or form. They put up with what has happened to our Country, but it's eating them alive to do so! A migrant earning $30,000 with a green card will get roughly $50,000 in yearly benefits for their family. The real migrant population is much higher. This refugee

[8] The administrative record cites a DHS press release issued on November 26, 2025. *See* ECF No. 16-2 at CAR-000007 n.9 (citing Press Release, U.S. Dep't of Homeland Sec., Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program (Nov. 26, 2025), https://www.dhs.gov/news/2025/11/26/terrorist-who-shot-two-national-guard-members-dc-was-let-country-biden [https://perma.cc/K6PZ-H7KJ]).

> burden is the leading cause of social dysfunction in America, something that did not exist after World War II (Failed schools, high crime, urban decay, overcrowded hospitals, housing shortages, and large deficits, etc.).

Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM), https://perma.cc/8JW9-D7B5; *see also* ECF No. 20-1 at 50.

A few days later, on December 1, 2026, the President reposted the following statement from then-Secretary of Homeland Security Kristi Noem, who described her conversation with the President about the 2025 Washington, D.C. Shooting as follows:

> I just met with the President.
>
> I am recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies.
>
> Our forefathers built this nation on blood, sweat, and the unyielding love of freedom—not for foreign invaders to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS.
>
> WE DON'T WANT THEM. NOT ONE.

Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 1, 2025, at 09:36 PM), https://perma.cc/P9V8-WZG7 (reposted from Secretary Kristi Noem, @Sec_Noem).

Finally, on December 10, 2026, while speaking at a rally in Pennsylvania, the President described the Travel Ban as "a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia, and many other countries." ECF No. 20-1 at 9 (citing Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025, 01:42 PM), https://perma.cc/2ES3-BCYU). Remarking on comments he had

previously made in 2018 about Haiti and certain African countries, the President stated: "Our country was going to hell. And we had a meeting, and I say, 'Why is it we only take people from shithole countries, right?' Why can't we have some people from Norway, Sweden, just a few? Let us have a few from Denmark." *Id.*

**4. USCIS Implements Several Policy Changes**

Following these incidents and statements, USCIS implemented several policy changes that are the subject of this lawsuit.

First, on November 27, 2025, a day after the 2025 Washington, D.C. Shooting occurred, USCIS issued a policy alert (hereinafter, the "November Memorandum") that revised controlling guidance in the USCIS Policy Manual regarding the manner in which agency personnel are to adjudicate discretionary benefit requests going forward. *See* Policy Alert PA-2025-26 from USCIS, Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits (Nov. 27, 2025); *see also* ECF No. 16-1 at CAR-000072–73. "Effective immediately," USCIS officials were instructed to "consider[ ] any relevant country-specific factors such as those specified in Proclamation No. 10949 as significant negative factors in the adjudication of discretionary benefit requests." *Id.* at CAR-000073. Among other things, officials were directed to consider a country's "insufficient vetting and screening information" as a significant negative factor. *Id.*; *see also* ECF No. 16-1 at CAR-000022. The agency also made clear that this new guidance "is controlling and supersedes any related prior guidance." ECF No. 16-1 at CAR-000072.

A few days later, on December 2, 2025, USCIS issued Policy Memorandum PM-602-0192 (the "December Memorandum"). *See* Dep't of Homeland Sec., USCIS, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, PM-602-0192 (Dec. 2, 2025); *see also* ECF No. 16-2 at CAR-000001–04. The December Memorandum marks the first time that USCIS began publicly referring to countries subject to the Travel Ban as "high-risk countries." ECF No. 16-2 at CAR-000001.[9] It also directed USCIS personnel to immediately take the following actions: (1) place a hold on all applications for asylum and withholding of removal, regardless of the applicant's country of nationality, pending a comprehensive review; (2) place a hold on pending benefit requests made by individuals listed in Proclamation No. 10949, regardless of the person's entry date, pending a comprehensive review; and (3) conduct a comprehensive re-review of already approved benefit requests for individuals from countries listed in Proclamation No. 10949 who entered the United States on or after January 20, 2021.[10] *Id.*

A month later, on January 1, 2026, USCIS issued another Policy Memorandum, PM-602-0194 (the "January Memorandum") that designated the

---

[9] An earlier, internal USCIS memorandum dated November 29, 2025 also announced the "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries." ECF No. 16-2 at CAR 000005.

[10] The December Memorandum also required that "all aliens meeting these criteria undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." ECF No. 16-2 at CAR-000001.

additional countries included in the Travel Ban by Proclamation No. 10998 as "high-risk countries" and extended the December Memorandum's policy changes to those countries as well. *See* Dep't of Homeland Sec., USCIS, Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries, PM-602-0194 (Jan. 1, 2026); *see also* ECF No. 16-3 at CAR-000045–49. The January Memorandum clarified that the "hold" put in place by USCIS allowed for individual cases to proceed through processing, but that they otherwise preclude any final adjudication of those cases, such as an approval, denial, or dismissal of an application. *See* ECF No. 16-3 at CAR-000045 n.2. Curiously, the January Memorandum also specified that, among others, noncitizen athletes participating in the 2026 World Cup, the 2028 Summer Olympics, and other major sporting events "as determined by the Secretary of State," as well as their coaches, persons performing necessary support roles, and immediate relatives, were excepted from USCIS's adjudicative hold. *Id.* at CAR-000048–49.

As a justification for implementing its sweeping policy changes, USCIS cited the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting. *See* ECF No. 16-2 at CAR-000002, CAR-000006–07. According to the agency, these two incidents demonstrated "what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people." *Id.* at CAR-000002. USCIS stated that it adopted its policy changes to ensure that all individuals "from high-risk countries of concern that entered the United States [on or after January 20, 2021] do not present threats to national security or public safety." *Id.* The January Memorandum

provides that USCIS's policies "will remain in effect until lifted by the USCIS Director through a subsequent memorandum." *Id.* at CAR-000002–03.

### 5. USCIS Posts Updates on Its New Policies

On March 30, 2026, almost a month after Plaintiffs filed this lawsuit, USCIS posted an alert on its website (the "March 30th Alert"). *See* Dep't of Homeland Sec., USCIS, Update on USCIS' Strengthened Screening and Vetting (Mar. 30, 2026); *see also* ECF No. 21-2 at 2–4. The March 30th Alert purported to provide updates on some of the policies USCIS had implemented in its December and January Memoranda.

First, USCIS announced that it had resumed processing asylum applications for individuals from "non high-risk countries." ECF No. 21-2 at 3. USCIS also stated that, after a "comprehensive review by multiple offices," it had lifted holds on benefit requests for individuals "vetted through Operation PARRIS,[11] certain petitions filed by U.S. citizens, intercountry adoption forms, certain rescheduled oath ceremonies, statutory and regulatory decision issuance, refugee registrations for South African

[11] According to a declaration submitted to the Court by Andrew Good, Chief of USCIS's Office of Policy and Strategy, Operation PARRIS stands for "Post-Admission Refugee Reverification and Integrity Strengthening." ECF No. 21-1 at 3. Mr. Good avers that Operation PARRIS's aim is to "initiate[ ] additional background checks, re-interviews, and merit reviews of refugee claims" to "strengthen the ability of America's immigration system to screen out terrorists, criminal aliens, and other foreign nationals who pose potential threats to public safety or who have committed fraud or other crimes." *Id.*; *see also id.* at 3 n.4 (citing Dep't of Homeland Sec., U.S. Citizenship & Immigr. Servs., DHS Launches Landmark USCIS Fraud Investigation in Minnesota (Jan. 9, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-launches-landmark-uscis-fraud-investigation-in-minnesota [https://perma.cc/5GQX-HXG2]).

citizens/nationals, certain special immigrant visa petitions, [and] certain employment authorization documents." ECF No. 21-2 at 3.

Moreover, USCIS observed that the Travel Ban Countries it had deemed high-risk "lack[ed] adequate screening and vetting information," and that a review of its records showed that "prior [USCIS] screening and vetting measures were wholly inadequate." *Id.* at 2. USCIS explained that the holds on asylum adjudications and benefits requests would remain for individuals from the Travel Ban Countries to ensure that they "are properly vetted" and as a way of "protect[ing] national security, public safety, and root[ing] out fraud." *Id.*

The Government recently informed the Court of another update from USCIS. According to the Government, as of April 30, 2026, "USCIS has lifted the hold on applications associated with medical physicians" (the "April 30th Update").[12] ECF No. 26 at 1. As the Government explained, this change came "as a result of USCIS' internal review process for lifting holds on individual or group cases." *Id.*

### C. Plaintiffs and Their Claims

Plaintiffs are a coalition of nonprofit organizations and labor unions that represent and serve immigrant communities around the country. ECF No. 20-1 at 17. These groups include: Dorcas International Institute of Rhode Island ("Dorcas"), a

---

[12] In sharing the April 30th Update, the Government points the Court's attention to the same press release that accompanied USCIS's March 30th Alert. *See* ECF No. 26 at 1 (citing Dep't of Homeland Sec., USCIS, Update on USCIS' Strengthened Screening and Vetting, https://www.uscis.gov/newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting [https://perma.cc/48BZ-UWYF] (last updated Apr. 30, 2026)). In that release, USCIS states that "[h]olds have been lifted for . . . applications associated with medical physicians." *Id.*

nonprofit headquartered in Providence, Rhode Island; Refugee Dream Center ("RDC"), a nonprofit headquartered in Providence, Rhode Island; Service Employees International Union ("SEIU"), a labor union headquartered in Washington, D.C.; United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), a labor union headquartered in Detroit, Michigan; African Communities Together ("ACT"), a nonprofit headquartered in New York, New York; Venezuelan Association of Massachusetts ("VAM"), a nonprofit headquartered in Boston, Massachusetts; Partnership for the Advancement of New Americans ("PANA"), a nonprofit headquartered in San Diego, California; and American Gateways, a nonprofit headquartered in Austin, Texas. ECF No. 1 at 6–9.

Dorcas, RDC, and American Gateways have helped many clients obtain asylum, green cards, citizenship, and other immigration benefits, including individuals from Afghanistan, Burma, Burundi, Cote d'Ivoire, Cuba, Equatorial Guinea, Eritrea, The Gambia, Haiti, Iraq, Mali, Mauritania, Nigeria, the Republic of the Congo, Senegal, Somalia, South Sudan, Sudan, Syria, Tanzania, Togo, Venezuela, Zambia, and Zimbabwe. *See, e.g.*, ECF No. 20-1 at 20–25; ECF No. 20-2 at 7; ECF No. 20-3 at 6. These organizations collectively have thousands of clients whose applications for immigration benefits are indefinitely stalled due to USCIS's new policies. ECF No. 20-1 at 20–25.

Likewise, SEIU, UAW, VAM, ACT, and PANA each have members impacted by USCIS's policies. *Id.* at 25–27. Many of these members have applications for asylum, adjustment of status, employment authorization, visas, travel documents,

and humanitarian parole that remain unadjudicated because they are from countries subject to the Travel Ban, including individuals from Afghanistan, Burma, Cote d'Ivoire, Cuba, Haiti, Iran, Somalia, Sudan, and Venezuela. *See, e.g.*, ECF No. 20-1 at 25–27; ECF No. 20-4 at 9–10, 12–13; ECF No. 20-5 at 5; ECF No. 20-6 at 7–9; ECF No. 20-7 at 3–7; ECF No. 20-8 at 5–10.

Plaintiffs challenge four distinct policies implemented by USCIS (collectively, the "Challenged Policies") that they have categorized as follows:

**1. The Global Asylum Hold Policy**

First, Plaintiffs challenge USCIS's decision to halt all adjudications of requests for asylum and withholding of removal, regardless of the applicant's country of origin (the "Global Asylum Hold Policy"). *See* ECF No. 16-2 at CAR-000001–06. As of March 30, 2026, USCIS has announced on its website that it has resumed processing asylum applications for individuals from "non high-risk countries." ECF No. 21-2 at 3. However, USCIS has also previously stated that its policies "will remain in effect until lifted by the USCIS Director through a subsequent memorandum," ECF No. 16-2 at CAR-000002–03, and given that a posting on a website is not a memorandum from the USCIS Director, the Court therefore must assume that the Global Asylum Hold Policy remains in effect.

**2. The Benefits Hold Policy**

Second, Plaintiffs challenge USCIS's decision to place a hold on all adjudications of immigration benefit requests submitted by people from the Travel Ban Countries (the "Benefits Hold Policy"). *See* ECF No. 16-2 at CAR-000001–06.

Aside from applications for asylum and withholding of removal (which are already covered by the Global Asylum Hold Policy), Plaintiffs state that the Benefits Hold Policy extends to applications for immigration benefits, such as adjustment of status, employment authorization, and naturalization.

#### 3. The Comprehensive Re-Review Policy

Third, Plaintiffs challenge USCIS's policy of re-reviewing and reconsidering all of its previous decisions to approve immigration benefit requests for any individual from one of the Travel Ban Countries who entered the United States on or after January 20, 2021 (the "Comprehensive Re-Review Policy"). *See* ECF No. 16-2 at CAR-000001–06. Plaintiffs assert that the Comprehensive Re-Review Policy extends to approved requests for benefits, such as asylum, withholding of removal, adjustment of status, employment authorization, and naturalization.

#### 4. The Country-Specific Factors Policy

Fourth, Plaintiffs challenge USCIS's update to its Policy Manual, which directs USCIS personnel charged with processing discretionary benefit requests to consider "any relevant country-specific factors such as those specified in [the Travel Ban] as significant negative factors in the adjudication of discretionary benefit requests." ECF No. 16-1 at CAR-000073. USCIS explains that, while the Travel Ban's "categorical ineligibility for entry or admission does not apply" to benefits adjudications, USCIS may begin considering "on a case-by-case basis country-specific facts and circumstances" discussed in the Travel Ban "as a significant negative factor when making an individual assessment in weighing discretion." *Id.* at CAR-000023.

The agency also specifies that some of those "country-specific facts and circumstances" include but are not limited to "insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the countries identified in [the Travel Ban]." *Id.* at CAR-000073.

**D. Procedural Background**

Plaintiffs sued the Government on March 5, 2026. ECF No. 1. The parties later conferred and filed a joint motion, requesting that the Court consider their cross motions for summary judgment on an expedited schedule. *See* ECF No. 12. The Court granted that motion. *See* Text Order (Mar. 17, 2026).

In their Complaint, Plaintiffs initially sought to set aside the Challenged Policies for two reasons. ECF No. 1. Plaintiffs first claimed that the Challenged Policies violate the APA because they are contrary to law, arbitrary and capricious, and violative of notice-and-comment-procedures. *Id.* at 65–68. Plaintiffs also contended that the Challenged Policies violate the Fifth Amendment's Due Process and Equal Protection Clauses. *Id.* at 69–72.

Now, in their Motion for Summary Judgment, Plaintiffs specify that they do not seek summary judgment on their Fifth Amendment claims at this stage, but that they reserve the right to move for summary judgment—or for other forms of relief—on those claims later. ECF No. 20 at 1 n.2.

The Government, in its Cross-Motion for Summary Judgment, raises threshold jurisdictional, justiciability, and standing challenges to Plaintiffs' APA claims, *see* ECF No. 21 at 14–40, before going on to dispute the merits of those claims. *Id.* at 40–

53. The Government also argues that, by electing not to move for summary judgment on their Fifth Amendment claims, Plaintiffs have waived those claims in their entirety. *Id.* at 3 n.1. In the alternative, the Government has moved to dismiss Plaintiffs' constitutional claims. *Id.* at 53–56.

## II. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

As mentioned, the parties have cross-moved for summary judgment on Plaintiffs' APA claims. *See* ECF Nos. 20, 21. The Court addresses the Government's jurisdictional, justiciability, and standing challenges before turning to the merits of Plaintiffs' APA claims. But first, the Court recites the governing standard of review.

### A. Standard of Review

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (quoting *Ameen v. Amphenol Printed Cirs., Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020) (citing *Fadili v. Deutsche Bank Nat'l Tr. Co.*, 772 F.3d 951, 953 (1st Cir. 2014)).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). In this context, "a motion for summary judgment is simply a vehicle to tee up

a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Id.* In making this determination, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

**B. The Government's Jurisdictional, Justiciability, and Standing Challenges**

The Government raises a variety of jurisdictional, justiciability, and standing challenges. First, the Government claims that "[b]ecause the Challenged Policies implicate national security—and, thus, separation-of-powers concerns—they are not justiciable." ECF No. 21 at 14. Second, the Government contends that "[t]he INA strips the federal courts of judicial review of the Challenged Policies." *Id.* at 17. Third, the Government attacks Plaintiffs' APA claims as nonjusticiable "because adjudication of immigration benefits is committed to USCIS discretion." *Id.* at 22. Fourth, the Government asserts that the Challenged Policies are not final agency actions under the APA. *Id.* at 24. Fifth, the Government argues that Plaintiffs' claims are not ripe for review. *Id.* Sixth, and finally, the Government challenges Plaintiffs' two theories of standing. *Id.* at 29. The Court addresses each argument in turn.

**1. National Security Concerns Do Not Shield USCIS from Judicial Review**

The Government first argues that Plaintiffs' claims are nonjusticiable because the Challenged Policies rest on national security determinations the President made that are largely shielded from judicial review. ECF No. 21 at 14–17. The Government seems to suggest that, because the President has such considerable

authority over matters of national security and foreign policy, Executive Branch policies that touch on these matters are beyond the reach of federal courts. *See id.* at 14–15.

To be sure, in the immigration context specifically, the Supreme Court has recognized that the President's factual determinations as to matters of national security and foreign policy are entitled to judicial deference. *See Trump v. Hawaii*, 585 U.S. 667, 708 (2018) ("[T]he Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010))). It is not the role of a court to second-guess the effectiveness or wisdom of those determinations. *Id.* at 707–08 (citing *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Regan v. Wald*, 468 U.S. 222, 242–243 (1984)). This Court will not do that.

That said, simply because the Executive Branch invokes the talisman of national security with respect to its policies does not render those policies unreviewable. *See Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("[N]ational-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523, (1985))); *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017) (per curiam) (observing that "[t]here is no precedent to support" the Government's position that "the President's decisions about immigration policy, particularly when motivated by

national security concerns, are *unreviewable*" because this position "runs contrary to the fundamental structure of our constitutional democracy" (emphasis in original)).

To the contrary, courts routinely consider challenges to immigration policies—even where "national security concerns" are raised—simply to ensure that the Executive Branch has not exceeded the scope of its constitutional or statutory authority[13] in enacting such policies. *See, e.g.*, *Doe v. Trump*, No. 1:25-cv-13946-JEK, 2026 WL 1170971, at *10 n.14 (D. Mass. Apr. 30, 2026) ("Courts, of course, regularly review executive action that touches on matters of national security."); *Behdin v. Edlow*, No. 26-cv-00566-SVK, 2026 WL 1031079, at *11 (N.D. Cal. Apr. 16, 2026) (finding that the Government had "failed to establish any particularized national security interest that would shield from judicial review" USCIS's policy of placing a hold on the adjudication of noncitizens' work permit applications).

Ultimately, the question here is not whether the Court thinks it is wise for USCIS to place a hold on all applications for immigration benefits filed by individuals from Travel Ban Countries. Such an inquiry is best left to the political branches. *See Hawaii*, 585 U.S. at 707–08; *see also El-Shifa Pharm. Indus. Co. v. United States*, 607

[13] The Government seems to suggest that the Court can only review *constitutional* challenges "arising from matters of foreign policy and national security and in the context of immigration," and it cites *Trump v. Hawaii* as the lead case supporting that proposition. ECF No. 21 at 15 & n.10. The Government's reliance on that case is unconvincing, however. In *Hawaii*, the Supreme Court "assum[ed] without deciding" that it had jurisdiction over the plaintiffs' constitutional *and* statutory challenges to the travel ban implemented by the first Trump administration. 585 U.S. 667, 683 (2018); *see also Dep't of State v. Muñoz*, 602 U.S. 899, 908 n.4 (2024). This hardly stands for the idea that Plaintiffs' statutory challenges here are entirely unreviewable.

F.3d 836, 842 (D.C. Cir. 2010) ("[C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security.").

The question instead is whether USCIS has the legal authority to enact its Challenged Policies in the first place, which is a purely legal question that this Court is well-equipped to address. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (evaluating whether federal officials' "interpretation of [a] statute is correct" is "a familiar judicial exercise"); *Stark v. Wickard*, 321 U.S. 288, 310 (1944) ("The responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction.").

#### 2. The INA Does Not Strip the Court of Jurisdiction over Plaintiffs' Claims

##### a. The Court Can Review Plaintiffs' Adjustment of Status and Employment Authorization Claims

The Government next argues that two provisions of the INA, 8 U.S.C. § 1252(a)(2)(B)(i) and 8 U.S.C. § 1252(a)(2)(B)(ii), each strip the Court of jurisdiction over Plaintiffs' adjustment of status and employment authorization claims. ECF No. 21 at 17–20. The Court addresses each argument in turn.

Before doing so, however, it is important to recognize "a familiar principle of statutory construction" frequently invoked by the Supreme Court in cases involving immigration legislation, which is "the presumption favoring judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). The Supreme Court has "consistently applied" this presumption "to questions concerning the

preservation of federal-court jurisdiction," including in cases involving the statutory provisions at issue. *Id.* This presumption "can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (citations omitted). This is a helpful backdrop by which to adjudge the Government's jurisdiction-stripping arguments.

### i. Section 1252(a)(2)(B)(i) Does Not Bar Review

The first provision at issue here is Section 1252(a)(2)(B)(i), which provides that "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1255."[14] 8 U.S.C. § 1252(a)(2)(B)(i). Section 1255 specifically concerns adjustment of status claims. *See Kucana*, 558 U.S. at 239 n.2 (citing 8 U.S.C. § 1255).

Plaintiffs here challenge, among other things, USCIS's Benefits Hold Policy that placed a pause on the adjudication of adjustment of status claims for individuals from the Travel Ban Countries. *See* ECF No. 20-1 at 22, 24, 26, 27. However, according to the Government, "challenges to policies governing the adjudication of adjustment of status applications" fall within Section 1252(a)(2)(B)(i)'s jurisdictional bar and are therefore foreclosed. ECF No. 21 at 19.

As support, the Government cites the Supreme Court's recent decision in *Patel v. Garland*, 596 U.S. 328 (2022). In that case, the Court reasoned that Section

---

[14] Section 1252(a)(2)(B)(i) also bars review over other enumerated forms of immigration relief, such as waivers of inadmissibility, cancellation of removal, and voluntary departure. *See Kucana*, 558 U.S. at 239 n.2 (citing 8 U.S.C. §§ 1182(h), (i), 1229b, 1229c). These forms of relief are not at issue here.

1252(a)(2)(B)(i) "prohibits review of *any* judgment *regarding* the granting of relief under § 1255," including "any judgment *relating to* the granting of [discretionary] relief." *Patel*, 596 U.S. at 338–39, 347 (emphasis in original). As the Court held, this jurisdictional bar encompasses "factual findings," meaning that federal courts are precluded from reviewing "facts found as part of discretionary-relief proceedings." *Id.* at 339, 347.

The Government interprets this provision of the INA far too broadly. In the context of judicial review over immigration benefit determinations, the Supreme Court has long differentiated between the "direct review of individual denials" of applications and "general collateral challenges to [unlawful] practices and policies used by the agency in processing applications." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (distinguishing between challenges to "the denial of any individual application" and challenges to the "legality of a regulation"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 213 (1994) (describing *McNary* as permitting "broad 'pattern and practice' challenges" despite an INA provision "expressly limiting judicial review of individual . . . determinations"). The former describes, for instance, "a single act," whereas the latter generally refers to "a group of decisions or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 492.

The most natural reading of Section 1252(a)(2)(B)(i) is that it bars review only over "a single act of granting or denying an individual application for relief," but that it does not preclude "collateral actions challenging general policies and procedures."

*Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1004, 1009 (9th Cir. 2024); *see also Garcia v. U.S. Citizenship & Immigr. Servs.*, 146 F.4th 743, 749 (9th Cir. 2025). A quick primer on statutory interpretation shows why this is so.

First, Section 1252(a)(2)(B)(i)'s "reference to 'the granting of relief under [Section 1255]' more likely describes a single act of granting or denying an individual application for relief" because "a policy or procedure would not typically 'grant' relief without case-specific adjudication." *Nakka*, 111 F.4th at 1004.

Second and relatedly, Section 1252(a)(2)(B)'s heading is entitled "Denials of discretionary relief," which "suggests that § 1252(a)(2)(B)(i)'s reference to 'any judgment regarding the granting of relief' refers to the adjudication of individual applications for relief." *Nakka*, 111 F.4th at 1004; *see Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[S]tatutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of a statute.'" (quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002))).

Third, and perhaps most significant, is that Section 1252(a)(2)(B)(i), unlike neighboring provisions of the statute, does not expressly strip courts of jurisdiction over agency policies and procedures.[15] *See Nakka*, 111 F.4th at 1005–06 ("Because Congress explicitly stripped jurisdiction to review agency . . . policies and procedures

[15] *Contrast* 8 U.S.C. § 1252(a)(2)(A)(iv) ("[N]o court shall have jurisdiction to review . . . *procedures and policies adopted by the Attorney General* to implement the provisions of section 1225(b)(1) of this title." (emphasis added)), *with* 8 U.S.C. § 1252(a)(2)(B)(i) ("[N]o court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title.").

in § 1252(a)(2)(A)(iv) but not in § 1252(a)(2)(B)(i), we presume that Congress did not intend for the latter provision to preclude review of agency policies and procedures."). This choice of words is not insignificant. *See Nken v. Holder*, 556 U.S. 418, 430 (2009) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987))).

Plaintiffs here, of course, are not challenging USCIS's individual denials of adjustment of status applications. They instead lodge a categorical attack on the agency's Benefits Hold Policy that prevents the adjudication of adjustment of status applications. *See Nakka*, 111 F.4th at 1004, 1009; *Garcia*, 146 F.4th at 749. In recent months, other district courts around the country addressing similar challenges to USCIS's policies have concluded that Section 1252(a)(2)(B)(i) does not foreclose these types of categorical attacks. *See, e.g.*, *Doe*, 2026 WL 1170971, at *8 (holding that Section 1252(a)(2)(B)(i)'s "text and context demonstrate that it does not extend to collateral attacks on agency policies and procedures"); *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 485490, at *7 (N.D. Cal. Feb. 20, 2026) (concluding that 1252(a)(2)(B)(i) does not strip the court of its jurisdiction over USCIS's failure to adjudicate adjustment of status applications). This Court reaches the same conclusion and holds that Section 1252(a)(2)(B)(i) does not deprive it of jurisdiction over Plaintiffs' adjustment of status claims.

### ii. Section 1252(a)(2)(B)(ii) Does Not Bar Review

The Court turns its attention next to Section 1252(a)(2)(B)(ii). This provision is "a catchall provision" that applies to "decisions of the same genre" as in Section 1252(a)(2)(B)(i). *Kucana*, 558 U.S. at 247. It specifically bars review of "any other decision or action . . . for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a)[16] of this title." 8 U.S.C. § 1252(a)(2)(B)(ii). "'[T]his subchapter' refers to Title 8, Chapter 12, Subchapter II, of the United States Code, codified at 8 U.S.C. §§ 1151–1381 and titled 'Immigration.'" *Kucana*, 558 U.S. at 239 n.3.

This time, the Government asserts that USCIS's decisions over whether to grant employment authorization or adjustment of status are "discretionary judgments," and that Section 1252(a)(2)(B)(ii) therefore precludes review over any challenge to the adjudication of those forms of relief. *See* ECF No. 17–20. Again, the Court is not persuaded by the Government's interpretation of the statute.

As many courts have held, Section 1252(a)(2)(B)(ii)—much like Section 1252(a)(2)(B)(i)—bars judicial review of orders denying discretionary benefits in *individual cases*, but the statute does not foreclose *categorical* challenges to agency policies and procedures concerning the adjudication of those benefits. *See, e.g.*, *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 630–31 (D.C. Cir. 2020); *Miot v. Trump*, 818 F.

---

[16] Section 1158 concerns applications for asylum, but the Supreme Court has recognized that asylum applicants do not fall under Section 1252(a)(2)(B)(ii)'s jurisdictional bar. *See Kucana*, 558 U.S. at 247 n.13.

Supp. 3d 126, 157 (D.D.C. 2026); *Varniab*, 2026 WL 485490, at *7; *Bowser v. Noem*, No. 26-cv-10382-AK, 2026 WL 555624, at *3 (D. Mass. Feb. 27, 2026); *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at *8 (D. Mass. May 12, 2023); *Doe 1 v. Mayorkas*, 530 F. Supp. 3d 893, 909 (N.D. Cal. 2021); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C. 2018). There are several reasons as to why this is so.

Start first with the statutory text. As mentioned in the Court's discussion of Section 1252(a)(2)(B)(i), the natural reading of Section 1252(a)(2)(B)(ii)'s title, "Denials of discretionary relief," suggests that Congress meant to strip courts of jurisdiction over *individual* denials of discretionary relief. *See Make the Rd. N.Y.*, 962 F.3d at 629. This view is supported by the Supreme Court's decision in *Nasrallah v. Barr* in which it described Section 1252(a)(2)(B) "as barring judicial review of 'challenges to *orders denying discretionary relief*,'" including adjustment of status claims. *Id.* at 629–30 (emphasis in original) (quoting *Nasrallah*, 590 U.S. 573, 586 (2020)).

It is further supported by the final portion of Section 1252(a)(2)(B)(ii)'s text, which "explicitly carves out from the jurisdictional bar another type of discretionary substantive relief from removal for individuals—asylum claims." *Id.* at 629; *see* 8 U.S.C. § 1252(a)(2)(B)(ii) (excluding "the granting of relief under section 1158(a) of this title" from the prohibition on judicial review). The phrase "granting of relief" indicates that Congress was referring to the single act of granting an individual claim for asylum. *See Make the Rd. N.Y.*, 962 F.3d at 629. It would be an odd result if the

statute were to instead refer to the "granting of relief" of a policy or procedure. *Id.*; *see also Nakka*, 111 F.4th at 1004.

The Supreme Court's decision in *Kucana v. Holder* is also informative. That case teaches that Section 1252(a)(2)(B)(ii)'s jurisdictional bar applies only to agency determinations made discretionary *by statute*, and not to determinations declared discretionary by the agency itself. *See Kucana*, 558 U.S. at 249–52. *Kucana* dealt directly with a regulation promulgated by the Attorney General, which placed the decision whether to grant a motion to reopen removal proceedings within the Attorney General's discretion. *Id.* at 242 (citing 8 C.F.R. § 1003.2(a)). Notably, no statute codified or otherwise specified that reopening decisions were in the Attorney General's discretion. *Id.* at 242–43. The Supreme Court thus held that the Attorney General could not insulate himself from judicial review simply by declaring a decision discretionary. *Id.* at 247. Rather, Congress itself had to make that decision "discretionary by legislation" for the Attorney General to benefit from Section 1252(a)(2)(B)(ii)'s bar on judicial review. *Id.*

That same reasoning holds true here. In this case, USCIS did not promulgate a regulation specifying that the decision to place a hold on the adjudication of immigration benefits was within the agency's discretion. Instead, the agency issued a series of Policy Memoranda in which USCIS purported to give itself this discretionary authority. *See* ECF No. 16-2 at CAR-000002 ("This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum. Any

requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.").

Thus, for the purposes of Section 1252(a)(2)(B)(ii), the question is: Has Congress passed any legislation conferring USCIS with the discretionary authority to place a hold on the adjudication of adjustment of status and employment authorization applications? *See Kucana*, 558 U.S. at 249–52. If the answer is "yes," then Section 1252(a)(2)(B)(ii)'s jurisdictional bar applies. *Id.*

The Government proposes that two statutes contained within Subchapter II—8 U.S.C. §§ 1255(a) and 1324a—confer such authority to USCIS. ECF No. 21 at 19, 20 n.14. A close review of those statutes suggests otherwise. Section 1255(a), for instance, provides that "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the [DHS Secretary],[17] in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). As Judge Julia E. Kobick of the District of Massachusetts recently explained, this statute does not, "by its terms, confer[ ] discretion to issue policies placing on hold all applications for adjustment of status . . . by noncitizens from particular countries." *Doe*, 2026 WL 1170971, at *9. "Section 1255(a) does afford the [DHS Secretary] significant discretion to adjust the status of '*an* alien who was inspected and admitted or paroled into the United States,'

[17] Although Section 1255(a) refers to the Attorney General here, Congress has since transferred the authority over adjustment of status adjudications to the DHS Secretary. *See* 6 U.S.C. § 271(b); 8 U.S.C. 1103(a).

but that language refers to a particular alien, not *all* noncitizens from an entire country." *Id.* (emphasis in original) (quoting 8 U.S.C. § 1255(a)).

As for Section 1324a, this statute makes it unlawful to employ "an unauthorized alien," which is defined as a noncitizen who has not been "lawfully admitted for permanent residence" or "authorized to be so employed by this chapter or by the [DHS Secretary]."[18] 8 U.S.C. §§ 1324a(a), (h)(3). As in Judge Kobick's case, the Government does not explain here how Section 1324a confers "discretion to indefinitely put on hold all work authorization applications or view such applications negatively based on country of origin." *Doe*, 2026 WL 1170971, at *9. The Government briefly cites to *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 664 F. Supp. 3d 143, 148–52 (D.D.C. 2023), which references Section 1324a. *See* ECF No. 21 at 20. However, that case cuts against the Government's own argument. The district court in that case stated as follows: "'[S]ection 1324a(h)(3) expressly acknowledges that employment authorization need not be specifically conferred by statute; it can also be granted by regulation, as it has been' here." *Save Jobs USA*, 664 F. Supp. 3d at 150 (quoting *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 191–92 (D.C. Cir. 2022)). That the source for conferring employment authorization is derived from regulation as opposed to statute would mean that employment authorization decisions are *not* subject to Section 1252(a)(2)(B)(ii)'s jurisdictional bar. *See Kucana*, 558 U.S. at 248.

---

[18] Like Section 1255(a), Section 1324a refers to the Attorney General, but Congress has also transferred this authority to the DHS Secretary. *See* 6 U.S.C. § 271(b); 8 U.S.C. 1103(a).

Thus, the Government "has not identified any sound basis on which to conclude that 'Congress itself set out [USCIS's] discretionary authority' for the adjudicative hold . . . polic[y] 'in the statute[s]' that govern adjustment of status and work authorization." *Doe*, 2026 WL 1170971, at *9 (quoting *Kucana*, 558 U.S. at 247).

As a last-ditch effort to salvage its jurisdiction-stripping argument, the Government relies on cases from multiple federal courts of appeals concerning USCIS's "visa retrogression policy." *See* ECF No. 21 at 19 n.13 (citing *Kale v. Alfonso-Royals*, 139 F.4th 329, 331 (4th Cir. 2025); *Geda v. Dir. U.S. Citizenship & Immigr. Servs.*, 126 F.4th 835 (3d Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 390 (5th Cir. 2024); *Thigulla v. Jaddou*, 94 F.4th 770 (8th Cir. 2024); *Kanapuram v. Dir., U.S. Citizenship & Immigr. Servs.*, 131 F.4th 1302, 1309 (11th Cir. 2025)).

For context, USCIS has promulgated regulations specifying that an applicant is ineligible for adjustment of status "unless an immigrant visa is immediately available to him or her at the time the application is filed," and that applications for permanent resident status "shall not be approved until an immigrant visa number has been allocated by the Department of State." 8 C.F.R. §§ 245.1(g)(1), 245.2(a)(5)(ii). In addition, Congress has imposed statutory caps on how many visas will be awarded each year. *See Gupta v. Jaddou*, 118 F.4th 475, 479 (1st Cir. 2024) (citing 8 U.S.C. §§ 1151, 1152, 1153). Thus, "visa retrogression" occurs when the demand for visas is higher than forecasted by USCIS, and there are more applicants than available visas. *See* 8 C.F.R. § 245.2(a)(5)(ii); *see also Kale*, 139 F.4th at 332–33. If a visa is not available, then USCIS has adopted an "Adjudication Hold

Policy" in which it holds applications for adjustment of status in abeyance until a visa becomes available. *See id.* at 333.

Several noncitizens, many of whom have grown tired of waiting for their visas, have filed suits challenging USCIS's visa retrogression policy. However, the courts of appeals have almost uniformly held that Section 1252(a)(2)(B)(ii) bars jurisdiction over these challenges, because that policy is committed to agency discretion by Section 1255(a). *See Kale*, 139 F.4th at 334–36; *Kanapuram*, 131 F.4th at 1306–08; *Geda*, 126 F.4th at 844; *Cheejati*, 106 F.4th at 394–95; *Thigulla*, 94 F.4th at 774–77.[19] Thus, the Government argues that, just as USCIS's visa retrogression policy is subject to Section 1252(a)(2)(B)(ii)'s jurisdictional bar, so too are the Challenged Policies at issue here because "[t]here is no principled, analytical distinction" between the two policies. ECF No. 21 at 19 n.13.

Not so. In fact, a few district courts have already identified several important distinctions between the visa retrogression policy and the Challenged Policies. For one thing, "Section 1255(a) expressly grants the executive branch discretion to promulgate 'such regulations as [it] may prescribe' regarding adjustment of status applications, and the retrogression policy, embodied in USCIS's regulations, is the

---

[19] The Government argues that the First Circuit's decision in *Gupta v. Jaddou*, 118 F.4th 475 (1st Cir. 2024), also precluded consideration of USCIS's visa retrogression policy under Section 1252(a)(2)(B)(ii)'s jurisdictional bar. *See* ECF No. 21 at 20. But that is inaccurate. In *Gupta*, the First Circuit declined to address the jurisdictional argument under Section 1252(a)(2)(B)(ii), and it assumed without deciding that there were "no statutory bars to [its] exercise of jurisdiction." 118 F.4th at 482; *see also Kanapuram*, 131 F.4th at 1307 n.2 ("The First Circuit also issued a similar merits-based decision without addressing jurisdiction." (citing *Gupta*, 118 F.4th at 482–87)).

exercise of that discretion conferred by Congress." *Doe*, 2026 WL 1170971, at *9; *see* 8 C.F.R. § 245.2(a)(5)(ii). Here, by contrast, none of the Challenged Policies were promulgated as regulations by USCIS, nor does Section 1255(a) by its terms grant USCIS the discretion to cease adjudicating adjustment of status applications altogether. *See Doe*, 2026 WL 1170971, at *9. Moreover, whereas the visa retrogression policy places adjustment applications on hold until a condition precedent is satisfied (i.e., the availability of a visa), there is no identified "condition precedent" for the hold at issue in this case and thus no definite end point for when the hold is expected to end. *See Varniab*, 2026 WL 485490, at *7.

Finally, the Court would be remiss if it did not mention that, for the last twenty years, the vast majority of district courts within the First Circuit have recognized that Section 1252(a)(2)(B)(ii) does *not* insulate DHS from its "failure to act" on immigration benefit applications. *See, e.g.*, *Bowser*, 2026 WL 555624, at *4; *Roe*, 2023 WL 3466327, at *8; *Zhou v. Fed. Bureau of Investigation*, No. 07-cv-238-PB, 2008 WL 2413896, at *4 (D.N.H. June 12, 2008); *Abdi v. Chertoff*, 589 F. Supp. 2d 120, 121 (D. Mass. 2008); *Vorontsova v. Chertoff,* No. 07-10426-RGS, 2007 WL 3238026, at *2 (D. Mass. Nov. 2, 2007); *Aziz v. Chadbourne,* No. 07-11806-GAO, 2007 WL 3024010, at *2 (D. Mass. Oct. 15, 2007). "[W]hile it is undisputed that the substance of the [DHS Secretary's] decision is discretionary, he does not have discretion to decide not to adjudicate at all." *Tang v. Chertoff*, 493 F. Supp. 2d 148, 154 (D. Mass. 2007).

All these reasons counsel in favor of finding that Section 1252(a)(2)(B)(ii) does not strip the Court of jurisdiction over Plaintiffs' adjustment of status or employment authorization claims.

#### b. The Court Can Review Plaintiffs' Naturalization Claims

The Government also contends that other provisions of the INA, 8 U.S.C. § 1421(c) and 8 U.S.C. § 1447(b), preclude judicial review over Plaintiffs' naturalization claims. ECF No. 21 at 20–22. Section 1421(c) provides that "[a] person whose application for naturalization under this subchapter is denied . . . may seek review of such denial before the United States district court for the district in which such person resides . . . ." 8 U.S.C. § 1421(c). And Section 1447(b) provides that "[i]f there is a failure to make a determination" on a naturalization application within 120 days, then "the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter." 8 U.S.C. § 1447(b).

According to the Government, these statutes highly circumscribe when courts may intervene in naturalization adjudications. ECF No. 21 at 20. The Government essentially argues that judicial review may be sought only when: (1) USCIS has denied a naturalization application; or (2) USCIS fails to render a decision within 120 days after the applicant's examination. *Id.* at 20–21.

This argument falls flat for the same reasons as the Government's other jurisdiction-stripping arguments. First, neither statute expressly prohibits judicial review over the type of categorical challenge that Plaintiffs bring against USCIS's

general policy of placing a hold on adjudications of naturalization applications. *See McNary*, 498 U.S. at 492 (1991); *Cath. Soc. Servs., Inc.*, 509 U.S. at 56.

Rather, the statutes upon which the Government relies are written in individualized terms: "*A person* whose application for naturalization under this subchapter is denied . . . may seek review of such denial before the United States district court for the district in which *such person* resides . . . ." 8 U.S.C. § 1421(c) (emphasis added); *see also* 8 U.S.C. § 1447(b) ("If there is a failure to make a determination . . ., *the applicant* may apply to the United States district court for the district in which *the applicant* resides for a hearing on the matter." (emphasis added)).

As the Supreme Court has instructed, "Congress' choice of words is presumed to be deliberate." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013); *see also King v. Burwell*, 576 U.S. 473, 492 (2015) (observing that a "fundamental canon of statutory construction" is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 320 (2014))). As relevant here, the text of Sections 1421(c) and 1447(b) appears to constrain review of individual claims regarding agency denials of, or delays in processing, naturalization applications. It does not proscribe Plaintiffs' categorical challenge to USCIS's policy of halting the adjudication of naturalization applications altogether.

The Government advances another argument in support of its position, which pertains to 8 C.F.R. § 335.2(b). ECF No. 21 at 21–22. That regulation provides that

USCIS may not conduct a naturalization examination until the Federal Bureau of Investigation ("FBI") has completed a background check on the applicant. *See* 8 C.F.R. § 335.2(b); *see also* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Pub. L. No. 105-119, 111 Stat. 2440, 2448–49 (1997) (creating obligation that "none of the funds appropriated or otherwise made available to [USCIS][20] shall be used to complete adjudication of an application for naturalization unless [USCIS] has received confirmation from the [FBI] that a full criminal background check has been completed"). The Government contends that, "where delays are attributable to the completion of required background and security checks," courts lack jurisdiction to order USCIS to process naturalization applications. ECF No. 21 at 22.

To be sure, many courts have recognized that they cannot order USCIS to act on a naturalization application until the FBI has completed its background check on the applicant. *See, e.g.*, *Nguyen v. Gonzalez*, No. H-07-0048, 2007 WL 713043, at *2 (S.D. Tex. Mar. 6, 2007); *Manzoor v. Chertoff*, 472 F. Supp. 2d 801, 808–09 (E.D. Va. 2007); *Antonishin v. Keisler*, 627 F. Supp. 2d 872, 879 (N.D. Ill. 2007); *Zaytsev v. Gantner*, No. 04 Civ.7101 WHP, 2004 WL 2251665, at *1 (S.D.N.Y. Sept. 24, 2004).

[20] This law originally referenced the Immigration and Naturalization Service ("INS"), which was a federal government agency that Congress disbanded with the Homeland Security Act of 2002. *See* Pub. L. No. 107-296, § 451(a)(1), 116 Stat. 2135, 2195 (codified at 6 U.S.C. § 271(a)(1)). Many of INS's functions were transferred to USCIS, as well as Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP").

The problem for the Government, however, is that the delays here are *not* because of the FBI's background checks on naturalization applicants. Nowhere in the administrative record does the Government even mention the FBI. Instead, the record makes clear that USCIS itself is the one conducting investigations into applicants. *See* ECF No. 16-2 at CAR-000003 ("USCIS has determined the operational necessity to ensure that . . . aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States."); *see also* ECF No. 16-3 at CAR-000047 (same).

As such, where USCIS is the one conducting the background and security checks into naturalization applicants, it does not follow that the Government gets to invoke 8 C.F.R. § 335.2(b) to shield the agency from judicial review. That regulation contemplates a pending *FBI* background investigation, not a pending *USCIS* investigation. *See* 8 C.F.R. § 335.2(b).

So, neither the INA nor its accompanying regulations strip the Court of jurisdiction over Plaintiffs' naturalization claims.

**3. USCIS's Actions Are Not Committed to Agency Discretion By Law**

The Government also contends that USCIS's actions are unreviewable because they are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). ECF No. 21 at 22–24. In general, the APA "establishes a 'basic presumption of judicial

review [for] one suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). This presumption can be rebutted by showing that the challenged "action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Regents*, 591 U.S. at 17.

However, the Supreme Court has long construed Section 701(a)(2)'s exception to reviewability "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)); *see also Heckler v. Chaney*, 470 U.S. 821, 838 (1985) (citing *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402 (1971)). It applies only to "those rare administrative decisions traditionally left to agency discretion," *Regents*, 591 U.S. at 17 (cleaned up), or "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Dep't of Com.*, 588 U.S. at 772 (cleaned up).

Here, the Government seems to be invoking the second circumstance in which Section 701(a)(2)'s exception applies. The Government argues that Congress has drawn the relevant statutes governing adjustment of status, employment authorization, naturalization, and asylum in such a way that they are precluded from review under Section 701(a)(2). *See* ECF No. 21 at 22–23.[21] "To determine if the

[21] The Government also argues that "for the same reasons that adjustment of status and employment authorization matters are also not reviewable under § 1252(a)(2)(B), they are likewise precluded from review under § 701(a)(2) of the APA." ECF No. 21 at 23. It would appear that the Government meant to invoke 5 U.S.C. § 701(a)(1) because that provision renders review of agency action unavailable

relevant statutes are so drawn, the Court must carefully examine 'each statute on which the claim of agency illegality is based' and the challenged regulatory framework." *Doe*, 2026 WL 1170971, at *10 (quoting *Webster v. Doe*, 486 U.S. 592, 600 (1988)). If there are "appropriate, 'judicially manageable standards' for evaluating the [Government's] actions," then those actions are reviewable under the APA. *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 53 (1st Cir. 2025) (quoting *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 21 (1st Cir. 2020)).

Because the Challenged Policies touch on the adjudication of adjustment of status, employment authorization, naturalization, and asylum claims, the Court addresses each of the statutes and regulations governing these forms of relief.

#### a. Plaintiffs' Adjustment of Status Claims Are Not Committed to Agency Discretion By Law

Adjustment of status claims are primarily governed by 8 U.S.C. § 1255(a). Through this provision, Congress has granted the DHS Secretary, "in his discretion and under such regulations as he may prescribe," the authority to adjust a noncitizen's status to "lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). Congress has also set clear parameters that an applicant must meet to be eligible for adjustment of status: (1) the noncitizen must apply for adjustment of status; (2) the noncitizen must be eligible to receive an immigrant visa and must be admissible to the United States for permanent residence; and (3) an immigrant visa

---

where "*statutes* preclude judicial review." *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 n.4 (1st Cir. 2020) (emphasis added) (citing 5 U.S.C. § 701(a)(1)). In any event, this particular argument is unavailing because the Court has determined that Plaintiffs' adjustment of status and employment authorization claims are *not* precluded by Section 1252(a)(2)(B).

must be immediately available to the noncitizen at the time his application is filed. *See id.*

USCIS has in turn issued a panoply of regulations governing how the adjustment of status process is supposed to play out. *See, e.g.*, 8 C.F.R. § 245.1(a) (describing who is eligible to adjust status); 8 C.F.R. § 245.2(a) (describing how an application for adjustment of status is filed); 8 C.F.R. § 245.6 (describing the interview process for applicants for adjustment of status); 8 C.F.R. § 245.2(a)(5)(i) (requiring that applicants "shall be notified of the decision of the director and . . . the reasons for [any] denial"). "The regulations contemplate that USCIS will accept, review, and adjudicate adjustment of status applications." *Doe*, 2026 WL 1170971, at *11.

Given this detailed statutory and regulatory scheme, adjustment of status is not one of "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772. Both the INA and USCIS's "own regulation[s] provide[ ] more than enough 'law' by which a court could review" the agency's decision to place a hold on adjudications. *Haoud v. Ashcroft*, 350 F.3d 201, 206 (1st Cir. 2003). Thus, there is ample law to apply in determining whether the application of the Challenged Policies to applicants for adjustment of status comports with the APA. *Id.*; *see also Doe*, 2026 WL 1170971, at *11.

**b. Plaintiffs' Employment Authorization Claims Are Not Committed to Agency Discretion By Law**

Congress has prohibited noncitizens from working without obtaining employment authorization. *See* 8 U.S.C. § 1324a. Under the INA, a noncitizen may work if they are "lawfully admitted for permanent residence," or if they are otherwise "authorized to be so employed by this chapter or by the [DHS Secretary]." 8 U.S.C. § 1324a(h)(3).

USCIS has also promulgated regulations pertaining to employment authorization. *See, e.g.*, 8 C.F.R. § 274a.12 (describing the classes of noncitizens "authorized to accept employment"); 8 C.F.R. § 274a.13(a) (describing how an application for employment authorization is filed); 8 C.F.R. § 274a.13(b), (c) (requiring that an applicant be notified of an approval or a denial of their application and, if denied, the reason(s) for that denial). There is also a regulation specifying eligibility criteria and timelines for adjudicating employment authorization applications made by asylum applicants. *See* 8 C.F.R. § 208.7(a).

This too is "more than enough law" to facilitate review of USCIS's decision to halt adjudications of employment authorization applications. *See Haoud*, 350 F.3d at 206; *Doe*, 2026 WL 1170971, at *11–12.

**c. Plaintiffs' Asylum and Withholding of Removal Claims Are Not Committed to Agency Discretion By Law**

Congress, through the INA, has codified a statutory right to apply for asylum. *See* 8 U.S.C. § 1158(a); *see also* 8 U.S.C. §§ 1225(b)(1)(A), 1229a(c)(4) (permitting individuals in removal proceedings—whether regular or expedited—to apply for asylum as a defense against removal). It has also codified a right to apply for

withholding of removal under the INA, as well as under the Convention Against Torture ("CAT"). *See* 8 U.S.C. § 1231(b)(3)(A); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681–822 (1998) (codified as 8 U.S.C. § 1231 note).

There are several statutory requirements that Congress has set out for these forms of relief. For instance, an applicant must qualify as a "refugee," which is defined as someone who is "unable or unwilling to return to, and is unable or unwilling to avail [themselves] of the protection of" their country of origin (or the last country where they resided) "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also* 8 U.S.C. § 1158(b)(1)(A) (authorizing immigration officials to grant asylum if the noncitizen is "a refugee within the meaning of" the INA).[22] And withholding of removal is available

---

[22] The relevant statute provides that either "[t]he Secretary of Homeland Security or the Attorney General may grant asylum." *See* 8 U.S.C. § 1158(b)(1)(A). More precisely, USICIS, which is a branch of DHS, generally has "initial jurisdiction" over affirmative asylum applications, that is, applications for asylum by individuals who are not in removal proceedings. *See* 8 C.F.R. § 208.2(a)(1). If wishing to affirmatively apply for asylum (as well as withholding of removal and CAT protection), the applicant files a Form I-589 with USCIS. *See* 8 C.F.R. § 208.3(a)(1). If the applicant meets the eligibility criteria, then "an asylum officer, subject to review within USCIS," may grant the application "in the exercise of his or her discretion." 8 C.F.R. § 208.14(b). However, if the applicant "appears to be inadmissible or deportable," then the asylum officer must refer the application to an immigration judge ("IJ") "for adjudication in removal proceedings." 8 C.F.R. § 208.14(c)(1). IJs are appointed by the Attorney General. *See* 8 C.F.R. § 1003.10(a). A separate process governs those who apply for defensive asylum because they are in removal proceedings, which is a matter primarily adjudicated by IJs. *See* 8 C.F.R. §§ 1003.42, 1208.30, 208.30.

to those who can show that their "life or freedom would be threatened in [their country of origin] because of" their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 U.S.C. § 1231 note (providing CAT protections to those who demonstrate a risk of torture in their countries of origin).

With respect to Plaintiffs' asylum claims, the Government argues that these claims are unreviewable because Congress has left "the timing and manner of adjudication to agency discretion." ECF No. 21 at 23. Not so. Congress has in fact specified that, "in the absence of exceptional circumstances" and "not including administrative appeal," a final adjudication of an asylum application "*shall* be completed within 180 days after the date an application is filed." 8 U.S.C. § 1158(d)(5)(A)(iii) (emphasis added). Of course, "[u]nlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016). The Supreme Court has spoken in even stronger terms about the lack of discretion involved in withholding of removal claims: "[T]he Attorney General has *no discretion* to deny relief to a noncitizen who establishes his eligibility [for withholding of removal]." *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) (emphasis added).

Again, this constitutes "more than enough law" to provide for the review of USCIS's decision to suspend adjudications of asylum and withholding of removal applications. *See Haoud*, 350 F.3d at 206; *Doe*, 2026 WL 1170971, at *12.

### d. Plaintiffs' Naturalization Claims Are Not Committed to Agency Discretion By Law

Through the INA, Congress has also set forth the process by which individuals can apply for naturalization and become U.S. citizens. *See, e.g.*, 8 U.S.C. § 1421(a) (describing that naturalization authority belongs with USCIS[23]); 8 U.S.C. § 1427 (describing requirements for naturalization); 8 U.S.C. § 1429 (describing applicant's prerequisites to naturalization and burden of proof they must meet); 8 U.S.C. § 1446(a) (requiring applicants for naturalization to undergo a "personal investigation," unless USCIS waives it); 8 U.S.C. § 1446(b) (requiring USCIS to "designate employees . . . to conduct examinations upon applications for naturalization," and directing those employees to "make a determination as to whether the application should be granted or denied, with reasons therefor").

USCIS has also issued many regulations concerning the four-step naturalization process. *See, e.g.*, 8 C.F.R. §§ 334.2, 316.4, 316.10 (describing the first step, which is to submit application materials, which include fingerprints, criminal background information, and information reflecting good moral character); 8 C.F.R. § 335.2(b) (describing the second step, which is an FBI background check into the applicant); 8 C.F.R. §§ 332.1(a), 335.2(a) (describing the third step, which is an examination of the applicant by USCIS); 8 C.F.R. §§ 310.3(a), 337.1(a), 338.1(a) (describing the fourth step, which is the applicant's participation in a naturalization

---

[23] Though the statute provides that naturalization authority is granted the "Attorney General," *see* 8 U.S.C. § 1421(a), "[t]hrough delegation, the Attorney General's authority over naturalization now is exercised by USCIS." *McKenzie v. U.S. Citizenship & Immigr. Servs., Dist. Dir.*, 761 F.3d 1149, 1153 (10th Cir. 2014) (citing 8 C.F.R. §§ 2.1, 310.1(b); 6 U.S.C. § 271(b)(2)).

ceremony at which they take the Oath of Allegiance and receive a Certificate of Naturalization).

The Government contends that this particular scheme "confirm[s] the breadth of the agency's discretion with respect to naturalization" and avers that "naturalization is not a right, but a privilege available only upon strict compliance with all statutory prerequisites." ECF No. 21 at 24. Interestingly, the cases that the Government cites in support of this proposition, *United States v. Ginsberg*, 243 U.S. 472, 474–75 (1917), and *Fedorenko v. United States*, 449 U.S. 490, 506 (1981), involve *denaturalization* proceedings. *Id.* Contrary to the Government's point, these cases confirm that naturalization *is* a right that individuals must be afforded, if they satisfy the statutory prerequisites. *See Ginsberg*, 449 U.S. at 476 ("No alien has the slightest *right* to naturalization *unless* all statutory requirements are complied with[.]" (emphasis added)); *Fedorenko*, 449 U.S. at 505 ("[O]ur decisions have recognized that the *right* to acquire American citizenship is a precious one[.]" (emphasis added)).

The text of USCIS's own regulation also makes clear that naturalization is a form of nondiscretionary relief: "USCIS *shall* grant the [naturalization] application if the applicant has complied with all requirements for naturalization under this chapter." 8 C.F.R. § 335.3(a) (emphasis added); *see Kingdomware Techs., Inc.*, 579 U.S. at 171. And, like the asylum statute, this regulation specifies a time period by which decisions must be rendered: "A decision to grant or deny the [naturalization] application *shall* be made at the time of the initial examination or within 120–days

after the date of the initial examination of the applicant for naturalization under § 335.2." 8 C.F.R. § 335.3(a) (emphasis added).

What is more, both the INA and USCIS's regulations contemplate judicial review over certain naturalization claims. For instance, if a naturalization determination is not made "before the end of the 120-day period after the date on which the examination is conducted," the INA provides district courts with jurisdiction to "either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter." 8 U.S.C. § 1447(b); *see also* 8 C.F.R. § 310.5(a). And an applicant whose naturalization application is denied may also seek review of that denial in the district court after a hearing before an immigration officer. *See* 8 U.S.C. § 1421(c); *see also* 8 C.F.R. §§ 310.5(b), 336.9.

Here, too, then there is "more than enough law" to allow for judicial review of USCIS's decision to halt adjudications of naturalization applications. *See Haoud*, 350 F.3d at 206; *Doe*, 2026 WL 1170971, at *13–14.

**4. USCIS's Actions Constitute Final Agency Action**

The Government alternatively argues that the Court cannot review Plaintiffs' claims because USCIS's actions are not final agency action. ECF No. 21 at 24–28. As a threshold matter, agency action is reviewable under the APA only if it is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "[T]he word 'action' . . . is meant to cover comprehensively every manner

in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citing *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980)).

Additionally, in order be considered "final," the agency action must satisfy two conditions. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024). First, it "must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines*, 333 U.S. at 113). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Here, the Government attacks both prongs of *Bennett*'s finality test.

**a. Plaintiffs Have Satisfied the Consummation Prong**

The Government first argues that the Challenged Policies do not represent the consummation of USCIS's decision-making process. ECF No. 21 at 25–26. According to the Government, the Challenged Policies "are neither fixed nor final, but instead reflect interim, operational guidance explaining how adjudications are to proceed while USCIS continues to evaluate security concerns and complete necessary vetting." *Id.* The Court is unconvinced. Consider the evidence that the Government marshals in support of its claim.

The Government first contends that the Challenged Policies "arise from, and operate within, an expressly ongoing and iterative decision-making framework established by Presidential Proclamation." ECF No. 21 at 25. The Government

specifically cites language from Proclamation No. 10949,[24] requiring that "[w]ithin 90 days of the date of this proclamation, and every 180 days thereafter," Cabinet-level officials are to reassess the conditions in countries subject to the Travel Ban and "recommend[ ] whether any suspensions and limitations imposed by [the Travel Ban] should be continued, terminated, modified, or supplemented." *See* Proclamation No. 10949, 90 Fed. Reg. at 24503; *see also* ECF No. 16-1 at CAR-000007.

As Plaintiffs point out, this language requires ongoing and iterative decisionmaking only with respect to *the Travel Ban*. ECF No. 23 at 23. But Proclamation No. 10949 has nothing to do with USCIS's actions and does not "expressly" require the agency's policies to be reviewed or reconsidered. Nor does the President's subsequent proclamation, Proclamation No. 10998, mention the Challenged Policies. It again merely instructs that "[w]ithin 180 days of the date of this proclamation, and every 180 days thereafter," Cabinet officials shall "recommend[ ] whether any suspensions and limitations imposed by [the Travel Ban] should be continued, terminated, modified, or supplemented." *See* Proclamation No. 10998, 90 Fed. Reg. at 59727; *see also* ECF No. 16-3 at CAR-000075.

In any event, even though the December and January Memoranda contemplated that USCIS would, "[w]ithin 90 days of issuance of [the respective memoranda], . . . issue operational guidance" on USCIS's new policies, *see* ECF

---

[24] The Government states that this language comes from Proclamation No. 10998, but it is mistaken. The language it refers to appears in the prior proclamation, Proclamation No. 10949. *See* 90 Fed. Reg. at 24503; *see also* ECF No. 16-1 at CAR-000007.

No. 16-2 at CAR-000003; ECF No. 16-3 at CAR-000049, both those deadlines—March 2, 2026 and April 1, 2026, respectively—came and went "without USCIS substantively modifying [its policies]." *Doe*, 2026 WL 1170971, at *6.

The Government instead offers up a declaration submitted by Andrew Good, the Chief of USCIS's Office of Policy and Strategy, on March 3, 2026. *See* ECF No. 21-1. In the declaration, Mr. Good asserts that, "[o]ver the past 90 days, USCIS has implemented and reviewed several changes to screening and vetting practices." *Id.* at 2. He adds that USCIS has established "an internal process for Program Offices and Directorates to request lifting holds on individual or group cases." *Id.* at 3. According to Mr. Good, USCIS has lifted some of its holds for noncitizens vetted through Operation PARRIS, as well as for certain family-based petitions filed by U.S. citizens, intercountry adoption forms, and particular forms filed by South African citizens/nationals. *Id.* at 3–4. Moreover, the Government attaches as an exhibit the March 30th Alert, which states that the agency has also since lifted holds for "certain rescheduled oath ceremonies . . ., certain special immigrant visa petitions, certain employment authorization documents, and asylum applications from non high-risk countries." ECF No. 21-2 at 2.

The Government cites this as proof that the Challenged Policies "are neither fixed nor final." *See* ECF No. 21 at 25. According to the Government, that "USCIS has already resumed final decisionmaking for applications for some immigration benefits," suggests a lack of finality. ECF No. 25 at 1. The Government also contends

that USCIS's actions are not final because the Challenged Policies "remain[ ] a subject for further guidance" from the agency. *Id.* at 17.

This position is unavailing for many reasons, not the least of which is that eight federal courts considering nearly identical arguments have concluded that USCIS's actions are sufficiently "final" for the purposes of APA review. *See Varniab*, 2026 WL 485490, at *16–17; *Bowser*, 2026 WL 555624, at *5–6; *Doe v. U.S. Citizenship & Immigr. Servs.*, No. 26-cv-02389, slip op. at 5–6 (N.D. Ill. Mar. 26, 2026); *Behdin v. Edlow*, No. 26-cv-00566-SVK, 2026 WL 1031079, at *19 (N.D. Cal. Apr. 16, 2026); *Karimi v. Mullin*, No. 5:26-cv-50492026, WL 1103448, at *5–6 (W.D. Ark. Apr. 23, 2026); *Saghafi v. Edlow*, No. GLR-26-100, 2026 WL 1127468, at *6 (D. Md. Apr. 24, 2026); *Doe*, 2026 WL 1170971, at *5–6; *Nezameslami v. Dep't of Homeland Sec.*, No. 1:26-cv-00151-SDG, slip op. at 17–19 (N.D. Ga. May 14, 2026).

The Court agrees with its sister courts. To start, a policy memorandum, particularly one issued by DHS, can constitute final agency action where it "[binds] DHS staff by forbidding them to continue [a] program in any way from that moment on." *Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (quoting *Texas v. Biden*, 20 F.4th 928, 948 (5th Cir. 2021)).

Each of the Policy Memoranda at issue here do just that. The November Memorandum directs USCIS officials, "*[e]ffective immediately*," to treat an applicant's country of origin as a "significant negative factor" if that applicant comes from a country subject to the Travel Ban. *See* ECF No. 16-1 at CAR-000072–73 (emphasis added); *see also* ECF No. 16-1 at CAR-000022. USCIS added this guidance

to its Policy Manual, which it emphasizes "is *controlling* and *supersedes* any related prior guidance." *Id.* at CAR-000072 (emphasis added).

The commands of the December and January Memoranda are just as explicit: "*Effective immediately*, this memorandum *directs* [USCIS] personnel to . . . [p]lace a hold on all . . . Application[s] for Asylum and for Withholding of Removal"; "[p]lace a hold on pending benefit requests for aliens from countries listed in [the Travel Ban], pending a comprehensive review, regardless of entry date"; and "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in [the Travel Ban] who entered the United States on or after January 20, 2021." ECF No. 16-2 at CAR-000001 (emphasis added); *see also* ECF No. 16-3 at CAR-000045 (same). Both Policy Memoranda make clear that the "hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum," and that "[a]ny requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director." ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000047.

That USCIS subsequently revised its policies as to a limited number of adjudications does not make these otherwise definitive decisions nonfinal. *See, e.g.*, *POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 404–05 (D.C. Cir. 2020 ("[T]he possibility of revision 'is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal.'" (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016)); *see also Sackett v. Env't Prot. Agency*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might

reconsider . . . does not suffice to make an otherwise final agency action nonfinal."); *Nat'l Env't Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future."); *Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.").

Indeed, it is significant that neither Mr. Good's declaration nor the March 30th Policy Alert purport to adjust the Challenged Policies' effect on individuals from the Travel Ban Countries. As USCIS's Policy Memoranda make clear, the Challenged Policies may only be lifted via superseding policy guidance or a subsequent policy memorandum. *See* ECF No. 16-1 at CAR-000072; ECF No. 16-2 at CAR-000003; ECF No. 16-3 at CAR-000047. That has not happened here. And the Government provides no indication in its filings as to when or if USCIS expects to suspend the Challenged Policies or provide any update on them.

If the Government truly had its way, it could indefinitely shield USCIS's actions from judicial review by labeling them as "interim" and by promising that the agency's final word is forthcoming. But that is not how the law works. "A number of cases support the proposition that significant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate." *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D.

Mass. 2025) (collecting cases); *see, e.g.*, *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020) ("[I]f an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions[.]"); *Oliveira v. Edlow*, No. 25-13228-BEM, 2025 WL 3492110, at *9 (D. Mass. Dec. 4, 2025) ("[A]n agency cannot exempt itself from APA review merely by labeling its policy interim '[g]uidance.'"); *Texas v. United States*, 555 F. Supp. 3d 351, 390 (S.D. Tex. 2021) ("[T]he Government's insinuation that agency action is not final simply because the agency says so, would produce the absurd result of precluding judicial review of any policy that the agency says is not final.").

"[A]t a certain point, an agency's ongoing characterization of its action as 'temporary' rings hollow." *Doe*, 2026 WL 1170971, at *6; *see also Massachusetts*, 790 F. Supp. 3d at 26 (concluding that agency's "temporary" pause on approving wind energy projects was final after months had passed and where the Government provided the court with no "reasonable timeframe for, or indeed any end on the horizon" to the pause); *New York v. Trump*, 811 F. Supp. 3d 215, 234 (D. Mass. 2025) (finding that agency's "temporary" pause on the issuance of wind energy authorizations was final after ten months had passed and "no end to the [pause] appear[ed] to be in sight").

Such is the case here. USCIS's Challenged Policies have remained in effect for over six months and counting. The agency has given no timeline as to when its "temporary" hold on immigration benefit requests will end. "As this appears to be an

indefinite moratorium on applications for immigration benefits from these 39 countries," the Court finds that the first prong of *Bennett* is satisfied. *Bowser*, 2026 WL 555624, at *5–6.

**b. Plaintiffs Have Satisfied the Legal Consequences Prong**

The Government next attacks *Bennett*'s second prong. As noted, this prong requires the Court to decide whether a particular action is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. This inquiry is meant to be a "pragmatic" one. *See Hawkes Co.*, 578 U.S. at 599; *see also Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 62 (D.C. Cir. 2020). Here, the Government argues that, with respect to the Challenged Policies, Plaintiffs "cannot point to any action that determines rights or obligations or from which legal consequences flow." ECF No. 21 at 26.

The Court disagrees. Courts have regularly determined that the second prong of *Bennett* is satisfied "when an indefinite pause is imposed by an agency." *New York*, 811 F. Supp. 3d at 234 (collecting cases). Indeed, where an agency suspension of activity "prevent[s] [an individual] from moving forward," such that they are "trapped without recourse due to the indefinite postponement of agency action," that can be enough to impose significant legal and practical consequences on the individual. *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 59–60 (D.D.C. 2019); *see also Doe v. Trump*, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) (holding that agency memorandum that suspended the entry of refugees for at least 90 days was a final agency action because "whether the Agency Memo produces a 'suspension' or an

indefinite delay, [it] has significant real-world impacts on Plaintiffs' various situations").

There is no question then that Plaintiffs are suffering from the legal consequences of USCIS's Challenged Policies. Plaintiffs submit a plethora of evidence. Several of Dorcas and RDC's clients point out, for instance, that their work permits have expired since the Benefits Hold went into effect and, as such, their requests to renew their work permits cannot be adjudicated. ECF No. 20-2 at 8–9; ECF No. 20-3 at 10. As noncitizens who are unable to renew their expired work permits, these individuals have lost their ability to legally work in the United States. *See* 8 C.F.R. § 274a.14(a)(1)(i).[25] Furthermore, some of RDC and American Gateways' clients share that they had completed the entire naturalization process and were scheduled to attend their naturalization oath ceremonies—only to have USCIS cancel those ceremonies as a result of the Benefits Hold. ECF No. 20-9 at 17–18. This has prevented them from attaining U.S. citizenship, as well as the legal rights that come with it, such as the right to vote. *See* 52 U.S.C. § 20501(a).

There are many more stories like these. Suffice it to say, Plaintiffs in this case are in an "indefinite limbo with respect to their applications for naturalization, work

[25] Before October 30, 2025, if a noncitizen timely filed an application to renew their work permit, USCIS would automatically extend the validity of that permit for up to 540 days. *See* 8 C.F.R. § 274a.13(d)(1). However, USCIS has since promulgated an interim final rule that terminates this automatic extension for certain renewal applications filed on or after October 30, 2025. *See* 8 C.F.R. § 274a.13(e); *see also* Removal of the Automatic Extension of Employment Authorization Documents, 90 Fed. Reg. 48799 (Oct. 30, 2025). Thus, the individuals in this case can no longer extend their work permits simply by filing renewal applications with USCIS.

authorization, permanent resident status, and asylum, affecting all manner of life plans." *Doe*, 2026 WL 1170971, at *7. In addition, any applicant "subject to the significant negative factor policy [is] now viewed with enhanced suspicion based on country of origin." *Id.* These individuals are "prevent[ed] . . . from moving forward" and are essentially "trapped without recourse" due to USCIS's indefinite postponement of their applications. *See Connecticut*, 363 F. Supp. 3d at 59–60 (D.D.C. 2019); *see also Doe*, 288 F. Supp. 3d at 1070. In light of these significant legal and practical consequences, the Court finds the second *Bennett* prong to be met in this case.

#### 5. Plaintiffs' Claims Are Ripe for Review[26]

The Government also contends that Plaintiffs' APA claims are not ripe for review. ECF No. 21 at 27. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Lab'ys*, 387 U.S. at 149). Here, the Government argues that Plaintiffs meet neither the

---

[26] The Government organizes its ripeness argument in the same section as its finality argument. *See* ECF No. 21 at 24–28. Though there is considerable overlap between the two doctrines, finality and ripeness are conceptually distinct. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808–12 (2003) (treating the ripeness question as distinct from the finality one and concluding that, even though an agency's action was final under the APA, the controversy was not yet ripe for judicial resolution); *see also Ticor Title Ins. Co. v. F.T.C.*, 814 F.2d 731, 745 (D.C. Cir. 1987) (Williams, J.) (describing finality and ripeness as "analytically distinct").

fitness prong nor the hardship prong. ECF No. 21 at 27–28. The Court addresses both arguments in turn.

**a. Plaintiffs Have Satisfied the Fitness Prong**

The "fitness prong" of the ripeness analysis "implicates both constitutional and prudential justiciability concerns." *Algonquin Gas Transmission, LLC v. Weymouth*, 919 F.3d 54, 62 (1st Cir. 2019) (citations omitted). "The constitutional component of the fitness prong asks 'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all,' thus rendering any opinion [the court] might offer advisory." *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025) (quoting *Algonquin Gas Transmission*, 919 F.3d at 62). "The prudential component of the fitness test asks whether resolution of the case turns on 'legal issues not likely to be significantly affected by further factual development.'" *Algonquin Gas Transmission*, 919 F.3d at 62 (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995)).

Plaintiffs here satisfy both the constitutional and prudential components of the fitness prong. Beginning with the constitutional component, the claims here do not involve uncertain or contingent events. USCIS implemented the Challenged Policies months ago via various Policy Memoranda, which—in the agency's own words—were "[e]ffective immediately." ECF No. 16-1 at CAR-000072; ECF No. 16-2 at CAR-000001; ECF No. 16-3 at CAR-000045; *see Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 390 (M.D.N.C. 2019) (finding case sufficiently "ripe" and "fit for judicial decision" where the agency action in controversy—USCIS's promulgation of a policy memorandum—was final, having taken effect months ago).

Moreover, in its Policy Memoranda, USCIS cited the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting, claiming that it had determined that the Challenged Policies were "necessary" "[i]n light of identified concerns and the threat to the American people." ECF No. 16-2 at CAR-000002; ECF No. 16-2 at CAR-000047. USCIS added that it "ha[d] determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance when weighed against the agency's obligation to protect and preserve national security." ECF No. 16-2 at CAR-000003; ECF No. 16-3 at CAR-000048. In other words, "resolution of the actual claim[s] here"—that USCIS may have unlawfully burdened Plaintiffs with its policies—"hinges on an assessment of events that have already occurred." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 143 (1st Cir. 2015).

The Government resists this conclusion, arguing that Plaintiffs' claims are unfit for review absent "an adverse adjudication." ECF No. 21 at 27–28. But Plaintiffs need not wait for an adverse adjudication to pursue their claims; indeed, that Plaintiffs have filed applications with USCIS that have not been adjudicated because of the agency's self-imposed hold is sufficient. *See, e.g.*, *Nakka*, 111 F.4th at 1010–15 (suggesting that plaintiffs who were pursuing a categorical attack against USCIS's adjudicative hold could potentially have a ripe claim if the plaintiffs actually filed immigration applications that the agency had not decided as a result of the hold); *Garcia*, 146 F.4th at 752 n.2 (suggesting the same). As such, the constitutional component is satisfied.

As for the prudential component, the First Circuit has recognized that this test is met where the challenges rest solely on the constitutionality or legality of the agency action itself and no further factual development is necessary. *See, e.g.*, *Jensen*, 160 F.4th at 25; *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92–93 (1st Cir. 2013); *Riva v. Massachusetts*, 61 F.3d 1003, 1010 (1st Cir. 1995). Such is the case here. Plaintiffs challenge the legality of the Challenged Policies under the APA, and no more facts are necessary to adjudicate this claim. Accordingly, the Court also finds the prudential component of the fitness prong to be satisfied.

**b. Plaintiffs Have Satisfied the Hardship Prong**

Turning now to the "hardship prong" of ripeness, this inquiry is "purely prudential and requires that [courts] evaluate 'whether the challenged action creates a "direct and immediate" dilemma for the parties.'" *Algonquin Gas Transmission*, 919 F.3d at 62 (quoting *W.R. Grace & Co.–Conn. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992) (quoting *Abbott Lab'ys*, 387 U.S. at 152–53)). This prong also "'concerns the harm to the parties seeking relief that would come to those parties from [the court's] "withholding of a decision" at this time.'" *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (quoting *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 330 (1st Cir. 2016) (quoting *McInnis–Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 73 (1st Cir. 2003))).

This prong is clearly met here. The Government argues that "there is no hardship to the Plaintiffs," ECF No. 21 at 28, but the Court cannot ignore the

evidence in this case that establishes the very real and immediate consequences that Plaintiffs face because of the Challenged Policies. As already noted, many of Plaintiffs' members and clients have lost their jobs and their legal status, and they continue to experience financial and emotional distress due to the situation USCIS has placed them in. *See, e.g.*, ECF No. 20-2 at 8–9; ECF No. 20-3 at 10; ECF No. 20-9 at 17–18. What is more, the Challenged Policies have directly interfered with the business operations of many of the organizational plaintiffs, draining them of their resources and impeding their core activities. *See* ECF No. 23 at 5–6 (noting that the Asylum Hold has prevented Dorcas from taking on new clients or cases); *id.* at 6 (noting that the Challenged Policies have required RDC "to spend more time responding to questions about pending cases and to devote more resources to counseling and supporting its clients in distress"); *id.* at 6 (noting that the Comprehensive Re-Review Policy "will require American Gateways to reopen closed files and devote additional resources to clients whose matters had already been resolved").

The Court therefore has no trouble in concluding that the Challenged Policies pose a direct and immediate dilemma for Plaintiffs, and the Court recognizes that withholding a decision on Plaintiffs' claims will only exacerbate that harm. *See Algonquin Gas Transmission*, 919 F.3d at 62; *Reddy*, 845 F.3d at 501. The Court finds that Plaintiffs have satisfied the hardship prong and, as such, concludes that this matter is ripe for review.

### 6. Plaintiffs Have Standing to Bring Their Claims

The Court next turns to standing. "Article III of the U.S. Constitution authorizes federal courts to adjudicate only 'Cases' and 'Controversies,' and 'standing is an essential and unchanging part of the case-or-controversy requirement.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 321 (1st Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (2024)). Thus, to establish Article III standing, the plaintiff must show that they "[have] suffered, or will suffer, an injury that is '[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Plaintiffs here are organizations as opposed to individual plaintiffs. "An organization with individual members may establish Article III standing" in one of two ways. *Doe v. Trump*, 157 F.4th 36, 47 (1st Cir. 2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024)). First, it can show that it has "organizational standing" by "satisfying the three elements of [Article III] standing based on an 'injury in fact' of its own." *Id.* Second, the organization "may establish 'associational standing' to sue in a 'representational capacity.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The Government argues that none of the Plaintiffs here meet the standards for organizational standing or associational standing. ECF No. 21 at 29–40. The Court evaluates both arguments.

**a. Plaintiffs Have Organizational Standing**

As mentioned, organizational standing requires that the organization establish "the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. for Hippocratic Med.*, 602 U.S. at 393–94 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)). "It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members." *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 44 n.7 (1st Cir. 2012) (citations omitted). For instance, courts have recognized that organizations have standing to sue if they can show "that 'the challenged conduct frustrated their organizational missions and that they diverted resources to combat that conduct.'" *Town of Milton v. Fed. Aviation Admin.*, 87 F.4th 91, 99 (1st Cir. 2023) (quoting *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021)); *accord Havens Realty Corp.*, 455 U.S. at 379; *Equal Means Equal v. Ferriero*, 3 F.4th 24, 29–30 (1st Cir. 2021).

**i. Plaintiffs Have Suffered Injury**

The Government relies heavily on the Supreme Court's recent decision in *F.D.A. v. Alliance for Hippocratic Medicine* to challenge Plaintiffs' theory of injury, *see* ECF No. 21 at 30–31, but that case does not aid its cause. There, a group composed of "plaintiff doctors and medical associations" sued to challenge regulations promulgated by the Food and Drug Administration ("FDA") that "appl[ied] to doctors

prescribing mifepristone and to pregnant women taking mifepristone." *All. for Hippocratic Med.*, 602 U.S. at 385. Critically, however, none of the plaintiffs "prescribe[d] or use[d] mifepristone" themselves and, as such, the "FDA ha[d] not required the plaintiffs to do anything or to refrain from doing anything." *Id.* Thus, as parties who did not prescribe, manufacture, sell, or advertise mifepristone or sponsor a competing drug, the Court concluded that the plaintiffs before it had not suffered "direct monetary injuries" or any "injuries to their property, or to the value of their property, from FDA's actions." *Id.* at 385–86.

The Supreme Court went on to recognize that the plaintiffs could not establish an injury simply because they disagreed with the FDA's practices. *Id.* at 386 ("[G]eneral legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court."). Nor could the plaintiffs manufacture standing by incurring costs to oppose FDA's actions. *Id.* at 394 ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.").

Plaintiffs here stand on entirely different footing from the plaintiffs in *Alliance for Hippocratic Medicine*. Dorcas, RDC, and American Gateways are organizations that are directly involved in providing "low-cost legal representation to noncitizens on a wide array of immigration-related matters, including assisting with applications for naturalization, adjustment of status, asylum, and other benefits." ECF No. 20-1 at 20; *see also id.* at 22 (explaining that RDC represents clients who have "pending

applications for adjustment of status, employment authorization and other benefits"); *id. at 24* (explaining that a core activity of American Gateways is "representing individuals seeking affirmative immigration relief from USCIS").

These organizations have in fact suffered direct injuries as a result of the Challenged Policies: They have incurred a backlog of cases that cannot reach final adjudications, which has strained their ability to take on new clients; they have been forced to divert financial and staff resources away from their core activities to meet clients' new needs for counseling, referrals, and other support; they have been precluded from carrying out their job training and job placement services due to their clients' loss of employment eligibility; and they have had to reopen closed client files and dedicate additional staff support to help clients who had been granted immigration relief. *See* ECF No. 20-1 at 20–25.

And rather than resulting in injuries that are merely speculative or based on hypothetical events that may occur in the future, the Challenged Policies have already caused actual harm to these organizations. RDC estimates that it has already devoted "approximately 330 staff hours per week, across 11 staff members, . . . to immigration-related counseling and support that would not have been necessary absent the Challenged Policies." ECF No. 20-3 at 16. RDC has also had to hire an additional paralegal "to respond to the increased volume of immigration-related questions," and it states that "[t]he cost of this position has been taken from funds that would otherwise have been allocated to direct assistance for community members." *Id.* Similarly, Dorcas has been barred from fulfilling its mission and,

consequently, prevented from taking on new clients or cases while it has 414 pending benefit applications frozen under the Benefits Hold Policy, 27 asylum applications frozen under the Global Asylum Hold Policy, and about 365 previously approved cases now subject to the Comprehensive Re-Review Policy. ECF No. 20-2 at 7, 8, 11.

Nor are Plaintiffs engaged in mere advocacy in opposition to USCIS's policies, like the plaintiffs in *Alliance for Hippocratic Medicine* were. Instead, the ongoing, day-to-day work of these organizations is to represent clients before USCIS and to file and obtain benefits applications on their behalf. ECF No. 23 at 5. Plaintiffs here bear more resemblance to the plaintiff organization in *Havens Realty*, which operated a housing counseling service. 455 U.S. at 368. In that case, the Supreme Court found that the defendant had "perceptibly impaired [the plaintiff organization's] ability to provide counseling and referral services," and the Court concluded that the organization had standing to sue because the defendant's actions had "directly affected and interfered with [the organization's] core business activities." *Id.* at 379; *All. for Hippocratic Med.*, 602 U.S. at 395.

So too here: USCIS's actions have directly affected and interfered with Plaintiffs' core business activity, which is providing legal, counseling, and referral services to noncitizens, and have caused Plaintiffs to divert considerable resources to meet the new needs of their clients. *See, e.g.*, *Am. Acad. of Pediatrics v. Kennedy*, 814 F. Supp. 3d 150, 159–61 (D. Mass. 2026) (finding that a "professional organization for pediatric medicine" had organizational standing because, after an agency's alterations to its COVID-vaccine recommendations, the plaintiff had to divert

resources away from its usual tasks and counsel its members on the alterations); *Presidents' All. on Higher Educ. & Immigr. v. Noem*, No. 25-cv-11109-PBS, --- F. Supp. 3d ----, 2026 WL 788185, at *9 (D. Mass. Mar. 20, 2026) (finding that a nonprofit organization had plausibly alleged organizational standing where an agency's policy of revoking student visas resulted in the organization having to expend resources to support the "flood of requests for assistance" from its member colleges and universities). As such, Plaintiffs have established an injury in fact. *See Doe*, 157 F.4th at 47; *Murthy*, 603 U.S. at 57.

**ii. Plaintiffs' Injuries Are Fairly Traceable to USCIS**

Moving to the second element of standing, the Government does not meaningfully contest traceability. Indeed, that element is certainly met here. Plaintiffs' injuries are "fairly traceable" to USCIS's actions because, had the agency not implemented the Challenged Policies, Plaintiffs would not have had to divert resources in the way that they have, nor would they have been impaired from carrying out their usual, core business activities. *See Murthy*, 603 U.S. at 57.

**iii. Plaintiffs' Injuries Are Redressable**

The Government does, however, challenge the redressability element of standing, asserting that Plaintiffs' "harms are fundamentally not redressable by this Court." ECF No. 21 at 38. According to the Government, "because immigration adjudications are discretionary and individualized, this Court cannot order relief that would guarantee any particular result." *Id.* at 39. This argument lacks merit because, once again, the Government misunderstands the nature of Plaintiffs' claims.

Plaintiffs are not challenging USCIS's failure to adjudicate *individual* cases; rather, they lodge a categorical attack on the legality of the Challenged Policies. *See* ECF No. 23 at 1 (explaining that Plaintiffs are challenging whether any statute provides "USCIS sweeping power to impose categorical restrictions on access to immigration benefits"). Thus, Plaintiffs do not request that the Court order that "a particular application . . . be adjudicated on any particular timeline" or that USCIS "reach a favorable outcome for [an] allegedly impacted individual," as the Government suggests. ECF No. 21 at 39. They instead ask the Court to set aside the Challenged Policies by vacating and/or enjoining them. *See* ECF No. 20-1 at 28 ("Plaintiffs seek a declaration that the Challenged Policies are unlawful, vacatur of those policies under the APA, and an injunction barring issuance or enforcement of any similar policy."). As such, if USCIS's policies are indeed unlawful, then Plaintiffs' injuries would be "redressable by a favorable ruling." *Murthy*, 603 U.S. at 57; *see New York*, 811 F. Supp. 3d at 229 (finding plaintiff states' injuries redressable where the executive order that they challenged "would be redressed by its vacatur"); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 125 (D. Mass. 2025) (finding university plaintiffs' injuries redressable where they sought "an order vacating and enjoining implementation" of a challenged agency policy).

The Government resists this conclusion, arguing that the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), forecloses the type of redress that Plaintiffs seek. ECF No. 21 at 40. But the Government misconstrues the holding in *CASA*. For one thing, as the First Circuit has observed, the Supreme

Court in that case "treat[ed] the question of whether an injunction is 'broader than necessary to provide complete relief' as *distinct* from whether a plaintiff has 'standing to sue.'" *Rhode Island v. Trump*, 155 F.4th 35, 45 (1st Cir. 2025) (emphasis added) (citing *CASA, Inc.*, 606 U.S. at 831).

The Government is also mistaken in asserting that any relief that Plaintiffs seek is "in direct conflict with *CASA*." ECF No. 21 at 40. To start, *CASA* explicitly left in place the Court's authority to vacate unlawful agency action. *See* 606 U.S. at 847 n.10 ("Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate agency action." (citing 5 U.S.C. § 706(2))). In addition, with respect to "universal injunctions," as the First Circuit has pointed out, "[n]othing in *CASA* provides that, as a categorical manner, it is improper for a district court to impose an injunction of such breadth if it is necessary to do so to provide the plaintiff with complete relief." *Doe*, 157 F.4th at 80–81; *see CASA, Inc.*, 606 U.S. at 852–53 (acknowledging that, in some instances, a universal injunction might be appropriate where necessary to provide a party to the case with "complete relief"). Plaintiffs here seek both forms of relief. *See* ECF No. 23 at 57–59 (requesting that the Court "vacat[e] the Challenged Policies under the APA" and/or "provide Plaintiffs with complete relief . . . through a universal injunction," but also accepting as a form of relief a "narrower injunction . . . limited to Plaintiffs"). *CASA* has left these avenues of relief untouched. As such, the Court finds that Plaintiffs have also satisfied the redressability element.

Having concluded that Plaintiffs Dorcas, RDC, and American Gateways have met all three requirements of organizational standing, the Court concludes that their claims can proceed on the merits.

#### b. Plaintiffs Have Associational Standing

Because at least three Plaintiffs have established organizational standing, the Court could end its standing analysis here. However, following the lead of other courts within this circuit, the Court will also analyze Plaintiffs' associational standing claim because that "may affect the relief this Court can offer." *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 379 (D. Mass. 2025); *Am. Acad. of Pediatrics*, 814 F. Supp. 3d at 161 (same). *But see President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 114 (D. Mass. 2025) ("[T]he Court finds that . . . the Organizational Plaintiffs have associational standing. Because of this, the Court does not reach their arguments regarding direct standing.").[27]

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 10 (1st Cir. 1986) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). An organization has

---

[27] On standing, the Supreme Court has stated that "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), but rather "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008). "The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Plaintiffs do not appear to be bringing different APA claims, nor do they seem to be seeking different forms of relief from one another. However, the Court addresses both theories of standing just to be thorough.

associational standing to sue on behalf of its members when: "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. "The first two prongs of this test have constitutional dimensions; the third prong is prudential." *Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*, 75 F.4th 248, 265 (1st Cir. 2023) (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554–58 (1996); *Back Beach Neighbors Comm. v. Town of Rockport*, 63 F.4th 126, 129 n.2 (1st Cir. 2023)).

**i. Plaintiffs Have Individual Standing**

The first prong of associational standing requires only "that at least one of the group's members have standing as an individual." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (citing *Town of Norwood v. F.E.R.C.*, 202 F.3d 392, 405–06 (1st Cir. 2000)); *see also Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 34 (1st Cir. 1990 ("[T]he Supreme Court has never required that *every* member of an association have standing before it can sue on behalf of its members." (emphasis in original)). "To satisfy this requirement, the association must, at the very least, 'identify [a] member[ ] who ha[s] suffered the requisite harm.'" *Draper*, 827 F.3d at 3 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).[28]

---

[28] As at least one court has pointed out, the "explicit naming requirement . . . has not been consistently applied across the First Circuit in recent years." *Equal Means Equal v. Trump*, No. 25-10806-WGY, 2026 WL 1078133, at *4 (D. Mass. Apr.

Plaintiffs here asserting associational standing, including SEIU, UAW, ACT, VAM, and PANA, have each submitted declarations that identify many members who have been impacted by the Challenged Policies. ECF No. 23 at 9. For example, UAW has identified an Iranian member, UAW Member A, who has pending applications for adjustment of status, travel documents, and employment authorization, none of which have been adjudicated. ECF No. 20-5 at 5–6. Additionally, ACT has identified a Sudanese member, ACT Member A, who applied for asylum in 2018, received her asylum interview in the fall of 2025, and though she was told at the end of the interview that she would receive her decision within five days, she still has not received that decision due to the Global Asylum Hold Policy. ECF No. 20-7 at 4–5. VAM has identified a Cuban member, VAM Member E, who has lost her job, taken on debt, and experienced eviction from her home because she cannot obtain a final adjudication on her employment authorization or adjustment of status applications from USCIS. ECF No. 20-6 at 8. And PANA has identified an Afghan member, PANA Member E, who entered the country in 2023 and was granted asylum in September 2025, and who has pending applications for adjustment of status and for immigrant visas for his two children in Afghanistan, thereby making him subject to

---

21, 2026). Last year, a First Circuit panel "refused to terminate the associational standing of an organization despite its failure to name injured individuals," and it "explained that the organization could later add named members and cure any standing issues." *Id.* (citing *Capen v. Campbell*, 134 F.4th 660, 667–68 (1st Cir. 2025)). "That case is currently stayed until July 2026 while the parties await the Supreme Court's disposition of a case with similar issues." *Id.* The explicit naming requirement is not at issue here since Plaintiffs have identified members affected by the Challenged Policies.

both the Benefits Hold Policy and the Comprehensive Re-Review Policy. ECF No. 20-8 at 9–10. As individuals from the Travel Ban Countries who have applied for various forms of discretionary relief, several of these members are also affected by the Country-Specific Factors Policy.

The next step is to analyze whether any of these individuals are "member[s] who 'suffered an injury in fact that [is] concrete, particularized, and actual or imminent,' 'likely caused by the defendant,' and 'likely [to] be redressed by judicial relief.'" *Housatonic River Initiative*, 75 F.4th at 265 (quoting *Plazzi v. FedEx Ground Package Sys., Inc.*, 52 F.4th 1, 4 (1st Cir. 2022)). "An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few examples." *All. for Hippocratic Med.*, 602 U.S. at 381.

As mentioned, Plaintiffs' members have suffered and continue to suffer very real harm from the Challenged Policies. Because some, like VAM Member E, have had their work permits expire during the Benefits Hold Policy, they have lost jobs, lost income, and lost the ability to care for their families. *See Bowser*, 2026 WL 555624, at *6 (recognizing the "very serious consequences" associated with a plaintiff losing her ability to work in the United States as a result of USCIS's Benefits Hold); *Miot*, 818 F. Supp. 3d at 157 ("[T]he harm [of losing work authorization] extends beyond ordinary economic injury. Plaintiffs would not only suffer lost wages. They would lose the legal ability to work at all. It would implicate Plaintiffs' fundamental ability to earn a livelihood, support their families, and remain self-sufficient.").

Others, like PANA Member E, have been separated from their family members for prolonged periods of time because USCIS has refused to adjudicate their family-based immigrant visas that would allow them to enter the United States. *See Hawaii*, 585 U.S. at 698 ("We agree that a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact."); *see also Doe*, 288 F. Supp. 3d at 1063 (collecting cases that support the proposition that "[p]rolonged separation from a family member is an injury in fact sufficient to establish Article III standing").[29]

As Judge Angel Kelley of the District of Massachusetts recently put it when addressing a similar challenge to USCIS's policies, "[e]ven short delays [in adjudications] can have serious consequences." *Bowser*, 2026 WL 555624, at *6 (citing *Doe*, 288 F. Supp. 3d at 1070; *Varniab*, 2026 WL 485490, at *17). Some individuals, who either lack legal status or have fallen out of legal status, have expressed fear of being arrested and detained by ICE and being removed from the United States while the Challenged Policies are in effect. *See* ECF No. 20-9 at 14 (describing how the Asylum and Benefits Holds "have created a great deal of uncertainty and anxiety for Ms. B and her children" because without adjudications,

---

[29] The Supreme Court's recent decision in *Department of State v. Muñoz*, 602 U.S. 899 (2024), does not command a different result with respect to the harm suffered by a person separated from a family member. In that case, the Court held that a U.S. citizen spouse did not have a fundamental liberty interest, protected by the Due Process Clause, in having her noncitizen spouse be admitted to the United States. *See Muñoz*, 602 U.S. at 909. However, the Supreme Court did not address the issue of standing at all in that case. Indeed, it acknowledged that the U.S. citizen spouse had "suffered harm from the denial of [her spouse's] visa application," just not *constitutional* harm. *Muñoz*, 602 U.S. at 917.

"Ms. B and her children are vulnerable to arrest, detention, and removal"). As is the case here, "'[t]he mere fear of immigration detention and deportation may alone constitute a sufficient irreparable injury.'" *Saghafi*, 2026 WL 1127468, at *11 (quoting *D.B. v. Trump*, No. 2:25-cv-419, 2025 WL 1203232, at *3 (S.D. Ohio Apr. 23, 2025)); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (concluding that plaintiffs' reasonable fear of being subject to unlawful detention on the basis of their unlawful presence may constitute irreparable harm). Thus, despite the Government's protestations to the contrary, *see* ECF No. 21 at 35, Plaintiffs have demonstrated sufficiently concrete, non-speculative injuries to their members.

Plaintiffs have also shown that their injuries are attributable to USCIS and are likely to be redressed by a favorable judicial decision. The Court is unpersuaded by the Government's argument that the injuries are the result of "routine processing variability inherent in a discretionary adjudicatory system." ECF No. 21 at 36. There is nothing "routine" about USCIS's actions here. In fact, with respect to at least one of its policies, the Comprehensive Re-Review Policy, the agency acknowledges that it has issued new guidance governing the adjudication of discretionary benefit requests that "*supersedes* any related prior guidance." ECF No. 16-1 at CAR-000072 (emphasis added).

The Government nevertheless asserts that Plaintiffs have failed to satisfy the traceability and redressability requirements because Plaintiffs cannot "identify any specific application that would result in a favorable outcome if the Challenged Policies were vacated," "[n]or can they, as that conclusion rests on speculation about

how discretionary adjudications (or received benefit reviews) would be resolved." ECF No. 21 at 37. According to the Government, the final two elements of standing cannot be established here because, even if the Court were to determine that the Challenged Policies are unlawful, the authority to adjudicate applications is left to the discretion of USCIS personnel and Plaintiffs' members may ultimately not get a favorable outcome in their individual cases. *Id.* at 36–37.

But the Government's argument "rests on a fundamental misconstrual of the [APA], which gives the courts the relatively modest task of correcting deviations in agency procedure – and not, of course, of second-guessing reasonably made decisions of the Executive Branch, or peering behind the curtain to guess at what an agency may do next." *Massachusetts*, 790 F. Supp. 3d at 21 (citing *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "As the Supreme Court has observed, even where '[a]gencies . . . have discretion about whether or not to take a particular action,' 'those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground.'" *Id.* (quoting *Fed. Elec. Comm'n v. Akins*, 524 U.S. 11, 25 (1998)).

As relevant here, Plaintiffs allege that USCIS unlawfully deviated from its usual procedures in evaluating their members' applications for immigration relief, and they have brought suit to correct that deviation. *See Prometheus Radio Project*, 592 U.S. at 423. The members' injuries may therefore be "both traceable and redressable 'even though [USCIS] might reach the same result exercising its

discretionary powers lawfully.'" *Massachusetts*, 790 F. Supp. 3d at 21 (quoting *Akins*, 524 U.S. at 25). "[Courts] rarely know when [they] entertain a case . . . whether the agency's *ultimate* action will be favorable to the [plaintiff]. [The court's] job is limited to correcting a legal error – if error is committed – in the agency decision." *Akins v. Fed. Elec. Comm'n*, 101 F.3d 731, 738 (D.C. Cir. 1996), *vacated on other grounds*, 524 U.S. 11 (1998).

In addition, if USCIS has committed legal error here, "it has *always* been an acceptable feature of judicial review of agency action that a petitioner's 'injury' is redressed by the reviewing court notwithstanding that the agency might well subsequently legitimately decide to reach the same result through different reasoning." *Akins*, 101 F.3d at 738 (emphasis in original) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)). As the Supreme Court has made clear, "[w]hen a litigant is vested with a procedural right [such as those conferred by the APA], that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 518 (2007).

Such is the case here. Plaintiffs' members need *not* show that "but for the [Challenged Policies] . . . approvals [of their applications] would be forthcoming and would bring the wide-ranging benefits" that they seek. *Massachusetts*, 790 F. Supp. 3d at 22; *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 117–18 (D.C. Cir. 1990) ("Petitioners need not prove that granting the

requested relief is certain to redress their injury, especially where some uncertainty is inevitable."). Rather, because the members "invoke a procedural right under the APA, the plaintiffs need plausibly allege only 'some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Massachusetts*, 790 F. Supp. 3d at 22 (quoting *Massachusetts*, 549 U.S. at 518); *see also Competitive Enter. Inst.*, 901 F.2d at 118 ("A remand that would leave the agency free to exercise its discretion in a *proper* manner, then, could lead to agency action that would redress petitioners' injury[.]" (emphasis added)). "It is a feature, not a bug, of this review process that, when the smoke settles, the parties may find themselves in roughly the same place they began." *Massachusetts*, 790 F. Supp. 3d at 21.

Plaintiffs' members have already suffered significant injuries as a result of the Challenged Policies and, even though their members might not ultimately get a favorable outcome in their individual cases, their injuries can still be redressed once the Challenged Policies are lifted and their applications can proceed to a final adjudication. *See, e.g.*, *Massachusetts*, 790 F. Supp. 3d at 22, 24 (finding that, where agency had "indefinitely halted" all approvals of wind energy projects via executive memorandum, plaintiff states and associational members could establish traceability and redressability by showing "a procedural violation [of the APA] paired with an injury that may possibly be redressed upon reconsideration" by the agency of the decision that harmed plaintiffs); *New York*, 811 F. Supp. 3d at 230 (finding that nonprofit plaintiffs challenging agency's pause on the issuance of wind energy project

permits met traceability and redressability requirements given the economic costs its members had incurred due to project delays and despite the fact that, even if the court were to lift the allegedly unlawful pause, agency defendants might still reach the same result in denying plaintiffs' permits after exercising their discretionary powers lawfully); *see also Doe*, 288 F. Supp. 3d at 1064–65 ("Whether [Plaintiff's] son's [refugee] application has other hurdles to cross . . . does not diminish the fact that the [challenged] provisions of the Agency Memo add two more. Removing these hurdles would speed the resolution of any others that may exist since processing of these applications is not presently proceeding at all.").

The Court therefore concludes that the elements of traceability and redressability, as well as injury in fact, have been established. Because at least one of its members would otherwise have standing to sue in their own right, Plaintiffs have satisfied the first prong of associational standing. *See Hunt*, 432 U.S. at 343.

**ii. Plaintiffs' Interests Are Germane to Their Organizational Purposes**

The second prong of associational standing looks to whether "the interests [the organization] seeks to protect are germane to the organization's purpose." *Id.* For this prong, courts typically analyze whether the "interests at stake are related to the organization's core purposes." *Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006). The Government does not contest this issue.

In any event, this prong is met. As their declarations make clear, SEIU, UAW, VAM, ACT, and PANA each "exist to assist their members in the immigration process

as well as to protect their interests, dignity, and working conditions." ECF No. 20-1 at 27–28; *see also* ECF No. 20-4 at 2 ("SEIU was founded in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland. Today, the union represents about two million members in healthcare, the public sectors, and property services—over 25% of whom identify as immigrants."); ECF No. 20-5 at 2 ("Although UAW does not collect citizenship information about its members, its chapters include substantial numbers of lawfully present, noncitizen members, many of whom rely on [employment authorization documents] to work."); ECF No. 20-6 at 2 ("Over time . . . VAM has expanded and adapted its mission in practice to guide, inform, and assist newly arrived immigrants (primarily Venezuelans, but increasingly other nationalities) in Massachusetts and across the U.S. on immigration-related issues."); ECF No. 20-7 at 1 ("ACT is a non-profit organization of African immigrants fighting for civil rights, opportunity, and a better life for families and communities here in the United States."); ECF No. 20-8 at 2 ("PANA is a non-profit, non-partisan organization fighting to advance the full economic, social, and civic inclusion of refugees and displaced populations in the San Diego region, throughout California, and across the country."). The "interests at stake" in this litigation are therefore germane to the core purpose of each organization, which is to support their immigrant members. *See Hunt*, 432 U.S. at 343; *Mallinckrodt*, 471 F.3d at 283.

**iii. Individual Member Participation Is Not Necessary**

Finally, the last prong of the associational standing analysis asks whether "individual members' participation is not necessary to either the claim asserted or the relief requested." *Animal Welfare Inst. v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010)

(citing *Friends of the Earth*, 528 U.S. at 181); *see also Hunt*, 432 U.S. at 343. The Government also does not contest this prong. Indeed, as Plaintiffs point out, the participation of its individual members is not necessary here because they "challenge agency actions under the APA and seek vacatur as well as declaratory and injunctive relief that would benefit all affected individuals without requiring individualized proof." ECF No. 20-1 at 28; *see Housatonic River Initiative*, 75 F.4th at 265 ("That requested 'prospective relief' would 'inure to the benefit of those members of the [Petitioners] actually injured,' support[s] a finding of associational standing." (quoting *Warth*, 422 U.S. at 515)).

Plaintiffs have therefore satisfied all three requirements of associational standing. *See Hunt*, 432 U.S. at 343. At long last, the Court may now turn to the merits of Plaintiffs' APA claims.

### C. The Merits

Plaintiffs argue that the Challenged Policies violate the APA for three reasons. First, they contend that the policies "exceed USCIS's statutory authority and are contrary to law." ECF No. 20-1 at 32. Second, they assert that the policies are "arbitrary and capricious." *Id.* And third, they object to USCIS having issued the policies "without following notice-and-comment procedures." *Id.* The Court addresses the first two of these arguments.[30]

[30] The Court does not reach and need not address Plaintiffs' notice-and-comment argument.

### 1. The Challenged Policies Are Contrary to Law

Plaintiffs' first APA-based claim is that "[t]he Challenged Policies exceed USCIS's statutory authority and are contrary to law." ECF No. 20-1 at 32 (citing 5 U.S.C. § 706(2)(A), (C)). Though Plaintiffs cite two distinct provisions of the APA, the provisions "contain a 'linguistic distinction without a practical difference' in the context of an agency action that is allegedly contrary to statutory requirements." *New York*, 811 F. Supp. 3d at 241 (quoting *Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104, 127 (D. Mass. 2021)).

As a general matter, the APA instructs reviewing courts to "hold unlawful and set aside" agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). Federal agencies are of course "creatures of statute," and thus "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022). "An agency may not confer power upon itself," because "[t]o permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). As such, "[i]t is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374).

Plaintiffs' theory of their contrary to law claim is that neither the INA nor any other statute provides USCIS with the authority to enact its Challenged Policies. *See* ECF No. 20-1 at 32; ECF No. 23 at 27. The Government counters by arguing that the

INA does indeed provide USCIS with "the authority to issue the Challenged Policies to temporarily pause final adjudication of pending applications for immigration benefits and to announce its intent to reconsider past benefit awards." ECF No. 21 at 40. Following the approach taken by the First Circuit, the Court will "examine the statutory provisions that the DOJ identifies as authorizing the imposition of the [Challenged Policies]." *City of Providence*, 954 F.3d at 32. This is an inquiry steeped in statutory interpretation. *Id.* at 31.

**a. Section 1182(f) Does Not Authorize USCIS's Actions**

The Court begins its analysis with a brief discussion of 8 U.S.C. § 1182(f) (also known as INA § 212(f)).[31] That statute authorizes the President to "suspend the entry" of "any class of aliens into the United States" when he finds that such entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). As some may recall, during the President's first term in office, the Supreme Court ruled that this provision of the INA gave the President broad authority to bar nationals from six predominantly Muslim countries from entering the United States. *See Hawaii*, 585 U.S. at 683–84 ("By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States.").

As relevant here, there appears to be some agreement between the parties that Section 1182(f) "addresses only the President's authority and concerns only a single aspect of federal immigration law: restrictions on entry." ECF No. 21 at 44; *see also*

---

[31] For a full analysis of the legislative history surrounding Section 1182(f), see generally Dan Ordorica, Note, *Presidential Power and American Fear: A History of INA § 212(f)*, 99 B.U. L. Rev. 1839 (2019).

ECF No. 23 at 27 ("Section 1182(f) gives the President the authority to impose entry restrictions—and nothing more. The government apparently agrees.").

However, at the same time, the prevalence of Section 1182(f) in this case is inescapable. All three of USCIS's Policy Memoranda make reference to this statutory provision. *See* ECF No. 16-1 at CAR-000072 (listing as the subject line of the November Memorandum: "Impact of INA § 212(f) on USCIS' Adjudication of Discretionary Benefits"); ECF No. 16-2 at CAR-000001 n.1 (citing INA 212(f) in the subject line—"Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries"—of the December Memorandum); ECF No. 16-3 at CAR-000045 n.1 (citing INA 212(f) in the subject line—"Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries"—of the January Memorandum).

Each of the Policy Memoranda are also accompanied by references to the Presidential Proclamations that imposed the Travel Ban restrictions in the first place, which were themselves promulgated under Section 1182(f). *See* Proclamation No. 10949, 90 Fed. Reg. at 24498 (imposing initial Travel Ban restrictions under 8 U.S.C. 1182(f)); Proclamation No. 10998, 90 Fed. Reg. at 59719 (imposing additional Travel Ban restrictions under 8 U.S.C. 1182(f)).

Against this backdrop, the Government appears to suggest that the Challenged Policies are required by Presidential Proclamations Nos. 10949 and 10998. For instance, the Government states that "[t]he Challenged Policies merely recognize and extend a policy directive that the President issued." ECF No. 21 at 43. Then, as

support for this assertion, the Government cites various cases that declare that "an agency under the direction of the executive branch . . . must implement the President's policy directives to the extent permitted by law." *Id.* (first quoting *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012); then citing *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[F]aithful execution of the laws enacted by the Congress, however, ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates. . . . Those officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law.")). USCIS goes even further in its March 30th Alert, stating outright that the Challenged Policies were implemented "[i]n accordance with relevant executive orders and presidential proclamations," which it identifies as Exec. Order No. 14161, Proclamation Nos. 10949 and 10998. ECF No. 21-2 at 1.

Just to be clear, nothing in Section 1182(f) or the Presidential Proclamations authorize the Challenged Policies at issue here. The statute enables the President to impose certain *entry restrictions* on noncitizens, but it does not give the Executive license to enact restrictions on the ability of noncitizens to obtain immigration benefits—especially those who have already entered the country. *See, e.g.*, *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 196 (D. Mass. 2025) (explaining that the purpose of Section 1182(f) "is to regulate and influence conduct abroad, rather than at home"); *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 563 (N.D. Cal. 2020) ("Congress' delegation of

authority in the immigration context under Section 1182(f) does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners."). Just last month, Chief Justice John G. Roberts, Jr. reaffirmed this distinction at oral arguments in a case concerning DHS's termination of Temporary Protected Status ("TPS") protections for Haitian and Syrian migrants: "[The Government] rel[ies] on *Trump v. Hawaii* in . . . [its] argument, but that involved the President and entry restrictions. Here, we're concerned with the [DHS] Secretary and . . . aliens that are already present." Transcript of Oral Argument at 8, Mullin v. Doe, --- S. Ct. ---- (2026) (Nos. 25-1083, 25-1084) (Roberts, C.J.).

And, as other courts have noted, there is nothing in Proclamations No. 10949 and No. 10998 "that requires or even anticipates the adjudicative hold policy. As reflected in their titles and throughout their text, those proclamations involve restrictions on 'the entry' of noncitizens 'into the United States' from other countries, not the consideration of benefit applications from noncitizens already within the United States." *Doe*, 2026 WL 1170971, at *15; *see also Varniab*, 2026 WL 485490, at *19 (recognizing that "the adjudicatory hold extends far beyond" the Proclamations' restrictions on "*entry* of aliens from . . . countries deemed to be high-risk," because "it applies to nearly all pending benefit requests from applicants such as Plaintiffs *who have already been admitted to the United States*" (emphasis in original)).

Because the Court finds that USCIS can neither invoke Section 1182(f) nor Proclamations Nos. 10949 and 10998 as the legal bases underlying the

implementation of the Challenged Policies, the next task is to determine whether any other statutory provision authorizes the agency's actions.

#### b. The Global Asylum Hold Policy Is Contrary to Law

The Court turns its attention first to the Global Asylum Hold. As a reminder, that policy places an adjudicative hold on all applications for asylum and withholding of removal, regardless of the applicant's country of origin. *See* ECF No. 16-2 at CAR-000001.[32] Plaintiffs contend that "USCIS did not have any valid authority" to enact the Global Asylum Hold Policy, and that the Government has failed to identify any legal grounds that grant it such authority. *See* ECF No. 20-1 at 35. Indeed, Plaintiffs assert that the Global Asylum Hold contravenes a statutory provision of the INA that specifies that USCIS "shall" adjudicate asylum applications. *Id.* at 36 (quoting 8 U.S.C. § 1158(d)(5)(A)). The statute specifically provides that final adjudications of asylum claims "shall be completed within 180 days after the date an application is filed," absent "exceptional circumstances." 8 U.S.C. § 1158(d)(5)(A)(iii).

As mentioned, the word "shall" carries great significance in the context of statutory interpretation. *See Kingdomware Techs.*, 579 U.S. at 171. That word "generally imposes a nondiscretionary duty" on the actor to whom it is directed, *see SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362 (2018), and it "creates a mandate, not a

[32] Again, even though USCIS posted on its website that it has resumed processing asylum applications for individuals from "non high-risk countries" as of March 30, 2026, *see* ECF No. 21-2 at 3, the Court assumes that this policy is still in effect given that the Global Asylum Hold Policy has not been "lifted by the USCIS Director through a subsequent memorandum," which is an express condition that USCIS introduced when it first enacted the policy. *See* ECF No. 16-2 at CAR-000002–03.

Case: 26-1703 Document: 00118436172 Page: 157 Date Filed: 11/12/2026 Entry ID: 6859257

liberty," *Murphy v. Smith*, 583 U.S. 220, 223 (2018). The Court then agrees with Plaintiffs that when Congress used the word "shall" in the asylum statute, it created a "nondiscretionary duty to perform." *Murphy*, 583 U.S. at 223. The statute contemplates USCIS invoking "exceptional circumstances," *see* 8 U.S.C. § 1158(d)(5)(A)(iii), but the Government does not even mention that exception in defending against the Global Asylum Hold. Otherwise, the statute says nothing about the wholesale suspension of asylum adjudications. USCIS may wish that it did, but as the Supreme Court instructs, "[w]here a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst.*, 584 U.S. at 363 (citing *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946)).

The Court also cannot ignore that the Global Asylum Hold contravenes USCIS's own regulations pertaining to asylum adjudications. "An agency action also must be set aside as contrary to law when it is inconsistent with regulations." *New York*, 811 F. Supp. 3d at 241 (citing *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1011 (D.C. Cir. 2014); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (noting that "law," as used in the APA, "includes . . . agency regulations that have the force of law"); *see also Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations.").

As relevant here, 8 C.F.R. § 208.9(a) provides: "USCIS *shall* adjudicate the claim of each asylum applicant whose application is complete[.]" 8 C.F.R. § 208.9(a) (emphasis added). And, re-enforcing the fact that USCIS must follow the commands

of the asylum statute, the regulation adds: "In *all* cases, such proceedings *shall* be conducted in accordance with [8 U.S.C. § 1158]." *Id.* (emphasis added). The use of the word "all" in the regulation is also meaningful because it signifies that USCIS is not free to adjudicate some cases while also putting an indefinite and categorical hold on a subset of others, particularly those cases involving applicants from "high-risk countries."[33] *See, e.g.*, *Nat'l Coal. For Students With Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998) ("[T]he use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth."); *Mayor & City Council of Balt. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 816 F. Supp. 3d 107, 122 (D.D.C. 2026) (explaining that "all" is a broad term referring to the "entirety" of a group and not just a "subset" of that group).

To the extent that the Global Asylum Hold Policy places a pause on statutory withholding of removal and CAT protection claims, that is an even easier case for this Court to resolve. The Supreme Court has already recognized that these are forms of relief that USCIS "has *no discretion* to deny . . . to a noncitizen who establishes his eligibility." *Moncrieffe*, 569 U.S. at 187 n.1; *see also I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) (explaining that "withholding [of removal] is mandatory" if the noncitizen establishes eligibility); *Nasrallah*, 590 U.S. at 575 (recognizing that noncitizens are "entitled to CAT relief," if they establish eligibility). Like the asylum

[33] Indeed, USCIS acknowledges in its March 30th Alert that it has done just that: "Holds have been lifted for . . . asylum applications from non high-risk countries. We continue to review all application types and lift holds for both individual and group cases as appropriate." ECF No. 21-2 at 3.

regulations, the withholding of removal regulations contain mandatory language: "[A]n application for withholding of . . . removal to a country of proposed removal *shall* be granted if the applicant's eligibility for withholding is established[.]" 8 C.F.R. § 208.16(d)(1) (emphasis added); *see also* 8 C.F.R. § 208.17(a) ("An alien who [establishes CAT eligibility] *shall* be granted deferral of removal to the country where he or she is more likely than not to be tortured." (emphasis added)). This too demonstrates USCIS's "nondiscretionary duty to perform" with respect to withholding of removal and CAT claims. *See Murphy*, 583 U.S. at 223.

So, because USCIS has exceeded its statutory authority in implementing the Global Asylum Hold and contravened its own regulations, the Court concludes that this policy is contrary to law and must be set aside.

**c. The Benefits Hold Policy Is Contrary to Law**

The Court turns next to the Benefits Hold Policy, which "place[s] a hold on pending benefit requests" for individuals from Travel Ban Countries "pending a comprehensive review, regardless of entry date." *See* ECF No. 16-2 at CAR-000001; *see also* ECF No. 16-3 at CAR-000045. As USCIS later explained in its January Memorandum, "[a] hold allows a case to proceed through processing," but it does not allow for a "final adjudication," which "refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal." ECF No. 16-3 at CAR-000045 n.2.

Plaintiffs contend that USCIS also lacked "a valid statutory basis" to enact the Benefits Hold Policy. ECF No. 20-1 at 35. They again point out that the INA dictates many aspects of the benefit adjudication process, but that it notably does not "give

USCIS authority to . . . withhold adjudications wholesale or enact other blanket restrictions on access to immigration benefits." *Id.* at 35–36. The Government pushes back, seemingly suggesting that the Benefits Hold Policy is justified by INA provisions that "require[ ] USCIS to conduct adequate security investigations before granting benefits." ECF No. 21 at 41.

Once again, Plaintiffs have the better of the argument. The relevant statutes and regulations speak in mandatory terms. Start first with naturalization. Like the asylum statute, the naturalization statute provides that USCIS employees "*shall* [be] designate[d] . . . to conduct examinations upon applications for naturalization," and that these employees "*shall* make a determination as to whether the application should be granted or denied, with reasons therefor." 8 U.S.C. § 1446(b), (d) (emphasis added). The INA also seems to suggest that naturalization determinations should be made within "the 120-day period" following the USCIS examination; otherwise, if the determination is not made by then, the applicant can seek a hearing in federal court on the matter. *See* 8 U.S.C. § 1447(b).

Again, the naturalization statute's use of the word "shall" speaks volumes, indicating a "nondiscretionary duty to perform" on naturalization applications. *See Murphy*, 583 U.S. at 223. USCIS's own regulation also support this conclusion, providing that "USCIS *shall* grant the application if the applicant has complied with all requirements for naturalization under this chapter." 8 C.F.R. § 335.3(a) (emphasis added). Indeed, with respect to the timeline under which naturalizations are to be adjudicated, the regulation provides even less flexibility than the statute,

stating that "[a] decision to grant or deny the application *shall* be made at the time of the initial examination or within 120-days after the date of the initial examination of the application for naturalization[.]" *Id.* (emphasis added).

Turning to employment authorization and adjustment of status, the statutes governing those benefits use discretionary terms. *See* 8 U.S.C. § 1324a(h)(1), (3) (providing that a noncitizen may work if they are "lawfully admitted for permanent residence" or "authorized to be so employed by this chapter or by the [DHS Secretary]"); 8 U.S.C. § 1255(a) (providing that a noncitizen's status "may be adjusted by the [DHS Secretary], in his discretion and under such regulations as he may prescribe").

But the regulations promulgated by USCIS to adjudicate those benefits use mandatory language that the agency is not free to ignore. *See Lovo v. Miller*, 107 F.4th 199, 212 (4th Cir. 2024) ("A regulation can mandate action even if a statute does not."). The employment authorization regulations state that an applicant "must apply" to USCIS for a work permit, *see* 8 C.F.R. § 274a.12(a), (c), and that if that application is granted or denied, the applicant "*shall* be notified of the decision" (and, if there is a denial, "the reasons for the denial"). *See* 8 C.F.R. § 274a.13(b), (c) (emphasis added); *see also Ayala v. Noem*, 781 F. Supp. 3d 1187, 1203 (D.N.M. 2025) (collecting cases that stand for the proposition that 8 C.F.R. § 274a.13(b) and (c) impose "a non-discretionary duty" to adjudicate applications for employment authorization). Similarly, the adjustment of status regulations provide that a noncitizen "must file" an application, *see* 8 C.F.R. § 245.2(a)(3)(iii), and that "[t]he

applicant *shall* be notified of the decision of the [USCIS] director and, if the application is denied, the reasons for the denial." *See* 8 C.F.R. § 245.2(a)(5)(i) (emphasis added); *see also Saghafi*, 2026 WL 1127468, at *5 (collecting cases that stand for the proposition that "§ 245.2(a)(5)(i)'s mandatory notification requirement" imposes a "duty to adjudicate [applications for adjustment of status] [that] is non-discretionary").

There is even a statute, 8 U.S.C. § 1571(b), that strongly indicates Congress's intent with respect to the processing of immigration benefit applications: "It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application[.]" 8 U.S.C. § 1571(b). The Government seizes on the statute's use of the word "should," suggesting that this "precatory" language absolves USCIS of responsibility to adjudicate applications on a settled timeline. ECF No. 21 at 45. However, in the Court's view, this provision reflects the sense of Congress that the adjudication work of USCIS should at least proceed—not be brought entirely to a standstill by the agency. *See* 8 U.S.C. § 1571(a)(1)–(2) (explaining that the purpose of the subchapter is "to maintain the elimination of the backlog [in the processing of immigration benefit applications] in future years" and to "provide for regular congressional oversight of the performance of [USCIS] in eliminating the backlog and processing delays in immigration benefits applications").

All told, the governing statutory and regulatory language, as well as relevant congressional intent, demonstrate "implicit requirement[s] that . . . applications be

decided." *Doe*, 2026 WL 1170971, at *15. The Benefits Hold Policy precludes any decision on these applications, which is "fundamentally inconsistent" with the commands of Congress and with USCIS's own regulations. *Id.* The Government does not directly challenge this conclusion, nor does it identify any statute or regulation that gives USCIS the green light to indefinitely withhold adjudications of benefit requests. Rather, the Government hangs its hat on the argument that USCIS is choosing to "evaluate public safety and national security risks . . . differently from how it has in the past." ECF No. 21 at 44. The Government claims that the agency's decision in doing this "is a matter of discretion Congress delegated to the Executive." *Id.*

The Court is unconvinced. None of the statutes that the Government points to provide USCIS with such discretion. The Government cites, for example, 8 U.S.C. § 1182(a)(3), but that provision only "enumerates security and related grounds that make aliens inadmissible to the United States." *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 136 n.12 (D. Mass. 2025). That statute is "inapposite where, as here, the challenged policy concerns domestic processing of benefit applications by noncitizens already admitted into the United States." *Doe*, 2026 WL 1170971, at *16; *see Hawaii*, 585 U.S. at 695 (explaining that admissibility and entry "operate in [a] different sphere[ ]" than the allocation of visas).

The Government also cites 8 U.S.C. § 1446(a), claiming that it "requires 'investigation and examination' before approval" of naturalization applicants. ECF No. 21 at 40. But that provision applies to *individual* applicants: "Before *a* person

may be naturalized, an employee of [USCIS] . . . shall conduct *a* personal investigation of *the person* applying for naturalization[.]" 8 U.S.C. § 1446(a) (emphasis added). This provision cannot reasonably be read to confer USCIS with the sweeping authority to adopt a generally applicable policy that withholds naturalization adjudications indefinitely. The Government attempts a similar tack with the adjustment of status statute, but that law also applies to individual applicants. *See* 8 U.S.C. § 1255(a) (providing that "[t]he status of *an alien*" may be adjusted provided that, among other things, "*the alien* . . . is admissible to the United States for permanent residence" (emphasis added)).[34]

Finally, the Government points to 8 U.S.C. § 1105(a) and 8 U.S.C. § 1105(b) as authority "direct[ing] the Secretary to liaise with other law enforcement and security agencies 'for the purpose of obtaining and exchanging information for use in enforcing the provisions of [the INA] in the interest of internal and border security.'" ECF No. 21 at 41. According to the Government, these provisions "impose affirmative

[34] To the extent the Government relies on 8 C.F.R. § 103.2(b)(18) as a basis for withholding adjudication of immigration benefits, that argument does not appear fully developed. The Government cites this regulation in the "Legal Background" section of its brief, but does not mention it anywhere else. In any event, Judge Kobick has already rejected an argument premised on this regulation. As she explained, this regulation, "which authorizes withholding of adjudication for *individual* benefit requests at specified intervals pending an ongoing investigation, [does not] confer authority to adopt a generally applicable policy withholding adjudication." *Doe*, 2026 WL 1170971, at *15 (citing 8 C.F.R. § 103.2(b)(18)); *see also Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1168 (N.D. Cal. 2007) (observing that 8 C.F.R. § 103.2(b)(18) "allows for the withholding of adjudication, for specified intervals, upon compliance with specific procedural requirements," but that it "is not a blanket authority to indefinitely withhold adjudication of an application").

duties to obtain and exchange security information—duties that cannot be fulfilled if applications are adjudicated before adequate information is obtained." *Id.*

The Court finds it difficult to believe that this statute requires the work of an entire agency to grind to a halt so that the agency may "obtain and exchange security information" about applicants, especially considering that, until quite recently, "USCIS's obligation to conduct investigations before issuing a decision on benefit applications . . . has coexisted . . . with its duty to issue a decision on those applications." *Doe*, 2026 WL 1170971, at *15. As Judge Kobick eloquently put it:

> By statute and regulation, Congress and USCIS have specified that, at a certain point, investigations must end and a decision must be made. The charge to conduct investigations does not give USCIS authority to perpetually delay adjudication of applications, where Congress required USCIS to make such decisions and the agency has, by regulation, committed itself to making such decisions.

*Id.*; *see also Bowser*, 2026 WL 555624, at *8 ("USCIS [appears] concerned that it may provide immigration benefits to those who are later discovered to pose a threat. But in those circumstances, the government still has a remedy, including the rescission of any grant of residency, criminal charges, and the initiation of removal proceedings.").

In the end, the relevant statutes, regulations, and legislative intent lead the Court to conclude that Congress has not empowered USCIS to categorically withhold adjudications of immigration benefits. As Plaintiffs accurately put it, "[h]ad Congress intended to give USCIS that sweeping authority, it surely would have said so." ECF No. 20-1 at 36. As such, the Court finds that the Benefits Hold Policy is contrary to law and must be set aside.

#### d. The Comprehensive Re-Review Policy Is Contrary to Law

Next, the Court looks to the Comprehensive Re-Review Policy, which directs USCIS personnel to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from [Travel Ban Countries] who entered the United States on or after January 20, 2021." *See* ECF No. 16-2 at CAR-000001; *see also* ECF No. 16-3 at CAR-000045. This policy "mandates" that covered noncitizens "undergo a thorough re-review process . . . to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." ECF No. 16-2 at CAR-000001.

With respect to this policy, Plaintiffs have expressed concern that USCIS may try to terminate or revoke benefits that have already been issued to their members. *See, e.g.*, ECF No. 20-1 at 21 ("The possibility that these benefits could be revoked has been traumatizing for Dorcas International's clients and made it more difficult to help them plan for their futures, pursue employment, and invest in education."); ECF No. 20-3 at 12 ("The announcement that USCIS may revoke, rescind, or terminate these previously granted benefits has caused enormous fear, anxiety, and uncertainty among RDC's community members.").

These concerns are understandable, given that USCIS never fully clarified in its Policy Memoranda whether termination or revocation of already-issued benefits was its end goal. The closest the agency came to revealing its true intentions was in the March 30th Alert in which it stated, rather cryptically, that "[m]any applicants for naturalization and lawful permanent residence were not sufficiently vetted. As a

result, applications were approved and individuals were naturalized who should not have been." ECF No. 21-2 at 2.

In any event, the Government seems to suggest that USCIS either has the "inherent" power to implement the Comprehensive Re-Review Policy under the INA, or that this authority has been expressly delegated to the agency by Congress "as a matter of discretion." *See* ECF No. 21 at 7.[35] Much has been written about whether agencies engaged in adjudication have the inherent authority to reconsider their final judgments.[36] The Supreme Court has never recognized this power and, in fact, cautioned decades ago that agencies generally may not "expand their powers of reconsideration without a solid foundation in the language of a statute." *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 333 (1961).[37]

By contrast, both the D.C. Circuit and the Ninth Circuit have recognized the inherent power to reconsider past agency decisions. *See Ivy Sports Med., LLC v.*

---

[35] The Government also suggests that conducting re-reviews to "evaluate public safety and national security risks" is a matter of discretion that Congress has delegated to the Executive Branch. *See* ECF No. 21 at 44. To the extent the Government relies on the statutes already discussed in the prior sections of this opinion, none of those statutes delegate to USCIS the authority to conduct a wholesale reassessment of approved applications on the basis of "public safety" or "national security."

[36] For a more detailed discussion of this subject, see generally Daniel Bress, Note, *Administrative Reconsideration*, 91 Va. L. Rev. 1737 (2005).

[37] The Supreme Court has, however, recognized an agency's power to reconsider or revoke past agency action to the extent that it involves "the correction of inadvertent ministerial errors." *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145 (1958). Even then, the Court was careful to clarify that "the power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies." *Id.* at 146.

*Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions."); *Nat'l TPS All.*, 150 F.4th at 1019 ("[A]gencies have some authority to reconsider prior decisions."). However, even those courts have expressed limits to this power, observing that reconsideration must be "done in a timely fashion," and that "any inherent reconsideration authority does not apply in cases where Congress has spoken." *Ivy Sports Med.*, 767 F.3d at 86; *see also Nat'l TPS All.*, 150 F.4th at 1020. As to this second limitation, each court has acknowledged that agencies cannot revisit past decisions "where Congress has spoken as to the proper procedure for reversing a decision." *Nat'l TPS All.*, 150 F.4th at 1020; *see also Ivy Sports Med.*, 767 F.3d at 86.

These principles hold sway here. Just as in *National TPS Alliance* and *Ivy Sports Medicine*, Congress has spoken as to the proper procedures for revoking and/or terminating immigration benefits, and those procedures contemplate only *individual* revocations or terminations of benefits. *See, e.g.*, 8 U.S.C. § 1451(a) (providing that United States attorneys have the duty to institute [denaturalization] proceedings in . . . the judicial district in which *the naturalized citizen* may reside" (emphasis added)); 8 U.S.C. § 1158(c)(2) (providing that asylum "may be terminated if the Attorney General determines that" (1) "*the alien* no longer meets the conditions" of eligibility; (2) "*the alien* meets a[n] [enumerated] condition"; (3) *"the alien* may be removed . . . to *a country* . . . in which *the alien's* life or freedom would not be threatened; (4) "*the alien* has voluntarily availed *himself* or *herself* of the protection

of *the alien's* country of nationality"; or (5) "*the alien* has acquired a new nationality and enjoys the protection of [that] country" (emphasis added)); 8 U.S.C. § 1256(a) (providing that noncitizen's lawful permanent residence may be rescinded if "it shall appear to the satisfaction of the Attorney General that *the person* was not in fact eligible for such adjustment of status" (emphasis added)); *see also* 8 C.F.R. §§ 274a.14(b)(1) (providing that a USCIS district director may revoke employment authorization "when it appears that any condition upon which *it* was granted has not been met or no longer exists, or for good cause shown" or "[u]pon a showing that the information contained in *the application* is not true and correct" (emphasis added)).

Congress has also enumerated specific reasons that benefits may be terminated or revoked, with the primary basis being that the person lacked eligibility for the benefit in the first place. For example, the naturalization statute contemplates denaturalization proceedings being instituted against "the naturalized citizen . . . on the ground that such order and certification of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Similarly, the adjustment of status statute provides for the rescission of lawful permanent residence if "it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status." 8 U.S.C. § 1256(a). To suggest then, as USCIS does here, that all naturalized citizens and lawful permanent residents from particular countries who entered the United States at a particular time must submit to re-reviews because certain "applications [for adjustment of status] were approved and individuals were

naturalized who should not have been," *see* ECF No. 21-2 at 2, is a vast overreading of the agency's authority.[38]

The Government is therefore mistaken in insisting that USCIS has the inherent or express statutory authority to implement its Comprehensive Re-Review Policy. Congress has spoken as to the proper procedures to be followed when revoking or terminating immigration benefits, which forecloses the Government's "inherent" authority argument. *See Nat'l TPS All.*, 150 F.4th at 1020; *Ivy Sports Med.*, 767 F.3d at 86. In addition, nothing in the statutes that Congress passed authorize or even contemplate USCIS's large-scale re-review of all noncitizens from certain countries who have already been approved for immigration benefits. Quite the opposite: The statutes make clear that, if the agency wishes to institute revocation or termination proceedings, it must proceed on an individualized level and determine whether a particular person—not a large swath of people—lacks eligibility for the benefit provided. USCIS did not follow the procedures prescribed by Congress and appears to have circumvented them entirely in favor of its Comprehensive Re-Review Policy.

---

[38] Particularly with respect to naturalization, this is not the first time the Executive Branch has tried to argue that, because Congress granted it the statutory authority to naturalize new U.S. citizens, it also necessarily conferred the power to reconsider prior naturalization decisions. *See Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc). In *Gorbach*, the Ninth Circuit ruled that Congress explicitly allocated the denaturalization power to the Judicial Branch—not the Executive Branch. *Id.* at 1093–94; *see* 8 U.S.C. § 1451(a) (providing that denaturalization proceedings may be brought "in any district court"). The court therefore rejected the Executive Branch's assertion of power to revoke naturalization decisions. *Gorbach*, 219 F.3d at 1095 ("Whether the Attorney General can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could.").

As such, the Court finds that USCIS has exceeded its statutory authority in implementing the Comprehensive Re-Review Policy. It too is contrary to law and must be set aside.

**e. The Country-Specific Factors Policy Is Contrary to Law**

Last but not least, the Court turns its attention to the Country-Specific Factors Policy. In its November Memorandum, USCIS amended its Policy Manual to include new guidance for those USCIS personnel charged with processing discretionary benefit requests. It provides that these officials are now to consider "any relevant country-specific factors such as those specified in [the Travel Ban] as significant negative factors in the adjudication of discretionary benefit requests." ECF No. 16-1 at CAR-000073. It also explains that, while the Travel Ban's "categorical ineligibility for entry or admission does not apply" to benefits adjudications, USCIS may begin considering "on a case-by-case basis country-specific facts and circumstances" discussed in the Travel Ban "as a significant negative factor when making an individual assessment in weighing discretion." *Id.* at CAR-000023. USCIS specifies that some of those "country-specific facts and circumstances" include but are not limited to "insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the countries identified in [the Travel Ban]." *Id.* at CAR-000073.

Plaintiffs state that this new policy "erects a barrier to securing discretionary immigration benefits for noncitizens from Travel Ban countries by requiring USCIS to discriminate on the basis of country of origin." ECF No. 20-1 at 31. According to

Plaintiffs, the Country-Specific Factors Policy imposes a "country-of-origin penalty" to which noncitizens from other countries are not subjected. *Id.* at 21.

The Government denies this assertion, claiming that "USCIS will use country-specific findings in assessing individual applications," and that it "will not consider the applicant's nationality itself as a significant negative factor." ECF No. 21 at 44. The Government also contends that USCIS has not exceeded its statutory authority in implementing the Country-Specific Factors Policy because it is merely exercising its discretion in how it chooses to evaluate public safety and national security risks in its adjudications. *Id.* at 44–45.

As relevant here, 8 U.S.C § 1152(a)(1)(A) provides that, with limited exceptions, " no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality*, place of birth, or place of residence." 8 U.S.C § 1152(a)(1)(A) (emphasis added). As Judge Kobick has noted, "this statute bears on the plaintiffs' applications for adjustment of status and work authorization, because those applications depend on visa availability,[39] but does not apply to applications for naturalization or asylum." *Doe*, 2026 WL 1170971, at *16.

---

[39] For example, a foreign worker who is already in the United States in a temporary visa classification may apply for adjustment of status if an immigrant visa number is available. *See Employment-Based Visa Categories in the United States: An Overview*, Am. Immigr. Council (Apr. 13, 2026), https://www.americanimmigrationcouncil.org/fact-sheet/employment-based-visa-categories-united-states/#fn35 [https://perma.cc/5NXU-GJCK]. But, in some circumstances, the date an immigrant visa becomes available to the worker is dependent upon USCIS's approval of the worker's immigrant visa petition. *Id.* (citing 8 C.F.R. §§ 204.5(d), (e)(3)).

Importantly, Section 1152(a)(1)(A) is no ordinary provision of the INA. Until the 1960s, the United States had in place a nationality-based quota system, which restricted the entry of immigrants into the country based on the immigrant's nation of birth. *See* Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153. Then, following calls from President John F. Kennedy and President Lyndon B. Johnson,[40] Congress "comprehensive[ly] revis[ed]" the INA in 1965 (the "1965 Revisions"). *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 338–39 (4th Cir. 2018) (Wynn, J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018) (quoting *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2*, 88th Cong. 78 (1964) (statement of Sen. Hiram Fong)). The 1965 Revisions "were drafted concurrently with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 and enacted at the height of the civil rights

[40] Judge James A. Wynn of the Fourth Circuit explained the years leading up to the passage of Section 1152(a)(1)(A) as follows:

> President Kennedy called on Congress to repeal the nationality-based quota system, condemning it as a system "without basis in either logic or reason" that "neither satisfie[d] a national need nor accomplishe[d] an international purpose" but instead "discriminate[d] among applicants for admission into the United States on the basis of accident of birth." Letter to the President of the Senate and to the Speaker of the House on Revision of the Immigration Laws, 1963 Pub. Papers 594, 595 (July 23, 1963). After President Kennedy's assassination, President Johnson renewed Kennedy's request for "the elimination of the national origins quota system," which he described as "incompatible with our basic American tradition" and "our fundamental belief that a man is to be judged—and judged exclusively—on his worth as a human being." Special Message to the Congress on Immigration, 1965 Pub. Papers 37, 37, 39 (Jan. 13, 1965).

*Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 339 (4th Cir. 2018) (Wynn, J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018).

movement with the express purpose of 'eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States.'" *Id.* at 339 (quoting H.R. Rep. No. 89-745, at 8 (1965)). "Congress explained that the 1965 Revisions abolished nationality-based discrimination in the immigration system to 'firmly express in our immigration policy the dedication which our nation has to the principles of equality, of human dignity, and of the individual worth of each man and woman.'" *Id.* (quoting *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 1*, 88th Cong. 4 (1964) (statement of Sen. Edward M. Kennedy)).

Once Section 1152(a)(1)(A) was signed into law, in a speech delivered at Liberty Island, New York,

> President Johnson lauded the end of the nationality-based discrimination that previously defined the American system of immigration, describing [it] as abolishing "the harsh injustice of the national origins quota system," which "violated the basic principle of American democracy—the principle that values and rewards each man on the basis of his merit as a man." As a result of the 1965 Revisions, immigrants would be permitted to come to America "because of what they are, and *not because of the land from which they sprung*."

*Id.* at 339–40 (emphasis in original) (quoting 1965 Pub. Papers 1037, 1038–39 (Oct. 3, 1965)).

Both Section 1152(a)(1)(A)'s text and legislative history make Congress's intent clear: No nationality-based discrimination shall occur in the immigrant visa process, which encompasses applications for adjustment of status and employment authorization. *See Doe*, 2026 WL 1170971, at *16. And yet, notwithstanding these commands, the Country-Specific Factors Policy "treats different groups of applicants

for immigration benefits differently based on their national origin." *Varniab*, 2026 WL 485490, at *21. It is not difficult to see how this is so. If an applicant applying for adjustment of status happens to come from one of the countries subject to the Travel Ban, then the Country-Specific Factors Policy directs USCIS personnel to consider aspects of the applicant's country as "significant negative factors" against the applicant. *See* ECF No. 16-1 at CAR-000073. This includes factors that are completely out of the applicant's control, such as their native country's "insufficient vetting and screening" practices. *Id.* By contrast, individuals from countries not listed in the Travel Ban can freely apply for that same benefit without certain aspects of their native countries being weighed negatively against them. This nationality-based discrimination plainly contravenes the requirements of Section 1152(a)(1)(A).

The Court would be remiss if it did not discuss some of the limits to this non-discriminatory provision of the INA. For example, in *Trump v. Hawaii*, the Supreme Court recognized that Section 1152(a)(1)(A) does not prevent the President from imposing entry restrictions on individuals based on their countries of origin. *See* 585 U.S. at 694–97. But again, that case was about imposing entry restrictions on individuals *outside* of the United States. *Id.* at 695 (distinguishing between "admissibility—to which § 1152(a)(1)(A) does not apply—and visa issuance—to which it does"). It did not address the "domestic processing of benefit applications by noncitizens *already admitted* into the United States." *Doe*, 2026 WL 1170971, at *16 (emphasis added). If anything, *Hawaii* reaffirmed that "§ 1152(a)(1)(A) prohibits

discrimination in the allocation of immigrant visas based on *nationality* and other traits." 585 U.S. at 695 (emphasis added).

To the Government's argument that USCIS is not acting in excess of its statutory authority because its personnel are merely exercising their discretion in how they choose to conduct their adjudications, the Court will remind the Government that it is not within USCIS's discretion to decide whether it will be bound by the law. *See, e.g., Zadvydas v. Davis,* 533 U.S. 678, 688 (2001) ("The aliens here . . . do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion."); *Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1196 (D.C. Cir. 1986) ("A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers.").

If the Government had its way, USCIS would be able to—in the exercise of its discretion—continue discriminating freely against applicants from Travel Ban Countries, thereby rendering Section 1152(a)(1)(A) a nullity. The Court refuses to accept that argument. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal citations and quotation marks omitted)).

So, at least as applied to the processing of adjustment of status and employment authorization applications, the Court finds that the Country-Specific Factors Policy is contrary to law and must be set aside.

**2. The Challenged Policies Are Arbitrary and Capricious**

The Court turns its attention next to Plaintiffs' arbitrary and capricious claims. The APA instructs reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *Prometheus Radio Project*, 592 U.S. at 423). While the scope of review under this standard is "'narrow'" and the Court may not "'substitute its judgment for that of the agency,'" *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)), it must still ensure that the agency has "offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio*, 603 U.S. at 292 (quoting *State Farm*, 463 U.S. at 43).

Plaintiffs advance several arguments as to why the Challenged Policies are arbitrary and capricious. The Court addresses three of those arguments, which include claims that: (1) USCIS did not offer a reasoned explanation for its policies; (2) USCIS did not consider the reliance interests of the noncitizens who rely on the agency to adjudicate immigration benefits; and (3) to the extent USCIS did provide

any explanation for the Challenged Policies, its reasoning was pretextual. *See* ECF No. 20-1 at 37.

**a. USCIS Failed to Provide a Reasoned Explanation for Its Actions**

A fundamental rule of administrative law is that "agencies [are] to engage in 'reasoned decisionmaking.'" *Regents*, 591 U.S. at 16 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). "Reasoned decisionmaking under the [APA] calls for an explanation for agency action." *Dep't of Com.*, 588 U.S. at 785. This rule, then, requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

Plaintiffs' first argument is that USCIS failed to offer a reasoned explanation for its Challenged Policies. ECF No. 20-1 at 38. The Government counters and points to two factual bases that the agency cited as support for its policies: (1) the references in the December and January Memoranda to the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting, each alleged to have been committed by an Afghan national; and (2) the references in all three Policy Memoranda to Proclamations Nos. 10949 and 10998, which purport to reveal deficiencies in vetting and screening of individuals from the Travel Ban Countries. *See* ECF No. 21 at 45–46.

But, as Judge Kobick explained, "[t]hese are thin reeds on which to rest an assertion of reasoned decisionmaking." *Doe*, 2026 WL 1170971, at *17. With respect to the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting, the

Government "makes no argument as to how two serious, but isolated, violent crimes planned by two people from one country is rationally connected with a policy stopping adjudication of benefit applications by people from 39 different countries, as well as applications for asylum by people from every country in the world." *Id.* "Extrapolating the criminal conduct of two noncitizens to thousands of other noncitizens, from dozens of countries around the world, does not rank as reasoned decisionmaking." *Id.*; *cf. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 980, 982-83 (9th Cir. 2020) (finding rule arbitrary and capricious where "the agencies ha[d] not justified the Rule's assumption that an alien who has failed to apply for asylum in a third country is, for that reason, not likely to have a meritorious asylum claim"); *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("An unjustified leap of logic or unwarranted assumption . . . can erode any pillar underpinning an agency action.").

Nor do the factual findings contained within Proclamations Nos. 10949 and 10998 aid the Government's cause. Once again, those Proclamations focus solely on restricting the *entry* of noncitizens from thirty-nine countries whose vetting and screening practices were deemed to be deficient. The Challenged Policies, however, "extend[ ] far beyond that context because it applies to nearly all pending benefit requests from applicants such as Plaintiffs *who have already been admitted to the United States*." *Varniab*, 2026 WL 485490, at *19 (emphasis in original). There is nothing then in the Policy Memoranda "linking the findings from the Presidential Proclamations regarding entry of foreign nationals into the United States to a

decision to suspend adjudication of benefit applications by foreign nationals already admitted into the United States." *Doe*, 2026 WL 1170971, at *18. Even more attenuated is the connection between the President's decision to limit the entry of individuals from thirty-nine countries and USCIS's decision to cease asylum adjudications for individuals from *all countries* in its Global Asylum Hold Policy.

Beyond those two factual bases, the Policy Memoranda also seem to invoke vague interests in national security as a justification for the Challenged Policies. And yet neither the Government nor USCIS can elaborate on how the agency concluded that individuals from Travel Ban Countries pose a threat to national security or how withholding benefits from and/or reconsidering benefit approvals to these individuals would serve national security interests. As one court has put it, "[t]he national security interests that the [Challenged Policies] purport[ ] to protect can hardly be served by making beggars out of legal immigrants who are likely to remain lawfully present in the United States indefinitely." *Karimi*, 2026 WL 1103448, at *10; *see also Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1260 (W.D. Wash. 2008) ("If [an applicant present in the country] presents a threat to national security and public safety, the Government does not ameliorate that threat by delaying a decision on his [benefit] application.").

Simply put, the Court finds that there is no rational connection between the facts found and USCIS's choice to implement the Challenged Policies. *See State Farm*, 463 U.S. at 41. Because they lack a reasoned explanation, the Challenged Policies are therefore arbitrary and capricious.

### b. USCIS Failed to Account for Reliance Interests

Plaintiffs also argue that, in enacting the Challenged Policies, USCIS failed to consider important reliance interests. ECF No. 20-1 at 42. Agencies are of course "free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, when an agency "changes its existing position," it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *Fox Television Stations*, 556 U.S. at 515).

Importantly, "[i]n explaining its changed position," the agency must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 221–22 (quoting *Fox Television Stations*, 556 U.S. at 515). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 515–16. In other words, the agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. "It would be arbitrary or capricious to ignore such matters." *Fox Television Stations*, 556 U.S. at 515.

The reliance interests in this case could not be more clear. For decades, immigrants have come to the United States with the understanding that they could apply for and eventually obtain work permits, green cards, asylum status, and/or U.S.

citizenship. As Plaintiffs explain, many of their members have built and structured their lives in reliance on the benefits that USCIS provides: They are employed, raising families, paying taxes, and contributing to their communities. *See* ECF No. 20-1 at 42; ECF No. 20-2 at 11. They followed the lawful processes that were laid out for them. They reasonably expected their applications to be considered fairly, in a manner consistent with past practices. Then, with three Policy Memoranda, USCIS pulled the rug out from under them.

The consequences of USCIS's actions have been severe. SEIU describes a member, SEIU Member A, who had employment authorization and who passed his medical licensing examinations and matched for a residency at a major U.S. hospital, where he started working in 2025. ECF No. 20-4 at 8. His employment authorization expired after the Challenged Policies took effect, and he was forced to stop his residency training. *Id.* VAM identifies a member, VAM Member B, warned by his employer that he would lose his job as of May 2026 if unable to present a renewed work permit. ECF No. 20-6 at 7–8. As the sole breadwinner for his family, this loss of employment would be devastating not only for him but for his wife and two children, including one with special needs. *Id.* And ACT explains that one of its members, ACT Member B, is a lawful permanent resident who was days away from her naturalization interview in December 2025 when USCIS canceled it. ECF No. 20-7 at 6. ACT Member B has dreams of working at the State Department as a foreign service officer, which is a role that requires U.S. citizenship, but she can no longer pursue her dream job while the Challenged Policies remain in place. *Id.* These are

all very serious reliance interests that USCIS had to contend with as a federal agency. *See Regents*, 591 U.S. at 31 (explaining that, before rescinding the DACA program, DHS had to at least consider serious reliance interests felt by DACA recipients who had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children," all in reliance on the DACA program).

What, then, did USCIS have to say about these reliance interests when it enacted the Challenged Policies? The best the agency could muster is the following, which is taken directly from its Policy Memoranda announcing the changes:

> USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security.

ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000044.

"While USCIS, arguably, 'display[s] awareness that it is changing position' by stating that it 'considered that this direction may result in delay to the adjudication of some pending applications,'" the agency "provides no 'reasoned explanation' for disregarding Plaintiffs' 'serious reliance interests' in prior . . . adjudication policies." *Saghafi*, 2026 WL 1127468, at *9 (quoting *Encino Motorcars*, 579 U.S. at 221–22). The agency's language is "merely conclusory" and "provides no explanation as to how USCIS 'weighed' the competing factors and determined that the consequences of

delays imposed by the [Challenged Policies] were necessary." *Behdin*, 2026 WL 1031079, at *21.

This is ultimately fatal to the Government's position. As the Supreme Court has stated, "summary discussion may suffice in other circumstances, but here—in particular because of decades of . . . reliance on the [agency's] prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position." *Encino Motorcars*, 579 U.S. at 222. So too here. USCIS was required to provide a "*reasoned* explanation" for disregarding the "serious reliance interests" at stake here. *Id.* at 221–22 (emphasis added). A mere two-sentence explanation that vaguely prioritizes "national security" concerns over the "burden of processing delays" does not cut it.

Further underscoring this conclusion is that USCIS only focused on "the delay consequence of the adjudicatory hold." *Behdin*, 2026 WL 1031079, at *21. Nowhere else in the administrative record does the agency discuss other consequences, such as those felt by individuals subject to the Comprehensive Re-Review Policy who have *already received* immigration benefits and who must now undergo re-reviews of their approved requests and re-interviews by USCIS personnel. Similarly, the November Memorandum, which instituted the Country-Specific Factors Policy, makes no mention of reliance interests or the weighing of competing factors that the agency considered.

On the record before it, the Court cannot conclude that USCIS meaningfully considered Plaintiffs' reliance interests when it implemented its Challenged Policies. For this reason, too, the Court finds USCIS's actions to be arbitrary and capricious.

**c. USCIS Provided Pretextual Reasons for Its Actions**

Plaintiffs also argue that the Challenged Policies were enacted for pretextual reasons. ECF No. 20-1 at 49. Providing a "pretextual" reason for taking agency action "that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" can also be a basis for setting aside agency action as arbitrary and capricious. *Dep't of Com.*, 588 U.S. at 785. Even when judicial "review is deferential," courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). Instead, they must "ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* "Where there is 'a significant mismatch between the decision the [agency] made and the rationale [it] provided,' the 'contrived' rationale is inadequate under the APA." *Afr. Cmtys. Together v. Noem*, 820 F. Supp. 3d 48, 66 (D. Mass. 2026) (quoting *Dep't of Com.*, 588 U.S. at 783, 785).

Plaintiffs contend that the Challenged Policies were never about addressing national security or public safety concerns. Rather, according to Plaintiffs, USCIS's policies were motivated by anti-immigrant animus. As evidence, they point to many statements the President and then-DHS Secretary made contemporaneously with the issuance of the Challenged Policies. *See* ECF No. 20-1 at 49.

Under the APA, courts are "ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com.*, 588 U.S. at 780 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (per curiam)). However, the Court "may supplement the record when there is 'a strong showing of bad faith or improper behavior' by agency decision makers." *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 14 (1st Cir. 2008) (cleaned up) (quoting *Olsen v. United States*, 414 F.3d 144, 155 (1st Cir. 2005)). This bad-faith exception "is discretionary with the reviewing court." *Id.* (citing *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989)).

Plaintiffs here submitted many public statements that are not part of the administrative record. However, after reviewing them, the Court finds those statements meet the bad-faith exception, particularly the President and former Secretary's numerous "statements of ethnic hostility and prejudice" toward individuals from Travel Ban Countries, which "reveals the ugly truth of bad faith and impermissible animus." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 775 (9th Cir. 2026) (Mendoza, J., concurring).

For example, on November 27, 2025, the day USCIS announced its first of the Challenged Policies, the Country-Specific Factors Policy, the President asserted on social media that most immigrants "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels," claimed that immigrants were responsible for "social dysfunction," and blamed them for "[f]ailed schools, high crime,

urban decay, overcrowded hospitals, housing shortages, and large deficits." ECF No. 20-1 at 50 (citing Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM), https://perma.cc/8JW9-D7B5); *see also* ECF No. 23 at 40.

On December 1, 2025, a mere day before enacting the Global Asylum Hold, Benefits Hold, and Comprehensive Re-Review Policies, then-Secretary Noem issued—and the President later reposted—a statement describing immigrants as "killers, leeches, and entitlement junkies," referring to them as "foreign invaders" who came to the United States "to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS," and concluding by saying: "WE DON'T WANT THEM. NOT ONE." ECF No. 20-1 at 50 (citing Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 1, 2025, at 09:36 PM), https://perma.cc/P9V8-WZG7 (reposted from Secretary Kristi Noem, @Sec_Noem).

Then, on December 10, 2025, a few days after the Challenged Policies went into effect, the President described the Travel Ban as "a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia, and many other countries." ECF No. 20-1 at 9 (citing Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025, 01:42 PM), https://perma.cc/2ES3-BCYU). The President repeated comments he had previously made in 2018, asking why the United States "only take[s] people from shithole countries," and wondering "[w]hy can't we have some people from Norway, Sweden, just a few? Let us have a few from Denmark." *Id.*

The Government does not attempt to defend these derogatory statements. It is hard to see how anyone could.[41] Instead, the Government simply points out that "none of those posts refer to the Challenged Policies, nor does the administrative record refer to the posts as informing the agency's predecisional guidance." ECF No. 25 at 16. In the Government's view, the identified statements have "fail[ed] to invalidate the reasoned analysis evidenced in the administrative record." ECF No. 21 at 48.

The Government effectively invites the Court to shut its eyes and ignore the strong evidence of anti-immigrant animus before it. Doing so would require profound naiveté on the Court's part. Unfortunately for the Government, that is an invitation that this Court will have to decline. *See Dep't of Com.*, 588 U.S. at 785 ("We are not required to exhibit a naiveté from which ordinary citizens are free." (cleaned up)).

It is impossible to ignore the backdrop against which the Challenged Policies were implemented. Both the President and former Secretary's statements came in the direct aftermath of the 2025 Washington, D.C. Shooting. Indeed, they seem to attribute the alleged act of a single individual of Afghan descent to the entire population of Afghanistan, as well as individuals from thirty-eight other countries. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM)

---

[41] Judge Ana C. Reyes of the U.S. District Court for the District of Columbia analyzed similar statements made by the President and the former Secretary in a case involving a challenge to the termination of TPS for Haitian migrants. *See Miot v. Trump*, 818 F. Supp. 3d 126 (D.D.C. 2026). As Judge Reyes put it, Americans can, of course, "rationally debate immigration policy," and that "[t]hey can even do so without calling fellow human beings 'garbage' and 'leeches.'" *Id.* at 178 n.32.

(claiming that immigrants are "the leading cause of social dysfunction in America" and are responsible for, among other things, "high crime"); Secretary Kristi Noem (@Sec_Noem), Truth Social (Dec. 1, 2025, at 06:52 PM) (describing immigrants as "killers, leeches, and entitlement junkies" who came to the United States to, among other things, "slaughter our heroes").

The statements are also notable, not just for their animus-ridden stereotyping,[42] but also because they were made by the head of the Executive Branch and by the then-Cabinet Secretary charged with overseeing USCIS. Their outright disdain for individuals from Travel Ban Countries seems to suggest that, in enacting the Challenged Policies, USCIS personnel seemed less concerned with matters of "national security" and more so focused on targeting groups of people that their leaders told them they "DON'T WANT" in the United States, "NOT ONE." *See* ECF No. 20-1 at 50 (quoting Secretary Kristi Noem (@Sec_Noem), Truth Social (Dec. 1, 2025, at 06:52 PM)).

Indeed, the timing of the President and former Secretary's statements is highly probative evidence of USCIS's true intentions. *See, e.g.*, *Miot*, 818 F. Supp. 3d at 180 (finding as relevant to the pretext analysis the fact that the former Secretary

---

[42] The Court emphasizes that "animus-ridden stereotyping . . . can never be viewed as 'reasonable' decision-making." *Nat'l TPS All.*, 166 F.4th at 776 n.5 (Mendoza, J., concurring) (citing *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1157 (N.D. Cal. 2025) ("Secretary Noem's generalization of the alleged acts of a few (for which there is little or no evidence) to the entire population of Venezuelan TPS holders who have lower rates of criminality and higher rates of college education and workforce participation than the general population is a classic form of racism.").

described Haitians as "leeches," "entitlement junkies," and "foreign invaders" a mere three days after she made the decision to terminate TPS for Haitian immigrants); *Nat'l TPS All.*, 166 F.4th at 776 (Mendoza, J., concurring) ("Many of [former Secretary Noem's] assertions [on social media] were made within days or hours of the Secretary's decision to vacate TPS for Venezuela and Haiti.").

To the Government's point, it may be so that USCIS never expressly referred to the President and the former Secretary's statements when the agency issued the Challenged Policies, but government officials rarely share their animus toward a particular group out in the open. *See, e.g.*, *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."); *Cook Cnty. v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020) ("Most people know by now that the quiet part should not be said out loud.").

Further supporting Plaintiffs' claim of pretext is that "the evidence tells a story that does not match the explanation [USCIS] gave for [its] decision." *Dep't of Com.*, 588 U.S. at 784. Recall that throughout this litigation, USCIS has insisted that it is an "operational necessity" to pause the adjudication of *all* benefit request applications for *any* individual from the Travel Ban Countries to ensure that they "do not pose a threat to national security or public safety." ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000047. But USCIS has made some notable exceptions to this categorical policy.

For example, a month after USCIS implemented the Benefits Hold Policy, the agency issued exemptions in the January Memorandum for athletes participating in the 2026 World Cup, the 2028 Summer Olympics, and other major sporting events "as determined by the Secretary of State," as well as their coaches, necessary support staff, and immediate relatives. *See* ECF No. 16-3 at CAR-000048–49. As of April 30, 2026, USCIS posted an update on its website, announcing that it also lifted its adjudicative hold specifically for those "applications associated with medical physicians." *See* ECF No. 26 at 1.

It seems rather odd that USCIS would resume adjudicating benefit requests filed by individuals from Travel Ban Countries who happen to be medical physicians, athletes, or the coaches and family members of those athletes without the same concern that these individuals might "pose a threat to national security or public safety." ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000047. Following the agency's own logic, these individuals would also be coming from "high-risk countries" with "significant deficiencies in screening, vetting, and information sharing." ECF No. 16-3 at CAR-000046–47. And if the agency declared that the "hold will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum," *see* ECF No. 16-2 at CAR-000002–03, then why was the hold modified for medical physicians through a simple update on the agency's website rather than with a subsequent policy memorandum by the USCIS Director? *See* ECF No. 26 at 1.

In other words, "[s]everal points, considered together, reveal a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Dep't of Com.*, 588 U.S. at 783. For one thing, the President and former Secretary's contemporaneous, anti-immigrant statements cannot be ignored; rather, they give the Court serious reason to doubt that the Challenged Policies were issued in furtherance of "national security" concerns. Moreover, many inconsistencies in USCIS's own logic—that athletes and medical physicians from Travel Ban Countries are somehow exempt from the adjudicative hold, that the Challenged Policies were apparently modified without the agency following procedures that it had itself established—lead the Court to conclude that the reasons USCIS gave for issuing the Challenged Policies seem to be contrived ones. *See Dep't of Com.*, 588 U.S. at 785 ("Accepting contrived reasons would defeat the purpose of the enterprise.").

The Court therefore finds that USCIS issued the Challenged Policies based on impermissible pretextual reasoning. This too renders the agency's actions arbitrary and capricious.

**3. A Summary of the Court's APA Rulings**

To summarize, the Court finds that each of the Challenged Policies violate the APA. First, the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy (particularly with respect to adjustment of status and employment authorization claims) are contrary to law. *See* 5 U.S.C. § 706(2)(A), (C). And second, the Challenged Policies are collectively arbitrary and capricious because USCIS: (1) failed to provide

a reasoned explanation for enacting the policies; (2) failed to account for reliance interests in enacting the policies; and (3) provided a pretextual reason for enacting the policies. *See* 5 U.S.C. § 706(2)(A).

### D. Remedy

Now that the Court has concluded that USCIS violated the APA in enacting the Challenged Policies, the remaining issue concerns the remedy warranted in this case. Plaintiffs argue that they are entitled to three forms of relief: Vacatur, declaratory relief, and injunctive relief. ECF No. 20-1 at 55–59. The Court addresses each argument in turn.

#### 1. Plaintiffs Are Entitled to Vacatur

Plaintiffs first seek vacatur of the Challenged Policies. ECF No. 20-1 at 55–57. The APA empowers federal courts to "hold unlawful and set aside agency action" that, as relevant here, is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Thus, where a particular agency action is found to have violated the APA, the ordinary type of relief granted is vacatur of the agency action. *See, e.g.*, *Regents*, 591 U.S. at 9 ("[W]e conclude that the [agency] did violate the APA, and that the [challenged action] must be vacated."); *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring) ("The text and history of the APA authorize vacatur. . . . [T]o 'set aside' a[n] [agency action] is to vacate it.").

The First Circuit has also recognized that "'[i]f a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward.'" *New York v. Trump*, 171 F.4th 1, 30 (1st Cir. 2026) (quoting *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 n.1 (2025) (Barrett, J., concurring)); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately.").

That is the result that the Court reaches here. Because each of the Challenged Policies—the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are "contrary to law" and "arbitrary and capricious," the Court VACATES the Challenged Policies in their entirety.

**2. Plaintiffs Are Entitled to a Declaratory Judgment**

Plaintiffs also ask that the Court "declare the Challenged Policies unlawful." ECF No. 20-1 at 59. Though the Government disputes the merits of Plaintiffs' claims, they do not seem to raise an objection to this form of relief. As such, the Court finds the Challenged Policies to be unlawful under 5 U.S.C. § 706(2)(A) and (C) and GRANTS Plaintiffs' request for declaratory relief.

**3. Plaintiffs Are Not Entitled to a Permanent Injunction**

Finally, Plaintiffs request that the Court enter a permanent injunction in their favor. ECF No. 20-1 at 57. For a district court to grant a permanent injunction, the plaintiff must show: (1) "actual success on the merits of its claims"; (2) that they

"would be irreparably injured in the absence of injunctive relief"; (3) that the harm suffered "from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction"; and (4) that "the public interest would not be adversely affected by an injunction." *Doe v. R.I. Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025) (quoting *United States v. Mass. Water Res. Auth.*, 256 F.3d 36, 50 n.15 (1st Cir. 2001)).

"'District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.'" *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)). In the context of analyzing claims under the APA, some courts have held that "once the court reache[s] the conclusion that the [agency action] was indeed illegal . . . there [is] no separate need to show irreparable injury. . . ." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal citations omitted).

While Plaintiffs have succeeded on the merits of their APA claims, the Court concludes that a permanent injunction is not necessary under the present circumstances. The Supreme Court has cautioned lower courts that "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010); *see also Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312 (1982). "If a less drastic remedy (such as partial or complete vacatur of [the agency's] decision) [is] sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief

of an injunction [is] warranted." *Id.* at 165–66 (citing *Weinberger*, 456 U.S. at 311–312; *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 31–33 (2008)).

Here, vacatur of the Challenged Policies and a judgment declaring them to be unlawful will provide Plaintiffs with complete relief. First, "because vacatur voids and rescinds the [Challenged Policies] [themselves], it provides nationwide relief that redresses injuries suffered by members of the Organizational Plaintiffs." *Ass'n of Am. Univs.*, 788 F. Supp. 3d at 143.

Second, "[a] declaratory judgment obviates the need to enjoin defendants from reimplementing [ ] substantively identical polic[ies] where a declaratory judgment declares the rights and obligations of the parties and has 'the force and effect of a final judgment or decree.'" *Id.* (quoting 28 U.S.C. § 2201(a)); *see Union de Empleados de Muelles de P.R., Inc. v. Int'l Longshoremen's Ass'n*, 884 F.3d 48, 58 (1st Cir. 2018) (explaining purpose of declaratory judgment "is to determine the rights and obligations of the parties so that they can act in accordance with the law"). "Indeed, [b]ecause [a] declaratory judgment is binding on the parties before the court and is res judicata in subsequent proceedings as to the matters declared, it can be used by a party to later obtain further relief" if necessary. *Id.* (internal citations and quotation marks omitted).

To Plaintiffs' point that USCIS might try to issue similar policies "under another name (or, for that matter, no name at all)," *see* ECF No. 23 at 57, "that possibility is not enough to justify the 'drastic remedy' of a permanent injunction." *Nat'l All. to End Homelessness v. Turner*, No. 25-cv-00447-MSM-AEM, --- F. Supp.

3d ----, 2026 WL 883437, at *7 (D.R.I. Mar. 31, 2026) (citing *Monsanto Co.*, 561 U.S. at 165–66). If it turns out that Plaintiffs are "aggrieved by a hypothetical future [USCIS] decision," then they "will have ample opportunity to challenge it, and to seek appropriate preliminary relief, if and when such a decision is made." *Monsanto Co.*, 561 U.S. at 164.

So, the Court DENIES Plaintiffs' request for a permanent injunction.

## III. THE MOTION TO DISMISS

The Government has also challenged Plaintiffs' constitutional claims brought under the Due Process and Equal Protection Clauses of the Fifth Amendment. First, the Government argues that because Plaintiffs have not moved for summary judgment on their Fifth Amendment claims, they have waived them. ECF No. 21 at 3 n.1. In the alternative, the Government has moved to dismiss these claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *Id.* at 53–56.

Beginning with the Government's first argument, no rule requires a party to move for summary judgment on all claims to prevent them from being waived. The case the Government cites in support of this proposition, *Rodriguez v. Municipality of San Juan*, 659 F.3d 168 (1st Cir. 2011), does not aid its cause. That case simply recites the ordinary rule that claims not made or fully developed *on appeal* are considered waived. *See Rodriguez*, 659 F.3d at 175. Thus, Plaintiffs did not waive their constitutional claims by electing not to press them on summary judgment.

Turning to its Motion to Dismiss, the Government asks the Court to rule on several constitutional issues as a matter of law, such as whether Plaintiffs have cognizable property rights in immigration benefits for purposes of procedural due

process, *see* ECF No. 21 at 53–54, and whether USCIS has denied Plaintiffs equal protection of the law through the Challenged Policies, *see id.* at 55–56. These are complex legal questions. Ultimately, they will have to be saved for another day.

The canon of constitutional avoidance generally counsels against ruling on constitutional issues unnecessarily. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them); *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 178 (1st Cir. 2021) ("Under the doctrine of constitutional avoidance, 'federal courts are not to reach constitutional issues where alternative grounds for resolution are available.'" (citations omitted)). Indeed, the First Circuit has instructed that "[c]ourts are obliged to avoid rulings on constitutional questions when non-constitutional grounds will suffice to resolve an issue." *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 563 (1st Cir. 2021) (citing *Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 511 (1st Cir. 2011)).

Here, the Government asks the Court to enter "into a thicket of constitutional issues it [is] not necessary to enter." *Sony BMG Music Ent.*, 660 F.3d at 511. The Court must decline that request. Given that the Court has concluded that the Challenged Policies violate the APA and require vacatur, it is not necessary to rule on Plaintiffs' constitutional claims at this time. *See, e.g.*, *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 246 (D.D.C. 2018) (declining to rule on the Government's motion to dismiss plaintiffs' constitutional

challenges to DHS's rescission of the DACA program after having already concluded that the DACA rescission violated the APA); *Texas v. United States*, 86 F. Supp. 3d 591, 677 (S.D. Tex. 2015) (declining to rule on whether plaintiffs were likely to succeed on their constitutional challenges to DHS's implementation of the DAPA program after having already concluded that they showed a likelihood of success on their APA notice-and-comment claim).

As such, the Court DENIES WITHOUT PREJUDICE the Government's Motion to Dismiss.

## IV. CONCLUSION

When USCIS first enacted the policies at the center of this litigation, the agency did not simply place a hold on adjudications. More fundamentally, the Challenged Policies placed the lives of countless individuals on hold—solely by virtue of their countries of birth. Over six months later, many of those individuals remain without work, without legal status, and without any meaningful ability to plan for their futures.

Ultimately, it is not the Court's role to pass on the wisdom of the Government's policy choices. Under our constitutional system, those judgments are reserved for the political branches. It is, however, the Court's duty to determine whether the Government's policies comport with the law. Having undertaken that inquiry, the Court concludes that they do not and therefore must be set aside.

For the above reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 20) is GRANTED IN PART and DENIED IN PART, and the Government's Cross-Motion

for Summary Judgment (ECF No. 21) is GRANTED IN PART and DENIED IN PART. Each of the Challenged Policies—the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are declared unlawful and are hereby VACATED and SET ASIDE. Plaintiffs' request for a permanent injunction is DENIED. The Government's related Motion to Dismiss Plaintiffs' constitutional claims (ECF No. 21) is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

***/s/ John J. McConnell, Jr.***
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

June 5, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND;

REFUGEE DREAM CENTER; SERVICE EMPLOYEES

INTERNATIONAL UNION;

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA;

AFRICAN COMMUNITIES TOGETHER;

VENEZUELAN ASSOCIATION OF MASSACHUSETTS;

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; and

AMERICAN GATEWAYS,

Plaintiffs,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;

JOSEPH EDLOW, *in his official capacity as Director of the United States Citizenship and Immigration Services*;

DEPARTMENT OF HOMELAND SECURITY; and

MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security*,

Defendants.

No. 26-cv-132-JJM-PAS

**ORDER**

On June 5, 2026, the Court issued an Order, granting in part Plaintiffs' Motion for Summary Judgment and denying in part the Government's Cross-Motion for Summary Judgment. *See* ECF No. 28; *see also Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.* ("*Dorcas*"), No. 26-cv-132-JJM-PAS, --- F. Supp. 3d ----, 2026 WL 1622708 (D.R.I. June 5, 2026). As the Court explained then, under the Administrative Procedure Act ("APA"), "[e]ach of the Challenged Policies that USCIS [United States Citizenship and Immigration Services] enacted—the Benefits Hold Policy, the Global Asylum Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are declared unlawful and are vacated and set aside." *Dorcas*, 2026 WL 1622708, at 2. Plaintiffs did not move for summary judgment on their constitutional claims, and the Court denied without prejudice the Government's separate Motion to Dismiss those claims. *Id.* at 56–57.

The Government now wishes to appeal the Court's ruling and seek a stay pending appeal. *See* ECF No. 31 at 2. So that it may do so, the Government requests that the Court enter partial final judgment on Plaintiffs' APA claims under Rule 54(b) of the Federal Rules of Civil Procedure. *Id.* Plaintiffs do not oppose the Government's request. *See* ECF No. 34 at 4–5. Plaintiffs have, however, filed a separate motion, asking the Court to enforce its prior Order. *See* ECF No. 35.

To begin, Rule 54(b) provides that, "[w]hen an action presents more than one claim for relief . . ., the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no

just reason for delay." Fed. R. Civ. P. 54(b). Thus, to certify a partial final judgment under this provision, the first step is to "ensure that the ruling underlying the proposed judgment is final." *Nystedt v. Nigro*, 700 F.3d 25, 29 (1st Cir. 2012) (citing *Spiegel v. Trs. of Tufts Coll.*, 843 F.2d 38, 42 (1st Cir. 1988)). "The finality requirement is satisfied as long as the 'trial court action underlying the judgment disposed of all the rights and liabilities of at least one party as to at least one claim.'" *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 28 (1st Cir. 2022) (quoting *Credit Francais Int'l, S.A. v. Bio-Vita, Ltd.*, 78 F.3d 698, 706 (1st Cir. 1996)). Here, the entry of partial summary judgment on Plaintiffs' APA claims fully resolved those claims,[1] thereby rendering them sufficiently final.

Rule 54(b) also requires the Court to find that "there is no just reason for delay" in entering partial final judgment on the resolved claims. Fed. R. Civ. 54(b); *see also Amyndas*, 48 F.4th at 28. Under this standard, the Court "typically must make an individualized assessment of the desirability and effect of an immediate appeal." *Quinn v. City of Boston*, 325 F.3d 18, 26 (1st Cir. 2003) (citing *Spiegel*, 843 F.2d at 42–43). This requires the Court to consider additional factors, such as "whether the disputed ruling raises legal or factual issues that overlap with any claims that remain pending" and "how the equities and efficiencies of piecemeal review would compare

[1] In their Complaint, Plaintiffs' APA claims are listed as follows: Count I (contrary-to-law claim), Count II (arbitrary-and-capricious claim), and Count III (notice-and-comment claim). *See* ECF No. 1 at 65–68. The Court resolved Counts I and II in Plaintiffs' favor but expressly declined to address Count III because Plaintiffs had already achieved their desired outcome—vacatur of each of the Challenged Policies. *See Dorcas*, 2026 WL 1622708, at *36 n.30 ("The Court does not reach and need not address Plaintiffs' notice-and-comment argument.").

to those in a single proceeding." *Britton v. Maloney*, 196 F.3d 24, 27 n.2 (1st Cir. 1999) (citing *Credit Francais*, 78 F.3d at 706).

The Court concludes that there is no just reason for delay in entering partial final judgment on Plaintiffs' APA claims. First, the legal issues presented by Plaintiffs' remaining constitutional claims differ considerably from those issues addressed by the Court in ruling on Plaintiffs' APA claims. *See Dorcas*, 2026 WL 1622708, at *56 ("[T]he Government asks the Court to rule on several constitutional issues . . . such as whether Plaintiffs have cognizable property rights in immigration benefits . . . and whether USCIS has denied Plaintiffs equal protection of the law . . . . These are complex legal questions. Ultimately, they will have to be saved for another day."). The Government also points out that "appellate resolution of the APA issues may obviate the need for any court to address the constitutional issues or provide guidance in resolving those issues." ECF No. 31 at 4; *see Guerrero Orellana v. Moniz*, 813 F. Supp. 3d 185, 197 (D. Mass. 2025) (entering partial final judgment on one of plaintiff class's claims where their "victory on this count and the issuance of a declaration in the class's favor may well obviate the need to address the remaining counts").

Second, the "equities and efficiencies" weigh in favor of granting the Government's motion to ensure that USCIS is complying with the Court's Order and not continuing to use policies that the Court has already declared to be unlawful. *See Britton*, 196 F.3d at 27 n.2. The Government seems to suggest that the entry of partial final judgment is a necessary prerequisite to render the Court's vacatur order

effective and enforceable. *See* ECF No. 31 at 4. This argument has no basis in the law. It should almost go without saying—but the Court will say it anyway for the sake of "clarify[ing]" the Government's "current obligations," *see* ECF No. 31 at 2—that court orders vacating and setting aside agency policies have *immediate* effect once they are issued. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103–04 (D.D.C. 2018), *aff'd sub nom.*, *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) ("When a court vacates an agency's [policies], the vacatur restores the status quo before the invalid [policies] took effect . . . . That is, the offending [policies] [are] rendered void and of no effect and there is a reinstatement of the [policies] previously in force." (cleaned up)); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (explaining that the effect of vacatur was to "*automatically* resurrect[ ]" the previous agency standard (emphasis in original)).

In any event, the outcome here is the same: USCIS's Challenged Policies are no longer in effect. To be perfectly clear, this means that the Challenged Policies are vacated, "set aside," "cancel[ed]," "annul[ed]," "revoke[d]," and "void[ed]." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring) (quoting Black's Law Dictionary 1612 (3d ed. 1933); Black's Law Dictionary 1537 (4th ed. 1951); Bouvier's Law Dictionary 1103 (W. Baldwin ed. 1926)).

Accordingly, finding there to be no just reason for delay under Rule 54(b), the Court GRANTS the Government's request (ECF No. 31) and ENTERS partial final

judgment in favor of Plaintiffs on their APA claims. There is no excuse this time; the Government has an obligation to immediately comply with this Order. This moots Plaintiffs' Motion to Enforce, which the Court DENIES WITHOUT PREJUDICE (ECF No. 35).

It is hereby ORDERED that:

1. The Challenged Policies as a whole—the Benefits Hold Policy, the Global Asylum Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are contrary to law and arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A), (C). Therefore, the Challenged Policies are vacated and set aside pursuant to 5 U.S.C. § 706(2).
2. Partial final judgment shall enter in favor of Plaintiffs and against the Government on Counts I and II of Plaintiffs' Complaint (ECF No. 1).
3. Within twenty-four (24) hours, the Government shall file a status report, advising the Court as to what specific steps it has taken to comply with the Court's Order.
4. The Court retains jurisdiction to enforce this judgment.

IT IS SO ORDERED.

***s/John J. McConnell, Jr.***

_________________________________
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

June 11, 2026

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF RHODE ISLAND**

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND, ET AL.,

Plaintiffs,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ET AL.

Defendants.

C.A. No. 1:26-cv-132-JJM-PAS

**JUDGMENT**

This action came to be heard before the Court and a decision has been rendered. Upon consideration whereof, it is now hereby ordered, adjudged, and decreed as follows:

Pursuant to this Court's Order entered on June 11, 2026, and in accordance with Fed. R. Civ. P. 58, partial final judgment is hereby entered in favor of Plaintiffs and against the Defendants on Counts I and II of Plaintiffs' Complaint.

It is so ordered.

June 11, 2026

By the Court:

/s/ Hanorah Tyer-Witek
Clerk of Court

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2026, I caused to be electronically filed this corrected brief and addendum with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be adequately served by that system.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044