**No. 26-1703**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND; REFUGEE DREAM CENTER; SERVICE EMPLOYEES INTERNATIONAL UNION; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; AFRICAN COMMUNITIES TOGETHER; VENEZUELAN ASSOCIATION OF MASSACHUSETTS; PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; AMERICAN GATEWAYS,

Plaintiffs-Appellees,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH EDLOW, in the official capacity as Director of the United States Citizenship and Immigration Services; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as Secretary of the Department of Homeland Security,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Rhode Island
District Court Case No. 1:26-cv-00132-JJM-PAS

# DEFENDANTS-APPELLANTS' APPENDIX

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

TYLER J. BECKER
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave., NW
Washington, DC 20530

AUGUST FLENTJE
Deputy Director

MARIE V. ROBINSON
Trial Attorney
U.S. Department of Justice, Civil Div.
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 514-2000

# TABLE OF CONTENTS

Document Name — Pages

District Court Opinion…………........................................................................ 1-135

District Court Order and Opinion Granting the Motion for Final Judgment…………...................................................................................... 136-141

District Court Order Denying Stay Pending Appeal ……………................... 142-169

District Court Docket Sheet…………….......................................................... 170-191

Notice of Appeal, Case No. 26-1703 (1st Cir.)…………… .............................. 192-193

Trial Exhibit 16, Certified Administrative Record (Excerpts)……………....... 194-267

Defendants' Statement of Production…………… ........................................ 194-195

Index of the Certified Administrative Record Policy Alert (PA)-2025-26 ………….......................................................... 197-198

Excerpts of the Certified Administrative Record Policy Alert (PA)-2025-26 ………….......................................................... 199-214

Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats (June 10, 2025)………………………………………………………...200-208

Presidential Proclamation 10949 and Other Applications of Section 212(f) of the INA: Impacts to USCIS's Exercise of Adjudicative Discretion (October 14, 2025)…………………………………..209-212

Policy Alert: Impact of INA 212(f) on USCIS's Adjudication of Discretionary Benefits (Nov. 27, 2025)…………………………213-214

Index of the Certified Administrative Record, Policy Memorandum (PM)-602-0192…………….......................................... 215-218

Excerpts of Certified Administrative Record, PM-602-0192………………..... 219-260

PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries……………………………………………………221-224

Decision Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries…………………………………………225-228

Executive Order 14161, Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats………………………………………...229-231

DOJ Press Release: Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States…………………………232-235

DHS Press Release: Terrorist Who Shot Two National Guard Members Was Let Into the Country By the Biden Administration's Operation Allies Welcome Program……………………………………..236-237

USCIS Policy Manual Part 1, Chapter 8 Discretionary Analysis…………………………………………238-260

Index of the Certified Administrative Record PM-602-0194 …………….................................................................................. 262-266

Excerpts of the Certified Administrative Record PM-602-0194 …………….................................................................................. 267-290

PM-602-0194, Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries…………………...267-277

Presidential Proclamation 10998, Restricting the Entry of Foreign Nationals to Protect the Security of the United States…………..278-90

Trial Exhibit 21, Certified Administrative Record (Excerpts)…………....... 291-299

Declaration of Andrew Good, Chief, Office of Policy and Strategy, USCIS………………………………...291-296

USCIS Newsroom Alert, *Update on USCIS's Strengthened Screening and Vetting*, March 30, 2026, https://www.uscis.gov/newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting................................................................297-299

Defendants' Notice of Ongoing Hold Lifts, filed May 15, 2026…………………………………………………………...300-301

June 11, 2026 Order……………………………………………………………302

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND;

REFUGEE DREAM CENTER;

SERVICE EMPLOYEES INTERNATIONAL UNION;

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA;

AFRICAN COMMUNITIES TOGETHER;

VENEZUELAN ASSOCIATION OF MASSACHUSETTS;

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; and

AMERICAN GATEWAYS,

Plaintiffs,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;

JOSEPH EDLOW, *in his official capacity as Director of the United States Citizenship and Immigration Services*;

DEPARTMENT OF HOMELAND SECURITY; and

MARKWAYNE MULLIN,[1] *in his official capacity as Secretary of the Department of Homeland Security*,

Defendants.

No. 26-cv-132-JJM-PAS

[1] Pursuant to Fed. R. Civ. P. 25(d), Markwayne Mullin has been substituted for Kristi Noem as the Secretary of the Department of Homeland Security.

**APPENDIX 1**

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

More than six months ago, the United States Citizenship and Immigration Services ("USCIS") enacted a series of policies that threw the lives of countless immigrants living in the United States into indeterminate legal limbo. The agency announced that it would be placing an indefinite pause on the adjudication of immigration benefit requests for individuals from thirty-nine African, Asian, Latin American, and Middle Eastern countries. Since then, individuals from these countries have been categorically barred from receiving final decisions on, among other things, their asylum, work permit, green card, and citizenship applications. And USCIS's hold on adjudications cannot be attributed to anything that these individuals did wrong; rather, it arises solely by the happenstance of their birth.

A coalition of nonprofits and unions representing individuals from the thirty-nine countries (collectively, the "Plaintiffs") have now sued USCIS, the Department of Homeland Security ("DHS"), as well as Joseph Edlow and Markwayne Mullin in their official capacities as the respective heads of their departments (collectively, "the Government"). *See* ECF No. 1. Plaintiffs challenge USCIS's new policies[2] under the Administrative Procedure Act ("APA") and the Fifth Amendment to the U.S.

---

[2] Plaintiffs also challenge USCIS's: hold on all applications for asylum and withholding of removal, regardless of the individual's country of origin; re-review of already approved applications for individuals from so-called "Travel Ban Countries" who entered the United States on or after January 20, 2021; and changes to its Policy Manual that now require agency personnel to consider "country-specific facts and circumstances" as significant negative factors when deciding whether to grant benefit requests to those from Travel Ban Countries.

Constitution. Now pending before the Court are the parties' respective Motions for Summary Judgment on Plaintiffs' APA claims, and the Government's Motion to Dismiss Plaintiffs' constitutional claims. *See* ECF Nos. 20, 21.

In ruling on these motions, the Court is reminded of a line often repeated in discussions around immigration policy: If people wish to immigrate to the United States, they ought to "follow the law" and "do things the right way." This case serves as a perfect example of immigrants doing just that. Plaintiffs and their members have observed the legal processes that Congress enacted by statute and USCIS promulgated by regulation so that they may one day obtain immigration benefits. They have, for example, filed the appropriate paperwork, paid the required filing fees, submitted to the requested biometrics collections, and attended the necessary in-person interviews. Even so, Plaintiffs and their members are stuck waiting, for months on end, for benefit requests that USCIS refuses to adjudicate.

But the rule of law has to apply to everyone equally and, as evident here, USCIS has neither "followed the law" nor "done things the right way." Indeed, the agency has violated the very immigration laws that Congress has charged it with administering, as well as the administrative laws that govern the agency's actions. In enacting its latest immigration policies, USCIS: claims statutory and regulatory authority that it does not possess; makes decisions without the reasoned explanations that it must provide; acts without regard for the reliance interests of applicants that it must consider; and justifies its actions with pretextual concerns of "national security" that mask anti-immigrant sentiments that it is forbidden from letting

influence its decision-making. In legal terms that means USCIS's actions are contrary to law and arbitrary and capricious.

Accordingly, as set forth below, each of the Challenged Policies that USCIS enacted—the Benefits Hold Policy, the Global Asylum Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are declared unlawful and are vacated and set aside.

## TABLE OF CONTENTS

I. BACKGROUND ..... 8
A. Statutory and Regulatory Framework ..... 8
B. Executive Branch Actions ..... 8
1. The President's Executive Order and Presidential Proclamations ..... 8
2. Events Leading Up to Policy Changes at USCIS ..... 10
3. The President and the DHS Secretary's Statements on Immigration ..... 11
4. USCIS Implements Several Policy Changes ..... 13
5. USCIS Posts Updates on Its New Policies ..... 16
C. Plaintiffs and Their Claims ..... 17
1. The Global Asylum Hold Policy ..... 19
2. The Benefits Hold Policy ..... 19
3. The Comprehensive Re-Review Policy ..... 20
4. The Country-Specific Factors Policy ..... 20
D. Procedural Background ..... 21
II. THE CROSS MOTIONS FOR SUMMARY JUDGMENT ..... 22
A. Standard of Review ..... 22
B. The Government's Jurisdictional, Justiciability, and Standing Challenges 23
1. National Security Concerns Do Not Shield USCIS from Judicial Review .. 23
2. The INA Does Not Strip the Court of Jurisdiction over Plaintiffs' Claims. 26
a. The Court Can Review Plaintiffs' Adjustment of Status and Employment Authorization Claims ..... 26
i. Section 1252(a)(2)(B)(i) Does Not Bar Review ..... 27
ii. Section 1252(a)(2)(B)(ii) Does Not Bar Review ..... 31
b. The Court Can Review Plaintiffs' Naturalization Claims ..... 39
3. USCIS's Actions Are Not Committed to Agency Discretion By Law ..... 42
a. Plaintiffs' Adjustment of Status Claims Are Not Committed to Agency Discretion By Law ..... 44

b. Plaintiffs' Employment Authorization Claims Are Not Committed to Agency Discretion By Law ........ 46

c. Plaintiffs' Asylum and Withholding of Removal Claims Are Not Committed to Agency Discretion By Law ........ 46

d. Plaintiffs' Naturalization Claims Are Not Committed to Agency Discretion By Law ........ 49

4. USCIS's Actions Constitute Final Agency Action ........ 51

a. Plaintiffs Have Satisfied the Consummation Prong ........ 52

b. Plaintiffs Have Satisfied the Legal Consequences Prong ........ 59

5. Plaintiffs' Claims Are Ripe for Review ........ 61

a. Plaintiffs Have Satisfied the Fitness Prong ........ 62

b. Plaintiffs Have Satisfied the Hardship Prong ........ 64

6. Plaintiffs Have Standing to Bring Their Claims ........ 66

a. Plaintiffs Have Organizational Standing ........ 67

i. Plaintiffs Have Suffered Injury ........ 67

ii. Plaintiffs' Injuries Are Fairly Traceable to USCIS ........ 71

iii. Plaintiffs' Injuries Are Redressable ........ 71

b. Plaintiffs Have Associational Standing ........ 74

i. Plaintiffs Have Individual Standing ........ 75

ii. Plaintiffs' Interests Are Germane to Their Organizational Purposes . 83

iii. Individual Member Participation Is Not Necessary ........ 84

C. The Merits ........ 85

1. The Challenged Policies Are Contrary to Law ........ 86

a. Section 1182(f) Does Not Authorize USCIS's Actions ........ 87

b. The Global Asylum Hold Policy Is Contrary to Law ........ 91

c. The Benefits Hold Policy Is Contrary to Law ........ 94

d. The Comprehensive Re-Review Policy Is Contrary to Law ........ 101

e. The Country-Specific Factors Policy Is Contrary to Law ........ 106

2. The Challenged Policies Are Arbitrary and Capricious ........ 112

a. USCIS Failed to Provide a Reasoned Explanation for Its Actions ........ 113

b. USCIS Failed to Account for Reliance Interests ........ 116

c. USCIS Provided Pretextual Reasons for Its Actions .... 120
3. A Summary of the Court's APA Rulings .... 127
D. Remedy .... 128
1. Plaintiffs Are Entitled to Vacatur .... 128
2. Plaintiffs Are Entitled to a Declaratory Judgment .... 129
3. Plaintiffs Are Not Entitled to a Permanent Injunction .... 129
III. THE MOTION TO DISMISS .... 132
IV. CONCLUSION .... 134

# I. BACKGROUND

## A. Statutory and Regulatory Framework

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, is a comprehensive statutory scheme that governs immigration law in the United States. Among other things, the INA authorizes DHS, through USCIS, to adjudicate a broad array of immigration benefit requests. Some of the most common forms of relief, which are the subject of this lawsuit, include: (1) asylum and withholding of removal; (2) adjustment of status to that of a lawful permanent resident (i.e., the ability to obtain a "green card"); (3) employment authorization (i.e., the ability to obtain a "work permit"); and (4) naturalization (i.e., the ability to become a U.S. citizen).

## B. Executive Branch Actions

### 1. The President's Executive Order and Presidential Proclamations

On the first day of his second term in office, the President issued Executive Order 14161 ("Exec. Order No. 14161"), which directed the Secretary of State to enhance vetting and screening of "all aliens[3] who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025). Exec. Order No. 14161 also gave the Secretary of State, Attorney

---

[3] The statutory provisions of the INA use the term "alien," which means "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). When quoting statutes, caselaw, and agency documents, the Court will use the language in those statutes, cases, and documents. Otherwise, under the recent approach of the Supreme Court, this Court will "use[ ] the term 'noncitizen' as equivalent to the statutory term 'alien.'" *Barton v. Barr*, 590 U.S. 222, 226 n.2 (2020); *see also Patel v. Garland*, 596 U.S. 328 (2022).

General, Secretary of Homeland Security, and Director of National Intelligence sixty days to submit a report to the President, identifying countries to include in a new "Travel Ban."[4] *Id.* These Cabinet members were instructed to "identify[ ] countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f))." *Id.* at 8451.

After receiving the report, the President issued Presidential Proclamation 10949 ("Proclamation No. 10949"). *See* Proclamation No. 10949, 90 Fed. Reg. 24497 (June 4, 2025). Invoking his authority under 8 U.S.C. §§ 1182(f) and 1185(a), the President implemented a new Travel Ban and restricted the entry into the United States of individuals from nineteen countries that the Secretary of State had identified as "deficient with regards to screening and vetting." *Id.* at 24497.[5] The President subsequently issued a second proclamation, Presidential Proclamation 10998 ("Proclamation No. 10998"), which expanded the list of countries subject to the

[4] During his first term, the President imposed entry restrictions (i.e., a "travel ban") on individuals from Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen. *See* Proclamation No. 9645, 82 Fed. Reg. 45161, 45163 (Sept. 24, 2017). The President had also previously imposed entry restrictions on individuals from Chad, Iraq, and Sudan, *see* Exec. Order No. 13769, 82 Fed. Reg. 8977 (Jan. 27, 2017); Exec. Order No. 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017), but those restrictions were later lifted. Upon assuming office in 2021, President Joe Biden eliminated the remaining restrictions. *See* Proclamation No. 10141, 86 Fed. Reg. 7005 (Jan. 20, 2021).

[5] In Proclamation No. 10949, the President opted to "fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen." 90 Fed. Reg. at 24499. The President also decided to "partially restrict and limit the entry of nationals from the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela." *Id.*

Travel Ban to thirty-nine.[6] *See* Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025). These countries are referred to collectively as the "Travel Ban Countries."

### 2. Events Leading Up to Policy Changes at USCIS

Following the issuance of Exec. Order No. 14161 and Proclamation No. 10949, two incidents occurred that would lead to significant policy shifts at USCIS. First, on June 13, 2025, an Afghan national named Nasir Ahmad Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham ("ISIS"). *See* ECF No. 16-2 at CAR-000002.[7] According to the Department of Justice ("DOJ"), Mr. Tawhedi had planned to commit

---

[6] In Proclamation No. 10998, the President opted to "fully restrict and limit the entry of nationals of 7 additional countries: Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria," as well as "individuals using travel documents issued or endorsed by the Palestinian Authority (PA)." 90 Fed. Reg. at 59721. The President also decided to "partially restrict and limit the entry of nationals of the following 15 countries: Angola, Antigua and Barbuda, Benin, Cote d' Ivoire, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe." *Id.* at 59721–22.

Though it is unclear why, the President decided to change course on Laos and Sierra Leone, moving from partially restricting to fully restricting the entry of individuals from those two countries. *Contrast* Proclamation No. 10949, 90 Fed. Reg. at 24499 ("I have determined to partially restrict and limit the entry of nationals [from] . . . Laos [and] Sierra Leone[.]"), *with* Proclamation No. 10998, 90 Fed. Reg. at 59721 ("I have determined to fully restrict and limit the entry of nationals [from] . . . Laos [and] . . . Sierra Leone[.]"). He also loosened certain entry restrictions on individuals coming from Turkmenistan. *See* Proclamation No. 10998, 90 Fed. Reg. at 59721, 59726.

[7] The administrative record cites a DOJ press release issued on June 13, 2025. *See* ECF No. 16-2 at CAR-000007 n.8 (citing Press Release, U.S. Dep't of Justice, Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States (June 13, 2025), https://www.justice.gov/opa/pr/afghan-national-pleads-guilty-plotting-election-day-terror-attack-united-states [https://perma.cc/4EBL-7YCU]).

a terrorist attack in the United States during Election Day on November 5, 2024 (the "2024 Election Day Attack"). *Id.*

Second, on November 26, 2025, an Afghan national named Rahmanullah Lakanwal is alleged to have shot two National Guard members stationed in Washington, D.C (the "2025 Washington, D.C. Shooting"). *Id.* According to DHS, Mr. Lakanwal "is suspected of planning and executing a terrorist attack in Washington, DC against [the] two National Guard members, one who was killed and another who remains critically injured." *Id.*[8]

### 3. The President and the DHS Secretary's Statements on Immigration

On November 27, 2025, the day after the 2025 Washington, D.C. Shooting, the President took to social media to issue the following statement on immigration:

> A very Happy Thanksgiving salutation to all of our Great American Citizens and Patriots who have been so nice in allowing our Country to be divided, disrupted, carved up, murdered, beaten, mugged, and laughed at, along with certain other foolish countries throughout the World, for being "Politically Correct," and just plain STUPID, when it comes to Immigration. The official United States Foreign population stands at 53 million people (Census), most of which are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels. They and their children are supported through massive payments from Patriotic American Citizens who, because of their beautiful hearts, do not want to openly complain or cause trouble in any way, shape, or form. They put up with what has happened to our Country, but it's eating them alive to do so! A migrant earning $30,000 with a green card will get roughly $50,000 in yearly benefits for their family. The real migrant population is much higher. This refugee

[8] The administrative record cites a DHS press release issued on November 26, 2025. *See* ECF No. 16-2 at CAR-000007 n.9 (citing Press Release, U.S. Dep't of Homeland Sec., Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program (Nov. 26, 2025), https://www.dhs.gov/news/2025/11/26/terrorist-who-shot-two-national-guard-members-dc-was-let-country-biden [https://perma.cc/K6PZ-H7KJ]).

> burden is the leading cause of social dysfunction in America, something that did not exist after World War II (Failed schools, high crime, urban decay, overcrowded hospitals, housing shortages, and large deficits, etc.).

Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM), https://perma.cc/8JW9-D7B5; *see also* ECF No. 20-1 at 50.

A few days later, on December 1, 2026, the President reposted the following statement from then-Secretary of Homeland Security Kristi Noem, who described her conversation with the President about the 2025 Washington, D.C. Shooting as follows:

> I just met with the President.
>
> I am recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies.
>
> Our forefathers built this nation on blood, sweat, and the unyielding love of freedom—not for foreign invaders to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS.
>
> WE DON'T WANT THEM. NOT ONE.

Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 1, 2025, at 09:36 PM), https://perma.cc/P9V8-WZG7 (reposted from Secretary Kristi Noem, @Sec_Noem).

Finally, on December 10, 2026, while speaking at a rally in Pennsylvania, the President described the Travel Ban as "a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia, and many other countries." ECF No. 20-1 at 9 (citing Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025, 01:42 PM), https://perma.cc/2ES3-BCYU). Remarking on comments he had

previously made in 2018 about Haiti and certain African countries, the President stated: "Our country was going to hell. And we had a meeting, and I say, 'Why is it we only take people from shithole countries, right?' Why can't we have some people from Norway, Sweden, just a few? Let us have a few from Denmark." *Id.*

#### 4. USCIS Implements Several Policy Changes

Following these incidents and statements, USCIS implemented several policy changes that are the subject of this lawsuit.

First, on November 27, 2025, a day after the 2025 Washington, D.C. Shooting occurred, USCIS issued a policy alert (hereinafter, the "November Memorandum") that revised controlling guidance in the USCIS Policy Manual regarding the manner in which agency personnel are to adjudicate discretionary benefit requests going forward. *See* Policy Alert PA-2025-26 from USCIS, Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits (Nov. 27, 2025); *see also* ECF No. 16-1 at CAR-000072–73. "Effective immediately," USCIS officials were instructed to "consider[ ] any relevant country-specific factors such as those specified in Proclamation No. 10949 as significant negative factors in the adjudication of discretionary benefit requests." *Id.* at CAR-000073. Among other things, officials were directed to consider a country's "insufficient vetting and screening information" as a significant negative factor. *Id.*; *see also* ECF No. 16-1 at CAR-000022. The agency also made clear that this new guidance "is controlling and supersedes any related prior guidance." ECF No. 16-1 at CAR-000072.

A few days later, on December 2, 2025, USCIS issued Policy Memorandum PM-602-0192 (the "December Memorandum"). *See* Dep't of Homeland Sec., USCIS, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, PM-602-0192 (Dec. 2, 2025); *see also* ECF No. 16-2 at CAR-000001–04. The December Memorandum marks the first time that USCIS began publicly referring to countries subject to the Travel Ban as "high-risk countries." ECF No. 16-2 at CAR-000001.[9] It also directed USCIS personnel to immediately take the following actions: (1) place a hold on all applications for asylum and withholding of removal, regardless of the applicant's country of nationality, pending a comprehensive review; (2) place a hold on pending benefit requests made by individuals listed in Proclamation No. 10949, regardless of the person's entry date, pending a comprehensive review; and (3) conduct a comprehensive re-review of already approved benefit requests for individuals from countries listed in Proclamation No. 10949 who entered the United States on or after January 20, 2021.[10] *Id.*

A month later, on January 1, 2026, USCIS issued another Policy Memorandum, PM-602-0194 (the "January Memorandum") that designated the

---

[9] An earlier, internal USCIS memorandum dated November 29, 2025 also announced the "Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries." ECF No. 16-2 at CAR 000005.

[10] The December Memorandum also required that "all aliens meeting these criteria undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." ECF No. 16-2 at CAR-000001.

additional countries included in the Travel Ban by Proclamation No. 10998 as "high-risk countries" and extended the December Memorandum's policy changes to those countries as well. *See* Dep't of Homeland Sec., USCIS, Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries, PM-602-0194 (Jan. 1, 2026); *see also* ECF No. 16-3 at CAR-000045–49. The January Memorandum clarified that the "hold" put in place by USCIS allowed for individual cases to proceed through processing, but that they otherwise preclude any final adjudication of those cases, such as an approval, denial, or dismissal of an application. *See* ECF No. 16-3 at CAR-000045 n.2. Curiously, the January Memorandum also specified that, among others, noncitizen athletes participating in the 2026 World Cup, the 2028 Summer Olympics, and other major sporting events "as determined by the Secretary of State," as well as their coaches, persons performing necessary support roles, and immediate relatives, were excepted from USCIS's adjudicative hold. *Id.* at CAR-000048–49.

As a justification for implementing its sweeping policy changes, USCIS cited the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting. *See* ECF No. 16-2 at CAR-000002, CAR-000006–07. According to the agency, these two incidents demonstrated "what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people." *Id.* at CAR-000002. USCIS stated that it adopted its policy changes to ensure that all individuals "from high-risk countries of concern that entered the United States [on or after January 20, 2021] do not present threats to national security or public safety." *Id.* The January Memorandum

provides that USCIS's policies "will remain in effect until lifted by the USCIS Director through a subsequent memorandum." *Id.* at CAR-000002–03.

**5. USCIS Posts Updates on Its New Policies**

On March 30, 2026, almost a month after Plaintiffs filed this lawsuit, USCIS posted an alert on its website (the "March 30th Alert"). *See* Dep't of Homeland Sec., USCIS, Update on USCIS' Strengthened Screening and Vetting (Mar. 30, 2026); *see also* ECF No. 21-2 at 2–4. The March 30th Alert purported to provide updates on some of the policies USCIS had implemented in its December and January Memoranda.

First, USCIS announced that it had resumed processing asylum applications for individuals from "non high-risk countries." ECF No. 21-2 at 3. USCIS also stated that, after a "comprehensive review by multiple offices," it had lifted holds on benefit requests for individuals "vetted through Operation PARRIS,[11] certain petitions filed by U.S. citizens, intercountry adoption forms, certain rescheduled oath ceremonies, statutory and regulatory decision issuance, refugee registrations for South African

---

[11] According to a declaration submitted to the Court by Andrew Good, Chief of USCIS's Office of Policy and Strategy, Operation PARRIS stands for "Post-Admission Refugee Reverification and Integrity Strengthening." ECF No. 21-1 at 3. Mr. Good avers that Operation PARRIS's aim is to "initiate[ ] additional background checks, re-interviews, and merit reviews of refugee claims" to "strengthen the ability of America's immigration system to screen out terrorists, criminal aliens, and other foreign nationals who pose potential threats to public safety or who have committed fraud or other crimes." *Id.*; *see also id.* at 3 n.4 (citing Dep't of Homeland Sec., U.S. Citizenship & Immigr. Servs., DHS Launches Landmark USCIS Fraud Investigation in Minnesota (Jan. 9, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-launches-landmark-uscis-fraud-investigation-in-minnesota [https://perma.cc/5GQX-HXG2]).

citizens/nationals, certain special immigrant visa petitions, [and] certain employment authorization documents." ECF No. 21-2 at 3.

Moreover, USCIS observed that the Travel Ban Countries it had deemed high-risk "lack[ed] adequate screening and vetting information," and that a review of its records showed that "prior [USCIS] screening and vetting measures were wholly inadequate." *Id.* at 2. USCIS explained that the holds on asylum adjudications and benefits requests would remain for individuals from the Travel Ban Countries to ensure that they "are properly vetted" and as a way of "protect[ing] national security, public safety, and root[ing] out fraud." *Id.*

The Government recently informed the Court of another update from USCIS. According to the Government, as of April 30, 2026, "USCIS has lifted the hold on applications associated with medical physicians" (the "April 30th Update").[12] ECF No. 26 at 1. As the Government explained, this change came "as a result of USCIS' internal review process for lifting holds on individual or group cases." *Id.*

**C. Plaintiffs and Their Claims**

Plaintiffs are a coalition of nonprofit organizations and labor unions that represent and serve immigrant communities around the country. ECF No. 20-1 at 17. These groups include: Dorcas International Institute of Rhode Island ("Dorcas"), a

[12] In sharing the April 30th Update, the Government points the Court's attention to the same press release that accompanied USCIS's March 30th Alert. *See* ECF No. 26 at 1 (citing Dep't of Homeland Sec., USCIS, Update on USCIS' Strengthened Screening and Vetting, https://www.uscis.gov/newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting [https://perma.cc/48BZ-UWYF] (last updated Apr. 30, 2026)). In that release, USCIS states that "[h]olds have been lifted for . . . applications associated with medical physicians." *Id.*

nonprofit headquartered in Providence, Rhode Island; Refugee Dream Center ("RDC"), a nonprofit headquartered in Providence, Rhode Island; Service Employees International Union ("SEIU"), a labor union headquartered in Washington, D.C.; United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), a labor union headquartered in Detroit, Michigan; African Communities Together ("ACT"), a nonprofit headquartered in New York, New York; Venezuelan Association of Massachusetts ("VAM"), a nonprofit headquartered in Boston, Massachusetts; Partnership for the Advancement of New Americans ("PANA"), a nonprofit headquartered in San Diego, California; and American Gateways, a nonprofit headquartered in Austin, Texas. ECF No. 1 at 6–9.

Dorcas, RDC, and American Gateways have helped many clients obtain asylum, green cards, citizenship, and other immigration benefits, including individuals from Afghanistan, Burma, Burundi, Cote d'Ivoire, Cuba, Equatorial Guinea, Eritrea, The Gambia, Haiti, Iraq, Mali, Mauritania, Nigeria, the Republic of the Congo, Senegal, Somalia, South Sudan, Sudan, Syria, Tanzania, Togo, Venezuela, Zambia, and Zimbabwe. *See, e.g.*, ECF No. 20-1 at 20–25; ECF No. 20-2 at 7; ECF No. 20-3 at 6. These organizations collectively have thousands of clients whose applications for immigration benefits are indefinitely stalled due to USCIS's new policies. ECF No. 20-1 at 20–25.

Likewise, SEIU, UAW, VAM, ACT, and PANA each have members impacted by USCIS's policies. *Id.* at 25–27. Many of these members have applications for asylum, adjustment of status, employment authorization, visas, travel documents,

and humanitarian parole that remain unadjudicated because they are from countries subject to the Travel Ban, including individuals from Afghanistan, Burma, Cote d'Ivoire, Cuba, Haiti, Iran, Somalia, Sudan, and Venezuela. *See, e.g.*, ECF No. 20-1 at 25–27; ECF No. 20-4 at 9–10, 12–13; ECF No. 20-5 at 5; ECF No. 20-6 at 7–9; ECF No. 20-7 at 3–7; ECF No. 20-8 at 5–10.

Plaintiffs challenge four distinct policies implemented by USCIS (collectively, the "Challenged Policies") that they have categorized as follows:

**1. The Global Asylum Hold Policy**

First, Plaintiffs challenge USCIS's decision to halt all adjudications of requests for asylum and withholding of removal, regardless of the applicant's country of origin (the "Global Asylum Hold Policy"). *See* ECF No. 16-2 at CAR-000001–06. As of March 30, 2026, USCIS has announced on its website that it has resumed processing asylum applications for individuals from "non high-risk countries." ECF No. 21-2 at 3. However, USCIS has also previously stated that its policies "will remain in effect until lifted by the USCIS Director through a subsequent memorandum," ECF No. 16-2 at CAR-000002–03, and given that a posting on a website is not a memorandum from the USCIS Director, the Court therefore must assume that the Global Asylum Hold Policy remains in effect.

**2. The Benefits Hold Policy**

Second, Plaintiffs challenge USCIS's decision to place a hold on all adjudications of immigration benefit requests submitted by people from the Travel Ban Countries (the "Benefits Hold Policy"). *See* ECF No. 16-2 at CAR-000001–06.

Aside from applications for asylum and withholding of removal (which are already covered by the Global Asylum Hold Policy), Plaintiffs state that the Benefits Hold Policy extends to applications for immigration benefits, such as adjustment of status, employment authorization, and naturalization.

### 3. The Comprehensive Re-Review Policy

Third, Plaintiffs challenge USCIS's policy of re-reviewing and reconsidering all of its previous decisions to approve immigration benefit requests for any individual from one of the Travel Ban Countries who entered the United States on or after January 20, 2021 (the "Comprehensive Re-Review Policy"). *See* ECF No. 16-2 at CAR-000001–06. Plaintiffs assert that the Comprehensive Re-Review Policy extends to approved requests for benefits, such as asylum, withholding of removal, adjustment of status, employment authorization, and naturalization.

### 4. The Country-Specific Factors Policy

Fourth, Plaintiffs challenge USCIS's update to its Policy Manual, which directs USCIS personnel charged with processing discretionary benefit requests to consider "any relevant country-specific factors such as those specified in [the Travel Ban] as significant negative factors in the adjudication of discretionary benefit requests." ECF No. 16-1 at CAR-000073. USCIS explains that, while the Travel Ban's "categorical ineligibility for entry or admission does not apply" to benefits adjudications, USCIS may begin considering "on a case-by-case basis country-specific facts and circumstances" discussed in the Travel Ban "as a significant negative factor when making an individual assessment in weighing discretion." *Id.* at CAR-000023.

The agency also specifies that some of those "country-specific facts and circumstances" include but are not limited to "insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the countries identified in [the Travel Ban]." *Id.* at CAR-000073.

**D. Procedural Background**

Plaintiffs sued the Government on March 5, 2026. ECF No. 1. The parties later conferred and filed a joint motion, requesting that the Court consider their cross motions for summary judgment on an expedited schedule. *See* ECF No. 12. The Court granted that motion. *See* Text Order (Mar. 17, 2026).

In their Complaint, Plaintiffs initially sought to set aside the Challenged Policies for two reasons. ECF No. 1. Plaintiffs first claimed that the Challenged Policies violate the APA because they are contrary to law, arbitrary and capricious, and violative of notice-and-comment-procedures. *Id.* at 65–68. Plaintiffs also contended that the Challenged Policies violate the Fifth Amendment's Due Process and Equal Protection Clauses. *Id.* at 69–72.

Now, in their Motion for Summary Judgment, Plaintiffs specify that they do not seek summary judgment on their Fifth Amendment claims at this stage, but that they reserve the right to move for summary judgment—or for other forms of relief—on those claims later. ECF No. 20 at 1 n.2.

The Government, in its Cross-Motion for Summary Judgment, raises threshold jurisdictional, justiciability, and standing challenges to Plaintiffs' APA claims, *see* ECF No. 21 at 14–40, before going on to dispute the merits of those claims. *Id.* at 40–

53. The Government also argues that, by electing not to move for summary judgment on their Fifth Amendment claims, Plaintiffs have waived those claims in their entirety. *Id.* at 3 n.1. In the alternative, the Government has moved to dismiss Plaintiffs' constitutional claims. *Id.* at 53–56.

## II. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

As mentioned, the parties have cross-moved for summary judgment on Plaintiffs' APA claims. *See* ECF Nos. 20, 21. The Court addresses the Government's jurisdictional, justiciability, and standing challenges before turning to the merits of Plaintiffs' APA claims. But first, the Court recites the governing standard of review.

### A. Standard of Review

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (quoting *Ameen v. Amphenol Printed Cirs., Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020) (citing *Fadili v. Deutsche Bank Nat'l Tr. Co.*, 772 F.3d 951, 953 (1st Cir. 2014)).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). In this context, "a motion for summary judgment is simply a vehicle to tee up

a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Id.* In making this determination, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

### B. The Government's Jurisdictional, Justiciability, and Standing Challenges

The Government raises a variety of jurisdictional, justiciability, and standing challenges. First, the Government claims that "[b]ecause the Challenged Policies implicate national security—and, thus, separation-of-powers concerns—they are not justiciable." ECF No. 21 at 14. Second, the Government contends that "[t]he INA strips the federal courts of judicial review of the Challenged Policies." *Id.* at 17. Third, the Government attacks Plaintiffs' APA claims as nonjusticiable "because adjudication of immigration benefits is committed to USCIS discretion." *Id.* at 22. Fourth, the Government asserts that the Challenged Policies are not final agency actions under the APA. *Id.* at 24. Fifth, the Government argues that Plaintiffs' claims are not ripe for review. *Id.* Sixth, and finally, the Government challenges Plaintiffs' two theories of standing. *Id.* at 29. The Court addresses each argument in turn.

#### 1. National Security Concerns Do Not Shield USCIS from Judicial Review

The Government first argues that Plaintiffs' claims are nonjusticiable because the Challenged Policies rest on national security determinations the President made that are largely shielded from judicial review. ECF No. 21 at 14–17. The Government seems to suggest that, because the President has such considerable

authority over matters of national security and foreign policy, Executive Branch policies that touch on these matters are beyond the reach of federal courts. *See id.* at 14–15.

To be sure, in the immigration context specifically, the Supreme Court has recognized that the President's factual determinations as to matters of national security and foreign policy are entitled to judicial deference. *See Trump v. Hawaii*, 585 U.S. 667, 708 (2018) ("[T]he Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010))). It is not the role of a court to second-guess the effectiveness or wisdom of those determinations. *Id.* at 707–08 (citing *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Regan v. Wald*, 468 U.S. 222, 242–243 (1984)). This Court will not do that.

That said, simply because the Executive Branch invokes the talisman of national security with respect to its policies does not render those policies unreviewable. *See Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("[N]ational-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523, (1985))); *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017) (per curiam) (observing that "[t]here is no precedent to support" the Government's position that "the President's decisions about immigration policy, particularly when motivated by

national security concerns, are *unreviewable*" because this position "runs contrary to the fundamental structure of our constitutional democracy" (emphasis in original)).

To the contrary, courts routinely consider challenges to immigration policies—even where "national security concerns" are raised—simply to ensure that the Executive Branch has not exceeded the scope of its constitutional or statutory authority[13] in enacting such policies. *See, e.g.*, *Doe v. Trump*, No. 1:25-cv-13946-JEK, 2026 WL 1170971, at *10 n.14 (D. Mass. Apr. 30, 2026) ("Courts, of course, regularly review executive action that touches on matters of national security."); *Behdin v. Edlow*, No. 26-cv-00566-SVK, 2026 WL 1031079, at *11 (N.D. Cal. Apr. 16, 2026) (finding that the Government had "failed to establish any particularized national security interest that would shield from judicial review" USCIS's policy of placing a hold on the adjudication of noncitizens' work permit applications).

Ultimately, the question here is not whether the Court thinks it is wise for USCIS to place a hold on all applications for immigration benefits filed by individuals from Travel Ban Countries. Such an inquiry is best left to the political branches. *See Hawaii*, 585 U.S. at 707–08; *see also El-Shifa Pharm. Indus. Co. v. United States*, 607

---

[13] The Government seems to suggest that the Court can only review *constitutional* challenges "arising from matters of foreign policy and national security and in the context of immigration," and it cites *Trump v. Hawaii* as the lead case supporting that proposition. ECF No. 21 at 15 & n.10. The Government's reliance on that case is unconvincing, however. In *Hawaii*, the Supreme Court "assum[ed] without deciding" that it had jurisdiction over the plaintiffs' constitutional *and* statutory challenges to the travel ban implemented by the first Trump administration. 585 U.S. 667, 683 (2018); *see also Dep't of State v. Muñoz*, 602 U.S. 899, 908 n.4 (2024). This hardly stands for the idea that Plaintiffs' statutory challenges here are entirely unreviewable.

F.3d 836, 842 (D.C. Cir. 2010) ("[C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security.").

The question instead is whether USCIS has the legal authority to enact its Challenged Policies in the first place, which is a purely legal question that this Court is well-equipped to address. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (evaluating whether federal officials' "interpretation of [a] statute is correct" is "a familiar judicial exercise"); *Stark v. Wickard*, 321 U.S. 288, 310 (1944) ("The responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction.").

**2. The INA Does Not Strip the Court of Jurisdiction over Plaintiffs' Claims**

**a. The Court Can Review Plaintiffs' Adjustment of Status and Employment Authorization Claims**

The Government next argues that two provisions of the INA, 8 U.S.C. § 1252(a)(2)(B)(i) and 8 U.S.C. § 1252(a)(2)(B)(ii), each strip the Court of jurisdiction over Plaintiffs' adjustment of status and employment authorization claims. ECF No. 21 at 17–20. The Court addresses each argument in turn.

Before doing so, however, it is important to recognize "a familiar principle of statutory construction" frequently invoked by the Supreme Court in cases involving immigration legislation, which is "the presumption favoring judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). The Supreme Court has "consistently applied" this presumption "to questions concerning the

preservation of federal-court jurisdiction," including in cases involving the statutory provisions at issue. *Id.* This presumption "can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (citations omitted). This is a helpful backdrop by which to adjudge the Government's jurisdiction-stripping arguments.

**i. Section 1252(a)(2)(B)(i) Does Not Bar Review**

The first provision at issue here is Section 1252(a)(2)(B)(i), which provides that "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1255."[14] 8 U.S.C. § 1252(a)(2)(B)(i). Section 1255 specifically concerns adjustment of status claims. *See Kucana*, 558 U.S. at 239 n.2 (citing 8 U.S.C. § 1255).

Plaintiffs here challenge, among other things, USCIS's Benefits Hold Policy that placed a pause on the adjudication of adjustment of status claims for individuals from the Travel Ban Countries. *See* ECF No. 20-1 at 22, 24, 26, 27. However, according to the Government, "challenges to policies governing the adjudication of adjustment of status applications" fall within Section 1252(a)(2)(B)(i)'s jurisdictional bar and are therefore foreclosed. ECF No. 21 at 19.

As support, the Government cites the Supreme Court's recent decision in *Patel v. Garland*, 596 U.S. 328 (2022). In that case, the Court reasoned that Section

[14] Section 1252(a)(2)(B)(i) also bars review over other enumerated forms of immigration relief, such as waivers of inadmissibility, cancellation of removal, and voluntary departure. *See Kucana*, 558 U.S. at 239 n.2 (citing 8 U.S.C. §§ 1182(h), (i), 1229b, 1229c). These forms of relief are not at issue here.

1252(a)(2)(B)(i) "prohibits review of *any* judgment *regarding* the granting of relief under § 1255," including "any judgment *relating to* the granting of [discretionary] relief." *Patel*, 596 U.S. at 338–39, 347 (emphasis in original). As the Court held, this jurisdictional bar encompasses "factual findings," meaning that federal courts are precluded from reviewing "facts found as part of discretionary-relief proceedings." *Id.* at 339, 347.

The Government interprets this provision of the INA far too broadly. In the context of judicial review over immigration benefit determinations, the Supreme Court has long differentiated between the "direct review of individual denials" of applications and "general collateral challenges to [unlawful] practices and policies used by the agency in processing applications." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (distinguishing between challenges to "the denial of any individual application" and challenges to the "legality of a regulation"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 213 (1994) (describing *McNary* as permitting "broad 'pattern and practice' challenges" despite an INA provision "expressly limiting judicial review of individual . . . determinations"). The former describes, for instance, "a single act," whereas the latter generally refers to "a group of decisions or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 492.

The most natural reading of Section 1252(a)(2)(B)(i) is that it bars review only over "a single act of granting or denying an individual application for relief," but that it does not preclude "collateral actions challenging general policies and procedures."

*Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1004, 1009 (9th Cir. 2024); *see also Garcia v. U.S. Citizenship & Immigr. Servs.*, 146 F.4th 743, 749 (9th Cir. 2025). A quick primer on statutory interpretation shows why this is so.

First, Section 1252(a)(2)(B)(i)'s "reference to 'the granting of relief under [Section 1255]' more likely describes a single act of granting or denying an individual application for relief" because "a policy or procedure would not typically 'grant' relief without case-specific adjudication." *Nakka*, 111 F.4th at 1004.

Second and relatedly, Section 1252(a)(2)(B)'s heading is entitled "Denials of discretionary relief," which "suggests that § 1252(a)(2)(B)(i)'s reference to 'any judgment regarding the granting of relief' refers to the adjudication of individual applications for relief." *Nakka*, 111 F.4th at 1004; *see Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[S]tatutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of a statute.'" (quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002))).

Third, and perhaps most significant, is that Section 1252(a)(2)(B)(i), unlike neighboring provisions of the statute, does not expressly strip courts of jurisdiction over agency policies and procedures.[15] *See Nakka*, 111 F.4th at 1005–06 ("Because Congress explicitly stripped jurisdiction to review agency . . . policies and procedures

[15] *Contrast* 8 U.S.C. § 1252(a)(2)(A)(iv) ("[N]o court shall have jurisdiction to review . . . *procedures and policies adopted by the Attorney General* to implement the provisions of section 1225(b)(1) of this title." (emphasis added)), *with* 8 U.S.C. § 1252(a)(2)(B)(i) ("[N]o court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title.").

in § 1252(a)(2)(A)(iv) but not in § 1252(a)(2)(B)(i), we presume that Congress did not intend for the latter provision to preclude review of agency policies and procedures."). This choice of words is not insignificant. *See Nken v. Holder*, 556 U.S. 418, 430 (2009) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987))).

Plaintiffs here, of course, are not challenging USCIS's individual denials of adjustment of status applications. They instead lodge a categorical attack on the agency's Benefits Hold Policy that prevents the adjudication of adjustment of status applications. *See Nakka*, 111 F.4th at 1004, 1009; *Garcia*, 146 F.4th at 749. In recent months, other district courts around the country addressing similar challenges to USCIS's policies have concluded that Section 1252(a)(2)(B)(i) does not foreclose these types of categorical attacks. *See, e.g.*, *Doe*, 2026 WL 1170971, at *8 (holding that Section 1252(a)(2)(B)(i)'s "text and context demonstrate that it does not extend to collateral attacks on agency policies and procedures"); *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 485490, at *7 (N.D. Cal. Feb. 20, 2026) (concluding that 1252(a)(2)(B)(i) does not strip the court of its jurisdiction over USCIS's failure to adjudicate adjustment of status applications). This Court reaches the same conclusion and holds that Section 1252(a)(2)(B)(i) does not deprive it of jurisdiction over Plaintiffs' adjustment of status claims.

### ii. Section 1252(a)(2)(B)(ii) Does Not Bar Review

The Court turns its attention next to Section 1252(a)(2)(B)(ii). This provision is "a catchall provision" that applies to "decisions of the same genre" as in Section 1252(a)(2)(B)(i). *Kucana*, 558 U.S. at 247. It specifically bars review of "any other decision or action . . . for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a)[16] of this title." 8 U.S.C. § 1252(a)(2)(B)(ii). "'[T]his subchapter' refers to Title 8, Chapter 12, Subchapter II, of the United States Code, codified at 8 U.S.C. §§ 1151–1381 and titled 'Immigration.'" *Kucana*, 558 U.S. at 239 n.3.

This time, the Government asserts that USCIS's decisions over whether to grant employment authorization or adjustment of status are "discretionary judgments," and that Section 1252(a)(2)(B)(ii) therefore precludes review over any challenge to the adjudication of those forms of relief. *See* ECF No. 17–20. Again, the Court is not persuaded by the Government's interpretation of the statute.

As many courts have held, Section 1252(a)(2)(B)(ii)—much like Section 1252(a)(2)(B)(i)—bars judicial review of orders denying discretionary benefits in *individual cases*, but the statute does not foreclose *categorical* challenges to agency policies and procedures concerning the adjudication of those benefits. *See, e.g.*, *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 630–31 (D.C. Cir. 2020); *Miot v. Trump*, 818 F.

---

[16] Section 1158 concerns applications for asylum, but the Supreme Court has recognized that asylum applicants do not fall under Section 1252(a)(2)(B)(ii)'s jurisdictional bar. *See Kucana*, 558 U.S. at 247 n.13.

Supp. 3d 126, 157 (D.D.C. 2026); *Varniab*, 2026 WL 485490, at *7; *Bowser v. Noem*, No. 26-cv-10382-AK, 2026 WL 555624, at *3 (D. Mass. Feb. 27, 2026); *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at *8 (D. Mass. May 12, 2023); *Doe 1 v. Mayorkas*, 530 F. Supp. 3d 893, 909 (N.D. Cal. 2021); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C. 2018). There are several reasons as to why this is so.

Start first with the statutory text. As mentioned in the Court's discussion of Section 1252(a)(2)(B)(i), the natural reading of Section 1252(a)(2)(B)(ii)'s title, "Denials of discretionary relief," suggests that Congress meant to strip courts of jurisdiction over *individual* denials of discretionary relief. *See Make the Rd. N.Y.*, 962 F.3d at 629. This view is supported by the Supreme Court's decision in *Nasrallah v. Barr* in which it described Section 1252(a)(2)(B) "as barring judicial review of 'challenges to *orders denying discretionary relief*,'" including adjustment of status claims. *Id.* at 629–30 (emphasis in original) (quoting *Nasrallah*, 590 U.S. 573, 586 (2020)).

It is further supported by the final portion of Section 1252(a)(2)(B)(ii)'s text, which "explicitly carves out from the jurisdictional bar another type of discretionary substantive relief from removal for individuals—asylum claims." *Id.* at 629; *see* 8 U.S.C. § 1252(a)(2)(B)(ii) (excluding "the granting of relief under section 1158(a) of this title" from the prohibition on judicial review). The phrase "granting of relief" indicates that Congress was referring to the single act of granting an individual claim for asylum. *See Make the Rd. N.Y.*, 962 F.3d at 629. It would be an odd result if the

statute were to instead refer to the "granting of relief" of a policy or procedure. *Id.*; *see also Nakka*, 111 F.4th at 1004.

The Supreme Court's decision in *Kucana v. Holder* is also informative. That case teaches that Section 1252(a)(2)(B)(ii)'s jurisdictional bar applies only to agency determinations made discretionary *by statute*, and not to determinations declared discretionary by the agency itself. *See Kucana*, 558 U.S. at 249–52. *Kucana* dealt directly with a regulation promulgated by the Attorney General, which placed the decision whether to grant a motion to reopen removal proceedings within the Attorney General's discretion. *Id.* at 242 (citing 8 C.F.R. § 1003.2(a)). Notably, no statute codified or otherwise specified that reopening decisions were in the Attorney General's discretion. *Id.* at 242–43. The Supreme Court thus held that the Attorney General could not insulate himself from judicial review simply by declaring a decision discretionary. *Id.* at 247. Rather, Congress itself had to make that decision "discretionary by legislation" for the Attorney General to benefit from Section 1252(a)(2)(B)(ii)'s bar on judicial review. *Id.*

That same reasoning holds true here. In this case, USCIS did not promulgate a regulation specifying that the decision to place a hold on the adjudication of immigration benefits was within the agency's discretion. Instead, the agency issued a series of Policy Memoranda in which USCIS purported to give itself this discretionary authority. *See* ECF No. 16-2 at CAR-000002 ("This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum. Any

requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.").

Thus, for the purposes of Section 1252(a)(2)(B)(ii), the question is: Has Congress passed any legislation conferring USCIS with the discretionary authority to place a hold on the adjudication of adjustment of status and employment authorization applications? *See Kucana*, 558 U.S. at 249–52. If the answer is "yes," then Section 1252(a)(2)(B)(ii)'s jurisdictional bar applies. *Id.*

The Government proposes that two statutes contained within Subchapter II—8 U.S.C. §§ 1255(a) and 1324a—confer such authority to USCIS. ECF No. 21 at 19, 20 n.14. A close review of those statutes suggests otherwise. Section 1255(a), for instance, provides that "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the [DHS Secretary],[17] in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). As Judge Julia E. Kobick of the District of Massachusetts recently explained, this statute does not, "by its terms, confer[ ] discretion to issue policies placing on hold all applications for adjustment of status . . . by noncitizens from particular countries." *Doe*, 2026 WL 1170971, at *9. "Section 1255(a) does afford the [DHS Secretary] significant discretion to adjust the status of '*an* alien who was inspected and admitted or paroled into the United States,'

[17] Although Section 1255(a) refers to the Attorney General here, Congress has since transferred the authority over adjustment of status adjudications to the DHS Secretary. *See* 6 U.S.C. § 271(b); 8 U.S.C. 1103(a).

but that language refers to a particular alien, not *all* noncitizens from an entire country." *Id.* (emphasis in original) (quoting 8 U.S.C. § 1255(a)).

As for Section 1324a, this statute makes it unlawful to employ "an unauthorized alien," which is defined as a noncitizen who has not been "lawfully admitted for permanent residence" or "authorized to be so employed by this chapter or by the [DHS Secretary]."[18] 8 U.S.C. §§ 1324a(a), (h)(3). As in Judge Kobick's case, the Government does not explain here how Section 1324a confers "discretion to indefinitely put on hold all work authorization applications or view such applications negatively based on country of origin." *Doe*, 2026 WL 1170971, at *9. The Government briefly cites to *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 664 F. Supp. 3d 143, 148–52 (D.D.C. 2023), which references Section 1324a. *See* ECF No. 21 at 20. However, that case cuts against the Government's own argument. The district court in that case stated as follows: "'[S]ection 1324a(h)(3) expressly acknowledges that employment authorization need not be specifically conferred by statute; it can also be granted by regulation, as it has been' here." *Save Jobs USA*, 664 F. Supp. 3d at 150 (quoting *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 191–92 (D.C. Cir. 2022)). That the source for conferring employment authorization is derived from regulation as opposed to statute would mean that employment authorization decisions are *not* subject to Section 1252(a)(2)(B)(ii)'s jurisdictional bar. *See Kucana*, 558 U.S. at 248.

[18] Like Section 1255(a), Section 1324a refers to the Attorney General, but Congress has also transferred this authority to the DHS Secretary. *See* 6 U.S.C. § 271(b); 8 U.S.C. 1103(a).

Thus, the Government "has not identified any sound basis on which to conclude that 'Congress itself set out [USCIS's] discretionary authority' for the adjudicative hold . . . polic[y] 'in the statute[s]' that govern adjustment of status and work authorization." *Doe*, 2026 WL 1170971, at *9 (quoting *Kucana*, 558 U.S. at 247).

As a last-ditch effort to salvage its jurisdiction-stripping argument, the Government relies on cases from multiple federal courts of appeals concerning USCIS's "visa retrogression policy." *See* ECF No. 21 at 19 n.13 (citing *Kale v. Alfonso-Royals*, 139 F.4th 329, 331 (4th Cir. 2025); *Geda v. Dir. U.S. Citizenship & Immigr. Servs.*, 126 F.4th 835 (3d Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 390 (5th Cir. 2024); *Thigulla v. Jaddou*, 94 F.4th 770 (8th Cir. 2024); *Kanapuram v. Dir., U.S. Citizenship & Immigr. Servs.*, 131 F.4th 1302, 1309 (11th Cir. 2025)).

For context, USCIS has promulgated regulations specifying that an applicant is ineligible for adjustment of status "unless an immigrant visa is immediately available to him or her at the time the application is filed," and that applications for permanent resident status "shall not be approved until an immigrant visa number has been allocated by the Department of State." 8 C.F.R. §§ 245.1(g)(1), 245.2(a)(5)(ii). In addition, Congress has imposed statutory caps on how many visas will be awarded each year. *See Gupta v. Jaddou*, 118 F.4th 475, 479 (1st Cir. 2024) (citing 8 U.S.C. §§ 1151, 1152, 1153). Thus, "visa retrogression" occurs when the demand for visas is higher than forecasted by USCIS, and there are more applicants than available visas. *See* 8 C.F.R. § 245.2(a)(5)(ii); *see also Kale*, 139 F.4th at 332–33. If a visa is not available, then USCIS has adopted an "Adjudication Hold

Policy" in which it holds applications for adjustment of status in abeyance until a visa becomes available. *See id.* at 333.

Several noncitizens, many of whom have grown tired of waiting for their visas, have filed suits challenging USCIS's visa retrogression policy. However, the courts of appeals have almost uniformly held that Section 1252(a)(2)(B)(ii) bars jurisdiction over these challenges, because that policy is committed to agency discretion by Section 1255(a). *See Kale*, 139 F.4th at 334–36; *Kanapuram*, 131 F.4th at 1306–08; *Geda*, 126 F.4th at 844; *Cheejati*, 106 F.4th at 394–95; *Thigulla*, 94 F.4th at 774–77.[19] Thus, the Government argues that, just as USCIS's visa retrogression policy is subject to Section 1252(a)(2)(B)(ii)'s jurisdictional bar, so too are the Challenged Policies at issue here because "[t]here is no principled, analytical distinction" between the two policies. ECF No. 21 at 19 n.13.

Not so. In fact, a few district courts have already identified several important distinctions between the visa retrogression policy and the Challenged Policies. For one thing, "Section 1255(a) expressly grants the executive branch discretion to promulgate 'such regulations as [it] may prescribe' regarding adjustment of status applications, and the retrogression policy, embodied in USCIS's regulations, is the

[19] The Government argues that the First Circuit's decision in *Gupta v. Jaddou*, 118 F.4th 475 (1st Cir. 2024), also precluded consideration of USCIS's visa retrogression policy under Section 1252(a)(2)(B)(ii)'s jurisdictional bar. *See* ECF No. 21 at 20. But that is inaccurate. In *Gupta*, the First Circuit declined to address the jurisdictional argument under Section 1252(a)(2)(B)(ii), and it assumed without deciding that there were "no statutory bars to [its] exercise of jurisdiction." 118 F.4th at 482; *see also Kanapuram*, 131 F.4th at 1307 n.2 ("The First Circuit also issued a similar merits-based decision without addressing jurisdiction." (citing *Gupta*, 118 F.4th at 482–87)).

exercise of that discretion conferred by Congress." *Doe*, 2026 WL 1170971, at *9; *see* 8 C.F.R. § 245.2(a)(5)(ii). Here, by contrast, none of the Challenged Policies were promulgated as regulations by USCIS, nor does Section 1255(a) by its terms grant USCIS the discretion to cease adjudicating adjustment of status applications altogether. *See Doe*, 2026 WL 1170971, at *9. Moreover, whereas the visa retrogression policy places adjustment applications on hold until a condition precedent is satisfied (i.e., the availability of a visa), there is no identified "condition precedent" for the hold at issue in this case and thus no definite end point for when the hold is expected to end. *See Varniab*, 2026 WL 485490, at *7.

Finally, the Court would be remiss if it did not mention that, for the last twenty years, the vast majority of district courts within the First Circuit have recognized that Section 1252(a)(2)(B)(ii) does *not* insulate DHS from its "failure to act" on immigration benefit applications. *See, e.g.*, *Bowser*, 2026 WL 555624, at *4; *Roe*, 2023 WL 3466327, at *8; *Zhou v. Fed. Bureau of Investigation*, No. 07-cv-238-PB, 2008 WL 2413896, at *4 (D.N.H. June 12, 2008); *Abdi v. Chertoff*, 589 F. Supp. 2d 120, 121 (D. Mass. 2008); *Vorontsova v. Chertoff,* No. 07-10426-RGS, 2007 WL 3238026, at *2 (D. Mass. Nov. 2, 2007); *Aziz v. Chadbourne,* No. 07-11806-GAO, 2007 WL 3024010, at *2 (D. Mass. Oct. 15, 2007). "[W]hile it is undisputed that the substance of the [DHS Secretary's] decision is discretionary, he does not have discretion to decide not to adjudicate at all." *Tang v. Chertoff*, 493 F. Supp. 2d 148, 154 (D. Mass. 2007).

All these reasons counsel in favor of finding that Section 1252(a)(2)(B)(ii) does not strip the Court of jurisdiction over Plaintiffs' adjustment of status or employment authorization claims.

**b. The Court Can Review Plaintiffs' Naturalization Claims**

The Government also contends that other provisions of the INA, 8 U.S.C. § 1421(c) and 8 U.S.C. § 1447(b), preclude judicial review over Plaintiffs' naturalization claims. ECF No. 21 at 20–22. Section 1421(c) provides that "[a] person whose application for naturalization under this subchapter is denied . . . may seek review of such denial before the United States district court for the district in which such person resides . . . ." 8 U.S.C. § 1421(c). And Section 1447(b) provides that "[i]f there is a failure to make a determination" on a naturalization application within 120 days, then "the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter." 8 U.S.C. § 1447(b).

According to the Government, these statutes highly circumscribe when courts may intervene in naturalization adjudications. ECF No. 21 at 20. The Government essentially argues that judicial review may be sought only when: (1) USCIS has denied a naturalization application; or (2) USCIS fails to render a decision within 120 days after the applicant's examination. *Id.* at 20–21.

This argument falls flat for the same reasons as the Government's other jurisdiction-stripping arguments. First, neither statute expressly prohibits judicial review over the type of categorical challenge that Plaintiffs bring against USCIS's

general policy of placing a hold on adjudications of naturalization applications. *See McNary*, 498 U.S. at 492 (1991); *Cath. Soc. Servs., Inc.*, 509 U.S. at 56.

Rather, the statutes upon which the Government relies are written in individualized terms: "*A person* whose application for naturalization under this subchapter is denied . . . may seek review of such denial before the United States district court for the district in which *such person* resides . . . ." 8 U.S.C. § 1421(c) (emphasis added); *see also* 8 U.S.C. § 1447(b) ("If there is a failure to make a determination . . ., *the applicant* may apply to the United States district court for the district in which *the applicant* resides for a hearing on the matter." (emphasis added)).

As the Supreme Court has instructed, "Congress' choice of words is presumed to be deliberate." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013); *see also King v. Burwell*, 576 U.S. 473, 492 (2015) (observing that a "fundamental canon of statutory construction" is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 320 (2014))). As relevant here, the text of Sections 1421(c) and 1447(b) appears to constrain review of individual claims regarding agency denials of, or delays in processing, naturalization applications. It does not proscribe Plaintiffs' categorical challenge to USCIS's policy of halting the adjudication of naturalization applications altogether.

The Government advances another argument in support of its position, which pertains to 8 C.F.R. § 335.2(b). ECF No. 21 at 21–22. That regulation provides that

USCIS may not conduct a naturalization examination until the Federal Bureau of Investigation ("FBI") has completed a background check on the applicant. *See* 8 C.F.R. § 335.2(b); *see also* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Pub. L. No. 105-119, 111 Stat. 2440, 2448–49 (1997) (creating obligation that "none of the funds appropriated or otherwise made available to [USCIS][20] shall be used to complete adjudication of an application for naturalization unless [USCIS] has received confirmation from the [FBI] that a full criminal background check has been completed"). The Government contends that, "where delays are attributable to the completion of required background and security checks," courts lack jurisdiction to order USCIS to process naturalization applications. ECF No. 21 at 22.

To be sure, many courts have recognized that they cannot order USCIS to act on a naturalization application until the FBI has completed its background check on the applicant. *See, e.g.*, *Nguyen v. Gonzalez*, No. H-07-0048, 2007 WL 713043, at *2 (S.D. Tex. Mar. 6, 2007); *Manzoor v. Chertoff*, 472 F. Supp. 2d 801, 808–09 (E.D. Va. 2007); *Antonishin v. Keisler*, 627 F. Supp. 2d 872, 879 (N.D. Ill. 2007); *Zaytsev v. Gantner*, No. 04 Civ.7101 WHP, 2004 WL 2251665, at *1 (S.D.N.Y. Sept. 24, 2004).

[20] This law originally referenced the Immigration and Naturalization Service ("INS"), which was a federal government agency that Congress disbanded with the Homeland Security Act of 2002. *See* Pub. L. No. 107-296, § 451(a)(1), 116 Stat. 2135, 2195 (codified at 6 U.S.C. § 271(a)(1)). Many of INS's functions were transferred to USCIS, as well as Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP").

The problem for the Government, however, is that the delays here are *not* because of the FBI's background checks on naturalization applicants. Nowhere in the administrative record does the Government even mention the FBI. Instead, the record makes clear that USCIS itself is the one conducting investigations into applicants. *See* ECF No. 16-2 at CAR-000003 ("USCIS has determined the operational necessity to ensure that . . . aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States."); *see also* ECF No. 16-3 at CAR-000047 (same).

As such, where USCIS is the one conducting the background and security checks into naturalization applicants, it does not follow that the Government gets to invoke 8 C.F.R. § 335.2(b) to shield the agency from judicial review. That regulation contemplates a pending *FBI* background investigation, not a pending *USCIS* investigation. *See* 8 C.F.R. § 335.2(b).

So, neither the INA nor its accompanying regulations strip the Court of jurisdiction over Plaintiffs' naturalization claims.

**3. USCIS's Actions Are Not Committed to Agency Discretion By Law**

The Government also contends that USCIS's actions are unreviewable because they are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). ECF No. 21 at 22–24. In general, the APA "establishes a 'basic presumption of judicial

review [for] one suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). This presumption can be rebutted by showing that the challenged "action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Regents*, 591 U.S. at 17.

However, the Supreme Court has long construed Section 701(a)(2)'s exception to reviewability "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)); *see also Heckler v. Chaney*, 470 U.S. 821, 838 (1985) (citing *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402 (1971)). It applies only to "those rare administrative decisions traditionally left to agency discretion," *Regents*, 591 U.S. at 17 (cleaned up), or "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Dep't of Com.*, 588 U.S. at 772 (cleaned up).

Here, the Government seems to be invoking the second circumstance in which Section 701(a)(2)'s exception applies. The Government argues that Congress has drawn the relevant statutes governing adjustment of status, employment authorization, naturalization, and asylum in such a way that they are precluded from review under Section 701(a)(2). *See* ECF No. 21 at 22–23.[21] "To determine if the

---

[21] The Government also argues that "for the same reasons that adjustment of status and employment authorization matters are also not reviewable under § 1252(a)(2)(B), they are likewise precluded from review under § 701(a)(2) of the APA." ECF No. 21 at 23. It would appear that the Government meant to invoke 5 U.S.C. § 701(a)(1) because that provision renders review of agency action unavailable

relevant statutes are so drawn, the Court must carefully examine 'each statute on which the claim of agency illegality is based' and the challenged regulatory framework." *Doe*, 2026 WL 1170971, at *10 (quoting *Webster v. Doe*, 486 U.S. 592, 600 (1988)). If there are "appropriate, 'judicially manageable standards' for evaluating the [Government's] actions," then those actions are reviewable under the APA. *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 53 (1st Cir. 2025) (quoting *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 21 (1st Cir. 2020)).

Because the Challenged Policies touch on the adjudication of adjustment of status, employment authorization, naturalization, and asylum claims, the Court addresses each of the statutes and regulations governing these forms of relief.

**a. Plaintiffs' Adjustment of Status Claims Are Not Committed to Agency Discretion By Law**

Adjustment of status claims are primarily governed by 8 U.S.C. § 1255(a). Through this provision, Congress has granted the DHS Secretary, "in his discretion and under such regulations as he may prescribe," the authority to adjust a noncitizen's status to "lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). Congress has also set clear parameters that an applicant must meet to be eligible for adjustment of status: (1) the noncitizen must apply for adjustment of status; (2) the noncitizen must be eligible to receive an immigrant visa and must be admissible to the United States for permanent residence; and (3) an immigrant visa

---

where "*statutes* preclude judicial review." *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 n.4 (1st Cir. 2020) (emphasis added) (citing 5 U.S.C. § 701(a)(1)). In any event, this particular argument is unavailing because the Court has determined that Plaintiffs' adjustment of status and employment authorization claims are *not* precluded by Section 1252(a)(2)(B).

must be immediately available to the noncitizen at the time his application is filed. *See id.*

USCIS has in turn issued a panoply of regulations governing how the adjustment of status process is supposed to play out. *See, e.g.*, 8 C.F.R. § 245.1(a) (describing who is eligible to adjust status); 8 C.F.R. § 245.2(a) (describing how an application for adjustment of status is filed); 8 C.F.R. § 245.6 (describing the interview process for applicants for adjustment of status); 8 C.F.R. § 245.2(a)(5)(i) (requiring that applicants "shall be notified of the decision of the director and . . . the reasons for [any] denial"). "The regulations contemplate that USCIS will accept, review, and adjudicate adjustment of status applications." *Doe*, 2026 WL 1170971, at *11.

Given this detailed statutory and regulatory scheme, adjustment of status is not one of "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772. Both the INA and USCIS's "own regulation[s] provide[ ] more than enough 'law' by which a court could review" the agency's decision to place a hold on adjudications. *Haoud v. Ashcroft*, 350 F.3d 201, 206 (1st Cir. 2003). Thus, there is ample law to apply in determining whether the application of the Challenged Policies to applicants for adjustment of status comports with the APA. *Id.*; *see also Doe*, 2026 WL 1170971, at *11.

### b. Plaintiffs' Employment Authorization Claims Are Not Committed to Agency Discretion By Law

Congress has prohibited noncitizens from working without obtaining employment authorization. *See* 8 U.S.C. § 1324a. Under the INA, a noncitizen may work if they are "lawfully admitted for permanent residence," or if they are otherwise "authorized to be so employed by this chapter or by the [DHS Secretary]." 8 U.S.C. § 1324a(h)(3).

USCIS has also promulgated regulations pertaining to employment authorization. *See, e.g.*, 8 C.F.R. § 274a.12 (describing the classes of noncitizens "authorized to accept employment"); 8 C.F.R. § 274a.13(a) (describing how an application for employment authorization is filed); 8 C.F.R. § 274a.13(b), (c) (requiring that an applicant be notified of an approval or a denial of their application and, if denied, the reason(s) for that denial). There is also a regulation specifying eligibility criteria and timelines for adjudicating employment authorization applications made by asylum applicants. *See* 8 C.F.R. § 208.7(a).

This too is "more than enough law" to facilitate review of USCIS's decision to halt adjudications of employment authorization applications. *See Haoud*, 350 F.3d at 206; *Doe*, 2026 WL 1170971, at *11–12.

### c. Plaintiffs' Asylum and Withholding of Removal Claims Are Not Committed to Agency Discretion By Law

Congress, through the INA, has codified a statutory right to apply for asylum. *See* 8 U.S.C. § 1158(a); *see also* 8 U.S.C. §§ 1225(b)(1)(A), 1229a(c)(4) (permitting individuals in removal proceedings—whether regular or expedited—to apply for asylum as a defense against removal). It has also codified a right to apply for

withholding of removal under the INA, as well as under the Convention Against Torture ("CAT"). *See* 8 U.S.C. § 1231(b)(3)(A); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681–822 (1998) (codified as 8 U.S.C. § 1231 note).

There are several statutory requirements that Congress has set out for these forms of relief. For instance, an applicant must qualify as a "refugee," which is defined as someone who is "unable or unwilling to return to, and is unable or unwilling to avail [themselves] of the protection of" their country of origin (or the last country where they resided) "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also* 8 U.S.C. § 1158(b)(1)(A) (authorizing immigration officials to grant asylum if the noncitizen is "a refugee within the meaning of" the INA).[22] And withholding of removal is available

[22] The relevant statute provides that either "[t]he Secretary of Homeland Security or the Attorney General may grant asylum." *See* 8 U.S.C. § 1158(b)(1)(A). More precisely, USICIS, which is a branch of DHS, generally has "initial jurisdiction" over affirmative asylum applications, that is, applications for asylum by individuals who are not in removal proceedings. *See* 8 C.F.R. § 208.2(a)(1). If wishing to affirmatively apply for asylum (as well as withholding of removal and CAT protection), the applicant files a Form I-589 with USCIS. *See* 8 C.F.R. § 208.3(a)(1). If the applicant meets the eligibility criteria, then "an asylum officer, subject to review within USCIS," may grant the application "in the exercise of his or her discretion." 8 C.F.R. § 208.14(b). However, if the applicant "appears to be inadmissible or deportable," then the asylum officer must refer the application to an immigration judge ("IJ") "for adjudication in removal proceedings." 8 C.F.R. § 208.14(c)(1). IJs are appointed by the Attorney General. *See* 8 C.F.R. § 1003.10(a). A separate process governs those who apply for defensive asylum because they are in removal proceedings, which is a matter primarily adjudicated by IJs. *See* 8 C.F.R. §§ 1003.42, 1208.30, 208.30.

to those who can show that their "life or freedom would be threatened in [their country of origin] because of" their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 U.S.C. § 1231 note (providing CAT protections to those who demonstrate a risk of torture in their countries of origin).

With respect to Plaintiffs' asylum claims, the Government argues that these claims are unreviewable because Congress has left "the timing and manner of adjudication to agency discretion." ECF No. 21 at 23. Not so. Congress has in fact specified that, "in the absence of exceptional circumstances" and "not including administrative appeal," a final adjudication of an asylum application "*shall* be completed within 180 days after the date an application is filed." 8 U.S.C. § 1158(d)(5)(A)(iii) (emphasis added). Of course, "[u]nlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016). The Supreme Court has spoken in even stronger terms about the lack of discretion involved in withholding of removal claims: "[T]he Attorney General has *no discretion* to deny relief to a noncitizen who establishes his eligibility [for withholding of removal]." *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) (emphasis added).

Again, this constitutes "more than enough law" to provide for the review of USCIS's decision to suspend adjudications of asylum and withholding of removal applications. *See Haoud*, 350 F.3d at 206; *Doe*, 2026 WL 1170971, at *12.

### d. Plaintiffs' Naturalization Claims Are Not Committed to Agency Discretion By Law

Through the INA, Congress has also set forth the process by which individuals can apply for naturalization and become U.S. citizens. *See, e.g.*, 8 U.S.C. § 1421(a) (describing that naturalization authority belongs with USCIS[23]); 8 U.S.C. § 1427 (describing requirements for naturalization); 8 U.S.C. § 1429 (describing applicant's prerequisites to naturalization and burden of proof they must meet); 8 U.S.C. § 1446(a) (requiring applicants for naturalization to undergo a "personal investigation," unless USCIS waives it); 8 U.S.C. § 1446(b) (requiring USCIS to "designate employees . . . to conduct examinations upon applications for naturalization," and directing those employees to "make a determination as to whether the application should be granted or denied, with reasons therefor").

USCIS has also issued many regulations concerning the four-step naturalization process. *See, e.g.*, 8 C.F.R. §§ 334.2, 316.4, 316.10 (describing the first step, which is to submit application materials, which include fingerprints, criminal background information, and information reflecting good moral character); 8 C.F.R. § 335.2(b) (describing the second step, which is an FBI background check into the applicant); 8 C.F.R. §§ 332.1(a), 335.2(a) (describing the third step, which is an examination of the applicant by USCIS); 8 C.F.R. §§ 310.3(a), 337.1(a), 338.1(a) (describing the fourth step, which is the applicant's participation in a naturalization

[23] Though the statute provides that naturalization authority is granted the "Attorney General," *see* 8 U.S.C. § 1421(a), "[t]hrough delegation, the Attorney General's authority over naturalization now is exercised by USCIS." *McKenzie v. U.S. Citizenship & Immigr. Servs., Dist. Dir.*, 761 F.3d 1149, 1153 (10th Cir. 2014) (citing 8 C.F.R. §§ 2.1, 310.1(b); 6 U.S.C. § 271(b)(2)).

ceremony at which they take the Oath of Allegiance and receive a Certificate of Naturalization).

The Government contends that this particular scheme "confirm[s] the breadth of the agency's discretion with respect to naturalization" and avers that "naturalization is not a right, but a privilege available only upon strict compliance with all statutory prerequisites." ECF No. 21 at 24. Interestingly, the cases that the Government cites in support of this proposition, *United States v. Ginsberg*, 243 U.S. 472, 474–75 (1917), and *Fedorenko v. United States*, 449 U.S. 490, 506 (1981), involve *denaturalization* proceedings. *Id.* Contrary to the Government's point, these cases confirm that naturalization *is* a right that individuals must be afforded, if they satisfy the statutory prerequisites. *See Ginsberg*, 449 U.S. at 476 ("No alien has the slightest *right* to naturalization *unless* all statutory requirements are complied with[.]" (emphasis added)); *Fedorenko*, 449 U.S. at 505 ("[O]ur decisions have recognized that the *right* to acquire American citizenship is a precious one[.]" (emphasis added)).

The text of USCIS's own regulation also makes clear that naturalization is a form of nondiscretionary relief: "USCIS *shall* grant the [naturalization] application if the applicant has complied with all requirements for naturalization under this chapter." 8 C.F.R. § 335.3(a) (emphasis added); *see Kingdomware Techs., Inc.*, 579 U.S. at 171. And, like the asylum statute, this regulation specifies a time period by which decisions must be rendered: "A decision to grant or deny the [naturalization] application *shall* be made at the time of the initial examination or within 120–days

after the date of the initial examination of the applicant for naturalization under § 335.2." 8 C.F.R. § 335.3(a) (emphasis added).

What is more, both the INA and USCIS's regulations contemplate judicial review over certain naturalization claims. For instance, if a naturalization determination is not made "before the end of the 120-day period after the date on which the examination is conducted," the INA provides district courts with jurisdiction to "either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter." 8 U.S.C. § 1447(b); *see also* 8 C.F.R. § 310.5(a). And an applicant whose naturalization application is denied may also seek review of that denial in the district court after a hearing before an immigration officer. *See* 8 U.S.C. § 1421(c); *see also* 8 C.F.R. §§ 310.5(b), 336.9.

Here, too, then there is "more than enough law" to allow for judicial review of USCIS's decision to halt adjudications of naturalization applications. *See Haoud*, 350 F.3d at 206; *Doe*, 2026 WL 1170971, at *13–14.

**4. USCIS's Actions Constitute Final Agency Action**

The Government alternatively argues that the Court cannot review Plaintiffs' claims because USCIS's actions are not final agency action. ECF No. 21 at 24–28. As a threshold matter, agency action is reviewable under the APA only if it is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "[T]he word 'action' . . . is meant to cover comprehensively every manner

in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citing *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980)).

Additionally, in order be considered "final," the agency action must satisfy two conditions. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024). First, it "must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines*, 333 U.S. at 113). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Here, the Government attacks both prongs of *Bennett*'s finality test.

### a. Plaintiffs Have Satisfied the Consummation Prong

The Government first argues that the Challenged Policies do not represent the consummation of USCIS's decision-making process. ECF No. 21 at 25–26. According to the Government, the Challenged Policies "are neither fixed nor final, but instead reflect interim, operational guidance explaining how adjudications are to proceed while USCIS continues to evaluate security concerns and complete necessary vetting." *Id.* The Court is unconvinced. Consider the evidence that the Government marshals in support of its claim.

The Government first contends that the Challenged Policies "arise from, and operate within, an expressly ongoing and iterative decision-making framework established by Presidential Proclamation." ECF No. 21 at 25. The Government

specifically cites language from Proclamation No. 10949,[24] requiring that "[w]ithin 90 days of the date of this proclamation, and every 180 days thereafter," Cabinet-level officials are to reassess the conditions in countries subject to the Travel Ban and "recommend[ ] whether any suspensions and limitations imposed by [the Travel Ban] should be continued, terminated, modified, or supplemented." *See* Proclamation No. 10949, 90 Fed. Reg. at 24503; *see also* ECF No. 16-1 at CAR-000007.

As Plaintiffs point out, this language requires ongoing and iterative decisionmaking only with respect to *the Travel Ban*. ECF No. 23 at 23. But Proclamation No. 10949 has nothing to do with USCIS's actions and does not "expressly" require the agency's policies to be reviewed or reconsidered. Nor does the President's subsequent proclamation, Proclamation No. 10998, mention the Challenged Policies. It again merely instructs that "[w]ithin 180 days of the date of this proclamation, and every 180 days thereafter," Cabinet officials shall "recommend[ ] whether any suspensions and limitations imposed by [the Travel Ban] should be continued, terminated, modified, or supplemented." *See* Proclamation No. 10998, 90 Fed. Reg. at 59727; *see also* ECF No. 16-3 at CAR-000075.

In any event, even though the December and January Memoranda contemplated that USCIS would, "[w]ithin 90 days of issuance of [the respective memoranda], . . . issue operational guidance" on USCIS's new policies, *see* ECF

[24] The Government states that this language comes from Proclamation No. 10998, but it is mistaken. The language it refers to appears in the prior proclamation, Proclamation No. 10949. *See* 90 Fed. Reg. at 24503; *see also* ECF No. 16-1 at CAR-000007.

No. 16-2 at CAR-000003; ECF No. 16-3 at CAR-000049, both those deadlines—March 2, 2026 and April 1, 2026, respectively—came and went "without USCIS substantively modifying [its policies]." *Doe*, 2026 WL 1170971, at *6.

The Government instead offers up a declaration submitted by Andrew Good, the Chief of USCIS's Office of Policy and Strategy, on March 3, 2026. *See* ECF No. 21-1. In the declaration, Mr. Good asserts that, "[o]ver the past 90 days, USCIS has implemented and reviewed several changes to screening and vetting practices." *Id.* at 2. He adds that USCIS has established "an internal process for Program Offices and Directorates to request lifting holds on individual or group cases." *Id.* at 3. According to Mr. Good, USCIS has lifted some of its holds for noncitizens vetted through Operation PARRIS, as well as for certain family-based petitions filed by U.S. citizens, intercountry adoption forms, and particular forms filed by South African citizens/nationals. *Id.* at 3–4. Moreover, the Government attaches as an exhibit the March 30th Alert, which states that the agency has also since lifted holds for "certain rescheduled oath ceremonies . . ., certain special immigrant visa petitions, certain employment authorization documents, and asylum applications from non high-risk countries." ECF No. 21-2 at 2.

The Government cites this as proof that the Challenged Policies "are neither fixed nor final." *See* ECF No. 21 at 25. According to the Government, that "USCIS has already resumed final decisionmaking for applications for some immigration benefits," suggests a lack of finality. ECF No. 25 at 1. The Government also contends

that USCIS's actions are not final because the Challenged Policies "remain[ ] a subject for further guidance" from the agency. *Id.* at 17.

This position is unavailing for many reasons, not the least of which is that eight federal courts considering nearly identical arguments have concluded that USCIS's actions are sufficiently "final" for the purposes of APA review. *See Varniab*, 2026 WL 485490, at *16–17; *Bowser*, 2026 WL 555624, at *5–6; *Doe v. U.S. Citizenship & Immigr. Servs.*, No. 26-cv-02389, slip op. at 5–6 (N.D. Ill. Mar. 26, 2026); *Behdin v. Edlow*, No. 26-cv-00566-SVK, 2026 WL 1031079, at *19 (N.D. Cal. Apr. 16, 2026); *Karimi v. Mullin*, No. 5:26-cv-50492026, WL 1103448, at *5–6 (W.D. Ark. Apr. 23, 2026); *Saghafi v. Edlow*, No. GLR-26-100, 2026 WL 1127468, at *6 (D. Md. Apr. 24, 2026); *Doe*, 2026 WL 1170971, at *5–6; *Nezameslami v. Dep't of Homeland Sec.*, No. 1:26-cv-00151-SDG, slip op. at 17–19 (N.D. Ga. May 14, 2026).

The Court agrees with its sister courts. To start, a policy memorandum, particularly one issued by DHS, can constitute final agency action where it "[binds] DHS staff by forbidding them to continue [a] program in any way from that moment on." *Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (quoting *Texas v. Biden*, 20 F.4th 928, 948 (5th Cir. 2021)).

Each of the Policy Memoranda at issue here do just that. The November Memorandum directs USCIS officials, "*[e]ffective immediately*," to treat an applicant's country of origin as a "significant negative factor" if that applicant comes from a country subject to the Travel Ban. *See* ECF No. 16-1 at CAR-000072–73 (emphasis added); *see also* ECF No. 16-1 at CAR-000022. USCIS added this guidance

to its Policy Manual, which it emphasizes "is *controlling* and *supersedes* any related prior guidance." *Id.* at CAR-000072 (emphasis added).

The commands of the December and January Memoranda are just as explicit: "*Effective immediately*, this memorandum *directs* [USCIS] personnel to . . . [p]lace a hold on all . . . Application[s] for Asylum and for Withholding of Removal"; "[p]lace a hold on pending benefit requests for aliens from countries listed in [the Travel Ban], pending a comprehensive review, regardless of entry date"; and "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in [the Travel Ban] who entered the United States on or after January 20, 2021." ECF No. 16-2 at CAR-000001 (emphasis added); *see also* ECF No. 16-3 at CAR-000045 (same). Both Policy Memoranda make clear that the "hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum," and that "[a]ny requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director." ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000047.

That USCIS subsequently revised its policies as to a limited number of adjudications does not make these otherwise definitive decisions nonfinal. *See, e.g.*, *POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 404–05 (D.C. Cir. 2020 ("[T]he possibility of revision 'is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal.'" (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016)); *see also Sackett v. Env't Prot. Agency*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might

reconsider . . . does not suffice to make an otherwise final agency action nonfinal."); *Nat'l Env't Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future."); *Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.").

Indeed, it is significant that neither Mr. Good's declaration nor the March 30th Policy Alert purport to adjust the Challenged Policies' effect on individuals from the Travel Ban Countries. As USCIS's Policy Memoranda make clear, the Challenged Policies may only be lifted via superseding policy guidance or a subsequent policy memorandum. *See* ECF No. 16-1 at CAR-000072; ECF No. 16-2 at CAR-000003; ECF No. 16-3 at CAR-000047. That has not happened here. And the Government provides no indication in its filings as to when or if USCIS expects to suspend the Challenged Policies or provide any update on them.

If the Government truly had its way, it could indefinitely shield USCIS's actions from judicial review by labeling them as "interim" and by promising that the agency's final word is forthcoming. But that is not how the law works. "A number of cases support the proposition that significant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate." *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D.

Mass. 2025) (collecting cases); *see, e.g.*, *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020) ("[I]f an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions[.]"); *Oliveira v. Edlow*, No. 25-13228-BEM, 2025 WL 3492110, at *9 (D. Mass. Dec. 4, 2025) ("[A]n agency cannot exempt itself from APA review merely by labeling its policy interim '[g]uidance.'"); *Texas v. United States*, 555 F. Supp. 3d 351, 390 (S.D. Tex. 2021) ("[T]he Government's insinuation that agency action is not final simply because the agency says so, would produce the absurd result of precluding judicial review of any policy that the agency says is not final.").

"[A]t a certain point, an agency's ongoing characterization of its action as 'temporary' rings hollow." *Doe*, 2026 WL 1170971, at *6; *see also Massachusetts*, 790 F. Supp. 3d at 26 (concluding that agency's "temporary" pause on approving wind energy projects was final after months had passed and where the Government provided the court with no "reasonable timeframe for, or indeed any end on the horizon" to the pause); *New York v. Trump*, 811 F. Supp. 3d 215, 234 (D. Mass. 2025) (finding that agency's "temporary" pause on the issuance of wind energy authorizations was final after ten months had passed and "no end to the [pause] appear[ed] to be in sight").

Such is the case here. USCIS's Challenged Policies have remained in effect for over six months and counting. The agency has given no timeline as to when its "temporary" hold on immigration benefit requests will end. "As this appears to be an

indefinite moratorium on applications for immigration benefits from these 39 countries," the Court finds that the first prong of *Bennett* is satisfied. *Bowser*, 2026 WL 555624, at *5–6.

**b. Plaintiffs Have Satisfied the Legal Consequences Prong**

The Government next attacks *Bennett*'s second prong. As noted, this prong requires the Court to decide whether a particular action is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. This inquiry is meant to be a "pragmatic" one. *See Hawkes Co.*, 578 U.S. at 599; *see also Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 62 (D.C. Cir. 2020). Here, the Government argues that, with respect to the Challenged Policies, Plaintiffs "cannot point to any action that determines rights or obligations or from which legal consequences flow." ECF No. 21 at 26.

The Court disagrees. Courts have regularly determined that the second prong of *Bennett* is satisfied "when an indefinite pause is imposed by an agency." *New York*, 811 F. Supp. 3d at 234 (collecting cases). Indeed, where an agency suspension of activity "prevent[s] [an individual] from moving forward," such that they are "trapped without recourse due to the indefinite postponement of agency action," that can be enough to impose significant legal and practical consequences on the individual. *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 59–60 (D.D.C. 2019); *see also Doe v. Trump*, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) (holding that agency memorandum that suspended the entry of refugees for at least 90 days was a final agency action because "whether the Agency Memo produces a 'suspension' or an

indefinite delay, [it] has significant real-world impacts on Plaintiffs' various situations").

There is no question then that Plaintiffs are suffering from the legal consequences of USCIS's Challenged Policies. Plaintiffs submit a plethora of evidence. Several of Dorcas and RDC's clients point out, for instance, that their work permits have expired since the Benefits Hold went into effect and, as such, their requests to renew their work permits cannot be adjudicated. ECF No. 20-2 at 8–9; ECF No. 20-3 at 10. As noncitizens who are unable to renew their expired work permits, these individuals have lost their ability to legally work in the United States. *See* 8 C.F.R. § 274a.14(a)(1)(i).[25] Furthermore, some of RDC and American Gateways' clients share that they had completed the entire naturalization process and were scheduled to attend their naturalization oath ceremonies—only to have USCIS cancel those ceremonies as a result of the Benefits Hold. ECF No. 20-9 at 17–18. This has prevented them from attaining U.S. citizenship, as well as the legal rights that come with it, such as the right to vote. *See* 52 U.S.C. § 20501(a).

There are many more stories like these. Suffice it to say, Plaintiffs in this case are in an "indefinite limbo with respect to their applications for naturalization, work

[25] Before October 30, 2025, if a noncitizen timely filed an application to renew their work permit, USCIS would automatically extend the validity of that permit for up to 540 days. *See* 8 C.F.R. § 274a.13(d)(1). However, USCIS has since promulgated an interim final rule that terminates this automatic extension for certain renewal applications filed on or after October 30, 2025. *See* 8 C.F.R. § 274a.13(e); *see also* Removal of the Automatic Extension of Employment Authorization Documents, 90 Fed. Reg. 48799 (Oct. 30, 2025). Thus, the individuals in this case can no longer extend their work permits simply by filing renewal applications with USCIS.

authorization, permanent resident status, and asylum, affecting all manner of life plans." *Doe*, 2026 WL 1170971, at *7. In addition, any applicant "subject to the significant negative factor policy [is] now viewed with enhanced suspicion based on country of origin." *Id.* These individuals are "prevent[ed] . . . from moving forward" and are essentially "trapped without recourse" due to USCIS's indefinite postponement of their applications. *See Connecticut*, 363 F. Supp. 3d at 59–60 (D.D.C. 2019); *see also Doe*, 288 F. Supp. 3d at 1070. In light of these significant legal and practical consequences, the Court finds the second *Bennett* prong to be met in this case.

### 5. Plaintiffs' Claims Are Ripe for Review[26]

The Government also contends that Plaintiffs' APA claims are not ripe for review. ECF No. 21 at 27. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Lab'ys*, 387 U.S. at 149). Here, the Government argues that Plaintiffs meet neither the

[26] The Government organizes its ripeness argument in the same section as its finality argument. *See* ECF No. 21 at 24–28. Though there is considerable overlap between the two doctrines, finality and ripeness are conceptually distinct. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808–12 (2003) (treating the ripeness question as distinct from the finality one and concluding that, even though an agency's action was final under the APA, the controversy was not yet ripe for judicial resolution); *see also Ticor Title Ins. Co. v. F.T.C.*, 814 F.2d 731, 745 (D.C. Cir. 1987) (Williams, J.) (describing finality and ripeness as "analytically distinct").

fitness prong nor the hardship prong. ECF No. 21 at 27–28. The Court addresses both arguments in turn.

**a. Plaintiffs Have Satisfied the Fitness Prong**

The "fitness prong" of the ripeness analysis "implicates both constitutional and prudential justiciability concerns." *Algonquin Gas Transmission, LLC v. Weymouth*, 919 F.3d 54, 62 (1st Cir. 2019) (citations omitted). "The constitutional component of the fitness prong asks 'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all,' thus rendering any opinion [the court] might offer advisory." *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025) (quoting *Algonquin Gas Transmission*, 919 F.3d at 62). "The prudential component of the fitness test asks whether resolution of the case turns on 'legal issues not likely to be significantly affected by further factual development.'" *Algonquin Gas Transmission*, 919 F.3d at 62 (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995)).

Plaintiffs here satisfy both the constitutional and prudential components of the fitness prong. Beginning with the constitutional component, the claims here do not involve uncertain or contingent events. USCIS implemented the Challenged Policies months ago via various Policy Memoranda, which—in the agency's own words—were "[e]ffective immediately." ECF No. 16-1 at CAR-000072; ECF No. 16-2 at CAR-000001; ECF No. 16-3 at CAR-000045; *see Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 390 (M.D.N.C. 2019) (finding case sufficiently "ripe" and "fit for judicial decision" where the agency action in controversy—USCIS's promulgation of a policy memorandum—was final, having taken effect months ago).

Moreover, in its Policy Memoranda, USCIS cited the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting, claiming that it had determined that the Challenged Policies were "necessary" "[i]n light of identified concerns and the threat to the American people." ECF No. 16-2 at CAR-000002; ECF No. 16-2 at CAR-000047. USCIS added that it "ha[d] determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance when weighed against the agency's obligation to protect and preserve national security." ECF No. 16-2 at CAR-000003; ECF No. 16-3 at CAR-000048. In other words, "resolution of the actual claim[s] here"—that USCIS may have unlawfully burdened Plaintiffs with its policies—"hinges on an assessment of events that have already occurred." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 143 (1st Cir. 2015).

The Government resists this conclusion, arguing that Plaintiffs' claims are unfit for review absent "an adverse adjudication." ECF No. 21 at 27–28. But Plaintiffs need not wait for an adverse adjudication to pursue their claims; indeed, that Plaintiffs have filed applications with USCIS that have not been adjudicated because of the agency's self-imposed hold is sufficient. *See, e.g.*, *Nakka*, 111 F.4th at 1010–15 (suggesting that plaintiffs who were pursuing a categorical attack against USCIS's adjudicative hold could potentially have a ripe claim if the plaintiffs actually filed immigration applications that the agency had not decided as a result of the hold); *Garcia*, 146 F.4th at 752 n.2 (suggesting the same). As such, the constitutional component is satisfied.

As for the prudential component, the First Circuit has recognized that this test is met where the challenges rest solely on the constitutionality or legality of the agency action itself and no further factual development is necessary. *See, e.g.*, *Jensen*, 160 F.4th at 25; *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92–93 (1st Cir. 2013); *Riva v. Massachusetts*, 61 F.3d 1003, 1010 (1st Cir. 1995). Such is the case here. Plaintiffs challenge the legality of the Challenged Policies under the APA, and no more facts are necessary to adjudicate this claim. Accordingly, the Court also finds the prudential component of the fitness prong to be satisfied.

**b. Plaintiffs Have Satisfied the Hardship Prong**

Turning now to the "hardship prong" of ripeness, this inquiry is "purely prudential and requires that [courts] evaluate 'whether the challenged action creates a "direct and immediate" dilemma for the parties.'" *Algonquin Gas Transmission*, 919 F.3d at 62 (quoting *W.R. Grace & Co.–Conn. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992) (quoting *Abbott Lab'ys*, 387 U.S. at 152–53)). This prong also "'concerns the harm to the parties seeking relief that would come to those parties from [the court's] "withholding of a decision" at this time.'" *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (quoting *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 330 (1st Cir. 2016) (quoting *McInnis–Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 73 (1st Cir. 2003))).

This prong is clearly met here. The Government argues that "there is no hardship to the Plaintiffs," ECF No. 21 at 28, but the Court cannot ignore the

evidence in this case that establishes the very real and immediate consequences that Plaintiffs face because of the Challenged Policies. As already noted, many of Plaintiffs' members and clients have lost their jobs and their legal status, and they continue to experience financial and emotional distress due to the situation USCIS has placed them in. *See, e.g.*, ECF No. 20-2 at 8–9; ECF No. 20-3 at 10; ECF No. 20-9 at 17–18. What is more, the Challenged Policies have directly interfered with the business operations of many of the organizational plaintiffs, draining them of their resources and impeding their core activities. *See* ECF No. 23 at 5–6 (noting that the Asylum Hold has prevented Dorcas from taking on new clients or cases); *id.* at 6 (noting that the Challenged Policies have required RDC "to spend more time responding to questions about pending cases and to devote more resources to counseling and supporting its clients in distress"); *id.* at 6 (noting that the Comprehensive Re-Review Policy "will require American Gateways to reopen closed files and devote additional resources to clients whose matters had already been resolved").

The Court therefore has no trouble in concluding that the Challenged Policies pose a direct and immediate dilemma for Plaintiffs, and the Court recognizes that withholding a decision on Plaintiffs' claims will only exacerbate that harm. *See Algonquin Gas Transmission*, 919 F.3d at 62; *Reddy*, 845 F.3d at 501. The Court finds that Plaintiffs have satisfied the hardship prong and, as such, concludes that this matter is ripe for review.

### 6. Plaintiffs Have Standing to Bring Their Claims

The Court next turns to standing. "Article III of the U.S. Constitution authorizes federal courts to adjudicate only 'Cases' and 'Controversies,' and 'standing is an essential and unchanging part of the case-or-controversy requirement.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 321 (1st Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (2024)). Thus, to establish Article III standing, the plaintiff must show that they "[have] suffered, or will suffer, an injury that is '[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Plaintiffs here are organizations as opposed to individual plaintiffs. "An organization with individual members may establish Article III standing" in one of two ways. *Doe v. Trump*, 157 F.4th 36, 47 (1st Cir. 2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024)). First, it can show that it has "organizational standing" by "satisfying the three elements of [Article III] standing based on an 'injury in fact' of its own." *Id.* Second, the organization "may establish 'associational standing' to sue in a 'representational capacity.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The Government argues that none of the Plaintiffs here meet the standards for organizational standing or associational standing. ECF No. 21 at 29–40. The Court evaluates both arguments.

**a. Plaintiffs Have Organizational Standing**

As mentioned, organizational standing requires that the organization establish "the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. for Hippocratic Med.*, 602 U.S. at 393–94 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)). "It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members." *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 44 n.7 (1st Cir. 2012) (citations omitted). For instance, courts have recognized that organizations have standing to sue if they can show "that 'the challenged conduct frustrated their organizational missions and that they diverted resources to combat that conduct.'" *Town of Milton v. Fed. Aviation Admin.*, 87 F.4th 91, 99 (1st Cir. 2023) (quoting *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021)); *accord Havens Realty Corp.*, 455 U.S. at 379; *Equal Means Equal v. Ferriero*, 3 F.4th 24, 29–30 (1st Cir. 2021).

**i. Plaintiffs Have Suffered Injury**

The Government relies heavily on the Supreme Court's recent decision in *F.D.A. v. Alliance for Hippocratic Medicine* to challenge Plaintiffs' theory of injury, *see* ECF No. 21 at 30–31, but that case does not aid its cause. There, a group composed of "plaintiff doctors and medical associations" sued to challenge regulations promulgated by the Food and Drug Administration ("FDA") that "appl[ied] to doctors

prescribing mifepristone and to pregnant women taking mifepristone." *All. for Hippocratic Med.*, 602 U.S. at 385. Critically, however, none of the plaintiffs "prescribe[d] or use[d] mifepristone" themselves and, as such, the "FDA ha[d] not required the plaintiffs to do anything or to refrain from doing anything." *Id.* Thus, as parties who did not prescribe, manufacture, sell, or advertise mifepristone or sponsor a competing drug, the Court concluded that the plaintiffs before it had not suffered "direct monetary injuries" or any "injuries to their property, or to the value of their property, from FDA's actions." *Id.* at 385–86.

The Supreme Court went on to recognize that the plaintiffs could not establish an injury simply because they disagreed with the FDA's practices. *Id.* at 386 ("[G]eneral legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court."). Nor could the plaintiffs manufacture standing by incurring costs to oppose FDA's actions. *Id.* at 394 ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.").

Plaintiffs here stand on entirely different footing from the plaintiffs in *Alliance for Hippocratic Medicine*. Dorcas, RDC, and American Gateways are organizations that are directly involved in providing "low-cost legal representation to noncitizens on a wide array of immigration-related matters, including assisting with applications for naturalization, adjustment of status, asylum, and other benefits." ECF No. 20-1 at 20; *see also id.* at 22 (explaining that RDC represents clients who have "pending

applications for adjustment of status, employment authorization and other benefits"); *id. at 24* (explaining that a core activity of American Gateways is "representing individuals seeking affirmative immigration relief from USCIS").

These organizations have in fact suffered direct injuries as a result of the Challenged Policies: They have incurred a backlog of cases that cannot reach final adjudications, which has strained their ability to take on new clients; they have been forced to divert financial and staff resources away from their core activities to meet clients' new needs for counseling, referrals, and other support; they have been precluded from carrying out their job training and job placement services due to their clients' loss of employment eligibility; and they have had to reopen closed client files and dedicate additional staff support to help clients who had been granted immigration relief. *See* ECF No. 20-1 at 20–25.

And rather than resulting in injuries that are merely speculative or based on hypothetical events that may occur in the future, the Challenged Policies have already caused actual harm to these organizations. RDC estimates that it has already devoted "approximately 330 staff hours per week, across 11 staff members, . . . to immigration-related counseling and support that would not have been necessary absent the Challenged Policies." ECF No. 20-3 at 16. RDC has also had to hire an additional paralegal "to respond to the increased volume of immigration-related questions," and it states that "[t]he cost of this position has been taken from funds that would otherwise have been allocated to direct assistance for community members." *Id.* Similarly, Dorcas has been barred from fulfilling its mission and,

consequently, prevented from taking on new clients or cases while it has 414 pending benefit applications frozen under the Benefits Hold Policy, 27 asylum applications frozen under the Global Asylum Hold Policy, and about 365 previously approved cases now subject to the Comprehensive Re-Review Policy. ECF No. 20-2 at 7, 8, 11.

Nor are Plaintiffs engaged in mere advocacy in opposition to USCIS's policies, like the plaintiffs in *Alliance for Hippocratic Medicine* were. Instead, the ongoing, day-to-day work of these organizations is to represent clients before USCIS and to file and obtain benefits applications on their behalf. ECF No. 23 at 5. Plaintiffs here bear more resemblance to the plaintiff organization in *Havens Realty*, which operated a housing counseling service. 455 U.S. at 368. In that case, the Supreme Court found that the defendant had "perceptibly impaired [the plaintiff organization's] ability to provide counseling and referral services," and the Court concluded that the organization had standing to sue because the defendant's actions had "directly affected and interfered with [the organization's] core business activities." *Id.* at 379; *All. for Hippocratic Med.*, 602 U.S. at 395.

So too here: USCIS's actions have directly affected and interfered with Plaintiffs' core business activity, which is providing legal, counseling, and referral services to noncitizens, and have caused Plaintiffs to divert considerable resources to meet the new needs of their clients. *See, e.g.*, *Am. Acad. of Pediatrics v. Kennedy*, 814 F. Supp. 3d 150, 159–61 (D. Mass. 2026) (finding that a "professional organization for pediatric medicine" had organizational standing because, after an agency's alterations to its COVID-vaccine recommendations, the plaintiff had to divert

resources away from its usual tasks and counsel its members on the alterations); *Presidents' All. on Higher Educ. & Immigr. v. Noem*, No. 25-cv-11109-PBS, --- F. Supp. 3d ----, 2026 WL 788185, at *9 (D. Mass. Mar. 20, 2026) (finding that a nonprofit organization had plausibly alleged organizational standing where an agency's policy of revoking student visas resulted in the organization having to expend resources to support the "flood of requests for assistance" from its member colleges and universities). As such, Plaintiffs have established an injury in fact. *See Doe*, 157 F.4th at 47; *Murthy*, 603 U.S. at 57.

**ii. Plaintiffs' Injuries Are Fairly Traceable to USCIS**

Moving to the second element of standing, the Government does not meaningfully contest traceability. Indeed, that element is certainly met here. Plaintiffs' injuries are "fairly traceable" to USCIS's actions because, had the agency not implemented the Challenged Policies, Plaintiffs would not have had to divert resources in the way that they have, nor would they have been impaired from carrying out their usual, core business activities. *See Murthy*, 603 U.S. at 57.

**iii. Plaintiffs' Injuries Are Redressable**

The Government does, however, challenge the redressability element of standing, asserting that Plaintiffs' "harms are fundamentally not redressable by this Court." ECF No. 21 at 38. According to the Government, "because immigration adjudications are discretionary and individualized, this Court cannot order relief that would guarantee any particular result." *Id.* at 39. This argument lacks merit because, once again, the Government misunderstands the nature of Plaintiffs' claims.

Plaintiffs are not challenging USCIS's failure to adjudicate *individual* cases; rather, they lodge a categorical attack on the legality of the Challenged Policies. *See* ECF No. 23 at 1 (explaining that Plaintiffs are challenging whether any statute provides "USCIS sweeping power to impose categorical restrictions on access to immigration benefits"). Thus, Plaintiffs do not request that the Court order that "a particular application . . . be adjudicated on any particular timeline" or that USCIS "reach a favorable outcome for [an] allegedly impacted individual," as the Government suggests. ECF No. 21 at 39. They instead ask the Court to set aside the Challenged Policies by vacating and/or enjoining them. *See* ECF No. 20-1 at 28 ("Plaintiffs seek a declaration that the Challenged Policies are unlawful, vacatur of those policies under the APA, and an injunction barring issuance or enforcement of any similar policy."). As such, if USCIS's policies are indeed unlawful, then Plaintiffs' injuries would be "redressable by a favorable ruling." *Murthy*, 603 U.S. at 57; *see New York*, 811 F. Supp. 3d at 229 (finding plaintiff states' injuries redressable where the executive order that they challenged "would be redressed by its vacatur"); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 125 (D. Mass. 2025) (finding university plaintiffs' injuries redressable where they sought "an order vacating and enjoining implementation" of a challenged agency policy).

The Government resists this conclusion, arguing that the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), forecloses the type of redress that Plaintiffs seek. ECF No. 21 at 40. But the Government misconstrues the holding in *CASA*. For one thing, as the First Circuit has observed, the Supreme

Court in that case "treat[ed] the question of whether an injunction is 'broader than necessary to provide complete relief' as *distinct* from whether a plaintiff has 'standing to sue.'" *Rhode Island v. Trump*, 155 F.4th 35, 45 (1st Cir. 2025) (emphasis added) (citing *CASA, Inc.*, 606 U.S. at 831).

The Government is also mistaken in asserting that any relief that Plaintiffs seek is "in direct conflict with *CASA*." ECF No. 21 at 40. To start, *CASA* explicitly left in place the Court's authority to vacate unlawful agency action. *See* 606 U.S. at 847 n.10 ("Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate agency action." (citing 5 U.S.C. § 706(2))). In addition, with respect to "universal injunctions," as the First Circuit has pointed out, "[n]othing in *CASA* provides that, as a categorical manner, it is improper for a district court to impose an injunction of such breadth if it is necessary to do so to provide the plaintiff with complete relief." *Doe*, 157 F.4th at 80–81; *see CASA, Inc.*, 606 U.S. at 852–53 (acknowledging that, in some instances, a universal injunction might be appropriate where necessary to provide a party to the case with "complete relief"). Plaintiffs here seek both forms of relief. *See* ECF No. 23 at 57–59 (requesting that the Court "vacat[e] the Challenged Policies under the APA" and/or "provide Plaintiffs with complete relief . . . through a universal injunction," but also accepting as a form of relief a "narrower injunction . . . limited to Plaintiffs"). *CASA* has left these avenues of relief untouched. As such, the Court finds that Plaintiffs have also satisfied the redressability element.

Having concluded that Plaintiffs Dorcas, RDC, and American Gateways have met all three requirements of organizational standing, the Court concludes that their claims can proceed on the merits.

**b. Plaintiffs Have Associational Standing**

Because at least three Plaintiffs have established organizational standing, the Court could end its standing analysis here. However, following the lead of other courts within this circuit, the Court will also analyze Plaintiffs' associational standing claim because that "may affect the relief this Court can offer." *Am. Ass'n of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 379 (D. Mass. 2025); *Am. Acad. of Pediatrics*, 814 F. Supp. 3d at 161 (same). *But see President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 114 (D. Mass. 2025) ("[T]he Court finds that . . . the Organizational Plaintiffs have associational standing. Because of this, the Court does not reach their arguments regarding direct standing.").[27]

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 10 (1st Cir. 1986) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). An organization has

---

[27] On standing, the Supreme Court has stated that "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), but rather "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008). "The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Plaintiffs do not appear to be bringing different APA claims, nor do they seem to be seeking different forms of relief from one another. However, the Court addresses both theories of standing just to be thorough.

associational standing to sue on behalf of its members when: "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. "The first two prongs of this test have constitutional dimensions; the third prong is prudential." *Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*, 75 F.4th 248, 265 (1st Cir. 2023) (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554–58 (1996); *Back Beach Neighbors Comm. v. Town of Rockport*, 63 F.4th 126, 129 n.2 (1st Cir. 2023)).

**i. Plaintiffs Have Individual Standing**

The first prong of associational standing requires only "that at least one of the group's members have standing as an individual." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (citing *Town of Norwood v. F.E.R.C.*, 202 F.3d 392, 405–06 (1st Cir. 2000)); *see also Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 34 (1st Cir. 1990 ("[T]he Supreme Court has never required that *every* member of an association have standing before it can sue on behalf of its members." (emphasis in original)). "To satisfy this requirement, the association must, at the very least, 'identify [a] member[ ] who ha[s] suffered the requisite harm.'" *Draper*, 827 F.3d at 3 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).[28]

[28] As at least one court has pointed out, the "explicit naming requirement . . . has not been consistently applied across the First Circuit in recent years." *Equal Means Equal v. Trump*, No. 25-10806-WGY, 2026 WL 1078133, at *4 (D. Mass. Apr.

Plaintiffs here asserting associational standing, including SEIU, UAW, ACT, VAM, and PANA, have each submitted declarations that identify many members who have been impacted by the Challenged Policies. ECF No. 23 at 9. For example, UAW has identified an Iranian member, UAW Member A, who has pending applications for adjustment of status, travel documents, and employment authorization, none of which have been adjudicated. ECF No. 20-5 at 5–6. Additionally, ACT has identified a Sudanese member, ACT Member A, who applied for asylum in 2018, received her asylum interview in the fall of 2025, and though she was told at the end of the interview that she would receive her decision within five days, she still has not received that decision due to the Global Asylum Hold Policy. ECF No. 20-7 at 4–5. VAM has identified a Cuban member, VAM Member E, who has lost her job, taken on debt, and experienced eviction from her home because she cannot obtain a final adjudication on her employment authorization or adjustment of status applications from USCIS. ECF No. 20-6 at 8. And PANA has identified an Afghan member, PANA Member E, who entered the country in 2023 and was granted asylum in September 2025, and who has pending applications for adjustment of status and for immigrant visas for his two children in Afghanistan, thereby making him subject to

21, 2026). Last year, a First Circuit panel "refused to terminate the associational standing of an organization despite its failure to name injured individuals," and it "explained that the organization could later add named members and cure any standing issues." *Id.* (citing *Capen v. Campbell*, 134 F.4th 660, 667–68 (1st Cir. 2025)). "That case is currently stayed until July 2026 while the parties await the Supreme Court's disposition of a case with similar issues." *Id.* The explicit naming requirement is not at issue here since Plaintiffs have identified members affected by the Challenged Policies.

both the Benefits Hold Policy and the Comprehensive Re-Review Policy. ECF No. 20-8 at 9–10. As individuals from the Travel Ban Countries who have applied for various forms of discretionary relief, several of these members are also affected by the Country-Specific Factors Policy.

The next step is to analyze whether any of these individuals are "member[s] who 'suffered an injury in fact that [is] concrete, particularized, and actual or imminent,' 'likely caused by the defendant,' and 'likely [to] be redressed by judicial relief.'" *Housatonic River Initiative*, 75 F.4th at 265 (quoting *Plazzi v. FedEx Ground Package Sys., Inc.*, 52 F.4th 1, 4 (1st Cir. 2022)). "An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few examples." *All. for Hippocratic Med.*, 602 U.S. at 381.

As mentioned, Plaintiffs' members have suffered and continue to suffer very real harm from the Challenged Policies. Because some, like VAM Member E, have had their work permits expire during the Benefits Hold Policy, they have lost jobs, lost income, and lost the ability to care for their families. *See Bowser*, 2026 WL 555624, at *6 (recognizing the "very serious consequences" associated with a plaintiff losing her ability to work in the United States as a result of USCIS's Benefits Hold); *Miot*, 818 F. Supp. 3d at 157 ("[T]he harm [of losing work authorization] extends beyond ordinary economic injury. Plaintiffs would not only suffer lost wages. They would lose the legal ability to work at all. It would implicate Plaintiffs' fundamental ability to earn a livelihood, support their families, and remain self-sufficient.").

Others, like PANA Member E, have been separated from their family members for prolonged periods of time because USCIS has refused to adjudicate their family-based immigrant visas that would allow them to enter the United States. *See Hawaii*, 585 U.S. at 698 ("We agree that a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact."); *see also Doe*, 288 F. Supp. 3d at 1063 (collecting cases that support the proposition that "[p]rolonged separation from a family member is an injury in fact sufficient to establish Article III standing").[29]

As Judge Angel Kelley of the District of Massachusetts recently put it when addressing a similar challenge to USCIS's policies, "[e]ven short delays [in adjudications] can have serious consequences." *Bowser*, 2026 WL 555624, at *6 (citing *Doe*, 288 F. Supp. 3d at 1070; *Varniab*, 2026 WL 485490, at *17). Some individuals, who either lack legal status or have fallen out of legal status, have expressed fear of being arrested and detained by ICE and being removed from the United States while the Challenged Policies are in effect. *See* ECF No. 20-9 at 14 (describing how the Asylum and Benefits Holds "have created a great deal of uncertainty and anxiety for Ms. B and her children" because without adjudications,

[29] The Supreme Court's recent decision in *Department of State v. Muñoz*, 602 U.S. 899 (2024), does not command a different result with respect to the harm suffered by a person separated from a family member. In that case, the Court held that a U.S. citizen spouse did not have a fundamental liberty interest, protected by the Due Process Clause, in having her noncitizen spouse be admitted to the United States. *See Muñoz*, 602 U.S. at 909. However, the Supreme Court did not address the issue of standing at all in that case. Indeed, it acknowledged that the U.S. citizen spouse had "suffered harm from the denial of [her spouse's] visa application," just not *constitutional* harm. *Muñoz*, 602 U.S. at 917.

"Ms. B and her children are vulnerable to arrest, detention, and removal"). As is the case here, "'[t]he mere fear of immigration detention and deportation may alone constitute a sufficient irreparable injury.'" *Saghafi*, 2026 WL 1127468, at *11 (quoting *D.B. v. Trump*, No. 2:25-cv-419, 2025 WL 1203232, at *3 (S.D. Ohio Apr. 23, 2025)); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (concluding that plaintiffs' reasonable fear of being subject to unlawful detention on the basis of their unlawful presence may constitute irreparable harm). Thus, despite the Government's protestations to the contrary, *see* ECF No. 21 at 35, Plaintiffs have demonstrated sufficiently concrete, non-speculative injuries to their members.

Plaintiffs have also shown that their injuries are attributable to USCIS and are likely to be redressed by a favorable judicial decision. The Court is unpersuaded by the Government's argument that the injuries are the result of "routine processing variability inherent in a discretionary adjudicatory system." ECF No. 21 at 36. There is nothing "routine" about USCIS's actions here. In fact, with respect to at least one of its policies, the Comprehensive Re-Review Policy, the agency acknowledges that it has issued new guidance governing the adjudication of discretionary benefit requests that "*supersedes* any related prior guidance." ECF No. 16-1 at CAR-000072 (emphasis added).

The Government nevertheless asserts that Plaintiffs have failed to satisfy the traceability and redressability requirements because Plaintiffs cannot "identify any specific application that would result in a favorable outcome if the Challenged Policies were vacated," "[n]or can they, as that conclusion rests on speculation about

how discretionary adjudications (or received benefit reviews) would be resolved." ECF No. 21 at 37. According to the Government, the final two elements of standing cannot be established here because, even if the Court were to determine that the Challenged Policies are unlawful, the authority to adjudicate applications is left to the discretion of USCIS personnel and Plaintiffs' members may ultimately not get a favorable outcome in their individual cases. *Id.* at 36–37.

But the Government's argument "rests on a fundamental misconstrual of the [APA], which gives the courts the relatively modest task of correcting deviations in agency procedure – and not, of course, of second-guessing reasonably made decisions of the Executive Branch, or peering behind the curtain to guess at what an agency may do next." *Massachusetts*, 790 F. Supp. 3d at 21 (citing *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "As the Supreme Court has observed, even where '[a]gencies . . . have discretion about whether or not to take a particular action,' 'those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground.'" *Id.* (quoting *Fed. Elec. Comm'n v. Akins*, 524 U.S. 11, 25 (1998)).

As relevant here, Plaintiffs allege that USCIS unlawfully deviated from its usual procedures in evaluating their members' applications for immigration relief, and they have brought suit to correct that deviation. *See Prometheus Radio Project*, 592 U.S. at 423. The members' injuries may therefore be "both traceable and redressable 'even though [USCIS] might reach the same result exercising its

discretionary powers lawfully.'" *Massachusetts*, 790 F. Supp. 3d at 21 (quoting *Akins*, 524 U.S. at 25). "[Courts] rarely know when [they] entertain a case . . . whether the agency's *ultimate* action will be favorable to the [plaintiff]. [The court's] job is limited to correcting a legal error – if error is committed – in the agency decision." *Akins v. Fed. Elec. Comm'n*, 101 F.3d 731, 738 (D.C. Cir. 1996), *vacated on other grounds*, 524 U.S. 11 (1998).

In addition, if USCIS has committed legal error here, "it has *always* been an acceptable feature of judicial review of agency action that a petitioner's 'injury' is redressed by the reviewing court notwithstanding that the agency might well subsequently legitimately decide to reach the same result through different reasoning." *Akins*, 101 F.3d at 738 (emphasis in original) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)). As the Supreme Court has made clear, "[w]hen a litigant is vested with a procedural right [such as those conferred by the APA], that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497, 518 (2007).

Such is the case here. Plaintiffs' members need *not* show that "but for the [Challenged Policies] . . . approvals [of their applications] would be forthcoming and would bring the wide-ranging benefits" that they seek. *Massachusetts*, 790 F. Supp. 3d at 22; *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 117–18 (D.C. Cir. 1990) ("Petitioners need not prove that granting the

requested relief is certain to redress their injury, especially where some uncertainty is inevitable."). Rather, because the members "invoke a procedural right under the APA, the plaintiffs need plausibly allege only 'some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Massachusetts*, 790 F. Supp. 3d at 22 (quoting *Massachusetts*, 549 U.S. at 518); *see also Competitive Enter. Inst.*, 901 F.2d at 118 ("A remand that would leave the agency free to exercise its discretion in a *proper* manner, then, could lead to agency action that would redress petitioners' injury[.]" (emphasis added)). "It is a feature, not a bug, of this review process that, when the smoke settles, the parties may find themselves in roughly the same place they began." *Massachusetts*, 790 F. Supp. 3d at 21.

Plaintiffs' members have already suffered significant injuries as a result of the Challenged Policies and, even though their members might not ultimately get a favorable outcome in their individual cases, their injuries can still be redressed once the Challenged Policies are lifted and their applications can proceed to a final adjudication. *See, e.g.*, *Massachusetts*, 790 F. Supp. 3d at 22, 24 (finding that, where agency had "indefinitely halted" all approvals of wind energy projects via executive memorandum, plaintiff states and associational members could establish traceability and redressability by showing "a procedural violation [of the APA] paired with an injury that may possibly be redressed upon reconsideration" by the agency of the decision that harmed plaintiffs); *New York*, 811 F. Supp. 3d at 230 (finding that nonprofit plaintiffs challenging agency's pause on the issuance of wind energy project

permits met traceability and redressability requirements given the economic costs its members had incurred due to project delays and despite the fact that, even if the court were to lift the allegedly unlawful pause, agency defendants might still reach the same result in denying plaintiffs' permits after exercising their discretionary powers lawfully); *see also Doe*, 288 F. Supp. 3d at 1064–65 ("Whether [Plaintiff's] son's [refugee] application has other hurdles to cross . . . does not diminish the fact that the [challenged] provisions of the Agency Memo add two more. Removing these hurdles would speed the resolution of any others that may exist since processing of these applications is not presently proceeding at all.").

The Court therefore concludes that the elements of traceability and redressability, as well as injury in fact, have been established. Because at least one of its members would otherwise have standing to sue in their own right, Plaintiffs have satisfied the first prong of associational standing. *See Hunt*, 432 U.S. at 343.

**ii. Plaintiffs' Interests Are Germane to Their Organizational Purposes**

The second prong of associational standing looks to whether "the interests [the organization] seeks to protect are germane to the organization's purpose." *Id.* For this prong, courts typically analyze whether the "interests at stake are related to the organization's core purposes." *Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006). The Government does not contest this issue.

In any event, this prong is met. As their declarations make clear, SEIU, UAW, VAM, ACT, and PANA each "exist to assist their members in the immigration process

as well as to protect their interests, dignity, and working conditions." ECF No. 20-1 at 27–28; *see also* ECF No. 20-4 at 2 ("SEIU was founded in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland. Today, the union represents about two million members in healthcare, the public sectors, and property services—over 25% of whom identify as immigrants."); ECF No. 20-5 at 2 ("Although UAW does not collect citizenship information about its members, its chapters include substantial numbers of lawfully present, noncitizen members, many of whom rely on [employment authorization documents] to work."); ECF No. 20-6 at 2 ("Over time . . . VAM has expanded and adapted its mission in practice to guide, inform, and assist newly arrived immigrants (primarily Venezuelans, but increasingly other nationalities) in Massachusetts and across the U.S. on immigration-related issues."); ECF No. 20-7 at 1 ("ACT is a non-profit organization of African immigrants fighting for civil rights, opportunity, and a better life for families and communities here in the United States."); ECF No. 20-8 at 2 ("PANA is a non-profit, non-partisan organization fighting to advance the full economic, social, and civic inclusion of refugees and displaced populations in the San Diego region, throughout California, and across the country."). The "interests at stake" in this litigation are therefore germane to the core purpose of each organization, which is to support their immigrant members. *See Hunt*, 432 U.S. at 343; *Mallinckrodt*, 471 F.3d at 283.

**iii. Individual Member Participation Is Not Necessary**

Finally, the last prong of the associational standing analysis asks whether "individual members' participation is not necessary to either the claim asserted or the relief requested." *Animal Welfare Inst. v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010)

(citing *Friends of the Earth*, 528 U.S. at 181); *see also Hunt*, 432 U.S. at 343. The Government also does not contest this prong. Indeed, as Plaintiffs point out, the participation of its individual members is not necessary here because they "challenge agency actions under the APA and seek vacatur as well as declaratory and injunctive relief that would benefit all affected individuals without requiring individualized proof." ECF No. 20-1 at 28; *see Housatonic River Initiative*, 75 F.4th at 265 ("That requested 'prospective relief' would 'inure to the benefit of those members of the [Petitioners] actually injured,' support[s] a finding of associational standing." (quoting *Warth*, 422 U.S. at 515)).

Plaintiffs have therefore satisfied all three requirements of associational standing. *See Hunt*, 432 U.S. at 343. At long last, the Court may now turn to the merits of Plaintiffs' APA claims.

### C. The Merits

Plaintiffs argue that the Challenged Policies violate the APA for three reasons. First, they contend that the policies "exceed USCIS's statutory authority and are contrary to law." ECF No. 20-1 at 32. Second, they assert that the policies are "arbitrary and capricious." *Id.* And third, they object to USCIS having issued the policies "without following notice-and-comment procedures." *Id.* The Court addresses the first two of these arguments.[30]

[30] The Court does not reach and need not address Plaintiffs' notice-and-comment argument.

### 1. The Challenged Policies Are Contrary to Law

Plaintiffs' first APA-based claim is that "[t]he Challenged Policies exceed USCIS's statutory authority and are contrary to law." ECF No. 20-1 at 32 (citing 5 U.S.C. § 706(2)(A), (C)). Though Plaintiffs cite two distinct provisions of the APA, the provisions "contain a 'linguistic distinction without a practical difference' in the context of an agency action that is allegedly contrary to statutory requirements." *New York*, 811 F. Supp. 3d at 241 (quoting *Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104, 127 (D. Mass. 2021)).

As a general matter, the APA instructs reviewing courts to "hold unlawful and set aside" agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). Federal agencies are of course "creatures of statute," and thus "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022). "An agency may not confer power upon itself," because "[t]o permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). As such, "[i]t is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374).

Plaintiffs' theory of their contrary to law claim is that neither the INA nor any other statute provides USCIS with the authority to enact its Challenged Policies. *See* ECF No. 20-1 at 32; ECF No. 23 at 27. The Government counters by arguing that the

INA does indeed provide USCIS with "the authority to issue the Challenged Policies to temporarily pause final adjudication of pending applications for immigration benefits and to announce its intent to reconsider past benefit awards." ECF No. 21 at 40. Following the approach taken by the First Circuit, the Court will "examine the statutory provisions that the DOJ identifies as authorizing the imposition of the [Challenged Policies]." *City of Providence*, 954 F.3d at 32. This is an inquiry steeped in statutory interpretation. *Id.* at 31.

**a. Section 1182(f) Does Not Authorize USCIS's Actions**

The Court begins its analysis with a brief discussion of 8 U.S.C. § 1182(f) (also known as INA § 212(f)).[31] That statute authorizes the President to "suspend the entry" of "any class of aliens into the United States" when he finds that such entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). As some may recall, during the President's first term in office, the Supreme Court ruled that this provision of the INA gave the President broad authority to bar nationals from six predominantly Muslim countries from entering the United States. *See Hawaii*, 585 U.S. at 683–84 ("By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States.").

As relevant here, there appears to be some agreement between the parties that Section 1182(f) "addresses only the President's authority and concerns only a single aspect of federal immigration law: restrictions on entry." ECF No. 21 at 44; *see also*

---

[31] For a full analysis of the legislative history surrounding Section 1182(f), see generally Dan Ordorica, Note, *Presidential Power and American Fear: A History of INA § 212(f)*, 99 B.U. L. Rev. 1839 (2019).

ECF No. 23 at 27 ("Section 1182(f) gives the President the authority to impose entry restrictions—and nothing more. The government apparently agrees.").

However, at the same time, the prevalence of Section 1182(f) in this case is inescapable. All three of USCIS's Policy Memoranda make reference to this statutory provision. *See* ECF No. 16-1 at CAR-000072 (listing as the subject line of the November Memorandum: "Impact of INA § 212(f) on USCIS' Adjudication of Discretionary Benefits"); ECF No. 16-2 at CAR-000001 n.1 (citing INA 212(f) in the subject line—"Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries"—of the December Memorandum); ECF No. 16-3 at CAR-000045 n.1 (citing INA 212(f) in the subject line—"Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries"—of the January Memorandum).

Each of the Policy Memoranda are also accompanied by references to the Presidential Proclamations that imposed the Travel Ban restrictions in the first place, which were themselves promulgated under Section 1182(f). *See* Proclamation No. 10949, 90 Fed. Reg. at 24498 (imposing initial Travel Ban restrictions under 8 U.S.C. 1182(f)); Proclamation No. 10998, 90 Fed. Reg. at 59719 (imposing additional Travel Ban restrictions under 8 U.S.C. 1182(f)).

Against this backdrop, the Government appears to suggest that the Challenged Policies are required by Presidential Proclamations Nos. 10949 and 10998. For instance, the Government states that "[t]he Challenged Policies merely recognize and extend a policy directive that the President issued." ECF No. 21 at 43. Then, as

support for this assertion, the Government cites various cases that declare that "an agency under the direction of the executive branch . . . must implement the President's policy directives to the extent permitted by law." *Id.* (first quoting *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012); then citing *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[F]aithful execution of the laws enacted by the Congress, however, ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates. . . . Those officers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law.")). USCIS goes even further in its March 30th Alert, stating outright that the Challenged Policies were implemented "[i]n accordance with relevant executive orders and presidential proclamations," which it identifies as Exec. Order No. 14161, Proclamation Nos. 10949 and 10998. ECF No. 21-2 at 1.

Just to be clear, nothing in Section 1182(f) or the Presidential Proclamations authorize the Challenged Policies at issue here. The statute enables the President to impose certain *entry restrictions* on noncitizens, but it does not give the Executive license to enact restrictions on the ability of noncitizens to obtain immigration benefits—especially those who have already entered the country. *See, e.g.*, *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 196 (D. Mass. 2025) (explaining that the purpose of Section 1182(f) "is to regulate and influence conduct abroad, rather than at home"); *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 563 (N.D. Cal. 2020) ("Congress' delegation of

authority in the immigration context under Section 1182(f) does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners."). Just last month, Chief Justice John G. Roberts, Jr. reaffirmed this distinction at oral arguments in a case concerning DHS's termination of Temporary Protected Status ("TPS") protections for Haitian and Syrian migrants: "[The Government] rel[ies] on *Trump v. Hawaii* in . . . [its] argument, but that involved the President and entry restrictions. Here, we're concerned with the [DHS] Secretary and . . . aliens that are already present." Transcript of Oral Argument at 8, Mullin v. Doe, --- S. Ct. ---- (2026) (Nos. 25-1083, 25-1084) (Roberts, C.J.).

And, as other courts have noted, there is nothing in Proclamations No. 10949 and No. 10998 "that requires or even anticipates the adjudicative hold policy. As reflected in their titles and throughout their text, those proclamations involve restrictions on 'the entry' of noncitizens 'into the United States' from other countries, not the consideration of benefit applications from noncitizens already within the United States." *Doe*, 2026 WL 1170971, at *15; *see also Varniab*, 2026 WL 485490, at *19 (recognizing that "the adjudicatory hold extends far beyond" the Proclamations' restrictions on "*entry* of aliens from . . . countries deemed to be high-risk," because "it applies to nearly all pending benefit requests from applicants such as Plaintiffs *who have already been admitted to the United States*" (emphasis in original)).

Because the Court finds that USCIS can neither invoke Section 1182(f) nor Proclamations Nos. 10949 and 10998 as the legal bases underlying the

implementation of the Challenged Policies, the next task is to determine whether any other statutory provision authorizes the agency's actions.

**b. The Global Asylum Hold Policy Is Contrary to Law**

The Court turns its attention first to the Global Asylum Hold. As a reminder, that policy places an adjudicative hold on all applications for asylum and withholding of removal, regardless of the applicant's country of origin. *See* ECF No. 16-2 at CAR-000001.[32] Plaintiffs contend that "USCIS did not have any valid authority" to enact the Global Asylum Hold Policy, and that the Government has failed to identify any legal grounds that grant it such authority. *See* ECF No. 20-1 at 35. Indeed, Plaintiffs assert that the Global Asylum Hold contravenes a statutory provision of the INA that specifies that USCIS "shall" adjudicate asylum applications. *Id.* at 36 (quoting 8 U.S.C. § 1158(d)(5)(A)). The statute specifically provides that final adjudications of asylum claims "shall be completed within 180 days after the date an application is filed," absent "exceptional circumstances." 8 U.S.C. § 1158(d)(5)(A)(iii).

As mentioned, the word "shall" carries great significance in the context of statutory interpretation. *See Kingdomware Techs.*, 579 U.S. at 171. That word "generally imposes a nondiscretionary duty" on the actor to whom it is directed, *see SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362 (2018), and it "creates a mandate, not a

---

[32] Again, even though USCIS posted on its website that it has resumed processing asylum applications for individuals from "non high-risk countries" as of March 30, 2026, *see* ECF No. 21-2 at 3, the Court assumes that this policy is still in effect given that the Global Asylum Hold Policy has not been "lifted by the USCIS Director through a subsequent memorandum," which is an express condition that USCIS introduced when it first enacted the policy. *See* ECF No. 16-2 at CAR-000002–03.

liberty," *Murphy v. Smith*, 583 U.S. 220, 223 (2018). The Court then agrees with Plaintiffs that when Congress used the word "shall" in the asylum statute, it created a "nondiscretionary duty to perform." *Murphy*, 583 U.S. at 223. The statute contemplates USCIS invoking "exceptional circumstances," *see* 8 U.S.C. § 1158(d)(5)(A)(iii), but the Government does not even mention that exception in defending against the Global Asylum Hold. Otherwise, the statute says nothing about the wholesale suspension of asylum adjudications. USCIS may wish that it did, but as the Supreme Court instructs, "[w]here a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst.*, 584 U.S. at 363 (citing *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946)).

The Court also cannot ignore that the Global Asylum Hold contravenes USCIS's own regulations pertaining to asylum adjudications. "An agency action also must be set aside as contrary to law when it is inconsistent with regulations." *New York*, 811 F. Supp. 3d at 241 (citing *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1011 (D.C. Cir. 2014); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (noting that "law," as used in the APA, "includes . . . agency regulations that have the force of law"); *see also Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations.").

As relevant here, 8 C.F.R. § 208.9(a) provides: "USCIS *shall* adjudicate the claim of each asylum applicant whose application is complete[.]" 8 C.F.R. § 208.9(a) (emphasis added). And, re-enforcing the fact that USCIS must follow the commands

of the asylum statute, the regulation adds: "In *all* cases, such proceedings *shall* be conducted in accordance with [8 U.S.C. § 1158]." *Id.* (emphasis added). The use of the word "all" in the regulation is also meaningful because it signifies that USCIS is not free to adjudicate some cases while also putting an indefinite and categorical hold on a subset of others, particularly those cases involving applicants from "high-risk countries."[33] *See, e.g.*, *Nat'l Coal. For Students With Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998) ("[T]he use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth."); *Mayor & City Council of Balt. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 816 F. Supp. 3d 107, 122 (D.D.C. 2026) (explaining that "all" is a broad term referring to the "entirety" of a group and not just a "subset" of that group).

To the extent that the Global Asylum Hold Policy places a pause on statutory withholding of removal and CAT protection claims, that is an even easier case for this Court to resolve. The Supreme Court has already recognized that these are forms of relief that USCIS "has *no discretion* to deny . . . to a noncitizen who establishes his eligibility." *Moncrieffe*, 569 U.S. at 187 n.1; *see also I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) (explaining that "withholding [of removal] is mandatory" if the noncitizen establishes eligibility); *Nasrallah*, 590 U.S. at 575 (recognizing that noncitizens are "entitled to CAT relief," if they establish eligibility). Like the asylum

---

[33] Indeed, USCIS acknowledges in its March 30th Alert that it has done just that: "Holds have been lifted for . . . asylum applications from non high-risk countries. We continue to review all application types and lift holds for both individual and group cases as appropriate." ECF No. 21-2 at 3.

regulations, the withholding of removal regulations contain mandatory language: "[A]n application for withholding of . . . removal to a country of proposed removal *shall* be granted if the applicant's eligibility for withholding is established[.]" 8 C.F.R. § 208.16(d)(1) (emphasis added); *see also* 8 C.F.R. § 208.17(a) ("An alien who [establishes CAT eligibility] *shall* be granted deferral of removal to the country where he or she is more likely than not to be tortured." (emphasis added)). This too demonstrates USCIS's "nondiscretionary duty to perform" with respect to withholding of removal and CAT claims. *See Murphy*, 583 U.S. at 223.

So, because USCIS has exceeded its statutory authority in implementing the Global Asylum Hold and contravened its own regulations, the Court concludes that this policy is contrary to law and must be set aside.

**c. The Benefits Hold Policy Is Contrary to Law**

The Court turns next to the Benefits Hold Policy, which "place[s] a hold on pending benefit requests" for individuals from Travel Ban Countries "pending a comprehensive review, regardless of entry date." *See* ECF No. 16-2 at CAR-000001; *see also* ECF No. 16-3 at CAR-000045. As USCIS later explained in its January Memorandum, "[a] hold allows a case to proceed through processing," but it does not allow for a "final adjudication," which "refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal." ECF No. 16-3 at CAR-000045 n.2.

Plaintiffs contend that USCIS also lacked "a valid statutory basis" to enact the Benefits Hold Policy. ECF No. 20-1 at 35. They again point out that the INA dictates many aspects of the benefit adjudication process, but that it notably does not "give

USCIS authority to . . . withhold adjudications wholesale or enact other blanket restrictions on access to immigration benefits." *Id.* at 35–36. The Government pushes back, seemingly suggesting that the Benefits Hold Policy is justified by INA provisions that "require[ ] USCIS to conduct adequate security investigations before granting benefits." ECF No. 21 at 41.

Once again, Plaintiffs have the better of the argument. The relevant statutes and regulations speak in mandatory terms. Start first with naturalization. Like the asylum statute, the naturalization statute provides that USCIS employees "*shall* [be] designate[d] . . . to conduct examinations upon applications for naturalization," and that these employees "*shall* make a determination as to whether the application should be granted or denied, with reasons therefor." 8 U.S.C. § 1446(b), (d) (emphasis added). The INA also seems to suggest that naturalization determinations should be made within "the 120-day period" following the USCIS examination; otherwise, if the determination is not made by then, the applicant can seek a hearing in federal court on the matter. *See* 8 U.S.C. § 1447(b).

Again, the naturalization statute's use of the word "shall" speaks volumes, indicating a "nondiscretionary duty to perform" on naturalization applications. *See Murphy*, 583 U.S. at 223. USCIS's own regulation also support this conclusion, providing that "USCIS *shall* grant the application if the applicant has complied with all requirements for naturalization under this chapter." 8 C.F.R. § 335.3(a) (emphasis added). Indeed, with respect to the timeline under which naturalizations are to be adjudicated, the regulation provides even less flexibility than the statute,

stating that "[a] decision to grant or deny the application *shall* be made at the time of the initial examination or within 120-days after the date of the initial examination of the application for naturalization[.]" *Id.* (emphasis added).

Turning to employment authorization and adjustment of status, the statutes governing those benefits use discretionary terms. *See* 8 U.S.C. § 1324a(h)(1), (3) (providing that a noncitizen may work if they are "lawfully admitted for permanent residence" or "authorized to be so employed by this chapter or by the [DHS Secretary]"); 8 U.S.C. § 1255(a) (providing that a noncitizen's status "may be adjusted by the [DHS Secretary], in his discretion and under such regulations as he may prescribe").

But the regulations promulgated by USCIS to adjudicate those benefits use mandatory language that the agency is not free to ignore. *See Lovo v. Miller*, 107 F.4th 199, 212 (4th Cir. 2024) ("A regulation can mandate action even if a statute does not."). The employment authorization regulations state that an applicant "must apply" to USCIS for a work permit, *see* 8 C.F.R. § 274a.12(a), (c), and that if that application is granted or denied, the applicant "*shall* be notified of the decision" (and, if there is a denial, "the reasons for the denial"). *See* 8 C.F.R. § 274a.13(b), (c) (emphasis added); *see also Ayala v. Noem*, 781 F. Supp. 3d 1187, 1203 (D.N.M. 2025) (collecting cases that stand for the proposition that 8 C.F.R. § 274a.13(b) and (c) impose "a non-discretionary duty" to adjudicate applications for employment authorization). Similarly, the adjustment of status regulations provide that a noncitizen "must file" an application, *see* 8 C.F.R. § 245.2(a)(3)(iii), and that "[t]he

applicant *shall* be notified of the decision of the [USCIS] director and, if the application is denied, the reasons for the denial." *See* 8 C.F.R. § 245.2(a)(5)(i) (emphasis added); *see also Saghafi*, 2026 WL 1127468, at *5 (collecting cases that stand for the proposition that "§ 245.2(a)(5)(i)'s mandatory notification requirement" imposes a "duty to adjudicate [applications for adjustment of status] [that] is non-discretionary").

There is even a statute, 8 U.S.C. § 1571(b), that strongly indicates Congress's intent with respect to the processing of immigration benefit applications: "It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application[.]" 8 U.S.C. § 1571(b). The Government seizes on the statute's use of the word "should," suggesting that this "precatory" language absolves USCIS of responsibility to adjudicate applications on a settled timeline. ECF No. 21 at 45. However, in the Court's view, this provision reflects the sense of Congress that the adjudication work of USCIS should at least proceed—not be brought entirely to a standstill by the agency. *See* 8 U.S.C. § 1571(a)(1)–(2) (explaining that the purpose of the subchapter is "to maintain the elimination of the backlog [in the processing of immigration benefit applications] in future years" and to "provide for regular congressional oversight of the performance of [USCIS] in eliminating the backlog and processing delays in immigration benefits applications").

All told, the governing statutory and regulatory language, as well as relevant congressional intent, demonstrate "implicit requirement[s] that . . . applications be

decided." *Doe*, 2026 WL 1170971, at *15. The Benefits Hold Policy precludes any decision on these applications, which is "fundamentally inconsistent" with the commands of Congress and with USCIS's own regulations. *Id.* The Government does not directly challenge this conclusion, nor does it identify any statute or regulation that gives USCIS the green light to indefinitely withhold adjudications of benefit requests. Rather, the Government hangs its hat on the argument that USCIS is choosing to "evaluate public safety and national security risks . . . differently from how it has in the past." ECF No. 21 at 44. The Government claims that the agency's decision in doing this "is a matter of discretion Congress delegated to the Executive." *Id.*

The Court is unconvinced. None of the statutes that the Government points to provide USCIS with such discretion. The Government cites, for example, 8 U.S.C. § 1182(a)(3), but that provision only "enumerates security and related grounds that make aliens inadmissible to the United States." *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 136 n.12 (D. Mass. 2025). That statute is "inapposite where, as here, the challenged policy concerns domestic processing of benefit applications by noncitizens already admitted into the United States." *Doe*, 2026 WL 1170971, at *16; *see Hawaii*, 585 U.S. at 695 (explaining that admissibility and entry "operate in [a] different sphere[ ]" than the allocation of visas).

The Government also cites 8 U.S.C. § 1446(a), claiming that it "requires 'investigation and examination' before approval" of naturalization applicants. ECF No. 21 at 40. But that provision applies to *individual* applicants: "Before *a* person

may be naturalized, an employee of [USCIS] . . . shall conduct *a* personal investigation of *the person* applying for naturalization[.]" 8 U.S.C. § 1446(a) (emphasis added). This provision cannot reasonably be read to confer USCIS with the sweeping authority to adopt a generally applicable policy that withholds naturalization adjudications indefinitely. The Government attempts a similar tack with the adjustment of status statute, but that law also applies to individual applicants. *See* 8 U.S.C. § 1255(a) (providing that "[t]he status of *an alien*" may be adjusted provided that, among other things, "*the alien* . . . is admissible to the United States for permanent residence" (emphasis added)).[34]

Finally, the Government points to 8 U.S.C. § 1105(a) and 8 U.S.C. § 1105(b) as authority "direct[ing] the Secretary to liaise with other law enforcement and security agencies 'for the purpose of obtaining and exchanging information for use in enforcing the provisions of [the INA] in the interest of internal and border security.'" ECF No. 21 at 41. According to the Government, these provisions "impose affirmative

[34] To the extent the Government relies on 8 C.F.R. § 103.2(b)(18) as a basis for withholding adjudication of immigration benefits, that argument does not appear fully developed. The Government cites this regulation in the "Legal Background" section of its brief, but does not mention it anywhere else. In any event, Judge Kobick has already rejected an argument premised on this regulation. As she explained, this regulation, "which authorizes withholding of adjudication for *individual* benefit requests at specified intervals pending an ongoing investigation, [does not] confer authority to adopt a generally applicable policy withholding adjudication." *Doe*, 2026 WL 1170971, at *15 (citing 8 C.F.R. § 103.2(b)(18)); *see also Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1168 (N.D. Cal. 2007) (observing that 8 C.F.R. § 103.2(b)(18) "allows for the withholding of adjudication, for specified intervals, upon compliance with specific procedural requirements," but that it "is not a blanket authority to indefinitely withhold adjudication of an application").

duties to obtain and exchange security information—duties that cannot be fulfilled if applications are adjudicated before adequate information is obtained." *Id.*

The Court finds it difficult to believe that this statute requires the work of an entire agency to grind to a halt so that the agency may "obtain and exchange security information" about applicants, especially considering that, until quite recently, "USCIS's obligation to conduct investigations before issuing a decision on benefit applications . . . has coexisted . . . with its duty to issue a decision on those applications." *Doe*, 2026 WL 1170971, at *15. As Judge Kobick eloquently put it:

> By statute and regulation, Congress and USCIS have specified that, at a certain point, investigations must end and a decision must be made. The charge to conduct investigations does not give USCIS authority to perpetually delay adjudication of applications, where Congress required USCIS to make such decisions and the agency has, by regulation, committed itself to making such decisions.

*Id.*; *see also Bowser*, 2026 WL 555624, at *8 ("USCIS [appears] concerned that it may provide immigration benefits to those who are later discovered to pose a threat. But in those circumstances, the government still has a remedy, including the rescission of any grant of residency, criminal charges, and the initiation of removal proceedings.").

In the end, the relevant statutes, regulations, and legislative intent lead the Court to conclude that Congress has not empowered USCIS to categorically withhold adjudications of immigration benefits. As Plaintiffs accurately put it, "[h]ad Congress intended to give USCIS that sweeping authority, it surely would have said so." ECF No. 20-1 at 36. As such, the Court finds that the Benefits Hold Policy is contrary to law and must be set aside.

### d. The Comprehensive Re-Review Policy Is Contrary to Law

Next, the Court looks to the Comprehensive Re-Review Policy, which directs USCIS personnel to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from [Travel Ban Countries] who entered the United States on or after January 20, 2021." *See* ECF No. 16-2 at CAR-000001; *see also* ECF No. 16-3 at CAR-000045. This policy "mandates" that covered noncitizens "undergo a thorough re-review process . . . to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." ECF No. 16-2 at CAR-000001.

With respect to this policy, Plaintiffs have expressed concern that USCIS may try to terminate or revoke benefits that have already been issued to their members. *See, e.g.*, ECF No. 20-1 at 21 ("The possibility that these benefits could be revoked has been traumatizing for Dorcas International's clients and made it more difficult to help them plan for their futures, pursue employment, and invest in education."); ECF No. 20-3 at 12 ("The announcement that USCIS may revoke, rescind, or terminate these previously granted benefits has caused enormous fear, anxiety, and uncertainty among RDC's community members.").

These concerns are understandable, given that USCIS never fully clarified in its Policy Memoranda whether termination or revocation of already-issued benefits was its end goal. The closest the agency came to revealing its true intentions was in the March 30th Alert in which it stated, rather cryptically, that "[m]any applicants for naturalization and lawful permanent residence were not sufficiently vetted. As a

result, applications were approved and individuals were naturalized who should not have been." ECF No. 21-2 at 2.

In any event, the Government seems to suggest that USCIS either has the "inherent" power to implement the Comprehensive Re-Review Policy under the INA, or that this authority has been expressly delegated to the agency by Congress "as a matter of discretion." *See* ECF No. 21 at 7.[35] Much has been written about whether agencies engaged in adjudication have the inherent authority to reconsider their final judgments.[36] The Supreme Court has never recognized this power and, in fact, cautioned decades ago that agencies generally may not "expand their powers of reconsideration without a solid foundation in the language of a statute." *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 333 (1961).[37]

By contrast, both the D.C. Circuit and the Ninth Circuit have recognized the inherent power to reconsider past agency decisions. *See Ivy Sports Med., LLC v.*

---

[35] The Government also suggests that conducting re-reviews to "evaluate public safety and national security risks" is a matter of discretion that Congress has delegated to the Executive Branch. *See* ECF No. 21 at 44. To the extent the Government relies on the statutes already discussed in the prior sections of this opinion, none of those statutes delegate to USCIS the authority to conduct a wholesale reassessment of approved applications on the basis of "public safety" or "national security."

[36] For a more detailed discussion of this subject, see generally Daniel Bress, Note, *Administrative Reconsideration*, 91 Va. L. Rev. 1737 (2005).

[37] The Supreme Court has, however, recognized an agency's power to reconsider or revoke past agency action to the extent that it involves "the correction of inadvertent ministerial errors." *Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145 (1958). Even then, the Court was careful to clarify that "the power to correct inadvertent ministerial errors may not be used as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies." *Id.* at 146.

*Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions."); *Nat'l TPS All.*, 150 F.4th at 1019 ("[A]gencies have some authority to reconsider prior decisions."). However, even those courts have expressed limits to this power, observing that reconsideration must be "done in a timely fashion," and that "any inherent reconsideration authority does not apply in cases where Congress has spoken." *Ivy Sports Med.*, 767 F.3d at 86; *see also Nat'l TPS All.*, 150 F.4th at 1020. As to this second limitation, each court has acknowledged that agencies cannot revisit past decisions "where Congress has spoken as to the proper procedure for reversing a decision." *Nat'l TPS All.*, 150 F.4th at 1020; *see also Ivy Sports Med.*, 767 F.3d at 86.

These principles hold sway here. Just as in *National TPS Alliance* and *Ivy Sports Medicine*, Congress has spoken as to the proper procedures for revoking and/or terminating immigration benefits, and those procedures contemplate only *individual* revocations or terminations of benefits. *See, e.g.*, 8 U.S.C. § 1451(a) (providing that United States attorneys have the duty to institute [denaturalization] proceedings in . . . the judicial district in which *the naturalized citizen* may reside" (emphasis added)); 8 U.S.C. § 1158(c)(2) (providing that asylum "may be terminated if the Attorney General determines that" (1) "*the alien* no longer meets the conditions" of eligibility; (2) "*the alien* meets a[n] [enumerated] condition"; (3) "*the alien* may be removed . . . to *a country* . . . in which *the alien's* life or freedom would not be threatened; (4) "*the alien* has voluntarily availed *himself* or *herself* of the protection

of *the alien's* country of nationality"; or (5) "*the alien* has acquired a new nationality and enjoys the protection of [that] country" (emphasis added)); 8 U.S.C. § 1256(a) (providing that noncitizen's lawful permanent residence may be rescinded if "it shall appear to the satisfaction of the Attorney General that *the person* was not in fact eligible for such adjustment of status" (emphasis added)); *see also* 8 C.F.R. §§ 274a.14(b)(1) (providing that a USCIS district director may revoke employment authorization "when it appears that any condition upon which *it* was granted has not been met or no longer exists, or for good cause shown" or "[u]pon a showing that the information contained in *the application* is not true and correct" (emphasis added)).

Congress has also enumerated specific reasons that benefits may be terminated or revoked, with the primary basis being that the person lacked eligibility for the benefit in the first place. For example, the naturalization statute contemplates denaturalization proceedings being instituted against "the naturalized citizen . . . on the ground that such order and certification of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Similarly, the adjustment of status statute provides for the rescission of lawful permanent residence if "it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status." 8 U.S.C. § 1256(a). To suggest then, as USCIS does here, that all naturalized citizens and lawful permanent residents from particular countries who entered the United States at a particular time must submit to re-reviews because certain "applications [for adjustment of status] were approved and individuals were

naturalized who should not have been," *see* ECF No. 21-2 at 2, is a vast overreading of the agency's authority.[38]

The Government is therefore mistaken in insisting that USCIS has the inherent or express statutory authority to implement its Comprehensive Re-Review Policy. Congress has spoken as to the proper procedures to be followed when revoking or terminating immigration benefits, which forecloses the Government's "inherent" authority argument. *See Nat'l TPS All.*, 150 F.4th at 1020; *Ivy Sports Med.*, 767 F.3d at 86. In addition, nothing in the statutes that Congress passed authorize or even contemplate USCIS's large-scale re-review of all noncitizens from certain countries who have already been approved for immigration benefits. Quite the opposite: The statutes make clear that, if the agency wishes to institute revocation or termination proceedings, it must proceed on an individualized level and determine whether a particular person—not a large swath of people—lacks eligibility for the benefit provided. USCIS did not follow the procedures prescribed by Congress and appears to have circumvented them entirely in favor of its Comprehensive Re-Review Policy.

---

[38] Particularly with respect to naturalization, this is not the first time the Executive Branch has tried to argue that, because Congress granted it the statutory authority to naturalize new U.S. citizens, it also necessarily conferred the power to reconsider prior naturalization decisions. *See Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc). In *Gorbach*, the Ninth Circuit ruled that Congress explicitly allocated the denaturalization power to the Judicial Branch—not the Executive Branch. *Id.* at 1093–94; *see* 8 U.S.C. § 1451(a) (providing that denaturalization proceedings may be brought "in any district court"). The court therefore rejected the Executive Branch's assertion of power to revoke naturalization decisions. *Gorbach*, 219 F.3d at 1095 ("Whether the Attorney General can undo what she has the power to do, naturalize citizens, depends on whether Congress said she could.").

As such, the Court finds that USCIS has exceeded its statutory authority in implementing the Comprehensive Re-Review Policy. It too is contrary to law and must be set aside.

**e. The Country-Specific Factors Policy Is Contrary to Law**

Last but not least, the Court turns its attention to the Country-Specific Factors Policy. In its November Memorandum, USCIS amended its Policy Manual to include new guidance for those USCIS personnel charged with processing discretionary benefit requests. It provides that these officials are now to consider "any relevant country-specific factors such as those specified in [the Travel Ban] as significant negative factors in the adjudication of discretionary benefit requests." ECF No. 16-1 at CAR-000073. It also explains that, while the Travel Ban's "categorical ineligibility for entry or admission does not apply" to benefits adjudications, USCIS may begin considering "on a case-by-case basis country-specific facts and circumstances" discussed in the Travel Ban "as a significant negative factor when making an individual assessment in weighing discretion." *Id.* at CAR-000023. USCIS specifies that some of those "country-specific facts and circumstances" include but are not limited to "insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the countries identified in [the Travel Ban]." *Id.* at CAR-000073.

Plaintiffs state that this new policy "erects a barrier to securing discretionary immigration benefits for noncitizens from Travel Ban countries by requiring USCIS to discriminate on the basis of country of origin." ECF No. 20-1 at 31. According to

Plaintiffs, the Country-Specific Factors Policy imposes a "country-of-origin penalty" to which noncitizens from other countries are not subjected. *Id.* at 21.

The Government denies this assertion, claiming that "USCIS will use country-specific findings in assessing individual applications," and that it "will not consider the applicant's nationality itself as a significant negative factor." ECF No. 21 at 44. The Government also contends that USCIS has not exceeded its statutory authority in implementing the Country-Specific Factors Policy because it is merely exercising its discretion in how it chooses to evaluate public safety and national security risks in its adjudications. *Id.* at 44–45.

As relevant here, 8 U.S.C § 1152(a)(1)(A) provides that, with limited exceptions, " no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality*, place of birth, or place of residence." 8 U.S.C § 1152(a)(1)(A) (emphasis added). As Judge Kobick has noted, "this statute bears on the plaintiffs' applications for adjustment of status and work authorization, because those applications depend on visa availability,[39] but does not apply to applications for naturalization or asylum." *Doe*, 2026 WL 1170971, at *16.

---

[39] For example, a foreign worker who is already in the United States in a temporary visa classification may apply for adjustment of status if an immigrant visa number is available. *See Employment-Based Visa Categories in the United States: An Overview*, Am. Immigr. Council (Apr. 13, 2026), https://www.americanimmigrationcouncil.org/fact-sheet/employment-based-visa-categories-united-states/#fn35 [https://perma.cc/5NXU-GJCK]. But, in some circumstances, the date an immigrant visa becomes available to the worker is dependent upon USCIS's approval of the worker's immigrant visa petition. *Id.* (citing 8 C.F.R. §§ 204.5(d), (e)(3)).

Importantly, Section 1152(a)(1)(A) is no ordinary provision of the INA. Until the 1960s, the United States had in place a nationality-based quota system, which restricted the entry of immigrants into the country based on the immigrant's nation of birth. *See* Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153. Then, following calls from President John F. Kennedy and President Lyndon B. Johnson,[40] Congress "comprehensive[ly] revis[ed]" the INA in 1965 (the "1965 Revisions"). *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 338–39 (4th Cir. 2018) (Wynn, J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018) (quoting *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 2*, 88th Cong. 78 (1964) (statement of Sen. Hiram Fong)). The 1965 Revisions "were drafted concurrently with the Civil Rights Act of 1964 and the Voting Rights Act of 1965 and enacted at the height of the civil rights

[40] Judge James A. Wynn of the Fourth Circuit explained the years leading up to the passage of Section 1152(a)(1)(A) as follows:

> President Kennedy called on Congress to repeal the nationality-based quota system, condemning it as a system "without basis in either logic or reason" that "neither satisfie[d] a national need nor accomplishe[d] an international purpose" but instead "discriminate[d] among applicants for admission into the United States on the basis of accident of birth." Letter to the President of the Senate and to the Speaker of the House on Revision of the Immigration Laws, 1963 Pub. Papers 594, 595 (July 23, 1963). After President Kennedy's assassination, President Johnson renewed Kennedy's request for "the elimination of the national origins quota system," which he described as "incompatible with our basic American tradition" and "our fundamental belief that a man is to be judged—and judged exclusively—on his worth as a human being." Special Message to the Congress on Immigration, 1965 Pub. Papers 37, 37, 39 (Jan. 13, 1965).

*Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 339 (4th Cir. 2018) (Wynn, J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018).

movement with the express purpose of 'eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States.'" *Id.* at 339 (quoting H.R. Rep. No. 89-745, at 8 (1965)). "Congress explained that the 1965 Revisions abolished nationality-based discrimination in the immigration system to 'firmly express in our immigration policy the dedication which our nation has to the principles of equality, of human dignity, and of the individual worth of each man and woman.'" *Id.* (quoting *S. 1932 & Other Legislation Relating to the Immigration Quota System Before the S. Subcomm. on Immigration & Naturalization Vol. 1*, 88th Cong. 4 (1964) (statement of Sen. Edward M. Kennedy)).

Once Section 1152(a)(1)(A) was signed into law, in a speech delivered at Liberty Island, New York,

> President Johnson lauded the end of the nationality-based discrimination that previously defined the American system of immigration, describing [it] as abolishing "the harsh injustice of the national origins quota system," which "violated the basic principle of American democracy—the principle that values and rewards each man on the basis of his merit as a man." As a result of the 1965 Revisions, immigrants would be permitted to come to America "because of what they are, and *not because of the land from which they sprung*."

*Id.* at 339–40 (emphasis in original) (quoting 1965 Pub. Papers 1037, 1038–39 (Oct. 3, 1965)).

Both Section 1152(a)(1)(A)'s text and legislative history make Congress's intent clear: No nationality-based discrimination shall occur in the immigrant visa process, which encompasses applications for adjustment of status and employment authorization. *See Doe*, 2026 WL 1170971, at *16. And yet, notwithstanding these commands, the Country-Specific Factors Policy "treats different groups of applicants

for immigration benefits differently based on their national origin." *Varniab*, 2026 WL 485490, at *21. It is not difficult to see how this is so. If an applicant applying for adjustment of status happens to come from one of the countries subject to the Travel Ban, then the Country-Specific Factors Policy directs USCIS personnel to consider aspects of the applicant's country as "significant negative factors" against the applicant. *See* ECF No. 16-1 at CAR-000073. This includes factors that are completely out of the applicant's control, such as their native country's "insufficient vetting and screening" practices. *Id.* By contrast, individuals from countries not listed in the Travel Ban can freely apply for that same benefit without certain aspects of their native countries being weighed negatively against them. This nationality-based discrimination plainly contravenes the requirements of Section 1152(a)(1)(A).

The Court would be remiss if it did not discuss some of the limits to this non-discriminatory provision of the INA. For example, in *Trump v. Hawaii*, the Supreme Court recognized that Section 1152(a)(1)(A) does not prevent the President from imposing entry restrictions on individuals based on their countries of origin. *See* 585 U.S. at 694–97. But again, that case was about imposing entry restrictions on individuals *outside* of the United States. *Id.* at 695 (distinguishing between "admissibility—to which § 1152(a)(1)(A) does not apply—and visa issuance—to which it does"). It did not address the "domestic processing of benefit applications by noncitizens *already admitted* into the United States." *Doe*, 2026 WL 1170971, at *16 (emphasis added). If anything, *Hawaii* reaffirmed that "§ 1152(a)(1)(A) prohibits

discrimination in the allocation of immigrant visas based on *nationality* and other traits." 585 U.S. at 695 (emphasis added).

To the Government's argument that USCIS is not acting in excess of its statutory authority because its personnel are merely exercising their discretion in how they choose to conduct their adjudications, the Court will remind the Government that it is not within USCIS's discretion to decide whether it will be bound by the law. *See, e.g., Zadvydas v. Davis,* 533 U.S. 678, 688 (2001) ("The aliens here . . . do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion."); *Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1196 (D.C. Cir. 1986) ("A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers.").

If the Government had its way, USCIS would be able to—in the exercise of its discretion—continue discriminating freely against applicants from Travel Ban Countries, thereby rendering Section 1152(a)(1)(A) a nullity. The Court refuses to accept that argument. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal citations and quotation marks omitted)).

So, at least as applied to the processing of adjustment of status and employment authorization applications, the Court finds that the Country-Specific Factors Policy is contrary to law and must be set aside.

**2. The Challenged Policies Are Arbitrary and Capricious**

The Court turns its attention next to Plaintiffs' arbitrary and capricious claims. The APA instructs reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *Prometheus Radio Project*, 592 U.S. at 423). While the scope of review under this standard is "'narrow'" and the Court may not "'substitute its judgment for that of the agency,'" *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)), it must still ensure that the agency has "offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio*, 603 U.S. at 292 (quoting *State Farm*, 463 U.S. at 43).

Plaintiffs advance several arguments as to why the Challenged Policies are arbitrary and capricious. The Court addresses three of those arguments, which include claims that: (1) USCIS did not offer a reasoned explanation for its policies; (2) USCIS did not consider the reliance interests of the noncitizens who rely on the agency to adjudicate immigration benefits; and (3) to the extent USCIS did provide

any explanation for the Challenged Policies, its reasoning was pretextual. *See* ECF No. 20-1 at 37.

**a. USCIS Failed to Provide a Reasoned Explanation for Its Actions**

A fundamental rule of administrative law is that "agencies [are] to engage in 'reasoned decisionmaking.'" *Regents*, 591 U.S. at 16 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). "Reasoned decisionmaking under the [APA] calls for an explanation for agency action." *Dep't of Com.*, 588 U.S. at 785. This rule, then, requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

Plaintiffs' first argument is that USCIS failed to offer a reasoned explanation for its Challenged Policies. ECF No. 20-1 at 38. The Government counters and points to two factual bases that the agency cited as support for its policies: (1) the references in the December and January Memoranda to the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting, each alleged to have been committed by an Afghan national; and (2) the references in all three Policy Memoranda to Proclamations Nos. 10949 and 10998, which purport to reveal deficiencies in vetting and screening of individuals from the Travel Ban Countries. *See* ECF No. 21 at 45–46.

But, as Judge Kobick explained, "[t]hese are thin reeds on which to rest an assertion of reasoned decisionmaking." *Doe*, 2026 WL 1170971, at *17. With respect to the 2024 Election Day Attack and the 2025 Washington, D.C. Shooting, the

Government "makes no argument as to how two serious, but isolated, violent crimes planned by two people from one country is rationally connected with a policy stopping adjudication of benefit applications by people from 39 different countries, as well as applications for asylum by people from every country in the world." *Id.* "Extrapolating the criminal conduct of two noncitizens to thousands of other noncitizens, from dozens of countries around the world, does not rank as reasoned decisionmaking." *Id.*; *cf. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 980, 982-83 (9th Cir. 2020) (finding rule arbitrary and capricious where "the agencies ha[d] not justified the Rule's assumption that an alien who has failed to apply for asylum in a third country is, for that reason, not likely to have a meritorious asylum claim"); *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("An unjustified leap of logic or unwarranted assumption . . . can erode any pillar underpinning an agency action.").

Nor do the factual findings contained within Proclamations Nos. 10949 and 10998 aid the Government's cause. Once again, those Proclamations focus solely on restricting the *entry* of noncitizens from thirty-nine countries whose vetting and screening practices were deemed to be deficient. The Challenged Policies, however, "extend[ ] far beyond that context because it applies to nearly all pending benefit requests from applicants such as Plaintiffs *who have already been admitted to the United States*." *Varniab*, 2026 WL 485490, at *19 (emphasis in original). There is nothing then in the Policy Memoranda "linking the findings from the Presidential Proclamations regarding entry of foreign nationals into the United States to a

decision to suspend adjudication of benefit applications by foreign nationals already admitted into the United States." *Doe*, 2026 WL 1170971, at *18. Even more attenuated is the connection between the President's decision to limit the entry of individuals from thirty-nine countries and USCIS's decision to cease asylum adjudications for individuals from *all countries* in its Global Asylum Hold Policy.

Beyond those two factual bases, the Policy Memoranda also seem to invoke vague interests in national security as a justification for the Challenged Policies. And yet neither the Government nor USCIS can elaborate on how the agency concluded that individuals from Travel Ban Countries pose a threat to national security or how withholding benefits from and/or reconsidering benefit approvals to these individuals would serve national security interests. As one court has put it, "[t]he national security interests that the [Challenged Policies] purport[ ] to protect can hardly be served by making beggars out of legal immigrants who are likely to remain lawfully present in the United States indefinitely." *Karimi*, 2026 WL 1103448, at *10; *see also Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1260 (W.D. Wash. 2008) ("If [an applicant present in the country] presents a threat to national security and public safety, the Government does not ameliorate that threat by delaying a decision on his [benefit] application.").

Simply put, the Court finds that there is no rational connection between the facts found and USCIS's choice to implement the Challenged Policies. *See State Farm*, 463 U.S. at 41. Because they lack a reasoned explanation, the Challenged Policies are therefore arbitrary and capricious.

b. **USCIS Failed to Account for Reliance Interests**

Plaintiffs also argue that, in enacting the Challenged Policies, USCIS failed to consider important reliance interests. ECF No. 20-1 at 42. Agencies are of course "free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). At a minimum, when an agency "changes its existing position," it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *Fox Television Stations*, 556 U.S. at 515).

Importantly, "[i]n explaining its changed position," the agency must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 221–22 (quoting *Fox Television Stations*, 556 U.S. at 515). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 515–16. In other words, the agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. "It would be arbitrary or capricious to ignore such matters." *Fox Television Stations*, 556 U.S. at 515.

The reliance interests in this case could not be more clear. For decades, immigrants have come to the United States with the understanding that they could apply for and eventually obtain work permits, green cards, asylum status, and/or U.S.

citizenship. As Plaintiffs explain, many of their members have built and structured their lives in reliance on the benefits that USCIS provides: They are employed, raising families, paying taxes, and contributing to their communities. *See* ECF No. 20-1 at 42; ECF No. 20-2 at 11. They followed the lawful processes that were laid out for them. They reasonably expected their applications to be considered fairly, in a manner consistent with past practices. Then, with three Policy Memoranda, USCIS pulled the rug out from under them.

The consequences of USCIS's actions have been severe. SEIU describes a member, SEIU Member A, who had employment authorization and who passed his medical licensing examinations and matched for a residency at a major U.S. hospital, where he started working in 2025. ECF No. 20-4 at 8. His employment authorization expired after the Challenged Policies took effect, and he was forced to stop his residency training. *Id.* VAM identifies a member, VAM Member B, warned by his employer that he would lose his job as of May 2026 if unable to present a renewed work permit. ECF No. 20-6 at 7–8. As the sole breadwinner for his family, this loss of employment would be devastating not only for him but for his wife and two children, including one with special needs. *Id.* And ACT explains that one of its members, ACT Member B, is a lawful permanent resident who was days away from her naturalization interview in December 2025 when USCIS canceled it. ECF No. 20-7 at 6. ACT Member B has dreams of working at the State Department as a foreign service officer, which is a role that requires U.S. citizenship, but she can no longer pursue her dream job while the Challenged Policies remain in place. *Id.* These are

all very serious reliance interests that USCIS had to contend with as a federal agency. *See Regents*, 591 U.S. at 31 (explaining that, before rescinding the DACA program, DHS had to at least consider serious reliance interests felt by DACA recipients who had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children," all in reliance on the DACA program).

What, then, did USCIS have to say about these reliance interests when it enacted the Challenged Policies? The best the agency could muster is the following, which is taken directly from its Policy Memoranda announcing the changes:

> USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security.

ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000044.

"While USCIS, arguably, 'display[s] awareness that it is changing position' by stating that it 'considered that this direction may result in delay to the adjudication of some pending applications,'" the agency "provides no 'reasoned explanation' for disregarding Plaintiffs' 'serious reliance interests' in prior . . . adjudication policies." *Saghafi*, 2026 WL 1127468, at *9 (quoting *Encino Motorcars*, 579 U.S. at 221–22). The agency's language is "merely conclusory" and "provides no explanation as to how USCIS 'weighed' the competing factors and determined that the consequences of

delays imposed by the [Challenged Policies] were necessary." *Behdin*, 2026 WL 1031079, at *21.

This is ultimately fatal to the Government's position. As the Supreme Court has stated, "summary discussion may suffice in other circumstances, but here—in particular because of decades of . . . reliance on the [agency's] prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position." *Encino Motorcars*, 579 U.S. at 222. So too here. USCIS was required to provide a "*reasoned* explanation" for disregarding the "serious reliance interests" at stake here. *Id.* at 221–22 (emphasis added). A mere two-sentence explanation that vaguely prioritizes "national security" concerns over the "burden of processing delays" does not cut it.

Further underscoring this conclusion is that USCIS only focused on "the delay consequence of the adjudicatory hold." *Behdin*, 2026 WL 1031079, at *21. Nowhere else in the administrative record does the agency discuss other consequences, such as those felt by individuals subject to the Comprehensive Re-Review Policy who have *already received* immigration benefits and who must now undergo re-reviews of their approved requests and re-interviews by USCIS personnel. Similarly, the November Memorandum, which instituted the Country-Specific Factors Policy, makes no mention of reliance interests or the weighing of competing factors that the agency considered.

On the record before it, the Court cannot conclude that USCIS meaningfully considered Plaintiffs' reliance interests when it implemented its Challenged Policies. For this reason, too, the Court finds USCIS's actions to be arbitrary and capricious.

**c. USCIS Provided Pretextual Reasons for Its Actions**

Plaintiffs also argue that the Challenged Policies were enacted for pretextual reasons. ECF No. 20-1 at 49. Providing a "pretextual" reason for taking agency action "that is incongruent with what the record reveals about the agency's priorities and decisionmaking process" can also be a basis for setting aside agency action as arbitrary and capricious. *Dep't of Com.*, 588 U.S. at 785. Even when judicial "review is deferential," courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Id.* at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). Instead, they must "ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* "Where there is 'a significant mismatch between the decision the [agency] made and the rationale [it] provided,' the 'contrived' rationale is inadequate under the APA." *Afr. Cmtys. Together v. Noem*, 820 F. Supp. 3d 48, 66 (D. Mass. 2026) (quoting *Dep't of Com.*, 588 U.S. at 783, 785).

Plaintiffs contend that the Challenged Policies were never about addressing national security or public safety concerns. Rather, according to Plaintiffs, USCIS's policies were motivated by anti-immigrant animus. As evidence, they point to many statements the President and then-DHS Secretary made contemporaneously with the issuance of the Challenged Policies. *See* ECF No. 20-1 at 49.

Under the APA, courts are "ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com.*, 588 U.S. at 780 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (per curiam)). However, the Court "may supplement the record when there is 'a strong showing of bad faith or improper behavior' by agency decision makers." *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 14 (1st Cir. 2008) (cleaned up) (quoting *Olsen v. United States*, 414 F.3d 144, 155 (1st Cir. 2005)). This bad-faith exception "is discretionary with the reviewing court." *Id.* (citing *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989)).

Plaintiffs here submitted many public statements that are not part of the administrative record. However, after reviewing them, the Court finds those statements meet the bad-faith exception, particularly the President and former Secretary's numerous "statements of ethnic hostility and prejudice" toward individuals from Travel Ban Countries, which "reveals the ugly truth of bad faith and impermissible animus." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 775 (9th Cir. 2026) (Mendoza, J., concurring).

For example, on November 27, 2025, the day USCIS announced its first of the Challenged Policies, the Country-Specific Factors Policy, the President asserted on social media that most immigrants "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels," claimed that immigrants were responsible for "social dysfunction," and blamed them for "[f]ailed schools, high crime,

urban decay, overcrowded hospitals, housing shortages, and large deficits." ECF No. 20-1 at 50 (citing Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM), https://perma.cc/8JW9-D7B5); *see also* ECF No. 23 at 40.

On December 1, 2025, a mere day before enacting the Global Asylum Hold, Benefits Hold, and Comprehensive Re-Review Policies, then-Secretary Noem issued—and the President later reposted—a statement describing immigrants as "killers, leeches, and entitlement junkies," referring to them as "foreign invaders" who came to the United States "to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS," and concluding by saying: "WE DON'T WANT THEM. NOT ONE." ECF No. 20-1 at 50 (citing Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 1, 2025, at 09:36 PM), https://perma.cc/P9V8-WZG7 (reposted from Secretary Kristi Noem, @Sec_Noem).

Then, on December 10, 2025, a few days after the Challenged Policies went into effect, the President described the Travel Ban as "a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, Somalia, and many other countries." ECF No. 20-1 at 9 (citing Alexandra Marquez, *Trump Revives Slur While Discussing Immigrants from Somalia and Other 'Disgusting' Nations*, NBC News (Dec. 10, 2025, 01:42 PM), https://perma.cc/2ES3-BCYU). The President repeated comments he had previously made in 2018, asking why the United States "only take[s] people from shithole countries," and wondering "[w]hy can't we have some people from Norway, Sweden, just a few? Let us have a few from Denmark." *Id.*

The Government does not attempt to defend these derogatory statements. It is hard to see how anyone could.[41] Instead, the Government simply points out that "none of those posts refer to the Challenged Policies, nor does the administrative record refer to the posts as informing the agency's predecisional guidance." ECF No. 25 at 16. In the Government's view, the identified statements have "fail[ed] to invalidate the reasoned analysis evidenced in the administrative record." ECF No. 21 at 48.

The Government effectively invites the Court to shut its eyes and ignore the strong evidence of anti-immigrant animus before it. Doing so would require profound naiveté on the Court's part. Unfortunately for the Government, that is an invitation that this Court will have to decline. *See Dep't of Com.*, 588 U.S. at 785 ("We are not required to exhibit a naiveté from which ordinary citizens are free." (cleaned up)).

It is impossible to ignore the backdrop against which the Challenged Policies were implemented. Both the President and former Secretary's statements came in the direct aftermath of the 2025 Washington, D.C. Shooting. Indeed, they seem to attribute the alleged act of a single individual of Afghan descent to the entire population of Afghanistan, as well as individuals from thirty-eight other countries. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, at 11:27 PM)

---

[41] Judge Ana C. Reyes of the U.S. District Court for the District of Columbia analyzed similar statements made by the President and the former Secretary in a case involving a challenge to the termination of TPS for Haitian migrants. *See Miot v. Trump*, 818 F. Supp. 3d 126 (D.D.C. 2026). As Judge Reyes put it, Americans can, of course, "rationally debate immigration policy," and that "[t]hey can even do so without calling fellow human beings 'garbage' and 'leeches.'" *Id.* at 178 n.32.

(claiming that immigrants are "the leading cause of social dysfunction in America" and are responsible for, among other things, "high crime"); Secretary Kristi Noem (@Sec_Noem), Truth Social (Dec. 1, 2025, at 06:52 PM) (describing immigrants as "killers, leeches, and entitlement junkies" who came to the United States to, among other things, "slaughter our heroes").

The statements are also notable, not just for their animus-ridden stereotyping,[42] but also because they were made by the head of the Executive Branch and by the then-Cabinet Secretary charged with overseeing USCIS. Their outright disdain for individuals from Travel Ban Countries seems to suggest that, in enacting the Challenged Policies, USCIS personnel seemed less concerned with matters of "national security" and more so focused on targeting groups of people that their leaders told them they "DON'T WANT" in the United States, "NOT ONE." *See* ECF No. 20-1 at 50 (quoting Secretary Kristi Noem (@Sec_Noem), Truth Social (Dec. 1, 2025, at 06:52 PM)).

Indeed, the timing of the President and former Secretary's statements is highly probative evidence of USCIS's true intentions. *See, e.g.*, *Miot*, 818 F. Supp. 3d at 180 (finding as relevant to the pretext analysis the fact that the former Secretary

---

[42] The Court emphasizes that "animus-ridden stereotyping . . . can never be viewed as 'reasonable' decision-making." *Nat'l TPS All.*, 166 F.4th at 776 n.5 (Mendoza, J., concurring) (citing *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)); *see also Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1157 (N.D. Cal. 2025) ("Secretary Noem's generalization of the alleged acts of a few (for which there is little or no evidence) to the entire population of Venezuelan TPS holders who have lower rates of criminality and higher rates of college education and workforce participation than the general population is a classic form of racism.").

described Haitians as "leeches," "entitlement junkies," and "foreign invaders" a mere three days after she made the decision to terminate TPS for Haitian immigrants); *Nat'l TPS All.*, 166 F.4th at 776 (Mendoza, J., concurring) ("Many of [former Secretary Noem's] assertions [on social media] were made within days or hours of the Secretary's decision to vacate TPS for Venezuela and Haiti.").

To the Government's point, it may be so that USCIS never expressly referred to the President and the former Secretary's statements when the agency issued the Challenged Policies, but government officials rarely share their animus toward a particular group out in the open. *See, e.g.*, *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."); *Cook Cnty. v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020) ("Most people know by now that the quiet part should not be said out loud.").

Further supporting Plaintiffs' claim of pretext is that "the evidence tells a story that does not match the explanation [USCIS] gave for [its] decision." *Dep't of Com.*, 588 U.S. at 784. Recall that throughout this litigation, USCIS has insisted that it is an "operational necessity" to pause the adjudication of *all* benefit request applications for *any* individual from the Travel Ban Countries to ensure that they "do not pose a threat to national security or public safety." ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000047. But USCIS has made some notable exceptions to this categorical policy.

For example, a month after USCIS implemented the Benefits Hold Policy, the agency issued exemptions in the January Memorandum for athletes participating in the 2026 World Cup, the 2028 Summer Olympics, and other major sporting events "as determined by the Secretary of State," as well as their coaches, necessary support staff, and immediate relatives. *See* ECF No. 16-3 at CAR-000048–49. As of April 30, 2026, USCIS posted an update on its website, announcing that it also lifted its adjudicative hold specifically for those "applications associated with medical physicians." *See* ECF No. 26 at 1.

It seems rather odd that USCIS would resume adjudicating benefit requests filed by individuals from Travel Ban Countries who happen to be medical physicians, athletes, or the coaches and family members of those athletes without the same concern that these individuals might "pose a threat to national security or public safety." ECF No. 16-2 at CAR-000003; *see also* ECF No. 16-3 at CAR-000047. Following the agency's own logic, these individuals would also be coming from "high-risk countries" with "significant deficiencies in screening, vetting, and information sharing." ECF No. 16-3 at CAR-000046–47. And if the agency declared that the "hold will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum," *see* ECF No. 16-2 at CAR-000002–03, then why was the hold modified for medical physicians through a simple update on the agency's website rather than with a subsequent policy memorandum by the USCIS Director? *See* ECF No. 26 at 1.

In other words, "[s]everal points, considered together, reveal a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Dep't of Com.*, 588 U.S. at 783. For one thing, the President and former Secretary's contemporaneous, anti-immigrant statements cannot be ignored; rather, they give the Court serious reason to doubt that the Challenged Policies were issued in furtherance of "national security" concerns. Moreover, many inconsistencies in USCIS's own logic—that athletes and medical physicians from Travel Ban Countries are somehow exempt from the adjudicative hold, that the Challenged Policies were apparently modified without the agency following procedures that it had itself established—lead the Court to conclude that the reasons USCIS gave for issuing the Challenged Policies seem to be contrived ones. *See Dep't of Com.*, 588 U.S. at 785 ("Accepting contrived reasons would defeat the purpose of the enterprise.").

The Court therefore finds that USCIS issued the Challenged Policies based on impermissible pretextual reasoning. This too renders the agency's actions arbitrary and capricious.

### 3. A Summary of the Court's APA Rulings

To summarize, the Court finds that each of the Challenged Policies violate the APA. First, the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy (particularly with respect to adjustment of status and employment authorization claims) are contrary to law. *See* 5 U.S.C. § 706(2)(A), (C). And second, the Challenged Policies are collectively arbitrary and capricious because USCIS: (1) failed to provide

a reasoned explanation for enacting the policies; (2) failed to account for reliance interests in enacting the policies; and (3) provided a pretextual reason for enacting the policies. *See* 5 U.S.C. § 706(2)(A).

**D. Remedy**

Now that the Court has concluded that USCIS violated the APA in enacting the Challenged Policies, the remaining issue concerns the remedy warranted in this case. Plaintiffs argue that they are entitled to three forms of relief: Vacatur, declaratory relief, and injunctive relief. ECF No. 20-1 at 55–59. The Court addresses each argument in turn.

**1. Plaintiffs Are Entitled to Vacatur**

Plaintiffs first seek vacatur of the Challenged Policies. ECF No. 20-1 at 55–57. The APA empowers federal courts to "hold unlawful and set aside agency action" that, as relevant here, is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Thus, where a particular agency action is found to have violated the APA, the ordinary type of relief granted is vacatur of the agency action. *See, e.g.*, *Regents*, 591 U.S. at 9 ("[W]e conclude that the [agency] did violate the APA, and that the [challenged action] must be vacated."); *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring) ("The text and history of the APA authorize vacatur. . . . [T]o 'set aside' a[n] [agency action] is to vacate it.").

The First Circuit has also recognized that "'[i]f a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward.'" *New York v. Trump*, 171 F.4th 1, 30 (1st Cir. 2026) (quoting *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 n.1 (2025) (Barrett, J., concurring)); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("[V]acation is a proper remedy when an agency fails to explain its reasoning adequately.").

That is the result that the Court reaches here. Because each of the Challenged Policies—the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are "contrary to law" and "arbitrary and capricious," the Court VACATES the Challenged Policies in their entirety.

**2. Plaintiffs Are Entitled to a Declaratory Judgment**

Plaintiffs also ask that the Court "declare the Challenged Policies unlawful." ECF No. 20-1 at 59. Though the Government disputes the merits of Plaintiffs' claims, they do not seem to raise an objection to this form of relief. As such, the Court finds the Challenged Policies to be unlawful under 5 U.S.C. § 706(2)(A) and (C) and GRANTS Plaintiffs' request for declaratory relief.

**3. Plaintiffs Are Not Entitled to a Permanent Injunction**

Finally, Plaintiffs request that the Court enter a permanent injunction in their favor. ECF No. 20-1 at 57. For a district court to grant a permanent injunction, the plaintiff must show: (1) "actual success on the merits of its claims"; (2) that they

"would be irreparably injured in the absence of injunctive relief"; (3) that the harm suffered "from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction"; and (4) that "the public interest would not be adversely affected by an injunction." *Doe v. R.I. Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025) (quoting *United States v. Mass. Water Res. Auth.*, 256 F.3d 36, 50 n.15 (1st Cir. 2001)).

"'District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.'" *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)). In the context of analyzing claims under the APA, some courts have held that "once the court reache[s] the conclusion that the [agency action] was indeed illegal . . . there [is] no separate need to show irreparable injury. . . ." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal citations omitted).

While Plaintiffs have succeeded on the merits of their APA claims, the Court concludes that a permanent injunction is not necessary under the present circumstances. The Supreme Court has cautioned lower courts that "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010); *see also Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311–312 (1982). "If a less drastic remedy (such as partial or complete vacatur of [the agency's] decision) [is] sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief

of an injunction [is] warranted." *Id.* at 165–66 (citing *Weinberger*, 456 U.S. at 311–312; *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 31–33 (2008)).

Here, vacatur of the Challenged Policies and a judgment declaring them to be unlawful will provide Plaintiffs with complete relief. First, "because vacatur voids and rescinds the [Challenged Policies] [themselves], it provides nationwide relief that redresses injuries suffered by members of the Organizational Plaintiffs." *Ass'n of Am. Univs.*, 788 F. Supp. 3d at 143.

Second, "[a] declaratory judgment obviates the need to enjoin defendants from reimplementing [ ] substantively identical polic[ies] where a declaratory judgment declares the rights and obligations of the parties and has 'the force and effect of a final judgment or decree.'" *Id.* (quoting 28 U.S.C. § 2201(a)); *see Union de Empleados de Muelles de P.R., Inc. v. Int'l Longshoremen's Ass'n*, 884 F.3d 48, 58 (1st Cir. 2018) (explaining purpose of declaratory judgment "is to determine the rights and obligations of the parties so that they can act in accordance with the law"). "Indeed, [b]ecause [a] declaratory judgment is binding on the parties before the court and is res judicata in subsequent proceedings as to the matters declared, it can be used by a party to later obtain further relief" if necessary. *Id.* (internal citations and quotation marks omitted).

To Plaintiffs' point that USCIS might try to issue similar policies "under another name (or, for that matter, no name at all)," *see* ECF No. 23 at 57, "that possibility is not enough to justify the 'drastic remedy' of a permanent injunction." *Nat'l All. to End Homelessness v. Turner*, No. 25-cv-00447-MSM-AEM, --- F. Supp.

3d ----, 2026 WL 883437, at *7 (D.R.I. Mar. 31, 2026) (citing *Monsanto Co.*, 561 U.S. at 165–66). If it turns out that Plaintiffs are "aggrieved by a hypothetical future [USCIS] decision," then they "will have ample opportunity to challenge it, and to seek appropriate preliminary relief, if and when such a decision is made." *Monsanto Co.*, 561 U.S. at 164.

So, the Court DENIES Plaintiffs' request for a permanent injunction.

## III. THE MOTION TO DISMISS

The Government has also challenged Plaintiffs' constitutional claims brought under the Due Process and Equal Protection Clauses of the Fifth Amendment. First, the Government argues that because Plaintiffs have not moved for summary judgment on their Fifth Amendment claims, they have waived them. ECF No. 21 at 3 n.1. In the alternative, the Government has moved to dismiss these claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *Id.* at 53–56.

Beginning with the Government's first argument, no rule requires a party to move for summary judgment on all claims to prevent them from being waived. The case the Government cites in support of this proposition, *Rodriguez v. Municipality of San Juan*, 659 F.3d 168 (1st Cir. 2011), does not aid its cause. That case simply recites the ordinary rule that claims not made or fully developed *on appeal* are considered waived. *See Rodriguez*, 659 F.3d at 175. Thus, Plaintiffs did not waive their constitutional claims by electing not to press them on summary judgment.

Turning to its Motion to Dismiss, the Government asks the Court to rule on several constitutional issues as a matter of law, such as whether Plaintiffs have cognizable property rights in immigration benefits for purposes of procedural due

process, *see* ECF No. 21 at 53–54, and whether USCIS has denied Plaintiffs equal protection of the law through the Challenged Policies, *see id.* at 55–56. These are complex legal questions. Ultimately, they will have to be saved for another day.

The canon of constitutional avoidance generally counsels against ruling on constitutional issues unnecessarily. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them); *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 178 (1st Cir. 2021) ("Under the doctrine of constitutional avoidance, 'federal courts are not to reach constitutional issues where alternative grounds for resolution are available.'" (citations omitted)). Indeed, the First Circuit has instructed that "[c]ourts are obliged to avoid rulings on constitutional questions when non-constitutional grounds will suffice to resolve an issue." *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, 563 (1st Cir. 2021) (citing *Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 511 (1st Cir. 2011)).

Here, the Government asks the Court to enter "into a thicket of constitutional issues it [is] not necessary to enter." *Sony BMG Music Ent.*, 660 F.3d at 511. The Court must decline that request. Given that the Court has concluded that the Challenged Policies violate the APA and require vacatur, it is not necessary to rule on Plaintiffs' constitutional claims at this time. *See, e.g.*, *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 246 (D.D.C. 2018) (declining to rule on the Government's motion to dismiss plaintiffs' constitutional

challenges to DHS's rescission of the DACA program after having already concluded that the DACA rescission violated the APA); *Texas v. United States*, 86 F. Supp. 3d 591, 677 (S.D. Tex. 2015) (declining to rule on whether plaintiffs were likely to succeed on their constitutional challenges to DHS's implementation of the DAPA program after having already concluded that they showed a likelihood of success on their APA notice-and-comment claim).

As such, the Court DENIES WITHOUT PREJUDICE the Government's Motion to Dismiss.

## IV. CONCLUSION

When USCIS first enacted the policies at the center of this litigation, the agency did not simply place a hold on adjudications. More fundamentally, the Challenged Policies placed the lives of countless individuals on hold—solely by virtue of their countries of birth. Over six months later, many of those individuals remain without work, without legal status, and without any meaningful ability to plan for their futures.

Ultimately, it is not the Court's role to pass on the wisdom of the Government's policy choices. Under our constitutional system, those judgments are reserved for the political branches. It is, however, the Court's duty to determine whether the Government's policies comport with the law. Having undertaken that inquiry, the Court concludes that they do not and therefore must be set aside.

For the above reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 20) is GRANTED IN PART and DENIED IN PART, and the Government's Cross-Motion

for Summary Judgment (ECF No. 21) is GRANTED IN PART and DENIED IN PART. Each of the Challenged Policies—the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are declared unlawful and are hereby VACATED and SET ASIDE. Plaintiffs' request for a permanent injunction is DENIED. The Government's related Motion to Dismiss Plaintiffs' constitutional claims (ECF No. 21) is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

***/s/ John J. McConnell, Jr.***
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

June 5, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND;<br>REFUGEE DREAM CENTER; SERVICE EMPLOYEES<br>INTERNATIONAL UNION;<br>INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA;<br>AFRICAN COMMUNITIES TOGETHER;<br>VENEZUELAN ASSOCIATION OF MASSACHUSETTS;<br>PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; and<br>AMERICAN GATEWAYS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;<br>JOSEPH EDLOW, *in his official capacity as Director of the United States Citizenship and Immigration Services*;<br>DEPARTMENT OF HOMELAND SECURITY; and<br>MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security*,<br><br>Defendants. | ) | No. 26-cv-132-JJM-PAS |

## ORDER

On June 5, 2026, the Court issued an Order, granting in part Plaintiffs' Motion for Summary Judgment and denying in part the Government's Cross-Motion for Summary Judgment. *See* ECF No. 28; *see also Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.* ("*Dorcas*"), No. 26-cv-132-JJM-PAS, --- F. Supp. 3d ----, 2026 WL 1622708 (D.R.I. June 5, 2026). As the Court explained then, under the Administrative Procedure Act ("APA"), "[e]ach of the Challenged Policies that USCIS [United States Citizenship and Immigration Services] enacted—the Benefits Hold Policy, the Global Asylum Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are declared unlawful and are vacated and set aside." *Dorcas*, 2026 WL 1622708, at 2. Plaintiffs did not move for summary judgment on their constitutional claims, and the Court denied without prejudice the Government's separate Motion to Dismiss those claims. *Id.* at 56–57.

The Government now wishes to appeal the Court's ruling and seek a stay pending appeal. *See* ECF No. 31 at 2. So that it may do so, the Government requests that the Court enter partial final judgment on Plaintiffs' APA claims under Rule 54(b) of the Federal Rules of Civil Procedure. *Id.* Plaintiffs do not oppose the Government's request. *See* ECF No. 34 at 4–5. Plaintiffs have, however, filed a separate motion, asking the Court to enforce its prior Order. *See* ECF No. 35.

To begin, Rule 54(b) provides that, "[w]hen an action presents more than one claim for relief . . ., the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no

just reason for delay." Fed. R. Civ. P. 54(b). Thus, to certify a partial final judgment under this provision, the first step is to "ensure that the ruling underlying the proposed judgment is final." *Nystedt v. Nigro*, 700 F.3d 25, 29 (1st Cir. 2012) (citing *Spiegel v. Trs. of Tufts Coll.*, 843 F.2d 38, 42 (1st Cir. 1988)). "The finality requirement is satisfied as long as the 'trial court action underlying the judgment disposed of all the rights and liabilities of at least one party as to at least one claim.'" *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 28 (1st Cir. 2022) (quoting *Credit Francais Int'l, S.A. v. Bio-Vita, Ltd.*, 78 F.3d 698, 706 (1st Cir. 1996)). Here, the entry of partial summary judgment on Plaintiffs' APA claims fully resolved those claims,[1] thereby rendering them sufficiently final.

Rule 54(b) also requires the Court to find that "there is no just reason for delay" in entering partial final judgment on the resolved claims. Fed. R. Civ. 54(b); *see also Amyndas*, 48 F.4th at 28. Under this standard, the Court "typically must make an individualized assessment of the desirability and effect of an immediate appeal." *Quinn v. City of Boston*, 325 F.3d 18, 26 (1st Cir. 2003) (citing *Spiegel*, 843 F.2d at 42–43). This requires the Court to consider additional factors, such as "whether the disputed ruling raises legal or factual issues that overlap with any claims that remain pending" and "how the equities and efficiencies of piecemeal review would compare

[1] In their Complaint, Plaintiffs' APA claims are listed as follows: Count I (contrary-to-law claim), Count II (arbitrary-and-capricious claim), and Count III (notice-and-comment claim). *See* ECF No. 1 at 65–68. The Court resolved Counts I and II in Plaintiffs' favor but expressly declined to address Count III because Plaintiffs had already achieved their desired outcome—vacatur of each of the Challenged Policies. *See Dorcas*, 2026 WL 1622708, at *36 n.30 ("The Court does not reach and need not address Plaintiffs' notice-and-comment argument.").

to those in a single proceeding." *Britton v. Maloney*, 196 F.3d 24, 27 n.2 (1st Cir. 1999) (citing *Credit Francais*, 78 F.3d at 706).

The Court concludes that there is no just reason for delay in entering partial final judgment on Plaintiffs' APA claims. First, the legal issues presented by Plaintiffs' remaining constitutional claims differ considerably from those issues addressed by the Court in ruling on Plaintiffs' APA claims. *See Dorcas*, 2026 WL 1622708, at *56 ("[T]he Government asks the Court to rule on several constitutional issues . . . such as whether Plaintiffs have cognizable property rights in immigration benefits . . . and whether USCIS has denied Plaintiffs equal protection of the law . . . . These are complex legal questions. Ultimately, they will have to be saved for another day."). The Government also points out that "appellate resolution of the APA issues may obviate the need for any court to address the constitutional issues or provide guidance in resolving those issues." ECF No. 31 at 4; *see Guerrero Orellana v. Moniz*, 813 F. Supp. 3d 185, 197 (D. Mass. 2025) (entering partial final judgment on one of plaintiff class's claims where their "victory on this count and the issuance of a declaration in the class's favor may well obviate the need to address the remaining counts").

Second, the "equities and efficiencies" weigh in favor of granting the Government's motion to ensure that USCIS is complying with the Court's Order and not continuing to use policies that the Court has already declared to be unlawful. *See Britton*, 196 F.3d at 27 n.2. The Government seems to suggest that the entry of partial final judgment is a necessary prerequisite to render the Court's vacatur order

effective and enforceable. *See* ECF No. 31 at 4. This argument has no basis in the law. It should almost go without saying—but the Court will say it anyway for the sake of "clarify[ing]" the Government's "current obligations," *see* ECF No. 31 at 2—that court orders vacating and setting aside agency policies have *immediate* effect once they are issued. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103–04 (D.D.C. 2018), *aff'd sub nom.*, *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) ("When a court vacates an agency's [policies], the vacatur restores the status quo before the invalid [policies] took effect . . . . That is, the offending [policies] [are] rendered void and of no effect and there is a reinstatement of the [policies] previously in force." (cleaned up)); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (explaining that the effect of vacatur was to "*automatically* resurrect[ ]" the previous agency standard (emphasis in original)).

In any event, the outcome here is the same: USCIS's Challenged Policies are no longer in effect. To be perfectly clear, this means that the Challenged Policies are vacated, "set aside," "cancel[ed]," "annul[ed]," "revoke[d]," and "void[ed]." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 829–30 (2024) (Kavanaugh, J., concurring) (quoting Black's Law Dictionary 1612 (3d ed. 1933); Black's Law Dictionary 1537 (4th ed. 1951); Bouvier's Law Dictionary 1103 (W. Baldwin ed. 1926)).

Accordingly, finding there to be no just reason for delay under Rule 54(b), the Court GRANTS the Government's request (ECF No. 31) and ENTERS partial final

judgment in favor of Plaintiffs on their APA claims. There is no excuse this time; the Government has an obligation to immediately comply with this Order. This moots Plaintiffs' Motion to Enforce, which the Court DENIES WITHOUT PREJUDICE (ECF No. 35).

It is hereby ORDERED that:

1. The Challenged Policies as a whole—the Benefits Hold Policy, the Global Asylum Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy—are contrary to law and arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A), (C). Therefore, the Challenged Policies are vacated and set aside pursuant to 5 U.S.C. § 706(2).
2. Partial final judgment shall enter in favor of Plaintiffs and against the Government on Counts I and II of Plaintiffs' Complaint (ECF No. 1).
3. Within twenty-four (24) hours, the Government shall file a status report, advising the Court as to what specific steps it has taken to comply with the Court's Order.
4. The Court retains jurisdiction to enforce this judgment.

IT IS SO ORDERED.

***s/John J. McConnell, Jr.***

________________________________

JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

June 11, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND;

REFUGEE DREAM CENTER;

SERVICE EMPLOYEES INTERNATIONAL UNION;

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA;

AFRICAN COMMUNITIES TOGETHER;

VENEZUELAN ASSOCIATION OF MASSACHUSETTS;

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; and

AMERICAN GATEWAYS,

Plaintiffs,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;

JOSEPH EDLOW, *in his official capacity as Director of the United States Citizenship and Immigration Services*;

DEPARTMENT OF HOMELAND SECURITY; and

MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security*,

Defendants.

No. 26-cv-132-JJM-PAS

**ORDER**

This case stands for the quite unremarkable proposition that the United States Citizenship and Immigration Services ("USCIS") cannot arbitrarily shut down the legal immigration system for individuals from thirty-nine African, Asian, Latin American, and Middle Eastern countries. USCIS nevertheless strived to do just that, adopting a series of policies (the "Challenged Policies"[1]) that, among other things, categorically barred individuals from these thirty-nine countries from obtaining final decisions on their asylum, work permit, green card, and citizenship applications.

A coalition of nonprofit organizations and labor unions (collectively, the "Plaintiffs") representing immigrants impacted by these policies sued and argued that USCIS's actions violated the Administrative Procedure Act ("APA") because they were contrary to law and arbitrary and capricious. The Court agreed with Plaintiffs and issued an Order, vacating the Challenged Policies in their entirety. ECF No. 28. The Government appealed that decision over a month ago but now argues that it is entitled to the "extraordinary relief" of a stay pending appeal. ECF No. 46; *see Nken v. Holder*, 556 U.S. 418, 433–34 (2009). The Court is unconvinced.

---

[1] The Challenged Policies include: (1) the "Benefits Hold Policy," which placed a hold on the adjudication of immigrant benefit requests for individuals from thirty-nine so-called "Travel Ban Countries"; (2) the "Global Asylum Hold Policy," which placed a hold on the adjudication of all applications for asylum and withholding of removal, regardless of the individual's country of origin; (3) the "Comprehensive Re-Review Policy," which directed USCIS officials to re-review already approved immigration benefit requests for individuals from Travel Ban Countries who entered the United States on or after January 20, 2021; and (4) the "Country-Specific Factors Policy," which required USCIS officials to consider country-specific facts and circumstances as significant negative factors when deciding whether to grant benefit requests to those from Travel Ban Countries. *See* ECF No. 28 at 19–21.

There are four factors that guide the Court's stay analysis, *see Nken*, 556 U.S. at 434, and none of those factors weigh in the Government's favor. First, the Government has not made a strong showing that it is likely to succeed on the merits of its appeal. It largely recycles jurisdictional and merits-based arguments from its Cross-Motion for Summary Judgment that the Court has already considered and rejected. In its Order, the Court recognized that, in implementing the Challenged Policies,

> USCIS: claims statutory and regulatory authority that it does not possess; makes decisions without the reasoned explanations that it must provide; acts without regard for the reliance interests of applicants that it must consider; and justifies its actions with pretextual concerns of "national security" that mask anti-immigrant sentiments that it is forbidden from letting influence its decision-making. In legal terms that means USCIS's actions are contrary to law and arbitrary and capricious.

ECF No. 28 at 3–4. The Government, for its part, does not offer a persuasive reason to disturb this ruling.

Second, the Government fails to demonstrate that it will be irreparably injured absent a stay. The Government waited two weeks to file its "emergency" stay motion, but it presents no evidence that any harm occurred within those two weeks. Nor does it point to any harm that has occurred in the last month since USCIS implemented the Court's Order and resumed adjudicating benefit requests for individuals from the covered countries.

In its search for an irreparable injury, the Government offers up a new declaration from the Deputy Director of USCIS, who laments that "[t]he main harm" of the Court's Order is that USCIS will have to adjudicate cases for individuals from "identified" "high-risk countries" that purportedly "possess little to no credible

identity management infrastructure." ECF No. 46-1 at 2, 6. Of the ten examples of "identified" "high-risk countries" that the Deputy Director highlights, three—Ethiopia, Liberia, and Pakistan—are not even among the thirty-nine countries covered by USCIS's hold on adjudications. *Id.* at 3–4. The Court therefore has a hard time crediting the Government's assertions of irreparable injury.

Finally, Plaintiffs' interests and the public interest weigh heavily against granting the Government's request for a stay. During the more than six months that the Challenged Policies were in effect, countless immigrants living in the United States—solely by virtue of their nationalities and not because of anything they did wrong—lost jobs, lost legal status, and lost the ability to meaningfully plan for their futures. There is overwhelming evidence of harm suffered by these individuals in the record, and there is no doubt that further injury would result if a stay were to be granted. Quite tellingly, the Government has little to say about these harms and provides no evidence to the contrary.

As explained in more detail below, the Government fails to meet the burden that a stay pending appeal requires. The Court therefore DENIES the Government's Motion.

## I. BACKGROUND

On June 5, 2026, the Court issued an Order (the "June 5th Order" or "Order") that granted partial summary judgment to Plaintiffs who, along with their members and clients, were impacted by the Challenged Policies. ECF No. 28. As part of that Order, the Court vacated the Challenged Policies after concluding that they were

contrary to law and arbitrary and capricious in violation of the APA.[2] *Id.* The Government then asked the Court to enter partial final judgment for Plaintiffs under Fed. R. Civ. P. 54(b). ECF No. 31. Finding there to be no just reason for delay, the Court granted that request on June 11, 2026. ECF No. 36.

The next day, the Government filed a Notice of Appeal, *see* ECF No. 39, and that appeal has been docketed with the United States Court of Appeals for the First Circuit. *See Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.* ("*Dorcas*"), No. 26-cv-132-JJM-PAS, --- F. Supp. 3d ----, 2026 WL 1622708 (D.R.I. June 5, 2026), *appeal docketed*, No. 26-1703 (1st Cir. June 12, 2026). In the meantime, USCIS has implemented the Court's Order and posted notice of compliance on its website.[3]

On June 19, 2026, two weeks after the Court issued its initial Order, the Government filed the present Motion for a Stay Pending Appeal. ECF No. 46. Plaintiffs filed their Response In Opposition to the Government's Motion two weeks later, ECF No. 47, and the Government waived its opportunity to file a Reply. ECF No. 48. The Court heard oral arguments on the Government's Motion on July 15, 2026.

---

[2] Plaintiffs also raised constitutional claims in their Complaint, *see* ECF No. 1 at 65–68, but they elected not to press them on summary judgment. *See* ECF No. 20 at 1 n.2.

[3] *See* U.S. Dep't of Homeland Sec., USCIS, Court Order on Hold Policies, https://www.uscis.gov/newsroom/alerts/court-order-on-hold-policies [https://perma.cc/4QTQ-X7CG] (last updated June 12, 2026) ("With entry of final judgment this order is effective immediately, and pursuant to the court-ordered vacatur, applies agency-wide. Thus, the vacatur applies to PM 602-0192, PM 602-0194, and PA 2025-26, which should be treated as if they are not in effect.").

## II. LEGAL STANDARD

"'A stay is not a matter of right'" but rather "'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926)). "As the party seeking a stay pending appeal, the [Government] bears the burden of justifying the extraordinary relief it requests." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 47 (1st Cir. 2025) (citing *Nken*, 556 U.S. at 433–34).

"To meet its burden for a stay," the Government must make: "'(1) a strong showing that [it] is likely to succeed on the merits; (2) a showing that it will be irreparably injured absent a stay; (3) a showing that the issuance of the stay will [not] substantially injure the other parties interested in the proceeding; and (4) a showing that the public interest lies with [it], not the plaintiffs.'" *R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 311 (1st Cir. 2025) (alterations in original) (quoting *Nat'l Insts. of Health*, 145 F.4th at 47). "The first two factors . . . are the most critical." *Nken*, 556 U.S. at 434. And the final two factors "merge when the Government" is a party. *Id.* at 435.

## III. DISCUSSION

In its Motion, the Government largely focuses on the first two factors of the stay analysis. But, as discussed below, the Court is unconvinced that the Government is likely to succeed on the merits of its appeal or that it will be irreparably injured absent a stay. The Court also finds that the issuance of a stay is

likely to substantially injure Plaintiffs, as well as their members and clients, and that the public interest does not lie with the Government.

### A. The Government Fails to Make a Strong Showing That It Is Likely to Succeed on the Merits of Its Appeal

In the First Circuit, "'[t]he most important' of the stay factors is the 'likelihood of success on the merits.'" *R.I. State Council of Churches*, 158 F.4th at 311 (quoting *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020)). "If the government fails to make a strong showing that it is likely to succeed on the merits, 'the remaining elements are of little consequence.'" *Id.* (quoting *Akebia Therapeutics*, 976 F.3d at 92).

Here, the Government argues that it is "likely to succeed on appeal for at least three independent reasons": (1) because "Congress deprived this Court of jurisdiction to review the [Challenged Policies]"; (2) because the Challenged Policies "are consistent with the broad discretion conferred upon [USCIS] by the INA ["Immigration and Nationality Act"], were not developed arbitrability or capriciously, and do not violate the APA"; and (3) because "substantial questions exist concerning the scope of the Court's remedy and its decision to vacate the [Challenged Policies] in their entirety." ECF No. 46 at 3–4. The Court briefly addresses each argument but ultimately finds none of them to be especially convincing.

#### 1. The Court Did Not Lack Jurisdiction to Review the Challenged Policies

The Government repackages many of the same jurisdictional challenges that it previously raised in its Cross-Motion for Summary Judgment. Specifically, the Government reiterates that: (1) federal courts are "preclude[d] or substantially

limit[ed] . . . from reviewing non-constitutional disputes arising from matters of foreign policy and national security and in the context of immigration"; (2) certain provisions of the INA strip the Court of jurisdiction over Plaintiffs' claims; (3) USCIS's actions were "committed to agency discretion by law"; and (4) USCIS's actions did not constitute "final agency action." ECF No. 46 at 4–21.

However, the Court already considered—and rejected—all four of these arguments in its June 5th Order. *See Dorcas*, 2026 WL 1622708, at *10–26. The Government expresses mere disagreement with the Court's decision, but that alone is not enough to show a strong likelihood of success on the merits. *See, e.g.*, *Afr. Cmtys. Together v. Noem*, No. 25-cv-13939-PBS, 2026 WL 961900, at *1 (D. Mass. Apr. 9, 2026) (denying motion for stay pending appeal where the Government largely "repeat[ed] the arguments they already raised in opposing Plaintiffs' motion"); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 588 F. Supp. 3d 191, 203–04 (D.P.R. 2022) (same).

The only intervening authority that has come out since the Court handed down its Order, which Plaintiffs themselves point out, *see* ECF No. 47 at 1, 8–9, is the Supreme Court's decision in *Mullin v. Doe*, 609 U.S. ----, --- S. Ct. ----, 2026 WL 1825840 (June 25, 2026).[4] This decision touches on a separate jurisdiction-stripping provision of the INA, 8 U.S.C. § 1254a(b)(5)(A), and the Supreme Court concluded

[4] The Government declined the opportunity to file a Reply in which it could have addressed Plaintiffs' invocation of the *Mullin* decision. ECF No. 48 at 1 ("The [Government] hereby waive[s] reply to Plaintiffs' response to [the Government's] emergency motion for a stay pending appeal."). The attorney for the Government only briefly mentioned *Mullin* at oral argument to preserve the issue for appeal.

that this provision barred judicial review over "all non-constitutional claims" brought by Haitian and Syrian nationals challenging the Secretary of Homeland Security's termination of their countries' Temporary Protected Status ("TPS") designation. *Mullin*, 2026 WL 1825840, at *2, *10.

Nothing in *Mullin* disturbs the Court's own jurisdictional findings in *Dorcas*. If anything, that decision reaffirms the Supreme Court's decades-long distinction, first drawn in *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), "between the 'direct review of individual denials' of applications and 'general collateral challenges to [unlawful] practices and policies used by the agency in processing applications.'" *Dorcas*, 2026 WL 1622708, at *12 (quoting *McNary*, 498 U.S. at 492). The Supreme Court reiterated that, because the jurisdiction-stripping provision at issue in *McNary* "referred to 'a single act,' *i.e.*, a ruling on an individual application," a noncitizen's "broad claims about the procedures used in implementing the [Special Agricultural Farmworker amnesty] program could proceed." *Mullin*, 2026 WL 1825840, at *8 (quoting *McNary*, 498 U.S. at 492). *McNary*, the Supreme Court emphasized, "turned on the specific wording of the provision at issue." *Id.*

So too here. The Government devotes a substantial portion of its Motion to arguing that this Court was wrong in concluding that Plaintiffs' claims did not fall under 8 U.S.C. § 1252(a)(2)(B)'s jurisdictional bar. ECF No. 46 at 6–11, 13–14, 19. To be sure, this case involves a separate INA jurisdiction-stripping provision from the one in *McNary*. But, just like that case, the Government's jurisdiction-stripping argument ultimately "turn[s] on the specific wording of the provision at issue."

*Mullin*, 2026 WL 1825840, at *8. And, as this Court previously observed, "[t]he most natural reading of Section 1252(a)(2)(B)(i) is that it bars review only over 'a single act of granting or denying an individual application for relief,' but that it does not preclude 'collateral actions challenging general policies and procedures.'" *Dorcas*, 2026 WL 1622708, at *12 (quoting *Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1004, 1009 (9th Cir. 2024)).[5]

In case it bears repeating, Plaintiffs here did *not* challenge "'a single act'" or "a ruling on an[y] individual application," *Mullin*, 2026 WL 1825840, at *8 (quoting *McNary*, 498 U.S. at 492), so their claims are not barred by Section 1252(a)(2)(B). Instead, Plaintiffs lodged "general collateral challenges to [unlawful] practices and policies used by [USCIS] in processing applications," which fits neatly into the category of claim that the Supreme Court has concluded can proceed in federal court. *See McNary*, 498 U.S. at 492; *Mullin*, 2026 WL 1825840, at *8.

Given these considerations, the Court sees no reason to disturb its prior jurisdictional findings.

#### 2. The Court Did Not Err in Finding That the Challenged Policies Violate the APA

With respect to the merits of Plaintiffs' APA claims, the Government again regurgitates many of the same arguments that it did in its Cross-Motion for Summary Judgment. In particular, the Government asserts that the Challenged Policies are

---

[5] The Court said the same of Section 1252(a)(2)(B)(ii). *See Dorcas*, 2026 WL 1622708, at *13 ("Section 1252(a)(2)(B)(ii)—much like Section 1252(a)(2)(B)(i)—bars judicial review of orders denying discretionary benefits in *individual cases*, but the statute does not foreclose *categorical* challenges to agency policies and procedures concerning the adjudication of those benefits." (emphasis in original)).

not contrary to law and are not arbitrary and capricious. ECF No. 46 at 22–35. As explained in its June 5th Order, the Court found otherwise. *Dorcas*, 2026 WL 1622708, at *1, 36–54 (finding the Challenged Policies to be contrary to law and arbitrary and capricious because USCIS: (1) "claim[ed] statutory and regulatory authority that it [did] not possess"; (2) "[made] decisions without the reasoned explanations that it must provide"; (3) "act[ed] without regard for the reliance interests of applicants that it must consider"; and (4) "justifie[d] its actions with pretextual concerns of 'national security' that mask anti-immigrant sentiments that it is forbidden from letting influence its decision-making"). A few new points raised in the Government's stay motion nevertheless warrant brief attention.

**a. The Government's "Party-Presentation" Argument**

First, with respect to the Court's finding that USCIS's Country-Specific Factors Policy is contrary to law, the Government contends that "[t]he Court erred in addressing arguments not advanced by Plaintiffs, and that were not raised or briefed by the parties in the case before it." ECF No. 46 at 25–26. According to the Government, the Court concluded that the Country-Specific Factors Policy "discriminated against applicants from [Travel Ban Countries] in violation of 8 U.S.C. § 1152(a)(1)(A)—despite the fact that Plaintiffs never asserted such an argument." *Id.* at 25.

But the Government is mistaken. Throughout this litigation, Plaintiffs have argued that the Challenged Policies, including the Country-Specific Factors Policy, "contravene numerous provisions in the INA that specify how USCIS should conduct

specific benefit adjudications." ECF No. 20-1 at 36. And in their Complaint, in discussing the many ways Congress has directed USCIS to adjudicate benefit applications, Plaintiffs specifically pointed to Section 1152(a)(1)(A) as an example of criteria that Congress has prohibited USCIS from considering. ECF No. 1 at 11–12 (citing 8 U.S.C. § 1152(a)(1)(A)).

As the Court previously recognized, this limitation on USCIS's authority directly relates to the policy at issue here. Section 1152(a)(1)(A) provides that, with limited exceptions, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality*, place of birth, or place of residence." 8 U.S.C § 1152(a)(1)(A) (emphasis added). "'[T]his statute bears on [Plaintiffs'] applications for adjustment of status and work authorization, because those applications depend on visa availability, but does not apply to applications for naturalization or asylum.'" *Dorcas*, 2026 WL 1622708, at *45 (quoting *Doe v. Trump*, No. 1:25-cv-13946-JEK, 2026 WL 1170971, at *16 (D. Mass. Apr. 30, 2026)). The Court thereafter found that the Country-Specific Factors Policy, which discriminated against individuals on the basis of their nationality, "plainly contravene[d] the requirements of Section 1152(a)(1)(A)," "at least as applied to the processing of adjustment of status and employment authorization applications." *Id.* at 46, 47.

As relevant here, the "party-presentation principle" provides that federal courts are to "rely on the parties to frame the issues for decision" and that "points not argued will not be considered." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. -

---, 146 S. Ct. 1285, 1288 (2026) (internal citations and quotation marks omitted). The Government seems to suggest that the Court violated this principle, but there is no dispute that Plaintiffs raised Section 1152(a)(1)(A) as an issue, albeit briefly. The Government can try to split hairs over whether the issue was *sufficiently* raised, but the Court will remind it that "[t]he party presentation principle is supple, not ironclad." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020).

**b. The Government's "Pretext" Argument**

The Government next suggests that the Court erred in finding USCIS's actions to be pretextual, in violation of the APA, because "in *Trump v. Hawaii*, the Supreme Court rejected the same extra-record, allegations-of-animus that the Court relied on here." ECF No. 46 at 31 (citing *Trump v. Hawaii*, 585 U.S. 667, 685–707 (2018)). *Hawaii*, according to the Government, set forth a "rational basis" standard of review that the Court should have applied in its analysis such "that the animus claim could only succeed if it is 'impossible to discern a relationship to legitimate state interest[s],' or that the policy is 'inexplicable by anything but animus.'" *Id.* at 32 (quoting *Hawaii*, 585 U.S. at 706). The Government therefore argues that the Challenged Policies should have been allowed to stand since it "'cannot be said that it is impossible to discern a relationship to legitimate state interests or that the polic[ies] [are] inexplicable by anything but animus'" and because they "'plausibly related to the Government's stated objective to protect the country and improve vetting processes.'" *Id.* (quoting *Hawaii*, 585 U.S. at 704–05, 706). Yet there are several flaws with the Government's argument.

First, *Trump v. Hawaii* is clearly distinguishable from this case. *Hawaii* dealt with a Presidential Proclamation that barred nationals from six predominantly Muslim countries from entering the United States. 585 U.S. at 676. The Supreme Court considered "whether the President had authority under the [INA] to issue the Proclamation, and whether the entry policy violate[d] the Establishment Clause of the First Amendment." *Id.* at 675–76. Notably, the Supreme Court did *not* consider an arbitrary-and-capricious claim under the APA like this Court did in *Dorcas*. It is hard to see how the Government's rational-basis standard can be extrapolated from *Hawaii* and applied here where the Court did not even address Plaintiffs' constitutional claims. *See Dorcas*, 2026 WL 1622708, at *56 ("[I]t is not necessary to rule on Plaintiffs' constitutional claims at this time.").

Second, even if the Government's rational-basis test were the correct standard to apply, this is news to the Court, given that the Government never argued that such a test be applied to Plaintiffs' APA claims in its Cross-Motion for Summary Judgment or in its Reply brief. The Government did reference the test with respect to Plaintiffs' *constitutional* claims, *see* ECF No. 20-1 at 56, but again the Court did not address those claims. The Government also contended that USCIS's "decision[s] need only be 'rational' to 'pass muster under the APA's "arbitrary and capricious test."'" *Id.* at 49 (quoting *Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 24 (1st Cir. 1999)). Of course, the Government said nothing at the time with respect to the pretext claim being able to succeed "only . . . if it is 'impossible to discern a

relationship to legitimate state interest[s],' or that the policy is 'inexplicable by anything but animus.'" ECF No. 46 at 32.

Nor does the First Circuit decision on which the Government relied in its Cross-Motion for Summary Judgment say anything of the sort. That case provides that "[i]n order for an agency decision to pass muster under the APA's 'arbitrary and capricious' test, the reviewing court must determine that the decision is 'rational,' . . . that it 'make[s] . . . sense.'" *Beverly Enters.-Mass.*, 174 F.3d at 24 (first quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995); then quoting *P.R. Sun Oil Co. v. U.S. Env't Prot. Agency*, 8 F.3d 73, 77 (1st Cir. 1993)). "Only by 'carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision' can the court 'ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.'" *Id.* (quoting *Marsh v. Or. Nat'l Res. Council,* 490 U.S. 360, 378 (1989)).

Indeed, this Court did conduct a careful review of the record before it and ultimately found itself unsatisfied that USCIS had made a reasoned decision with respect to the Challenged Policies. Chief among the reasons for that finding was the "'significant mismatch between the decision [USCIS] made and the rationale [it] provided.'" *Dorcas*, 2026 WL 1622708, at *53 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019)). The Court based this conclusion on the Supreme Court's *Department of Commerce* decision, which did in fact deal with an arbitrary-and-capricious claim under the APA. *See* 588 U.S. at 773 ("At the heart of this suit is respondents' claim that the Secretary abused his discretion in deciding to reinstate a

citizenship question. We review the Secretary's exercise of discretion under the deferential 'arbitrary and capricious' standard."). Glaringly missing from the Government's stay motion is any attempt to grapple with that decision. *See Agatha v. Trump*, 151 F.4th 9, 12 (1st Cir. 2025) (declining the Government's request for a stay pending appeal where it failed to grapple with the district court's reasoning as to the plaintiff's animus claim and merely devoted two sentences to disputing the district court's ruling on that particular claim).

**c. The Government's "Timeframe" Argument**

Finally, one last point of contention is that, according to the Government, "the Court reasoned, based on various statutory and regulatory provisions, that adjudication [of immigration benefit requests] was required within a certain timeframe." ECF No. 46 at 28. But this argument merely attacks a straw man. The Court never concluded that Plaintiffs were entitled to have their benefit requests be adjudicated within any particular timeframe.

Rather, the Court recognized that the relevant statutes and regulations governing USCIS's processing of applications for asylum, withholding of removal, adjustment of status, employment authorization, and naturalization each contained mandatory language, such as "shall," that imposed a "nondiscretionary duty" on USCIS to adjudicate those applications. *Dorcas*, 2026 WL 1622708, at *38–41; *see, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362 (2018) ("The word 'shall'

generally imposes a nondiscretionary duty."); *Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty[.]").

Sometimes, the relevant statute or regulation does provide that an application "shall" be adjudicated within a certain time period. *See* 8 U.S.C. § 1158(d)(5)(A)(iii) (providing that final adjudications of asylum claims "shall be completed within 180 days after the date an application is filed," absent "exceptional circumstances"); 8 C.F.R. § 335.3(a) ("A decision to grant or deny the [naturalization] application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the application for naturalization."). But, again, the Court did not state that USCIS must adjudicate *any* application within those time periods, and the Government's argument otherwise misses the forest for the trees. Instead, the Court held that the Global Asylum Hold Policy and the Benefits Hold Policy were contrary to law because USCIS has a nondiscretionary duty to adjudicate Plaintiffs' applications, and the agency simply stopped adjudicating those applications altogether. *Dorcas*, 2026 WL 1622708, at *38–41.

***

Having considered the Government's merits-based arguments, the Court also sees no reason to disturb its ruling that the Challenged Policies are contrary to law and arbitrary and capricious.

### 3. Vacatur Remains a Proper Remedy in This Case

Finally, the Government contends that it is likely to prevail on appeal because the Court's vacatur of the Challenged Policies "is not necessary to redress the injuries

asserted" and is "in direct conflict with" the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). ECF No. 46 at 34.

Notably, the Government did not argue in its Cross-Motion for Summary Judgment (or in its Reply brief, for that matter) that vacatur itself, as a remedy, contravened the Supreme Court's holding in *CASA*. The Government instead challenged the Court's ability to grant a permanent injunction to those other than the very Plaintiffs that were before the Court. *See* ECF No. 21 at 60 ("[T]o comply with Article III and the mandate of *CASA*, any permanent injunction must be limited to specifically identified individuals who have been shown to have standing and who were members of an organizational Plaintiff at the time suit was filed."); *see also* ECF No. 25 at 9 ("Defendants reiterate their request that, to comply with Article III and *CASA*, any permanent injunction this Court is inclined to grant be limited to specifically identified individuals who have been shown to have standing and who were members of an organizational Plaintiff at the time suit was filed."). Indeed, the Court expressly declined to grant Plaintiffs any such injunction. *Dorcas*, 2026 WL 1622708, at *55 ("[T]he Court concludes that a permanent injunction is not necessary under the present circumstances.").

The Government's newfound vacatur argument is therefore waived at this stage in the litigation. *Cf. Acevedo-García v. Vera-Monroig*, 296 F.3d 13, 18 (1st Cir. 2002) (declining to consider arguments raised for first time in support of motion for stay pending appeal of preliminary injunction); *New Jersey v. Trump*, 131 F.4th 27, 41–42, 43 (1st Cir. 2025) (same).

This waiver issue aside, as this Court has noted before, nothing in *CASA* forecloses the ability of a court to vacate an agency policy under the APA. *See Dorcas*, 2026 WL 1622708, at *31 ("*CASA* explicitly left in place the Court's authority to vacate unlawful agency action."); *see also Rhode Island v. Trump*, 810 F. Supp. 3d 283, 311 (D.R.I. 2025); *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 312 (D.R.I. 2025). The Supreme Court itself stated in that decision: "Nothing we say today resolves the distinct question whether the [APA] authorizes federal courts to vacate federal agency action." *CASA*, 606 U.S. at 847 n.10 (citing 5 U.S.C. § 706(2)); *see also id.* at 873 (Kavanaugh, J., concurring) (recognizing that *CASA* did not alter a district court's ability to "set[ ] aside . . . an agency rule under the APA").

The Government complains that the Court's "nationwide, programmatic vacatur governs the agency's conduct toward non-parties," ECF No. 46 at 34, but this argument fundamentally misunderstands vacatur as a remedy. Vacatur "applies to the unlawful action itself, rather than merely to its application to the individual challengers." *California*, 808 F. Supp. 3d at 312 (citing *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). To borrow the words of Chief Justice Roberts, it would be "fairly radical and inconsistent with" the longstanding practices of federal courts to provide party-

specific relief under the APA. Transcript of Oral Argument at 35, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58) (Roberts, C.J.)).[6]

The Court therefore discerns no error in granting Plaintiffs' request to vacate the Challenged Policies.

### B. The Government Fails to Show That It Will Be Irreparably Injured Absent a Stay

The second factor in the stay analysis asks whether the Government "will be irreparably injured absent a stay." *Nken*, 556 U.S. at 434. The First Circuit has recognized that "speculative and conclusory statement[s]" of future harm do not suffice. *New York v. Trump*, 133 F.4th 51, 72 (1st Cir. 2025); *see also R.I. State Council of Churches*, 158 F.4th at 316.

The Government argues that it will suffer "immediate and irreparable harm" because the Court's Order "effectively compels [USCIS] to make discretionary immigration decisions under circumstances that the agency has determined may be inadequate to protect national-security and public-safety interests." ECF No. 46 at 35, 36. According to the Government, "[t]he risk that immigration benefits may be granted before relevant, potentially significant, security concerns are identified and resolved constitutes irreparable harm to [it] and the public." *Id.* The Government

---

[6] The Government does not even try to explain how an agency policy could possibly be vacated only as to certain plaintiffs. Judge Randolph D. Moss of the U.S. District Court for the District of Columbia has pointed out the "logistical gymnastics" associated with the Government's position. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019) ("As a practical matter, . . . how could [a] [c]ourt vacate [a challenged policy] with respect to the . . . plaintiffs in [a] case without vacating the [policy] writ large? What would it mean to 'vacate' a [policy] as to some but not other members of the public?").

has also submitted a declaration from Angelica Alfonso-Royals, the Deputy Director of USCIS, which purports to show why "the remaining factors required to evaluate the need for a stay likewise favor it." *Id.* at 3 (citing ECF No. 46-1). The Court is unpersuaded.

First, the Government fails to demonstrate that it "*will* be irreparably injured absent a stay." *R.I. State Council of Churches*, 158 F.4th at 316 (emphasis in original). Any harm here seems "speculative" at best, which is plainly insufficient to satisfy the second factor of the stay analysis. *New York*, 133 F.4th at 72. Consider the Government's own words. Following the Court's Order, USCIS has had "to make discretionary immigration decisions under circumstances that the agency has determined *may* be inadequate to protect national-security and public-safety interests." ECF No. 46 at 36 (emphasis added). And, as a result of the Order, "immigration benefits *may* be granted before relevant, *potentially* significant, security concerns are identified and resolved." *Id.* (emphasis added). These statements hardly exude certitude or definiteness of irreparable harm to the Government. *See R.I. State Council of Churches*, 158 F.4th at 316–17 (holding that "speculative predictions" as to "*potential* monetary harm to the government" were insufficient to show irreparable harm).

Second, it is difficult to take seriously the Government's position that it will suffer "immediate" harm, given that it waited *two weeks* after the Court issued its decision to file the present "emergency" motion for a stay. The Government offers no evidence to show that any irreparable harm occurred within those two weeks. Nor

has it shown that any irreparable harm has occurred in the last month since the Challenged Policies were vacated and USCIS lifted its hold on adjudications. The Court struggles to see the "immediate" nature of the harm here.

Third, and most significant, is that Ms. Alfonso-Royals' new declaration severely undercuts any argument in favor of finding irreparable harm for the Government. It is unclear why this declaration was not part of the administrative record and why the Government felt the need to file it at this stage in the litigation, considering that "[t]he basic rule" is that "[a]n agency must defend its actions based on the reasons it gave when it acted." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020); *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022) ("[A]n agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation.").

In any event, to the extent that the Court does consider the declaration, it does not aid the Government's cause. Ms. Alfonso-Royals claims that the "[t]he main harm" of the Court's Order is that USCIS will have to adjudicate cases for individuals from "identified" "high-risk countries" that purportedly "possess little to no credible identity management infrastructure." ECF No. 46-1 at 2, 6. This, she contends, "makes it very difficult, if not impossible, for USCIS to rely on civil and identity documents presented to perform identity verification, conduct screening and vetting, or evaluate eligibility for immigration benefits." ECF No. 46-1 at 2. Ms. Alfonso-Royals then proceeds to cite ten examples of "countries impacted by the vacated hold

policies" and explains the purported security "risks posed by each country." *Id.* at 2–4.

But, as Plaintiffs point out, there is a glaring problem with this declaration. ECF No. 47 at 3, 26. Of the ten "high-risk countries" that the declaration highlights, three—Ethiopia, Liberia, and Pakistan—are not even among the thirty-nine countries that are subject to the Benefits Hold Policy, the Comprehensive Re-Review Policy, or the Country-Specific Factors Policy. ECF No. 46-1 at 3 ("With Pakistan, corruption and frivolous document issuance are major concerns."); *id.* at 4 ("[A]ny documentation derived from a Liberian birth certificate, to include a national ID or passport, is not reliable."); *id.* ("[E]ven in instances where an Ethiopian document was issued by the proper authority, credibility is limited.").

Are general concerns over the reliability and credibility of documents issued by Ethiopia, Liberia, and Pakistan—countries that were never even subject to the aforementioned policies, let alone the administration's Travel Ban—supposed to constitute irreparable harm to the Government? The Court struggles to see how these concerns are at all relevant, given that the Government has never previously expressed them to the Court. *See Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 34 (1st Cir. 2026) ("Although agencies may later 'elaborate' on the reasons initially provided to justify agency action, they may not provide altogether new reasons after-the-fact.").[7] As Plaintiffs aptly observe, that USCIS can and does adjudicate applications

[7] Once again, the Court notes that the Government declined the opportunity to file a Reply brief to explain, among other things, why Ms. Alfonso-Royals' declaration references these countries in the first place. ECF No. 48.

for individuals from Ethiopia, Liberia, and Pakistan, despite the alleged screening and vetting deficiencies, "belies any suggestion of irreparable harm." ECF No. 47 at 27.

In conclusion, the Court finds that the Government has failed to establish that it will suffer irreparable harm absent a stay. The Court's June 5th Order simply told the Government that it must follow the law in processing immigration benefit requests, and "an agency is not harmed by an order prohibiting it from violating the law." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 477 (D.R.I. 2025).

### C. Plaintiffs' Interests and the Public Interest Weigh Against Granting a Stay

As for the last two factors of the stay analysis, which again "merge" when the Government is a party, *see Nken*, 556 U.S. at 435, it is undeniable that issuance of a stay would result in substantial injury to Plaintiffs and to the public.

The Court has already identified the considerable harm that Plaintiffs, their members, and their clients faced during the more than six months that the Challenged Policies were in effect. Many of these individuals "lost jobs, lost income, and lost the ability to care for their families." *Dorcas*, 2026 WL 1622708, at *33. Some "have been separated from their family members for prolonged periods of time[.]" *Id.* And others, "who either lack legal status or have fallen out of legal status, have expressed fear of being arrested and detained by ICE ["Immigration and Customs Enforcement"] and being removed from the United States[.]" *Id.*

In addition, as Plaintiffs point out, "the Challenged Policies are not limited to Plaintiffs and their members," and "the consequences of the Challenged Policies have been felt in every corner of the country by immigrants, their families, their employers, and their communities." ECF No. 47 at 30. Indeed, since the Court issued its Order, courts across the country addressing similar lawsuits have had occasion to recognize the extensive harms inflicted by the Challenged Policies and have sided with the challengers, either granting them preliminary injunctive relief or temporary restraining orders ("TROs"). *See, e.g.*, *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 1708505, at *1–2 (N.D. Cal. June 12, 2026) (granting in part TRO motion brought by Iranian plaintiffs seeking to have their work permits delivered to them); *Karami v. Edlow*, No. 6:26-cv-00585-MTK, 2026 WL 1723913, at *1 (D. Or. June 15, 2026) (granting preliminary injunction to Iranian plaintiff seeking to have her work permit application adjudicated); *Choupanzadeh v. Mullin*, No. 26-cv-0277-SM-TSM, 2026 WL 1724398, at *1 (D.N.H. June 15, 2026) (granting preliminary injunction to Iranian plaintiffs seeking to have their work permit applications adjudicated); *Sunny-Odio v. Trump*, No. 26-cv-04816-RFL, 2026 WL 1763854, at *1 (N.D. Cal. June 18, 2026) (granting preliminary injunction to Nigerian plaintiff seeking to have his work permit application adjudicated); *Doe v. Edlow*, No. 2:26-cv-494, --- F. Supp. 3d ----, 2026 WL 1945085, at *1 (S.D. Ohio July 6, 2026) (granting preliminary injunction to twenty-five plaintiffs, including those from Burma, Iran, Nigeria, Syria, Tanzania, and Venezuela, seeking to have their work permit and green card applications adjudicated); *Hedayati v. Edlow*, No. 26-cv-04054-VKD, 2026 WL 1970745, at *1–2

(N.D. Cal. July 7, 2026) (granting in part preliminary injunction to 137 plaintiffs, including those from Afghanistan, Burma, Cote d' Ivoire, Cuba, Haiti, Iran, Malawi, Nigeria, Senegal, Sudan, Syria, Togo, Turkmenistan, Venezuela, and Yemen, seeking to have their work permit applications adjudicated); *Sadighi v. Edlow*, No. 26-cv-02494-CRB, 2026 WL 2020999, at *1 (N.D. Cal. July 13, 2026) (granting preliminary injunction to plaintiffs, including those impacted by the Challenged Policies, seeking to have their naturalization applications adjudicated).

The Government has little to say about the harms that would result to Plaintiffs and the public if a stay were to be granted. Essentially, the Government contends that because immigration benefit requests already take a long time to be processed, the difference in adjudication times should any hold be put back in place is "likely to be marginal for many applicants." ECF No. 46 at 38. But the Government declines to provide an estimate as to how long this hold is supposed to last, and it merely states that USCIS's process of developing and implementing "enhanced vetting procedures" is still ongoing and is expected to be completed "in the coming weeks/months." *Id.* at 35.[8]

---

[8] When pressed on this issue nearly two months ago at oral argument, the attorney for the Government also could not provide an estimate as to how long USCIS planned for the hold to last.

> **THE COURT:** Right now, when does USCIS intend to lift the categorical pause, do you know?
>
> **THE GOVERNMENT:** I do not know. I do know that the agency is actively working to try and accelerate all the things that have been on hold. . . . [B]ut in terms of a date certain, I can't give that to you today, your Honor.

That is cold comfort for the individuals whose lives would quite literally be placed on hold, yet again, for those coming weeks/months. *See Dorcas*, 2026 WL 1622708, at *57 ("When USCIS first enacted the policies at the center of this litigation, the agency did not simply place a hold on adjudications. More fundamentally, the Challenged Policies placed the lives of countless individuals on hold—solely by virtue of their countries of birth.").

That the Government "does not address in any meaningful way" the "immediate, predictable" harms that even a short delay in adjudicating benefit requests would cause ultimately "weigh[s] heavily against a stay." *R.I. State Council of Churches*, 158 F.4th at 316; *see also Washington v. U.S. Dep't of Hous. & Urb. Dev.*, 171 F.4th 473, 493 (1st Cir. 2026) ("As for the risk of substantial injury to the interested parties and where the public interest lies, HUD has failed to dispute many of the 'immediate, predicable' harms that would flow to the plaintiffs and their constituents if the preliminary injunctions were lifted.").

The Court therefore finds that the third and fourth stay factors also weigh against granting the Government the stay that it seeks.

## IV. CONCLUSION

For the reasons stated, the Government has failed to meet its burden of "justifying the extraordinary relief it requests." *Am. Pub. Health Ass'n*, 145 F.4th at 47 (citing *Nken*, 556 U.S. at 433–34). Accordingly, the Government's Motion for a Stay Pending Appeal is DENIED. ECF No. 46.

---

Rough Transcript of Oral Argument at 41:2–8 (May 21, 2026).

IT IS SO ORDERED.

***s/John J. McConnell, Jr.***

JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

July 15, 2026

APPEAL

# U.S. District Court
# District of Rhode Island (Providence)
# CIVIL DOCKET FOR CASE #: 1:26-cv-00132-JJM-PAS

| | |
|---|---|
| Dorcas International Institute of Rhode Island et al v. United States Citizenship and Immigration Services et al<br>Assigned to: Chief Judge John J. McConnell, Jr.<br>Referred to: Magistrate Judge Patricia A. Sullivan<br>Case in other court: First Circuit, 26-01703<br>Cause: 05:702 Administrative Procedure Act | Date Filed: 03/05/2026<br>Jury Demand: None<br>Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision<br>Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Dorcas International Institute of Rhode Island** represented by

**Abbey Rutherford**
Muslim Advocates
1032 15th Street NW No. 362
Washington, DC 20005
202-655-2969
Email: abbey@muslimadvocates.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
Democracy Forward
DC
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: adutta@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
South Asian American Justice Collaborative
333 West San Carlos St., Ste 600
San Jose, CA 95110
408-550-9260
Email: anisa.rahim@saajco.org
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: ccarroll@democracyforward.org

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
Muslim Advocates
1032 15th Street Northwest # 362
Washington, DC 20005
202-655-2969
Email: golnaz.fakhimi@gmail.com
*TERMINATED: 04/27/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
South Asian American Justice Collaborative
333 W. San Carlos St., Ste. 600
San Jose, CA 95110
(408) 550-9240
Email: kalpana@saajco.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
Lawyers' Committee for Rhode Island
56 Pine Street
Suite 200
Providence, RI 02903
401-238-3953
Email: kevin@lawyerscommitteeri.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
131 Interpark Blvd
San Antonio, TX 78216
210-469-4218
Fax: 210-910-6588
Email:
kristy.blumeyermartinez@raicestexas.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
Muslim Advocates
1032 15th St. N.W No. 362
Washington, DC 20005
202-655-2969
Email: melissa@muslimadvocates.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
RAICES
131 Interpark Blvd.

San Antonio, TX 78216
210-625-6692
Fax: 210-910-6588
Email: mona.iman@raicestexas.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
Muslim Advocates
103215thSt.NW#362
Washington, DC 20043
(419) 699-2080
Email: reem@muslimadvocates.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-455-9060
Email: rthurston@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: rcooper@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
South Asian American Justice Collaborative
333 W. San Carlos St., Ste. 600
San Jose, CA 95110
(917) 742-7800
Email: Vijay.Bondada@saajco.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
Lawyers' Committee for Rhode Island
56 Pine Street
Suite 200
Providence, RI 02903
401-238-3953
Email: amy@lawyerscommitteeri.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Refugee Dream Center** represented by **Abbey Rutherford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
(See above for address)
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*TERMINATED: 04/27/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Service Employees International Union** represented by **Abbey Rutherford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
(See above for address)
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*TERMINATED: 04/27/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America** represented by **Abbey Rutherford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
(See above for address)
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*TERMINATED: 04/27/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**African Communities Together** represented by **Abbey Rutherford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
(See above for address)
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*TERMINATED: 04/27/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Venezuelan Association of Massachusetts** represented by **Abbey Rutherford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
(See above for address)
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*TERMINATED: 04/27/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Partnership for the Advancement of New Americans** represented by **Abbey Rutherford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
(See above for address)
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*TERMINATED: 04/27/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Gateways** represented by **Abbey Rutherford**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anashua Dutta**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anisa Rahim**
(See above for address)
*TERMINATED: 07/14/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A Carroll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*TERMINATED: 04/27/2026*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin Love Hubbard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristy Blumeyer-Martinez**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Keaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mona Iman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Reem Subei**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Cooper**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vijayasaradhi V. Bondada**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amy Retsinas Romero**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Citizenship and Immigration Services**

represented by **Kevin Bolan**
DOJ-USAO
U.S. Attorney's Office for the District of Rhode Island
One Financial Plaza
Ste 17th Floor
Providence, RI 02903
401-709-5000
Email: kevin.bolan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Lauren Sandler Zurier**
DOJ-USAO
District of Rhode Island
One Financial Plaza
17th Floor
Providence, RI 02903
401-709-5030
Fax: 401-709-5001
Email: Lauren.Zurier@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
DOJ-Civ
Office of the Assistant Attorney General, Civil Division
950 Pennsylvania Ave NW
Rm. 3632
Washington, DC 20530
202-514-4052
Email: tyler.becker@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Edlow**
*in his official capacity as Director of the United States Citizenship and Immigration Services*

represented by **Kevin Bolan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Sandler Zurier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Homeland Security**

represented by **Kevin Bolan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Sandler Zurier**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kristi Noem**
*in her official capacity as Secretary of the Department of Homeland Security*
*TERMINATED: 03/25/2026*

represented by **Kevin Bolan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Markwayne Mullin**
*Secretary of the Department of Homeland Security*

represented by **Kevin Bolan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren Sandler Zurier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/05/2026 | 1 | COMPLAINT ( filing fee paid $ 405.00, receipt number ARIDC-2250908 ), filed by Venezuelan Association of Massachusetts, Service Employees International Union, Partnership for the Advancement of New Americans, Refugee Dream Center, American Gateways, Dorcas International Institute of Rhode Island, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, African Communities Together. (Attachments: # 1 Exhibit Exhibit A - Nov 27 Memo, # 2 Exhibit Exhibit B - Dec 2 Memo, # 3 Exhibit Exhibit C - Jan 1 Memo, # 4 Civil Cover Sheet, # 5 USCIS Summons, # 6 Edlow Summons, # 7 DHS Summons, # 8 Noem Summons, # 9 USAG Summons, # 10 USAO Summons)(Romero, Amy) (Entered: 03/05/2026) |
| 03/05/2026 | | Case assigned to Chief Judge John J. McConnell, Jr. and Magistrate Judge Patricia A. Sullivan. (Simoncelli, Michael) (Entered: 03/05/2026) |
| 03/05/2026 | 2 | CASE OPENING NOTICE ISSUED (Simoncelli, Michael) (Entered: 03/05/2026) |
| 03/05/2026 | 3 | Corporate Disclosure Statement by African Communities Together, American Gateways, Dorcas International Institute of Rhode Island, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Partnership for the Advancement of New Americans, Refugee Dream Center, Service Employees International Union, Venezuelan Association of Massachusetts. (Romero, Amy) (Entered: 03/05/2026) |

| | | |
|---|---|---|
| 03/05/2026 | 4 | Summons Issued as to Department of Homeland Security, Joseph Edlow, Kristi Noem, United States Citizenship and Immigration Services, U.S. Attorney and U.S. Attorney General. (Simoncelli, Michael) (Entered: 03/05/2026) |
| 03/06/2026 | 5 | MOTION for Kevin Love Hubbard to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2251447 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/06/2026) |
| 03/06/2026 | 6 | MOTION for Ryan Cooper to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2251448 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/06/2026) |
| 03/06/2026 | 7 | MOTION for Anashua Dutta to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2251453 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/06/2026) |
| 03/06/2026 | 8 | MOTION for Catherine M.A. Carroll to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2251454 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/06/2026) |
| 03/06/2026 | 9 | MOTION for Robin Thurston to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2251456 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/06/2026) |
| 03/06/2026 | | TEXT ORDER granting 5 Motion to Appear Pro Hac Vice of Kevin Love Hubbard. So Ordered by Chief Judge John J. McConnell, Jr. on 3/6/2026. (Hill, Cherelle) (Entered: 03/06/2026) |
| 03/06/2026 | | TEXT ORDER granting 6 Motion to Appear Pro Hac Vice of Ryan Cooper. So Ordered by Chief Judge John J. McConnell, Jr. on 3/6/2026. (Hill, Cherelle) (Entered: 03/06/2026) |
| 03/06/2026 | | TEXT ORDER granting 7 Motion to Appear Pro Hac Vice of Anashua Dutta. So Ordered by Chief Judge John J. McConnell, Jr. on 3/6/2026. (Hill, Cherelle) (Entered: 03/06/2026) |
| 03/06/2026 | | TEXT ORDER granting 8 Motion to Appear Pro Hac Vice of Catherine M.A Carroll. So Ordered by Chief Judge John J. McConnell, Jr. on 3/6/2026. (Hill, Cherelle) (Entered: 03/06/2026) |
| 03/06/2026 | | TEXT ORDER granting 9 Motion to Appear Pro Hac Vice of Robin F. Thurston. So Ordered by Chief Judge John J. McConnell, Jr. on 3/6/2026. (Hill, Cherelle) (Entered: 03/06/2026) |
| 03/09/2026 | 10 | MOTION for Kristy Blumeyer-Martinez to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2252076 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/09/2026) |
| 03/09/2026 | 11 | MOTION for Mona Iman to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2252080 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/09/2026) |
| 03/09/2026 | | TEXT ORDER granting 10 Motion to Appear Pro Hac Vice of Kristy Blumeyer-Martinez. So Ordered by Chief Judge John J. McConnell, Jr. on 3/9/2026. (Hill, Cherelle) (Entered: 03/09/2026) |
| 03/09/2026 | | TEXT ORDER granting 11 Motion to Appear Pro Hac Vice of Mona Iman. So Ordered by Chief Judge John J. McConnell, Jr. on 3/9/2026. (Hill, Cherelle) (Entered: 03/09/2026) |
| 03/13/2026 | 12 | Joint MOTION for Expedited Summary Judgment Briefing Schedule and To Waive Statements of Undisputed Facts filed by All Plaintiffs. **Responses due by 3/27/2026.** (Hubbard, Kevin) (Entered: 03/13/2026) |
| 03/17/2026 | 13 | NOTICE of Appearance by Kevin Bolan on behalf of Department of Homeland Security, Joseph Edlow, Kristi Noem, United States Citizenship and Immigration Services (Bolan, Kevin) (Entered: 03/17/2026) |

| | | |
|---|---|---|
| 03/17/2026 | | TEXT ORDER granting 12 Joint MOTION for Expedited Summary Judgment Briefing Schedule and To Waive Statements of Undisputed Facts: Defendants will produce and file the administrative record by 3/25/26; Plaintiffs will file their motion for summary judgment by 4/3/26; Defendants will file a cross-motion for summary judgment and response to Plaintiffs' motion by 4/24/26; Plaintiffs will file a reply and response to the cross-motion for summary judgment by 5/1/26; and, Defendants will file a reply re: the cross-motion by 5/8/26. So Ordered by Chief Judge John J. McConnell, Jr. on 3/17/2026. (Jackson, Ryan) (Entered: 03/17/2026) |
| 03/17/2026 | 14 | MOTION for Kalpana V. Peddibhotla to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2255225 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/17/2026) |
| 03/17/2026 | 15 | MOTION for Anisa Rahim to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2255229 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/17/2026) |
| 03/17/2026 | | TEXT ORDER granting 14 Motion to Appear Pro Hac Vice of Kalpana V. Peddibhotla. So Ordered by Chief Judge John J. McConnell, Jr. on 3/17/2026. (Gonzalez Gomez, Viviana) (Entered: 03/17/2026) |
| 03/17/2026 | | TEXT ORDER granting 15 Motion to Appear Pro Hac Vice of Anisa Rahim. So Ordered by Chief Judge John J. McConnell, Jr. on 3/17/2026. (Gonzalez Gomez, Viviana) (Entered: 03/17/2026) |
| 03/25/2026 | | TEXT ORDER: Pursuant to Fed. R. Civ. P. 25(d), Markwayne Mullin has been substituted for Kristi Noem as Secretary of the Department of Homeland Security in this action. So Ordered by Chief Judge John J. McConnell, Jr. on 3/25/2026. (Simoncelli, Michael) (Entered: 03/25/2026) |
| 03/25/2026 | 16 | ADMINISTRATIVE RECORD filed by Department of Homeland Security, Joseph Edlow, Markwayne Mullin, United States Citizenship and Immigration Services. (Attachments: # 1 Exhibit 1 -- PA-2025-26, # 2 Exhibit 2 -- PM-602-0192, # 3 Exhibit 3 -- PM-602-0194) (Bolan, Kevin) (Entered: 03/25/2026) |
| 03/30/2026 | 17 | MOTION for Golnaz Fakhimi to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2259098 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/30/2026) |
| 03/30/2026 | 18 | MOTION for Abbey Rutherford to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2259101 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/30/2026) |
| 03/30/2026 | 19 | MOTION for Melissa Keaney to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2259102 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 03/30/2026) |
| 03/30/2026 | | TEXT ORDER granting 17 Motion to Appear Pro Hac Vice of Golnaz Fakhimi. So Ordered by Chief Judge John J. McConnell, Jr. on 3/30/2026. (Hill, Cherelle) (Entered: 03/30/2026) |
| 03/30/2026 | | TEXT ORDER granting 18 Motion to Appear Pro Hac Vice of Abbey Rutherford. So Ordered by Chief Judge John J. McConnell, Jr. on 3/30/2026. (Hill, Cherelle) (Entered: 03/30/2026) |
| 03/30/2026 | | TEXT ORDER granting 19 Motion to Appear Pro Hac Vice of Melissa Keaney. So Ordered by Chief Judge John J. McConnell, Jr. on 3/30/2026. (Hill, Cherelle) (Entered: 03/30/2026) |
| 04/03/2026 | 20 | MOTION for Summary Judgment filed by All Plaintiffs. **Responses due by 4/17/2026.** (Attachments: # 1 Supporting Memorandum, # 2 Exhibit A (Sique), # 3 Exhibit B (Bah), # 4 Exhibit C (Medina Neuman), # 5 Exhibit D (Sweeney), # 6 Exhibit E (Velasquez), # 7 |

| | | |
|---|---|---|
| | | Exhibit F (Kassa), # 8 Exhibit G (Sahid), # 9 Exhibit H (Yang))(Cooper, Ryan) (Entered: 04/03/2026) |
| 04/24/2026 | 21 | Cross MOTION for Summary Judgment *, Mot. to Dismiss (Fifth Amendment Claims), and Opposition to Pls.' Summary Judgment Motion* filed by All Defendants. **Responses due by 5/8/2026.** (Attachments: # 1 Exhibit Ex. 1 -- Good Decl. (Mar. 3, 2026), # 2 Exhibit Ex. 2 -- USCIS Update (Mar. 30, 2026))(Bolan, Kevin) (Entered: 04/24/2026) |
| 04/24/2026 | 22 | MOTION to Withdraw as Attorney filed by African Communities Together, American Gateways, Dorcas International Institute of Rhode Island, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Partnership for the Advancement of New Americans, Refugee Dream Center, Service Employees International Union, Venezuelan Association of Massachusetts. **Responses due by 5/8/2026.** (Fakhimi, Golnaz) (Entered: 04/24/2026) |
| 04/27/2026 | | TEXT ORDER granting 22 Motion to Withdraw as Attorney. Attorney Golnaz Fakhimi terminated. So Ordered by Chief Judge John J. McConnell, Jr. on 4/27/2026. (Jackson, Ryan) (Entered: 04/27/2026) |
| 05/01/2026 | 23 | RESPONSE In Opposition to 21 Cross MOTION for Summary Judgment *, Mot. to Dismiss (Fifth Amendment Claims), and Opposition to Pls.' Summary Judgment Motion* filed by All Plaintiffs. **Replies due by 5/8/2026.** (Cooper, Ryan) (Entered: 05/01/2026) |
| 05/05/2026 | 24 | Assented MOTION for an Extension of Time to File Response/Reply as to Order on Motion for Miscellaneous Relief,, filed by All Defendants. **Responses due by 5/19/2026.** (Bolan, Kevin) (Entered: 05/05/2026) |
| 05/05/2026 | | TEXT ORDER granting 24 Motion for Extension of Time to File Reply re 20 MOTION for Summary Judgment; **Replies due by 5/11/2026 by 5 PM**. So Ordered by Chief Judge John J. McConnell, Jr. on 5/5/2026. (Jackson, Ryan) (Entered: 05/05/2026) |
| 05/05/2026 | | NOTICE of Hearing on 20 MOTION for Summary Judgment and 21 Cross-MOTION for Summary Judgment: Motion Hearing ***scheduled for Thursday 5/21/2026 at 2:00 PM in Courtroom 1*** before Chief Judge John J. McConnell, Jr. (Jackson, Ryan) (Entered: 05/05/2026) |
| 05/11/2026 | 25 | REPLY to Response re 23 Response to Motion, filed by All Defendants. (Bolan, Kevin) (Entered: 05/11/2026) |
| 05/15/2026 | 26 | NOTICE by Department of Homeland Security, Joseph Edlow, Markwayne Mullin, United States Citizenship and Immigration Services re 21 Cross MOTION for Summary Judgment *, Mot. to Dismiss (Fifth Amendment Claims), and Opposition to Pls.' Summary Judgment Motion* (Bolan, Kevin) (Entered: 05/15/2026) |
| 05/19/2026 | | TEXT ORDER: At the hearing on the Motions for Summary Judgment Thursday, 5/21/26, the Court will allot up to 30 minutes to the Plaintiffs, 45 minutes to the Defendants, and 15 minutes to the Plaintiffs for rebuttal. The parties should plan to concentrate any arguments on the issues of standing and the merits of the APA claims. So Ordered by Chief Judge John J. McConnell, Jr. on 5/19/2026. (Jackson, Ryan) (Entered: 05/19/2026) |
| 05/21/2026 | | Minute Entry for proceedings held before Chief Judge John J. McConnell, Jr.: Motion Hearing held on 5/21/2026 re: 20 MOTION for Summary Judgment and 21 Cross MOTION for Summary Judgment: Counsel present: K. Love Hubbard, A. Romero, R. Cooper; K. Bolan, R. Vyas. Plaintiffs (Hubbard and Cooper) argue their motion for Summary Judgment; questioned by the Court. Defendant (Bolan) responds and argues its own Cross-Motion for Summary Judgment; questioned by the Court. Plaintiffs give brief reply arguments and are further questioned by the Court. The Court takes the matter under |

| | | |
|---|---|---|
| | | advisement. Adjourned. (Court Reporter D. Webb in Courtroom 1 at 2:00 PM) (Jackson, Ryan) (Entered: 05/27/2026) |
| 06/03/2026 | 27 | TRANSCRIPT ORDER for proceedings held on 05/21/2026 before Judge John J. McConnell, Jr.. 3-Day Transcript Selected. Transcript to be delivered within 3 calendar days.. (Hill, Cherelle) (Entered: 06/03/2026) |
| 06/05/2026 | 28 | MEMORANDUM AND ORDER: Plaintiffs' Motion for Summary Judgment (ECF No. 20) is GRANTED IN PART and DENIED IN PART, and the Government's Cross-Motion for Summary Judgment (ECF No. 21) is GRANTED IN PART and DENIED IN PART. Each of the Challenged Policiesthe Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policyare declared unlawful and are hereby VACATED and SET ASIDE. Plaintiffs' request for a permanent injunction is DENIED. The Government's related Motion to Dismiss Plaintiffs' constitutional claims (ECF No. 21) is DENIED WITHOUT PREJUDICE. So Ordered by Chief Judge John J. McConnell, Jr. on 6/5/2026. (Simoncelli, Michael) (Main Document 28 replaced on 6/6/2026 to correct typographical error.) (Simoncelli, Michael). (Entered: 06/05/2026) |
| 06/05/2026 | 29 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 27 Transcript Order. Court Reporter/Transcriber: Denise Webb. (Dias, Jennifer) (Entered: 06/05/2026) |
| 06/05/2026 | | TRANSCRIPT ORDER RESCINDED re: 27 Transcript Order The Court Reporter certifies the transcript order is unable to be fulfilled for the following reasons: Transcript order has been withdrawn by filer. (Dias, Jennifer) (Entered: 06/05/2026) |
| 06/09/2026 | 30 | NOTICE of Appearance by Tyler J. Becker on behalf of All Defendants (Becker, Tyler) (Entered: 06/09/2026) |
| 06/09/2026 | 31 | MOTION for Entry of Judgment under Rule 54(b) *or for Clarification Regarding Vacatur Order* filed by All Defendants. **Responses due by 6/23/2026.** (Becker, Tyler) (Entered: 06/09/2026) |
| 06/10/2026 | 32 | TRANSCRIPT ORDER for proceedings held on 5/21/2026 before Judge John J. McConnell, Jr. Ordinary Transcript delivery selected. Transcript to be delivered in 30 days. (Gonzalez Gomez, Viviana) (Entered: 06/10/2026) |
| 06/10/2026 | 33 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 32 Transcript Order. Court Reporter/Transcriber: Denise Webb. (Dias, Jennifer) (Entered: 06/10/2026) |
| 06/10/2026 | 34 | RESPONSE In Opposition to 31 MOTION for Entry of Judgment under Rule 54(b) *or for Clarification Regarding Vacatur Order* filed by All Plaintiffs. **Replies due by 6/17/2026.** (Cooper, Ryan) (Entered: 06/10/2026) |
| 06/10/2026 | 35 | Emergency MOTION for Enforcement of Order Granting Partial Summary Judgment and Vacatur filed by All Plaintiffs. **Responses due by 6/24/2026.** (Cooper, Ryan) (Entered: 06/10/2026) |
| 06/11/2026 | 36 | ORDER: granting 31 MOTION for Entry of Judgment under Rule 54(b) and entering partial final judgment in favor Plaintiffs on their APA claims and denying without prejudice 35 MOTION to Enforce. So Ordered by Chief Judge John J. McConnell, Jr. on 6/11/2026. (Simoncelli, Michael) (Entered: 06/11/2026) |
| 06/11/2026 | 37 | JUDGMENT in favor of African Communities Together, American Gateways, Dorcas International Institute of Rhode Island, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Partnership for the Advancement of New Americans, Refugee Dream Center, Service Employees International Union, Venezuelan Association of Massachusetts against Department of Homeland Security, United States |

| | | |
|---|---|---|
| | | Citizenship and Immigration Services, Joseph Edlow, Markwayne Mullin. So Ordered by Clerk of Court on 6/11/2026. (Simoncelli, Michael) (Entered: 06/11/2026) |
| 06/12/2026 | 38 | NOTICE of Appearance by Lauren Sandler Zurier on behalf of All Defendants (Zurier, Lauren) (Entered: 06/12/2026) |
| 06/12/2026 | 39 | NOTICE OF APPEAL by Department of Homeland Security, Joseph Edlow, Markwayne Mullin, Kristi Noem, United States Citizenship and Immigration Services as to 28 Memorandum and Order, 36 Order, 37 Judgment. (No fee paid, USA, Waived by Statute, or IFP.)<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 6/22/2026. (Zurier, Lauren) *Docket text modified on 6/12/2026 to remove extra text.* (Gonzalez Gomez, Viviana) (Entered: 06/12/2026) |
| 06/12/2026 | 40 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated record on appeal consisting of notice of appeal, order(s) being appealed, and a copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b) re: 39 Notice of Appeal. Documents Sent: 28, 36, 37. (Attachments: # 1 Record on Appeal) (Gonzalez Gomez, Viviana) (Entered: 06/12/2026) |
| 06/12/2026 | | USCA Case Number 26-1703 for 39 Notice of Appeal. (Simoncelli, Michael) (Entered: 06/12/2026) |
| 06/12/2026 | 41 | STATUS REPORT *Concerning Compliance With Court's Order* by All Defendants. (Attachments: # 1 Affidavit Ex. A (Declaration))(Zurier, Lauren) (Entered: 06/12/2026) |
| 06/12/2026 | 42 | NOTICE by Department of Homeland Security, Joseph Edlow, Markwayne Mullin, United States Citizenship and Immigration Services *of Withdrawal of Appearance* (Zurier, Lauren) (Entered: 06/12/2026) |
| 06/12/2026 | 43 | MOTION for Reem Subei to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2294172 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 06/12/2026) |
| 06/12/2026 | | TEXT ORDER granting 43 Motion to Appear Pro Hac Vice of Reem Subei. So Ordered by Chief Judge John J. McConnell, Jr. on 6/12/2026. (Gonzalez Gomez, Viviana) (Entered: 06/12/2026) |
| 06/15/2026 | 44 | TRANSCRIPT of Cross Motions for Summary Judgment hearing held on 5/21/2026 before Chief Judge John J. McConnell, Jr. Court Reporter Denise A Webb, Telephone number 401-752-7045. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. **NOTICE TO COUNSEL: Redaction Requests must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option. Redaction Request due 7/6/2026. Redacted Transcript Deadline set for 7/16/2026. Release of Transcript Restriction set for 9/14/2026. (Webb, Denise) (Entered: 06/15/2026)** |
| 06/15/2026 | 45 | TRANSCRIPT ORDER for proceedings held on 5/21/2026 before Judge McConnell. Ordinary Transcript delivery selected. Transcript to be delivered in 30 days.. (Bolan, Kevin) (Entered: 06/15/2026) |

| | | |
|---|---|---|
| 06/19/2026 | 46 | Emergency MOTION to Stay re 28 Memorandum and Order,,,, Terminate Motions,,, 37 Judgment,, 36 Order on Motion for Entry of Judgment under Rule 54(b),, Order on Motion for Miscellaneous Relief, filed by All Defendants. **Responses due by 7/6/2026.** (Attachments: # 1 Alfonso-Royals Declaration)(Becker, Tyler) (Entered: 06/19/2026) |
| 06/22/2026 | | NOTICE of In-Person Hearing on 46 Emergency MOTION to Stay re 28 Memorandum and Order, 37 Judgment: Motion Hearing ***scheduled for Wednesday 7/8/2026 at 11:00 AM in Courtroom 1*** before Chief Judge John J. McConnell, Jr. (UPDATE: This hearing will be available to view on the Court's YouTube channel) (Jackson, Ryan) (Entered: 06/22/2026) |
| 07/06/2026 | | TEXT ORDER: To allow more time for the Court to review the Government's Motion for a Stay Pending Appeal and the Plaintiffs' Objection expected to be filed today, and to allow time for the Government to file a Reply if it wishes to, the in-person hearing scheduled for July 8, 2026 will be rescheduled. So Ordered by Chief Judge John J. McConnell, Jr. on 7/6/2026. (Simoncelli, Michael) (Entered: 07/06/2026) |
| 07/06/2026 | | HEARING CANCELLED: Motion Hearing scheduled for Wednesday 7/8/2026 at 11:00 AM in Courtroom 1 before Chief Judge John J. McConnell, Jr. is cancelled, and will be rescheduled. (Simoncelli, Michael) (Entered: 07/06/2026) |
| 07/06/2026 | 47 | RESPONSE In Opposition to 46 Emergency MOTION to Stay re 28 Memorandum and Order,,,, Terminate Motions,,, 37 Judgment,, 36 Order on Motion for Entry of Judgment under Rule 54(b),, Order on Motion for Miscellaneous Relief, filed by All Plaintiffs. **Replies due by 7/13/2026.** (Cooper, Ryan) (Entered: 07/06/2026) |
| 07/08/2026 | 48 | NOTICE by Department of Homeland Security, Joseph Edlow, Markwayne Mullin, United States Citizenship and Immigration Services re Order, Hearing Cancelled (Becker, Tyler) (Entered: 07/08/2026) |
| 07/08/2026 | | UPDATED NOTICE of Hearing on 46 Emergency MOTION to Stay re: 28 Memorandum and Order: Motion Hearing ***scheduled for Wednesday 7/15/2026 at 2:00 PM in Courtroom 1*** before Chief Judge John J. McConnell, Jr. This hearing will be available to view on the Court's YouTube channel. (Jackson, Ryan) (Entered: 07/08/2026) |
| 07/09/2026 | 49 | MOTION for Vijayasaradhi V. Bondada to Appear Pro Hac Vice ( filing fee paid $ 100.00, receipt number ARIDC-2306681 ) filed by All Plaintiffs. (Romero, Amy) (Entered: 07/09/2026) |
| 07/09/2026 | | TEXT ORDER granting 49 Motion to Appear Pro Hac Vice of Vijayasaradhi V. Bondada. So Ordered by Chief Judge John J. McConnell, Jr. on 7/9/2026. (Gonzalez Gomez, Viviana) (Entered: 07/09/2026) |
| 07/09/2026 | 50 | MOTION to Withdraw as Attorney *Anisa Rahim* filed by All Plaintiffs. **Responses due by 7/23/2026.** (Romero, Amy) (Entered: 07/09/2026) |
| 07/14/2026 | | TEXT ORDER granting 50 Motion to Withdraw as Attorney. Attorney Anisa Rahim terminated. So Ordered by Chief Judge John J. McConnell, Jr. on 7/14/2026. (Jackson, Ryan) (Entered: 07/14/2026) |
| 07/15/2026 | | Minute Entry for proceedings held before Chief Judge John J. McConnell, Jr.: Motion Hearing held on 7/15/2026 re: 46 Emergency MOTION to Stay re 28 Memorandum and Order: Counsel present: A. Romero, K. Love Hubbard, R. Cooper; T. Becker. US (Becker) argues its Motion to Stay and is questioned by the Court. Plaintiff (Cooper) responds and is questioned by the Court. US (Becker) is further questioned by the Court and gives rebuttal argument. Court takes the matter under advisement. Adjourned. (Court Reporter D. Webb in Courtroom 1 at 2:05 PM) (Jackson, Ryan) (Entered: 07/15/2026) |

| | | |
|---|---|---|
| 07/15/2026 | 51 | ORDER denying 46 Motion to Stay Pending Appeal. So Ordered by Chief Judge John J. McConnell, Jr. on 7/15/2026. (Jackson, Ryan) (Entered: 07/15/2026) |
| 07/16/2026 | 52 | TRANSCRIPT ORDER for proceedings held on 07/15/2026 before Judge John J. McConnell. Daily Transcript selected. Transcript to be delivered following adjournment and prior to the normal opening hour of court on the following morning.. (Bolan, Kevin) (Entered: 07/16/2026) |
| 07/17/2026 | 53 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 52 Transcript Order,. Daily Transcript Ordered. Court Reporter/Transcriber: Denise Webb. (Simoncelli, Michael) (Entered: 07/17/2026) |
| 07/22/2026 | 54 | TRANSCRIPT ORDER for proceedings held on 7/15/2026 before Judge John J. McConnell, Jr.. Daily Transcript selected. Transcript to be delivered following adjournment and prior to the normal opening hour of court on the following morning.. (Cooper, Ryan) (Entered: 07/22/2026) |
| 07/23/2026 | 55 | TRANSCRIPT ORDER ACKNOWLEDGMENT Entered re: 54 Transcript Order,. Daily Transcript Ordered. Court Reporter/Transcriber: Denise Webb. (Dias, Jennifer) (Entered: 07/23/2026) |
| 07/23/2026 | 56 | TRANSCRIPT of Motion to Stay hearing held on 7/15/2026 before Chief Judge John J. McConnell, Jr. Court Reporter Denise A Webb, Telephone number 401-752-7045. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. **NOTICE TO COUNSEL: Redaction Requests must be filed for personal identifiers only. All other redactions must be requested by motion. For local policy and sample redaction request visit our website at www.rid.uscourts.gov and select Transcripts under the Case Information menu option. Redaction Request due 8/13/2026. Redacted Transcript Deadline set for 8/24/2026. Release of Transcript Restriction set for 10/21/2026. (Webb, Denise) (Entered: 07/23/2026)** |
| 08/14/2026 | 57 | ORDER of the U.S. Court of Appeals for the First Circuit entered as to 39 Notice of Appeal, filed by Markwayne Mullin, Kristi Noem, Department of Homeland Security, Joseph Edlow, United States Citizenship and Immigration Services. ORDER entered by Lara E. Montecalvo, Appellate Judge; Seth Robert Aframe, Appellate Judge; and Joshua D. Dunlap, Appellate Judge: Defendants-appellants have filed in this court an "emergency motion for... a stay pending appeal." Defendants-appellants seek a stay of a Federal Rule of Civil Procedure 54(b) partial final judgment the district court entered in favor of plaintiffs-appellees on two claims under the Administrative Procedure Act. On June 11, 2026, the district court entered the Rule 54(b) judgment, as well as an order setting out the district court's reasoning for having entered the Rule 54(b) judgment. The court has received and considered a response to the "emergency motion" and a reply. Among other jurisdictional and merits arguments, defendants-appellants raise a variety of arguments that the policies plaintiffs-appellees challenge do not constitute agency action within the meaning of the Administrative Procedure Act, that any agency action is not final, and that plaintiffs-appellees' claims are not ripe. Upon careful consideration of the parties' stay papers in this court, we conclude that stay relief is in order only with respect to the district court's stay of the Comprehensive Re-Review Policy, which directs USCIS personnel to "[c]onduct a comprehensive re-review of approved benefit requests for aliens from [certain countries] who entered the United States on or after January 20, 2021." The government has not met its burden to demonstrate entitlement to a stay with respect to the other two policies stayed by the district court. Therefore, we grant defendants-appellants' request for stay, in part, limited to the Comprehensive Re-Review Policy. The request for stay is otherwise denied. [26-1703] (Gonzalez Gomez, Viviana) (Entered: 08/17/2026) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DORCAS INT'L INST. OF R.I., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVS., et al.,<br><br>Defendants. | Civil Action No.<br>26-cv-132-JJM-PAS |

**DEFENDANTS' NOTICE OF APPEAL**

Notice is hereby given that the United States, on behalf of all Defendants, appeals to the United States Court of Appeals for the First Circuit from the judgment that the district court (McConnell, C.J.) entered in favor of the Plaintiffs on June 11, 2026 (ECF No. 37). The judgment was entered pursuant to the memorandum and order that the district court entered on June 5, 2026, in which the court granted in part Plaintiffs' motion for partial summary judgment (ECF No. 28). The judgment also encompasses the district court's order entered on June 11, 2026, in which the court granted Defendants' motion for final judgment under Federal Rule of Civil Procedure 54(b) (ECF No. 36).

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

CHARLES C. CALENDA
First Assistant U.S. Attorney

*/s/* Lauren S. Zurier
LAUREN S. ZURIER
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
Lauren.Zurier@usdoj.gov

**<u>Certificate of Service</u>**

I hereby certify that, on June 12, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, which will serve it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

/s/ Lauren S. Zurier
LAUREN S. ZURIER
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DORCAS INT'L INST. OF R.I., *et al.*,<br>Plaintiffs,<br>v.<br>U.S. CITIZENSHIP AND IMMIGRATION SERVS., *et al.*,<br>Defendants. | Civil Action No.<br>26cv132-JJM-PA |

**DEFENDANT U.S. CITIZENSHIP AND IMMIGRATION SERVICES' PRODUCTION OF CERTIFIED ADMINISTRATIVE RECORDS**

The United States, on behalf of Defendant U.S. Citizenship and Immigration Services ("USCIS"), produces the Certified Administrative Record ("CAR") in three separate exhibits corresponding to the polices that the Plaintiffs contest in this case:

1. USCIS Policy Alert, Impact of INA [Immigration and Nationality Act] 212(f) on USCIS' Adjudication of Discretionary Benefits, PA-2025-26 (Nov. 27, 2025) (to which Plaintiffs refer as the "November Memorandum," *see e.g.*, ECF 1, ¶ 70).

2. USCIS Policy Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, PM-602-0192 (Dec. 2, 2025) (to which Plaintiffs refer as the "December Memorandum," *see e.g.*, ECF 1, ¶ 71). The copy attached as Exhibit 2 corresponds to the same CAR already produced in *Varniab v. Edlow*, No. 5:25-cv-10602-SVK (N.D. Cal. Feb. 3, 2026). Although the copy in Exhibit 2 is not marked as such, it was filed in *Varniab* as ECF 23. And while the declaration in Exhibit 2 refers to *Varniab*, the CAR produced there remains the operative CAR for the December Memorandum.

3. USCIS Policy Memorandum, Hold and Review and USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries, PM-602-0194 (Jan. 1, 2026) (to which Plaintiffs refer as the "January Memorandum," *see e.g.*, ECF 1, ¶ 76). The copy attached as Exhibit 3 corresponds to the same CAR

Case 1:26-cv-00132-JJM-PAS    Document 16    Filed 03/25/26    Page 2 of 2 PageID #: 148

produced in *Behdin v. Edlow*, No. 5:26-CV-00566 (N.D. Cal. Feb. 20, 2026) (ECF 23-1). While the accompanying declaration refers to *Behdin*, the CAR produced there remains the operative CAR.

Dated: March 25, 2026

Respectfully submitted,

CHARLES C. CALENDA
United States Attorney

*/s/ Kevin Bolan*

KEVIN BOLAN
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
401.709.5000
kevin.bolan@usdoj.gov

**Certificate of Service**

I hereby certify that, on March 25, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Kevin Bolan*

KEVIN BOLAN
Assistant United States Attorney

# Ex. 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DORCAS INT'L INST. OF R.I., *et al.*,<br>Plaintiffs,<br>v.<br>U.S. CITIZENSHIP AND IMMIGRATION SERVS., *et al.*,<br>Defendants. | Civil Action No.<br>26-cv-132-JJM-PA |

**INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD FOR POLICY ALERT PA-2025-26**

| Document No. | Date | Document Title | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|---|
| 01 | 06/10/2025 | Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR-000001 | CAR-000009 |
| 02 | 10/14/2025 | Presidential Proclamation 10949 and Other Applications of Section 212(f) of the INA: Impacts to USCIS' Exercise of Adjudicative Discretion | CAR-000010 | CAR-000013 |
| 03 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 1, Part E, Chapter 8 | CAR-000014 | CAR-000036 |
| 04 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 7, Part A, Chapter 10 | CAR-000037 | CAR-000048 |
| 05 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 9, Part A, Chapter 5 | CAR-000049 | CAR-000054 |
| 06 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 10, Part A, Chapter 4 | CAR-000055 | CAR-000071 |

| | | | | |
|---|---|---|---|---|
| 07 | 11/27/2025 | Policy Alert: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits | CAR-000072 | CAR-000073 |

I, Nathaniel Stiefel, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the Northern District of California. I hereby certify that:

1. I am the Deputy Chief for the Office of Policy and Strategy (OP&S), of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since May 2025. Since 2006, I have served in a variety of roles at USCIS, including my current role, which I also held prior to my appointment as the Deputy Ombudsman within the DHS Office of the Citizenship and Immigration Services Ombudsman. I also previously served as Deputy Chief of the USCIS Office of Citizenship.
2. OP&S leads the development, coordination, and governance of immigration policy and the regulatory development process for USCIS to ensure compliance with leadership's policy goals.
3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing Policy Alert "Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits" (PA-2025-26) (Nov. 27, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

NATHANIEL I STIEFEL
Digitally signed by NATHANIEL I STIEFEL
Date: 2026.03.25 15:58:33 -04'00'

______________________________ ______________________

Nathaniel Stiefel — Date
Deputy Chief, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

# Presidential Documents

**Proclamation 10949 of June 4, 2025**

## Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations

set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

(c) Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

(d) On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

(e) In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

(f) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(g) I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

(a) *Afghanistan*

(i) The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report (''Overstay Report''), Afghanistan had a business/tourist (B–1/B–2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

(ii) The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

(b) *Burma*

(i) According to the Overstay Report, Burma had a B–1/B–2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

(ii) The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

(c) *Chad*

(i) According to the Overstay Report, Chad had a B–1/B–2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B–1/B–2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

(ii) The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

(d) *Republic of the Congo*

(i) According to the Overstay Report, the Republic of the Congo had a B–1/B–2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

(ii) The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

(e) *Equatorial Guinea*

(i) According to the Overstay Report, Equatorial Guinea had a B–1/B–2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

(ii) The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

(f) *Eritrea*

(i) The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B–1/B–2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

(ii) The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

(g) *Haiti*

(i) According to the Overstay Report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

(ii) The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

(h) *Iran*

(i) Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

(i) *Libya*

(i) There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

(j) *Somalia*

(i) Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

(k) *Sudan*

(i) Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B–1/B–2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

(ii) The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

(l) *Yemen*

(i) Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

(ii) The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3.** *Partial Suspension of Entry for Nationals of Countries of Identified Concern.*

(a) *Burundi*

(i) According to the Overstay Report, Burundi had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

(ii) The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

(b) *Cuba*

(i) Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B–1/B–2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

(ii) The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

(c) *Laos*

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

(d) *Sierra Leone*

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

(e) *Togo*

(i) According to the Overstay Report, Togo had a B–1/B–2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

(ii) The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

(f) *Turkmenistan*

(i) According to the Overstay Report, Turkmenistan had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

(ii) The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

(g) *Venezuela*

(i) Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B–1/B–2 visa overstay rate of 9.83 percent.

(ii) The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and

any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) *Exceptions.* The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) immediate family immigrant visas (IR–1/CR–1, IR–2/CR–2, IR–5) with clear and convincing evidence of identity and family relationship (*e.g.,* DNA);

(vi) adoptions (IR–3, IR–4, IH–3, IH–4);

(vii) Afghan Special Immigrant Visas;

(viii) Special Immigrant Visas for United States Government employees; and

(ix) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(c) Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

**Sec. 6**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

**Sec. 7**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 8**. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

**Sec. 9**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.



[FR Doc. 2025–10669
Filed 6–9–25; 11:15 am]
Billing code 3395–F4–P

FOR OFFICIAL USE ONLY

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

October 14, 2025

# Memorandum

☒ Close Hold (Limit review to senior leadership)

TO: Sarah Kendall, Associate Director
Field Operations Directorate

Carrie Selby, Associate Director
Service Center Operations Directorate

Ted Kim, Associate Director
Refugee, Asylum and International Operations Directorate

Andrew Davidson, Associate Director (A)
Fraud Detection and National Security Directorate

Susan Dibbins, Chief
Administrative Appeals Office

FROM: Joseph B. Edlow
Director, U.S. Citizenship and Immigration Services

SUBJECT: **Presidential Proclamation 10949 and Other Applications of Section 212(f) of the INA: Impacts to USCIS' Exercise of Adjudicative Discretion**

---

**Purpose:** Effective immediately, this memorandum directs USCIS to consider adverse country-specific factors in Presidential Proclamation 10949 (PP 10949) *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats*[1] as significant negative discretionary factors when adjudicating all discretionary benefit requests filed by aliens from these countries, given the insufficient vetting and screening information which limits USCIS' ability to assess the risks these aliens pose to the United States. This guidance specifically addresses PP 10949, but all past and future proclamations applying section 212(f) of the Immigration and Nationality Act (INA) that are still in effect will be addressed in an equivalent manner.

---

[1] *See* 90 FR 24497 (June 4, 2025).

**Background:** On June 4, 2025, the President issued Proclamation 10949, *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and other National Security and Public Safety Threats*, suspending the entry or admission of aliens from nineteen countries due to insufficient vetting and screening information as well as other country-specific reasons. There is a full entry or admission restriction of aliens from twelve countries which includes, both immigrant and nonimmigrants, from Afghanistan, Burma, Chad, Republic of Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. There is a partial restriction on the entry or admission of aliens from seven additional countries which includes immigrants and B-1, B-2, B-1/B-2, F, M, and J nonimmigrant visas from Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. The reasons for the restrictions are country-specific and specified in the Proclamation.

USCIS has assessed the specific terms of the Proclamation as they relate to USCIS' adjudication of any discretionary immigration benefit request, including but not limited to adjustment of status (AOS), extension of status (EOS), and change of status (COS).[2]

PP 10949 only applies to aliens who both 1) are outside the United States on June 9, 2025, and 2) do not hold a valid visa on June 9, 2025.[3] Since USCIS can only adjust the status of an alien who is physically present in the United States, aliens from the 19 countries who are present in the United States and are seeking adjustment of status are not categorically ineligible for adjustment of status based on the restrictions in PP 10949. Similarly, aliens present in the United States as nonimmigrants who are seeking EOS or COS are not categorically ineligible for those benefits due to PP 10949.[4]

However, when adjudicating an AOS, EOS, or COS application or petition, or any other discretionary benefit, once the applicant or petitioner has demonstrated that they meet all threshold eligibility criteria, USCIS makes a separate discretionary determination, in which USCIS assesses whether the applicant or petitioner demonstrated he or she warrants a favorable exercise of discretion.[5] In doing so, USCIS weighs all relevant positive and negative factors and considers the totality of the circumstances in the specific case.[6]

**Discussion:** USCIS has broad authority to deny discretionary benefit requests when adverse factors outweigh positive factors based on the totality of the circumstances. Therefore, when determining whether an alien from one of the designated countries, either fully or partially restricted from entry and admission, warrants a favorable exercise of discretion, USCIS will

---

[2] Form I-730, following-to-join asylee petitions filed on behalf of domestic beneficiaries shall be considered within the discretionary framework outlined in this memo.

[3] Section 4b. of PP 10949 provides for certain exceptions to the suspension and limitation on entry of citizens and nationals of the 19 listed countries. If an exception is present in a case, an adjudicator may factor it into the discretionary analysis.

[4] See INA §§ 214(a)(1) and 248(a).

[5] USCIS Policy Manual, Volume 1, Part E, Chapter 8 Discretionary Analysis, found at https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-8; see also *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980).

[6] *See Matter of Marin*, 13 I&N Dec. 581, 585 (NIA 1978) (in making a decision as to whether to favorably exercise discretion, adjudicator must balance all positive and negative factors).

review all relevant factors in the alien's individual case, which will include the country-specific facts and circumstances set forth in PP 10949 such as insufficient vetting and screening information. USCIS will treat relevant country-specific facts and circumstances set forth in PP 10949 as a significant negative discretionary factor in the totality of the circumstances. For example, the countries: Afghanistan, Eritrea, Libya, Somalia, Sudan, Yemen, and Venezuela lack a competent or central authority for issuing passports and civil documents among other concerns which may directly relate to USCIS' ability to meaningfully assess eligibility for benefit requests and, at a minimum, is worthy of USCIS consideration when exercising discretion.

USCIS will consider insufficient vetting and screening information as well as other country-specific factors as significant negative factors when performing the discretionary analysis. USCIS adjudicates many discretionary benefit requests and will include the insufficient screening and vetting, and other country-specific information cited in the President's Proclamation, as part of its adjudicative discretionary determinations consistent with law.

Benefit requests denied on the basis of an unfavorable exercise of discretion must include analysis containing the positive and negative factors considered and why the negative factors outweigh the positive factors in the decision.[7] As directed in this memo, this discretionary analysis should take into account the extraordinary nature of the President's decision to exercise his authority under section 212(f) of the INA to bar entire classes of aliens from entry, with some exceptions.

**Authorities:** A non-exhaustive list of legal, regulatory, and policy authorities relevant to this decision include:

- INA § 103(a)(1) – Authority to Administer and Enforce the INA
- INA § 204 – Procedure for Granting Immigrant Status
- INA § 214 – Admission of Nonimmigrants
- INA § 215(a) – Travel Control of Citizens and Aliens, Restrictions and Prohibitions
- INA § 212(a)(3) – Inadmissible Aliens, Security Related Grounds
- INA § 212(f) – Inadmissible Aliens, Suspension of Entry or Imposition of Restrictions by President
- INA § 245(a) – Adjustment of Status
- INA § 248 – Change of Nonimmigrant Status
- 8 CFR 103.2(b)(16)(i)-(iv) – Inspection of evidence
- 8 CFR 214 – Nonimmigrant Classes
- 8 CFR 248.1(a)- Change of Nonimmigrant Classification, Eligibility
- Presidential Proclamation 10949 – Restricting The Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats

The above authorities list is not exhaustive. This memo applies to all discretionary adjudicative decisions.

---

[7] 8 CFR 103.2.

**Decision/Action:** Effective immediately, USCIS will consider the above referenced country-specific factors found in PP 10949 as significant negative discretionary factors when adjudicating all discretionary benefit requests filed aliens from those countries.

Within 30 days of issuance of this memorandum, USCIS adjudicative directorates and program offices, in consultation with Fraud Detection and National Security Directorate (FDNS) will provide implementation guidance to officers. The Office of Policy & Strategy (OP&S), in consultation with FDNS, will update the USCIS Policy Manual to reflect this policy decision within 30 days.

cc: Andrew Good, Chief, Office of Policy & Strategy
David Roy, Acting Chief Counsel, Office of Chief Counsel

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

November 27, 2025 PA-2025-26

# Policy Alert

SUBJECT: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits

**Purpose**

U.S. Citizenship and Immigration Services (USCIS) is issuing policy guidance in the USCIS Policy Manual addressing the President's recent exercise of his authority under section 212(f) of the Immigration and Nationality Act (INA) through Presidential Proclamation 10949, "Restricting the Entry of Foreign Nationals To Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats"[1] (PP 10949) and its impact on USCIS adjudications.

**Background**

INA 212(f) authorizes the President to, by proclamation, suspend the entry of all aliens or any class of aliens, or impose on the entry of aliens any restrictions he may deem appropriate. On June 4, 2025, the President issued PP 10949 to exercise his INA 212(f) authority and suspend the entry or admission of aliens from nineteen countries.[2] With certain exceptions,[3] PP 10949 applies to aliens who are outside of the United States on or after June 9, 2025 and who do not have a valid visa on or after June 9, 2025.

Effective immediately, USCIS will consider relevant country-specific facts and circumstances such as those outlined in PP 10949 as part of its adjudication of discretionary benefit requests. Discretionary benefit requests that USCIS adjudicates include, but are not limited to, certain adjustment of status applications, extension of nonimmigrant stay, and change of nonimmigrant status. USCIS is now updating its guidance to explain how INA 212(f) and PP 10949 impact USCIS' exercise of discretion.

This guidance, contained in Volume 1 of the Policy Manual, applies to requests pending or filed on or after the publication date. The guidance contained in the Policy Manual is controlling and supersedes any related prior guidance.

**Policy Highlights**

---

[1] See 90 FR 24497 (June 4, 2025).
[2] See 90 FR 24497 (June 4, 2025) (imposing a partial or full suspension of and limitation on entry on aliens from the following countries, based on a finding that such entry would be detrimental to the interests of the United States for country-specific reasons: Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen).
[3] The Proclamation also includes certain exceptions to the suspension of and limitation on entry (for example, lawful permanent residents and certain immigrant and nonimmigrant categories are excepted). See Section 4(b)-(d) of PP 10949, 90 FR 24497, 24503 (June 4, 2025).

- Provides that, with certain exceptions, USCIS considers any relevant country-specific factors such as those specified in PP 10949 as significant negative factors in the adjudication of discretionary benefit requests.

- Provides country-specific factors that include but are not limited to insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the countries identified in PP 10949.

**Summary of Changes**

Affected Section: Volume 1 > Part E > Chapter 8, Discretionary Analysis

- Revises table in Section A (Applicability).

- In Section C (Adjudicating Discretionary Benefits), revises Subsection 2 (Identifying Discretionary Factors) throughout.

Affected Section: Volume 7 > Part A > Chapter 10 > Section B, Adjustment of Status Applications Involving Discretion

- Revises fifth paragraph and adds new paragraph six in Subsection 1 (Determining Whether Favorable Exercise of Discretion is Warranted).

Affected Section: Volume 9 > Part A > Chapter 5 > Section A, Discretionary Factors

- Revises first paragraph and adds new second and third paragraphs.

Affected Section: Volume 10 > Part A > Chapter 4 > Section A, General

- Adds new fourth paragraph.

USCIS may also make other minor technical, stylistic, and conforming changes consistent with this update.

**Citation**

Volume 1: General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

Volume 7: Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

Volume 9: Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5].

Volume 10: Employment Authorization, Part A, Employment Authorization Policies and Procedures, Chapter 4, Adjudication [10 USCIS-PM A.4].

# Ex. 2

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
SARAH E. BALKISSOON (CABN 327066)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6474
Fax: (415) 436-6748
sarah.balkissoon@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ZAHRA SHOKRI VARNIAB and ASHKAN POURABHARI LANGOUDI,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; KRISTI NOEM, in her official capacity as Secretary of U.S. Department of Homeland Security; and PAMELA BONDI, in her official capacity as Attorney General,<br><br>Defendants. | Case No. 5:25-cv-10602-SVK |

**CERTIFIED ADMINISTRATIVE RECORD**

**USCIS POLICY MEMORANDUM PM-602-0192**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

ZAHRA SHOKRI VARNIAB and ASHKAN POURABHARI LANGOUDI,

Plaintiffs,

v.

JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; KRISTI NOEM, in her official capacity as Secretary of U.S. Department of Homeland Security; and PAMELA BONDI, in her official capacity as Attorney General,

Defendants.

Case No. 5:25-cv-10602-SVK

**CERTFICATION OF ADMINISTRATIVE RECORD**

**INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD**

| PM-602-0192 records (in chronological order) | | | |
|---|---|---|---|
| **Document Number** | **Document Title** | **Beginning Bates Number** | **Ending Bates Number** |
| 1 | Policy Memorandum, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000001 | 000004 |
| 2 | Decision Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000005 | 000008 |
| 3 | Delegation to the Bureau of Citizenship and Immigration Services | 000009 | 000014 |
| 4 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National | 000015 | 000017 |

| | | | |
|---|---|---|---|
| | Security and Public Safety Threats | | |
| 5 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000018 | 000026 |
| 6 | DOJ Press Release: Press Release: Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States | 000027 | 000030 |
| 7 | DHS Press Release, Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program | 000031 | 000032 |
| 8 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 – Discretionary Analysis | 000033 | 000055 |

I, James Kernochan, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the Northern District of California. I hereby certify that:

1. I am the Deputy Director of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since December 22, 2025. Previously, I served as Chief of Staff at the U.S. Customs and Border Protection from January 20, 2025.
2. I assist the Director in the overall administration and supervision of the agency. I provide executive oversight of USCIS operations, including the adjudication of immigration benefit applications and petitions; support the implementation of immigration laws, regulations, and policies; oversee operational components such as service centers and field offices; ensure compliance with applicable statutory and regulatory requirements; and exercise delegated authority on behalf of the Director.
3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing USCIS Policy Memorandum 602-0192 (PM-602-0192) (Dec. 2, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

2/3/26

James Kernochan
Deputy Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

Date

| | | | |
|---|---|---|---|
| 01 | 2025-12-02 | Policy Memorandum, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | CAR 000001 |
| 02 | 2025-11-29 | Decision Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | CAR 000005 |
| 03 | 2003-06-05 | Delegation to the Bureau of Citizenship and Immigration Services | CAR 000009 |
| 04 | 2025-01-20 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR 000015 |
| 05 | 2025-06-04 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR 000018 |
| 06 | 2025-06-13 | DOJ Press Release: Press Release: Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States | CAR 000027 |
| 07 | 2025-11-26 | DHS Press Release, Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program | CAR 000031 |
| 08 | 2025-11-27 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | CAR 000033 |

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

December 2, 2025

PM-602-0192

# Policy Memorandum

**SUBJECT:** Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries[1]

## Purpose

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats,*[3] pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This memorandum mandates that all aliens meeting these criteria undergo a thorough re-review process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant information and facts. USCIS will also conduct a comprehensive review of all relevant policies,

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats.* Exercising authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).
[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear, reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative Agreements.
[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.
[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization Purposes), Form I-751, (Petition to Remove Conditions on Residence), and Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records).
[5] Entered may include admitted, inspected, paroled, or entered without inspection.
[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.
[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi, planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members,[9] one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that USCIS' screening and vetting and adjudications prioritize the safety of the American people and uphold all U.S. laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain

---

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States*, U.S. Department of Justice, June 13, 2025.
[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program*, U.S. Department of Homeland Security Press Release, November 26, 2025.

in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.[10]

**Guidance**

USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance.

**Use**

---

[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.
[11] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions. It may not be relied upon to create any right or benefit, substantive or procedural, enforceable under law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

November 29, 2025

# Memorandum

TO: Sarah M. Kendall, Associate Director
Field Operations Directorate

Ted Kim, Associate Director
Refugee, Asylum and International Operations Directorate

Carrie Selby, Acting Associate Director
Service Center Operations Directorate

Andrew Davidson, Acting Associate Director
Fraud Detection and National Security Directorate

Susan Dibbins, Chief
Administrative Appeals Office

Andrew Good, Chief
Office of Policy and Strategy

FROM: Joesph B. Edlow
Director, U.S. Citizenship and Immigration Services

SUBJECT: **Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries[1]**

**Purpose:** Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*. Exercising authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*,[3] pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This directive mandates that all aliens meeting these criteria undergo a thorough re-review process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant information and facts. USCIS will also conduct a comprehensive review of all relevant policies, procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background:** On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi,

---

[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear, reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative Agreements.
[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.
[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization Purposes), Form I-751, (Petition to Remove Conditions on Residence) and Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records).
[5] Entered may include admitted, inspected, paroled, or entered without inspection.
[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.
[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members[9], one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that our screening and vetting and adjudications prioritize the safety of the American people and uphold all of our laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.[10]

**Discussion:** USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the TSDS with significant derogatory information related to the alien.

---

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States*, U.S. Department of Justice, June 13, 2025.
[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program*, Department of Homeland Security Press Release, November 26, 2025.
[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.

2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA §§ 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve our national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance.

cc:
David Roy, Acting Chief Counsel, Office of the Chief Counsel

[11] See USCIS Policy Manual, Volume 1,General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

**Federal Register**

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

**Title 3—**

**The President**

**Executive Order 14161 of January 20, 2025**

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

PRESS RELEASE

# Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States

Friday, June 13, 2025

**For Immediate Release**

Office of Public Affairs

Nasir Ahmad Tawhedi, 27, a native and citizen of Afghanistan, pleaded guilty today in federal court in Oklahoma City to two terrorism-related offenses: conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS), a designated foreign terrorist organization, and receiving, attempting to receive, and conspiring to receive firearms and ammunition in furtherance of a federal crime of terrorism.

“By pledging allegiance to ISIS and plotting an attack against innocent Americans on Election Day, this defendant endangered lives and gravely betrayed the nation that gave him refuge,” said Attorney General Pamela Bondi. “Today’s guilty plea guarantees he will be held accountable, stripped of his immigration status, and permanently removed from the United States, and shows the Justice Department has zero tolerance for those who exploit our freedoms to spread violence.”

“The defendant admits he planned and obtained firearms to carry out a violent terror attack on Election Day in 2024, a plot that was detected and disrupted through the good work of the FBI and our partners,” said FBI Director Kash Patel. “Let this serve as notice to anyone who tries to conduct attacks in our homeland for ISIS or any other terror group: we will find you and you’ll face American justice. I want to commend the FBI teams and our partners for their hard work and success in executing the mission.”

“Through incredible law enforcement effort and coordination, a violent terrorist attack on American soil was thwarted, and those responsible are being held accountable,” said U.S. Attorney Robert J. Troester for the Western District of Oklahoma. “I commend the outstanding work by the FBI, our law enforcement partners, and prosecutors to diligently discover, thoroughly investigate, and

completely foil this terror plot. These guilty pleas serve as an emphatic reminder that the Department of Justice and its law enforcement partners will aggressively pursue those who attempt to harm Americans through terrorist acts."

"Thanks to outstanding work by the Oklahoma City Joint Terrorism Task Force, the defendant's plan to kill innocent Americans in a terrorist attack on Election Day was stopped," said Special Agent in Charge Doug Goodwater of the FBI Oklahoma City Field Office. "The FBI is grateful to all who stand beside us in our fight against terrorism. Together, we will continue to safeguard our communities from those who conspire against the United States."

According to court documents, Tawhedi admitted that between June 2024 and October 2024 he conspired with at least one other individual to purchase two AK-47 rifles, 500 rounds of ammunition, and 10 magazines, with the intent to carry out a mass-casualty attack on or around Election Day, Nov. 5, 2024, on behalf of ISIS. According to a criminal complaint affidavit filed in the case, Tawhedi communicated with an ISIS facilitator about his plan to purchase firearms for use in the terror plot, including asking the individual whether 500 rounds of ammunition would be sufficient.

Tawhedi and his co-conspirator, Abdullah Haji Zada, were arrested on Oct. 7, 2024, after purchasing the firearms and ammunition from an undercover FBI employee. Zada, 18, pleaded guilty in April 2025 to the firearms offense in connection with his role in the terror plot and is awaiting sentencing. Zada, who was 17 at the time of his arrest, entered his guilty plea as an adult and will be sentenced as an adult.

At sentencing, Tawhedi faces a maximum penalty 20 years in prison for the material support charge and up to 15 years in prison for the firearms charge. Zada faces up to 15 years in federal prison. Upon completion of any sentence, Tawhedi and Zada will be permanently removed from the United States and barred from reentry under stipulated judicial orders of removal to Afghanistan. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

The FBI Oklahoma City Field Office's Joint Terrorism Task Force, which includes Homeland Security Investigations, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Marshals Service, Oklahoma State Bureau of Investigation, the Edmond Police Department, the Moore Police Department, the Oklahoma City Police Department, the Oklahoma City Community College Police Department, and the Oklahoma City University Police Department, is investigating the case.

Assistant U.S. Attorneys Jessica L. Perry and Matt Dillon for the Western District of Oklahoma; Assistant U.S. Attorney Everett McMillian, who previously served in the National Security Division's Counterterrorism Section; and Trial Attorney Jennifer Levy of the Counterterrorism Section are prosecuting the case. Trial Attorney Mark Stoneman of the Money Laundering and Asset Recovery Section, who previously served as an Assistant U.S. Attorney for the Western District of Oklahoma, also assisted with the prosecution.

*Updated June 13, 2025*

**Topics**

COUNTERTERRORISM | NATIONAL SECURITY

**Components**

Office of the Attorney General | Federal Bureau of Investigation (FBI) | National Security Division (NSD) | USAO - Oklahoma, Western

Press Release Number: 25-617

# Related Content

PRESS RELEASE

### Brooklyn Man Sentenced to 15 Years in Prison for Murder-for-Hire Plot and Stalking a Journalist and Prominent Critic of the Iranian Government

Convicted murderer Carlisle Rivera, also known as "Pop," was sentenced to 15 years in prison for his participation in a murder-for-hire plot directed by the Government of Iran targeting Masih...

PRESS RELEASE

### Investigation into International "ATM Jackpotting" Scheme and Tren de Aragua results in Additional Indictment and 87 Total Charged Defendants

A federal grand jury in the District of Nebraska returned an additional indictment Thursday charging 31 individuals for their roles in a large conspiracy to deploy malware and steal millions...

PRESS RELEASE

### Maryland Man Indicted on Unlawful Transmission and Retention of Classified National Defense Information Charges

Today, a federal grand jury indicted a Laurel, Maryland man on five counts of unlawfully transmitting and one count of unlawfully retaining classified national defense information, in violation of 18...

January 28, 2026

January 26, 2026

January 22, 2026

**Office of Public Affairs**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

Countdown to America's 250th Anniversary!
155 Days 10 Hours 46 Minutes

INFO
2026 winter storm resources: One-stop shop for information, resources and tips on how to stay safe during and after the winter storm.

U.S. Department of Homeland Security

# Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program

**Release Date:** November 26, 2025

*This terrorist is one of thousands of unvetted Afghan nationals let into the country under the Biden Administration's Operation Allies Welcome program*

WASHINGTON – The Department of Homeland Security (DHS) released immigration history of Rahmanullah Lakanwal a criminal alien from Afghanistan who shot two national guard members in a terror attack in Washington D.C.

> *"The suspect who shot our brave National Guardsmen is an Afghan national who was one of the many unvetted, mass paroled into the United States under Operation Allies Welcome on September 8, 2021, under the Biden Administration. I will not utter this depraved individual's name. He should be starved of the glory he so desperately wants," said* ***Secretary Noem****. "These men and women of the National Guard are mothers, fathers, sisters, daughters, children of God, carrying out the same basic public safety and immigration laws enshrined in law for decades. Those politicians and media who continue to vilify our men and women in uniform need to take a long hard look in the mirror. Bryon and I will be praying hard for these two National Guardsmen, their families, and every American who puts on a uniform to defend our freedom."*

The Biden Administration let this terrorist into the country as part of their Operation Allies Welcome program on September 8, 2021. This program let in thousands of unvetted Afghan nationals including terrorists into our country.

We will keep the public apprised as more information becomes available.

###

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE) SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM) ALIEN (/KEYWORDS/ALIEN) CRIME (/KEYWORDS/CRIME)
OPERATION ALLIES WELCOME (/KEYWORDS/OPERATION-ALLIES-WELCOME) TARGETED VIOLENCE (/KEYWORDS/TARGETED-VIOLENCE)
TERRORISM (/KEYWORDS/TERRORISM)

Last Updated: 11/28/2025



Case: 26-1703 Document: 00118537379 Page: 241 Date Filed: 11/13/2026 Entry ID: 6859861

[^ 99] If the derogatory information is disclosed during an interview, the officer records the information and the benefit requestor's rebuttal. See Section D, Types of Evidence, Subsection 2, Testimonial Evidence [1 USCIS-PM E.6(D)(2)].

[^ 100] See 8 CFR 103.2(b)(16). A determination of statutory eligibility must be based only on information contained in the record of proceeding that is disclosed to the benefit requestor, except as provided in 8 CFR 103.2(b)(16)(iv). See 8 CFR 103.2(b)(16)(ii).

[^ 101] Any attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth lies, will not suffice. See *Matter of Ho*, 19 I&N Dec. 582 (BIA 1988).

[^ 102] For example, a benefit requestor's tax return statement submitted with the Form I-130 that USCIS uses as evidence of a lack of a qualifying spousal relationship.

[^ 103] For example, records such as marriage certificates or personal financial statements submitted with a previous spousal petition.

[^ 104] USCIS is not required to disclose derogatory information of which the benefit requestor is aware. See 8 CFR 103.2(b)(16). See Section F, Requests for Evidence and Notices of Intent to Deny [1 USCIS-PM E.6(F)]. However, USCIS may disclose derogatory information that the benefit requestor may be aware of to ensure the benefit requestor has sufficient opportunity to rebut information used in an adverse decision.

[^ 105] For example, officers may provide a copy of the source document containing derogatory information, such as a lease agreement, in instances where the document contains no privileged or confidential information, or information that is otherwise prohibited from disclosure.

[^ 106] USCIS must not provide screenshots of information obtained from DHS or other third agency systems absent permission from the data owner. If an adverse decision is based primarily on derogatory information that originates from such systems, any disclosure must be in a detailed summary statement and is subject to the terms and conditions of applicable data sharing agreements, such as the agreement between USCIS and DOS on disclosure authorization requirements.

## Chapter 7 - Interviews [Reserved]

## Chapter 8 - Discretionary Analysis

Many immigration benefits require the requestor[1] to demonstrate that the request merits a favorable exercise of discretion in order to receive the benefit.[2] For these benefits, a discretionary analysis is a separate, additional component of adjudicating the benefit request. Whether to favorably exercise discretion is typically assessed after an officer has determined that the requestor meets all applicable threshold eligibility requirements.

The discretionary analysis involves the review of all relevant, specific facts and circumstances in an individual case. However, there are limitations on how the officer may exercise discretion; the officer may not

Historical Version

exercise discretion arbitrarily, inconsistently, or in reliance on biases or assumptions.

In some contexts, there are regulations and case law that outline certain factors that officers must review and use as a guide in making a discretionary determination. However, there is no exhaustive list of factors that officers must consider. To perform a discretionary analysis, officers must weigh all positive factors present in a particular case against any negative factors in the totality of the record.[3] The analysis must be comprehensive, specific to the case, and based on all relevant facts known at the time of adjudication. For complex or difficult cases, officers should consult with supervisors and local counsel.

## A. Applicability

Congress generally provides discretionary authority explicitly in the statutory language that governs an immigration benefit. In some instances, however, discretionary authority is less explicit and must be inferred from the statutory language. Executive agencies may also outline their discretionary authority explicitly in regulations.[4]

Many immigration benefit requests are filed under provisions of law that require the favorable exercise of discretion to administer the benefit.[5] In these cases, the benefit requestor has the burden of demonstrating eligibility for the benefit sought and that USCIS should favorably exercise discretion.[6] Where an immigration benefit is discretionary, meeting the statutory and regulatory requirements alone does not entitle the requestor to the benefit sought.

Certain immigration benefits are not discretionary.[7] In these cases, if the requestor properly filed and meets the eligibility requirements then USCIS must approve the benefit request. There is no discretionary analysis as part of the adjudication, and these requests cannot be denied as a matter of discretion.

The following table provides a non-exhaustive overview of immigration benefits and whether discretion is involved in the adjudication of such benefits.

Historical Version

Immigration Benefits Involving Discretionary Review

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Petition to classify an alien as a nonimmigrant worker[8] | No (with some exceptions) |
| Petition to classify an alien as a fiancé(e) of a U.S. citizen[9] | Yes |
| Application to extend or change nonimmigrant status[10] | Yes |
| Advance permission to enter as a nonimmigrant[11] | Yes |

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Initial Parole Document (for aliens who are currently outside the United States) also referred to as "humanitarian parole"[12] | Yes |
| International entrepreneur parole[13] | Yes |
| Temporary protected status[14] | Yes |
| Refugee status[15] | Yes (with some exceptions)[16] |
| Asylum[17] | Yes |
| Petition to classify an alien as a family-based immigrant[18] | No (with some exceptions) |
| Petition to classify an alien as an employment-based immigrant[19] | No (with one exception)[20] |
| Petition to classify an alien as an immigrant investor[21] | No (with some exceptions)[22] |
| Applications by an existing or prospective Regional Center[23] | No (with some exceptions)[24] |
| Adjustment of status[25] | Yes (with some exceptions)[26] |
| Registration[27] | Yes |
| Recognition as an American Indian born in Canada[28] | No |
| Waivers of inadmissibility[29] | Yes |
| Consent to reapply for admission after deportation or removal[30] | Yes |
| Employment authorization[31] | Yes (with some exceptions) |
| Removal of conditions on permanent residence[32] | No (with some exceptions)[33] |
| Naturalization[34] | No |
| Application for a Certificate of Citizenship[35] | No |

[Redaction - Start]

Historical Version

Officers are reminded to follow regulations and specific guidance applicable to the underlying eligibility category, as reflected in standard operating procedures (SOPs) and training materials. For example, specific regulations at 8 CFR 208.13(b)(1)(i)-(ii) govern portions of the discretionary analysis for asylum applications. The RAIO Training Module on Discretion (PDF) provides further information. In cases affected by special circumstances outlined in operational guidance, officers should consult with their supervisors before deciding if the negative factors in a particular case are significant enough to warrant an unfavorable exercise of discretion.

[Redaction - End]

## B. Overview of Discretion

### 1. Definition

The Board of Immigration Appeals (BIA) has described the exercise of discretion as:

- A balancing of the negative factors evidencing the alien's undesirability as a permanent resident with the social and humane considerations presented on his or her behalf to determine whether relief appears in the best interests of this country.[36]
- A matter of administrative grace where the applicant has the burden of showing that discretion should be exercised in his or her favor.[37]
- A consideration of negative factors and the need for the applicant to offset such factors by showing unusual or even outstanding equities.[38]

These characterizations imply that the exercise of discretion cannot be arbitrary, inconsistent, or dependent on intangible or imagined circumstances.

In short, discretion is defined as the ability or power to exercise sound judgment in decision-making. While the discretionary analysis gives the officer some autonomy in the way in which he or she decides a particular case after all applicable eligibility requirements are established, that autonomy may only be exercised within the confines of certain legal restrictions. These restrictions define the scope of the officer's discretionary authority.[39]

### 2. Adjudicative Discretion

There are two broad types of discretion that may be exercised in the context of immigration law: prosecutorial (or enforcement) discretion[40] and adjudicative discretion. The scope of discretion is defined by what type of discretionary decision is being made. This chapter only discusses the exercise of adjudicative discretion.

Adjudicative discretion requires an officer to decide whether to exercise discretion favorably when adjudicating a request for an immigration benefit. This decision is guided by the applicable statutes,

Historical Version

regulations, and policies that outline the eligibility requirements for the benefit and the facts present in the case at issue. The U.S. Supreme Court has referred to adjudicative discretion as merit-deciding discretion.[41]

In general, an officer may exercise favorable adjudicative discretion to approve a benefit request when the requestor has met the applicable eligibility requirements and negative factors impacting discretion are not present.[42] An exercise of discretion to grant a benefit may also be appropriate when the requestor has met the eligibility requirements for the benefit, and the positive factors outweigh the negative factors. An exercise of discretion to deny, rather than to grant, may likewise be appropriate when the requestor has met the requirements of the request, but negative factors found in the course of the adjudication outweigh the positive factors.

**3. Who Exercises Discretion**

Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. For example, the Immigration and Nationality Act (INA) states: "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum . . . ."[43]

The Secretary's discretionary power is delegated to the officer, through DHS and USCIS. Therefore, when an officer exercises discretion in adjudicating a request for an immigration benefit, the officer is exercising discretion on behalf of the Secretary of Homeland Security.

In many cases, the INA still refers to the Attorney General's discretion because the statutory text has not been changed to reflect the creation of DHS and the transfer of many functions from the U.S. Department of Justice (DOJ) to DHS.[44] If USCIS has adjudicative authority over the benefit, the statute should be read as conferring the power to exercise discretion on the Secretary of Homeland Security.[45]

**4. Discretion**

*Eligibility Threshold*

For discretionary benefits, there is never discretion to grant an immigration benefit if the benefit requestor has not first met all applicable threshold eligibility requirements.

It is legally permissible to deny an application as a matter of discretion without determining whether the requestor is otherwise eligible for the benefit.[46] However, the record is essentially incomplete if USCIS denies an application, petition, or request in its exercise of discretion without making a determination concerning eligibility.

Therefore, as a matter of policy, officers should generally make a specific determination regarding eligibility before addressing the exercise of discretion. Where denying the benefit request is appropriate, the officer should generally include in the denial letter his or her determination on all eligibility requirements, including

Historical Version

but not limited to discretionary grounds, if applicable, so that the reasons for the ultimate denial are clearly reflected in the record.

*Lack of Negative Factors*

An alien's threshold eligibility for the benefit sought is generally also a positive factor. Therefore, absent any negative factors, USCIS ordinarily exercises discretion positively.[47] Generally, if there are no negative factors to weigh against that positive factor, denial of the benefit would be an inappropriate use of discretion.

## C. Adjudicating Discretionary Benefits

When adjudicating a discretionary benefit, the officer should first determine whether the requestor meets all threshold eligibility requirements. For example, in adjudicating an application for adjustment of status under INA 245(a), the officer should first determine:

- Whether the applicant was inspected and admitted or paroled or has an approved petition as a VAWA self-petitioner;
- Is eligible to receive an immigrant visa;
- Is admissible to the United States for permanent residence; and
- Has an immigrant visa immediately available to him or her at the time he or she files the adjustment application.[48]

If the officer finds that the requestor does not meet the eligibility requirements but may be eligible for a waiver, exemption, or other form of relief, the officer should determine whether the requestor qualifies for a waiver, exemption, or other form of relief. Not all applications are concurrently filed, and in some instances, applicants must file a separate waiver application or application for relief and have that application approved before the applicant qualifies for the benefit.

If the officer finds that the requestor meets the eligibility requirements because of an approved waiver, exemption, or other form of relief, the officer must then determine whether the request should be granted as a matter of discretion. If the officer finds that the requestor does not meet all applicable eligibility requirements, the officer can still include a discretionary analysis in the denial. The discretionary determination is the final step in the adjudication of a benefit request. Adding a discretionary analysis to a denial is useful if an appellate body on review disagrees with the officer's conclusion that the requestor failed to meet the threshold eligibility requirements. In such a situation, the discretionary denial may still stand.

### 1. Basic Adjudication Steps

Officers should generally follow a three-step process when adjudicating a benefit request involving a discretionary analysis.

Historical Version

| Basic Adjudication Steps Involving Discretion | |
|---|---|
| **Step One** | Fact finding |
| **Step Two** | Determine whether requestor meets the threshold eligibility requirements |
| **Step Three** | Conduct discretionary analysis |

*Fact Finding[49]*

Fact finding refers to the process of gathering and assessing evidence. The focus of fact finding should be to obtain credible evidence relevant to a requestor's eligibility for the benefit, including the discretionary determination. If a requestor is interviewed, the officer should elicit information pertinent to fact finding during the interview. As part of fact finding, officers should evaluate relevant information present in the record. Depending on the benefit sought, such information might include, but is not limited to:

- Immigration history;
- Family ties in the United States;
- Any serious medical conditions;
- Any criminal history;
- Other connections to the community; or
- Information indicating a public safety or national security concern.

Background information may be relevant for eligibility determinations and to the exercise of discretion.

For discretionary benefits, the benefit requestor has the burden of showing that a favorable exercise of discretion is warranted through the submission of evidence.[50] In cases where negative factors are present, the officer may ask the requestor directly why he or she warrants a favorable exercise of discretion. The officer should document any response, or lack thereof, in the record.

*Determining Whether Requestor First Meets Threshold Eligibility Requirements*

The discretionary analysis is the final step in the adjudication. Generally, the officer should first determine whether the requestor meets all threshold eligibility requirements before beginning the discretionary analysis. If the officer determines the requestor has not met the eligibility requirements for the benefit sought, the officer may deny the request without completing a discretionary analysis. However, an officer may include a discretionary analysis if a discretionary denial would be warranted even if the requestor had met the threshold statutory and regulatory requirements.

In the process of determining whether the requestor has met the eligibility requirements for the benefit sought, the officer might find that certain facts related to threshold eligibility for the specific benefit may also be relevant to the discretionary determination.

For example, if an officer finds that an adjustment applicant was convicted of a crime, the applicant might be inadmissible. The criminal conviction may also affect the discretionary analysis.

Historical Version

*Conducting Discretionary Analysis*

The act of exercising discretion involves the weighing of positive and negative factors and considering the totality of the circumstances in the specific case. In the immigration context, the goal is to assess whether, based on the totality of the circumstances, the alien warrants a favorable exercise of discretion.[51]

**2. Identifying Discretionary Factors**

Any facts related to the alien's identity, conduct, character, family or other ties to the United States, immigration status, or any other humanitarian concerns may be appropriate factors to consider in the exercise of discretion. An alien's conduct can include how he or she entered the United States and what he or she has done since arrival, such as employment, schooling, or any evidence of criminal activity.

Whether the alien has family members living in the United States also is relevant to the discretionary analysis. Ties to the United States may include owning real estate or a business; the conduct of that business (including maintenance of such business in compliance with the law) may also be relevant to the discretionary analysis. Humanitarian concerns may include, but are not limited to, health issues.

Precedent case law provides guidance on how to consider evidence and weigh the positive and negative factors present in a case. These precedent decisions and USCIS guidance provide a framework to assist officers in making discretionary decisions that are reasonable and fair.[52]

*Factors That May Be Considered*

There are a number of factors or factual circumstances that are generally considered when conducting a discretionary analysis. Factors may include, but are not limited to:

- Extent to which identity can be established and aliases are disclosed;
- Contribute to the good order and happiness of the United States;
- Ties to family members in the United States and the closeness of the underlying relationships;[53]
- Hardship due to an adverse decision;[54]
- Value and service to the community;[55]
- Length of lawful residence in the United States and any immigration status held during that residence, including the age at which residence in the United States began;[56]
- Service in the U.S. armed forces;[57]
- History of employment;[58]
- Property or business ties in the United States;[59]
- History of taxes paid;
- Nature and underlying circumstances of any inadmissibility grounds at issue, the seriousness of the violations, and eligibility for a waiver of inadmissibility or other form of relief;[60]
- Likelihood that lawful permanent resident (LPR) status will ensue soon;

Historical Version

- Evidence regarding respect for law and order, good character, and intent to hold family responsibilities (for example, affidavits from family, friends, and responsible community representatives);[61]
- Criminal history (in the United States and abroad) and extent of rehabilitation and reform;[62]
- Community service, not including any instances imposed by the courts;
- Existence of an unexecuted administratively final removal, deportation, or exclusion order;[63]
- Public safety or national security concerns;[64]
- Moral depravity or criminal tendencies reflected by a single serious crime or an ongoing or continuing criminal record, with attention to the nature, scope, seriousness, and recent occurrence of criminal activity.[65]
- Findings of juvenile delinquency;[66]
- Compliance with immigration laws, including lawful entry into the United States;[67]
- Whether the alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group (including in social media content by, or involving an alien). This includes organizations who support or promote anti-American ideologies or activities, antisemitic terrorism, antisemitic terrorist organizations, antisemitic ideologies, or has engaged in physical harassment of any person in furtherance of the organization or group;[68]

[Redaction - Start]

This also includes antisemitic terrorism and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah “the Houthis.” Upon identifying such a case, officers must notify and consult with their supervisory chain of command, and their local Fraud Detection and National Security point of contact.

[Redaction - End]

- In the case of an alien who was admitted or paroled into the United States, whether the application for admission or parole violated the laws, regulations, and policies in place at the time;[69]
- Relevant country-specific facts and circumstances, such as insufficient vetting and screening information;[70]
- Previous instances of fraud or false testimony in dealings with USCIS or any government agency;
- Marriage to a U.S. citizen or LPR for the primary purpose of circumventing immigration laws;[71]
- Conduct after admission as a nonimmigrant, where such conduct is inconsistent with the nonimmigrant status (for example, engaging in unlawful employment or unauthorized academic study) or with representations made to consular officers or DHS officers when applying for admission (for example, failing to engage in the activities for which they sought admission); and
- Other indicators of character.[72]

This is a non-exhaustive list of factors; the officer may consider any relevant fact in the discretionary analysis.

*Country-Specific Facts and Circumstances*

Historical Version

On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, to exercise his authority under INA 212(f) and impose certain restrictions, limitations, and exceptions on the entry of aliens from 19 countries: Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen.[73] The Proclamation fully or partially restricts the entry or admission of aliens from those 19 countries who were outside the United States on or after June 9, 2025, and who do not have a valid visa on or after June 9, 2025. The reasons for the restrictions are country-specific and specified in the Proclamation.

The Proclamation's categorical ineligibility for entry or admission does not apply to adjustment of status, extension of stay, change of status, or other discretionary benefits made by applicants physically present in the United States. However, USCIS may considers on a case-by-case basis country-specific facts and circumstances, such as those outlined in the Proclamation, as a significant negative factor when making an individual assessment in weighing discretion, with certain exceptions.[74]

For example, certain countries (including but not limited to Afghanistan, Eritrea, Libya, Somalia, Sudan, Yemen, and Venezuela) lack a competent or central authority for issuing passports and civil documents among other concerns, which directly relates to USCIS' ability to meaningfully assess eligibility for benefit requests including identity, and therefore whether an alien warrants a favorable exercise of discretion.[75]

Where country-specific concerns relate to a high rate of overstay, such data may impact an officer's determination of likelihood that a particular individual may overstay, coupled with other case-specific facts and circumstances. For example, if an alien's conduct after admission as a nonimmigrant is inconsistent with the nonimmigrant status, and the alien is from a country with a high rate of overstay, then the officer may conclude that the alien's conduct should be considered as a significantly negative factor.

The mere fact that an individual is from a country subject to INA 212(f) restrictions on entry or admission, however, is not by itself a significant negative factor. USCIS considers relevant country-specific facts and circumstances such as those outlined in the Proclamation[76] on a case-by-case basis in the totality of the circumstances, considering the relevance of those facts to the benefit request being adjudicated and the alien requesting the benefit. USCIS weighs all relevant positive and negative factors when making these discretionary determinations.

[Redaction - Start]

Officers should consult with their supervisory chains of command before issuing a discretionary denial where country-specific factors such as those outlined in the Proclamation would warrant a denial but the case may also fall under an exception. See, for example, Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (June 4, 2025).

[Redaction - End]

Historical Version

*Anti-American Views or Views of a Terrorist Organization*

USCIS considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group, including terrorist organizations who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, as mentioned above, to be overwhelmingly negative factors in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such circumstances.

[Redaction - Start]

While engaging in the conduct cited above at any time is an overwhelmingly negative discretionary factor in the exercise of discretion, the officer should assign particular focus to aliens who engaged in on-campus anti-American and antisemitic activities that occurred on or after October 7, 2023.

This includes, in particular, aliens who file the following particular benefit requests:

Petition for a Nonimmigrant Worker (Form I-129) for the following categories:

- Petitions filed by any college, university, technical school, or similar educational institution where USCIS determines that significant antisemitic activity in violation of Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90 FR 8847 (Jan. 29, 2025), has occurred.

Application to Register Permanent Residence or Adjust Status (Form I-485) for the following categories:

- Applications where, upon review, the officer has reason to believe the alien was studying, teaching, working, or otherwise affiliated with a college, university, technical school, or similar educational institution at any point after the October 7, 2023 Hamas attacks, regardless of whether the alien was engaged in this activity pursuant to an F1 or other nonimmigrant visa.

Application to Extend/Change Nonimmigrant Status (Form I-539) for the following category:

- Reinstatement of F-1 nonimmigrant status.

Application for Employment Authorization (Form I-765) for the following category:

- (c)(3)(A), F-1 student, pre-completion Optional Practical Training.

In addition, on February 20, 2025, the United States designated Tren de Aragua (TdA) as a Foreign Terrorist Organization. On March 14, 2025, the President issued Presidential Proclamation 10903, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua." In furtherance of the proclamation, USCIS officers must not approve any petition, application, or benefit request, under any circumstances, where an activity, association, or nexus with a known or suspected TdA member has been identified.

Historical Version

USCIS officers may continue to process cases with a known or suspected TdA member other than a grant or approval (such as denials or referrals). However, officers should consult with their supervisory chains of command to coordinate notification with U.S. Immigration and Customs Enforcement (ICE) prior to taking any adjudicative action and provide any relevant information ICE deems appropriate. USCIS will take all actions necessary to support law enforcement at all levels with their actions in support of the provisions of the proclamation.

Evidence of a nexus to TdA (or any other terrorist organization), which includes any unresolved evidence that tends to suggest an alien's involvement or association with TdA, is an overwhelmingly negative factor in any discretionary analysis.

When compelling circumstances exist, necessary vetting, deconfliction, and administrative investigative actions have been completed, and USCIS determines the approval of the benefit does not pose a threat to national security or public safety, the benefit may be approved only following approval from the USCIS Senior Leadership Review Board.

[Redaction - End]

**3. Weighing Factors**

The act of exercising discretion involves weighing both positive and negative factors and considering the totality of the circumstances in the case before making a decision. Whether a favorable exercise of discretion is warranted is case-specific and depends on the evidence of positive and negative factors submitted by the requestor. As the negative factors grow more serious, a favorable exercise of discretion may not be warranted without the existence of unusual or outstanding equities in the case.[77]

*Totality of the Circumstances: Evaluating the Case-Specific Considerations for Each Factor*

An officer must consider the totality of the facts and circumstances of each individual case involving discretionary benefit requests. To do so, officers should ensure discretionary factors are considered in the context of all factors in the case.

There is no formula for determining the weight to be given a specific positive or negative factor. Officers should not attempt to assign numbers or points to a specific factor to determine if one factor is more or less favorable than another. Officers should consider each factor separately and then all the factors as a whole. The negative and positive factors should be balanced against each other and then evaluated cumulatively.[78] The weight given to each factor may vary depending on the facts of a particular case as well as the relationship of the factor to other factors in the analysis.

Discretionary factors are often interrelated. Officers must therefore determine whether each particular factor is positive or negative and how it affects the other factors under consideration. Some factors are generally given more weight than others. A small number of positive factors may overcome a larger number of negative factors, and vice versa, depending on the specific factors.



Historical Version

Case: 26-1326 Document: 00118437379 Page: 254 Date Filed: 03/11/2026 Entry ID: 6359861

For example, when weighing the positive and negative factors, the officer should not consider the various factors individually, in isolation from one another.[79] When considering each factor individually, without considering how all the factors relate to each other, it becomes difficult to weigh the positive and negative factors properly.

Once the officer has weighed each factor individually, the officer should consider all the factors cumulatively to determine whether the unfavorable factors outweigh the favorable ones. If, after weighing all the factors, the officer determines that the positive factors outweigh the negative factors, then the requestor merits a favorable exercise of discretion. If the negative factors outweigh the positive factors, then the officer may decline to favorably exercise discretion and deny the benefit request. There may be instances where the gravity of a negative factor is of such significance that the factor by itself weighs heavily against a favorable exercise of discretion.[80]

Cases that are denied on the basis of an unfavorable exercise of discretion must include an officer's explanation of why USCIS is not exercising discretion in the requestor's favor.[81] The denial notice must clearly set forth the positive and negative factors considered and explain why the negative factors outweigh the positive factors.

#### 4. Supervisory Review[82]

Officers should discuss complex or difficult cases with their supervisors, as needed, particularly those involving criminality or national security issues, regardless of whether the outcome is favorable or unfavorable to the applicant. As appropriate, supervisors may raise issues with USCIS local counsel.

Sometimes a case, especially when coupled with government errors or delay and compelling humanitarian factors, may justify an exercise of discretion resulting in an extraordinarily favorable outcome for the applicant. Officers considering such action should carefully confirm the availability of such action under the law, weigh the factors as in every discretionary decision, consult with supervisors or counsel, and make a record of the analysis and consultation.

### D. Documenting Discretionary Determinations

When issuing a decision that involves a discretionary determination, a careful explanation of the officer's findings and analysis (communicating the positive and negative factors considered and how the officer weighed these factors) helps ensure that the decision is legally sufficient and appropriate. The discretionary determination gives the officer authority to ultimately approve a benefit or form of relief or deny a benefit or form of relief when the applicant otherwise meets eligibility requirements. Officers, however, cannot exercise that authority arbitrarily or capriciously.

*Favorable Exercise of Discretion*

If no negative factors are present, the officer may provide a simple statement in the file noting the absence of negative factors (for example, comments indicating that the applicant is eligible, that there are no negative

Historical Version

factors, and that therefore USCIS grants the benefit in the exercise of discretion).

If an officer grants a benefit in the exercise of discretion where negative factors are present but the positive factors outweigh the negative factors, the file should contain a record of the officer's deliberations. The officer should clearly annotate the favorable factors in the file. The officer should also annotate the file regarding any consultations that supported the approval in complex or difficult cases. In some situations, the file annotation may be the only record or documentation for other officers to understand the reasons for the decision.

The officer should indicate the rationale for the decision in a clear manner so that it is easily understandable to others reviewing the file. This may include the officer addressing the discretionary issues in the written decision or by making an annotation in the file.

*Unfavorable Exercise of Discretion*[83]

If negative factors outweigh the positive factors and USCIS denies the benefit request, the written decision must contain an analysis of the factors considered in exercising discretion, where possible.[84]

Negative factors must never be analyzed in a generalized way. The decision must address negative factors on an individualized basis, applying the totality of the circumstances to the specific facts of the case. The decision should specify both the positive and negative factors that the officer identified and considered in support of the decision and should explain how the officer weighted the different factors. The denial notice should set forth the rationale for the decision so that the officer's deliberation may be understood by the requestor as well as any administrative reviewer (such as the Administrative Appeals Office or immigration judge) and the federal courts.

*Articulating Analysis Separately for Discretion and Threshold Eligibility Requirements*

In cases involving the negative exercise of discretion, officers should generally articulate clearly the legal analysis of whether the applicant meets the threshold eligibility requirements and then, separately, the discretionary analysis.

*Denying Benefit Requests as a Matter of Discretion*

If the officer denies a benefit request as a matter of discretion, the officer generally must, in the written notice to the requestor:[85]

- Indicate the decision to deny was made as a matter of discretion;
- Identify, specifically, each positive factor presented by the facts of the case;
- Identify, specifically, each negative factor;
- Explain the relative decisional weight given to each negative and positive factor; and
- Explain the cumulative weight given to the negative and positive factors, and reason for the outcome.

Historical Version

By including the appropriate articulation of discretionary determinations in USCIS decision-making, officers enhance the quality of adjudications and provide appropriate explanation to the requestor.

### Footnotes

---

[^ 1] For purposes of this Policy Manual part, the term requestor means the person, organization, or business requesting an immigration benefit from USCIS. This may include an applicant or petitioner, depending on the request.

[^ 2] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See the program-specific Policy Manual part to determine whether the adjudication of a benefit request requires the exercise of discretion.

[^ 3] See Section C, Adjudicating Discretionary Benefits, Subsection 3, Weighing Factors [1 USCIS-PM E.8(C)(3)].

[^ 4] For example, see *Kucana v. Holder*, 558 U.S. 233 (2010) (comparing discretion provided in statutory language against regulations promulgated by the U.S. Department of Justice).

[^ 5] See, for example, INA 245(a) (adjustment of status).

[^ 6] See INA 291. See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See *Matter of Leung (PDF)*, 16 I&N Dec. 12 (BIA 1976). See *Matter of Arai (PDF)*, 13 I&N Dec. 494 (BIA 1970).

[^ 7] See, for example, INA 316 (naturalization).

[^ 8] See Petition for a Nonimmigrant Worker (Form I-129). See INA 101(a)(15). See INA 214 and 8 CFR 214.

[^ 9] See Petition for Alien Fiancé(e) (Form I-129F). See INA 101(a)(15)(K). See INA 214(d) and INA 214(r). See 8 CFR 214.2(k).

[^ 10] See Application to Extend/Change Nonimmigrant Status (Form I-539). See INA 214 and 8 CFR 214.

[^ 11] See Application for Advance Permission to Enter as a Nonimmigrant (Form I-192). See INA 212(d)(3)(A).

[^ 12] See Application for Travel Documents, Parole Documents, and Arrival/Departure Records (Form I-131). See INA 212(d)(5)(A).

[^ 13] See INA 212(d)(5)(A). See 8 CFR 212.19. See Volume 3, Humanitarian Protection and Parole, Part G, International Entrepreneur Parole [3 USCIS-PM G].

[^ 14] See Application for Temporary Protected Status (Form I-821). See INA 244 and 8 CFR 244.

[^ 15] See Refugee/Asylee Relative Petition (Form I-730). See INA 207 and 8 CFR 207.

[^ 16] Except for following-to-join refugee adjudications. See 8 CFR 207.7.

Historical Version

[^ 17] See Application for Asylum and for Withholding of Removal (Form I-589). See INA 208 and 8 CFR 208. See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 471 (BIA 1987).

[^ 18] See Petition for Alien Relative (Form I-130). See INA 203(a) and INA 204(a)(1)(A)-(D). See 8 CFR 204.

[^ 19] See Immigrant Petition for Alien Workers (Form I-140). See INA 203(b) and INA 204(a)(1)(E)-(G). See 8 CFR 204.5.

[^ 20] The national interest waiver element of a petition seeking classification under INA 203(b)(2)(B) is discretionary. See *Mousavi v. USCIS*, 828 Fed. Appx. 130, 133 (3rd Cir. 2020). See *Poursina v. USCIS*, 936 F.3d 868, 870-72 (9th Cir. 2019). See *Matter of Dhanasar*, 26 I&N Dec. 884, 889 n. 9 (AAO 2016). For specific information on applying discretion in national interest waiver petitions, see Volume 6, Immigrants, Part F, Employment-Based Classifications, Chapter 5, Advanced Degree or Exceptional Ability, Section D, National Interest Waiver of Job Offer [6 USCIS-PM F.5(D)].

[^ 21] See Immigrant Petition by Standalone Investor (Form I-526) or Immigrant Petition by Regional Center Investor (Form I-526E). See INA 203(b)(5) and INA 204(a)(1)(H). See 8 CFR 204.6.

[^ 22] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 23] See Application for Regional Center Designation (Form I-956) and Application for Approval of an Investment in a Commercial Enterprise (Form I-956F).

[^ 24] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 25] See Application to Register Permanent Residence or Adjust Status (Form I-485). For more information on how to conduct a discretionary analysis in the context of an adjustment application, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 26] See, for example, INA 245(a) and INA 209(b). Exceptions include adjustment of status based on Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160, 2193 (November 19, 1997); refugee-based adjustment under INA 209(a)(2); adjustment of status based on Haitian Refugee Immigration Fairness Act of 1998 (HRIFA), Section 902 of Division A, Title IX of Pub. L. 105-277 (PDF), 112 Stat. 2681, 2681-538 (October 21, 1998); adjustment of status based on Liberian Refugee Immigration Fairness (LRIF) law, Section 7611 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92 (PDF), 113 Stat. 1198, 2309 (December 20, 2019).

[^ 27] See Application to Register Permanent Residence or Adjust Status (Form I-485). See INA 249. See 8 CFR 249. For more information, see Volume 7, Adjustment of Status, Part O, Registration [7 USCIS-PM O].

Historical Version

[^ 28] See INA 289 and 8 CFR 289.

[^ 29] See Application for Waiver of Grounds of Inadmissibility (Form I-601). See Application for Provisional Unlawful Presence Waiver (Form I-601A). See Application by Refugee for Waiver of Inadmissibility Grounds (Form I-602). See, for example, INA 209(c), INA 212(a)(9)(B)(v), INA 212(a)(9)(C)(iii), and INA 212(g)-(i). For more information on how to conduct a discretionary analysis in the context of a waiver application, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5]. [Redaction - Start] Additional guidance for officers adjudicating refugee claims is available in International and Refugee Affairs Division (IRAD) materials. [Redaction - End]

[^ 30] See Application for Permission to Reapply for Admission into the United States After Deportation or Removal (Form I-212). See INA 212(a)(9)(A)(iii) and INA 212(a)(9)(C)(ii).

[^ 31] See Application for Employment Authorization (Form I-765). See INA 274A. See 8 CFR 274a.12. For more information, see Volume 10, Employment Authorization [10 USCIS-PM].

[^ 32] See Petition to Remove Conditions on Residence (Form I-751). See Petition by Investor to Remove Conditions on Permanent Resident Status (Form I-829). See INA 216 and INA 216A. See 8 CFR 216.

[^ 33] When a family-based conditional permanent resident files a Petition to Remove Conditions on Residence (Form I-751) as a waiver request based on termination of marriage, battery or extreme cruelty, or extreme hardship, it is a discretionary decision. See INA 216(c)(4).

[^ 34] See Application for Naturalization (Form N-400). See INA 316. For more information, see Volume 12, Citizenship and Naturalization [12 USCIS-PM].

[^ 35] See Application for Certificate of Citizenship (Form N-600). See INA 301, INA 309 and INA 320. For more information, see Volume 12, Citizenship and Naturalization, Part K, Certificates of Citizenship and Naturalization [12 USCIS-PM K].

[^ 36] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 300 (BIA 1996).

[^ 37] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980) (adjustment of status). See *Von Pervieux v. INS*, 572 F.2d 114, 118 (3rd Cir. 1978). See *Ameeriar v. INS*, 438 F.2d 1028, 1030 (3rd Cir. 1971). See *Matter of Marques (PDF)*, 16 I&N Dec. 314 (BIA 1977).

[^ 38] See *Matter of Ortiz-Prieto (PDF)*, 11 I&N Dec. 317 (BIA 1965).

[^ 39] See Subsection 4, Discretion [1 USCIS-PM E.8(B)(4)].

[^ 40] Prosecutorial discretion is a decision to enforce or not enforce the law against someone. Prosecutorial discretion is exercised when an agency makes a decision with respect to enforcing the law. USCIS, along with

Historical Version

other DHS agencies such as U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, has the authority to exercise prosecutorial discretion related to immigration enforcement actions it may take, particularly in the context of initiating removal proceedings through the issuance of a non-mandatory Notice to Appear. Prosecutorial discretion does not decrease USCIS' commitment to enforcing the immigration laws. Rather, it is a means to use agency resources in a way that best accomplishes the mission of administering and enforcing the immigration laws of the United States.

[^ 41] See *INS v. Doherty (PDF)*, 502 U.S. 314 (1992).

[^ 42] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970) ("In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion."). See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 474 (BIA 1987) ("In the absence of any adverse factors, however, asylum should be granted in the exercise of discretion.").

[^ 43] See INA 209(b).

[^ 44] As of March 1, 2003, in accordance with Section 1517 of the Homeland Security Act of 2002 (HSA), Pub. L. 107-296 (PDF), 116 Stat. 2135, 2311 (November 25, 2002), any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other DOJ official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. See 6 U.S.C. 557 (codifying Section 1517 of the HSA).

[^ 45] See 6 U.S.C. 275.

[^ 46] See *INS v. Abudu (PDF)*, 485 U.S. 94, 105 (1988). See *INS v. Bagamasbad (PDF)*, 429 U.S. 24, 26 (1976). See *INS v. Rios-Pineda (PDF)*, 471 U.S. 444 (1985).

[^ 47] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432 (BIA 1978).

[^ 48] See INA 245(a). See Volume 7, Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements [7 USCIS-PM B.2].

[^ 49] See Chapter 6, Evidence [1 USCIS-PM E.6].

[^ 50] See 8 CFR 103.2(b)(1).

[^ 51] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 586-587 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 52] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

Historical Version

[^ 53] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) ("... if the alien has relatives in the United States, the quality of their relationship must be considered in determining the weight to be awarded this equity.").

[^ 54] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 55] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 56] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584-85 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). Residence must be lawful to be considered a positive factor. See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978).

[^ 57] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 58] See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) ("... if the alien has a history of employment, it is important to consider the type of employment and its length and stability.").

[^ 59] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 60] See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 61] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 62] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, reformation is not an absolute prerequisite to a favorable exercise of discretion. Rather, the discretionary analysis must be conducted on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. See *Matter of Edwards (PDF)*, 20 I&N Dec.

Historical Version

Case 1:26-cv-00132-JJM-PAS Document 16-21 Filed 03/25/26 Page 58 of 61 PageID #: 283

191, 196 (BIA 1990) (considering rehabilitation a significant factor in view of the nature and extent of the respondent's criminal history, which spanned 10 years).

[^ 63] USCIS generally does not exercise discretion favorably to grant adjustment where the adjustment applicant has an unexecuted removal order. For information on the effect of an unexecuted removal order of an arriving alien on adjustment of status, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)].

[^ 64] See Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, PM-602-0187, issued February 28, 2025.

[^ 65] The officer should not go behind the record of conviction to reassess an alien's ultimate guilt or innocence, but rather inquire into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 197 (BIA 1990).

[^ 66] USCIS considers findings of juvenile delinquency on a case-by-case basis, based on the totality of the evidence, to determine whether a favorable exercise of discretion is warranted. Therefore, an adjustment applicant must disclose all arrests and charges. If any arrest or charge was disposed of as a matter of juvenile delinquency, the alien must include the court or other public record that establishes this disposition. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 4, Documentation, Section A, Initial Evidence, Subsection 7, Certified Copies of Arrest Records and Court Dispositions [7 USCIS-PM A.4(A)(7)]. For more information, see Volume 7, Adjustment of Status, Part B, 245(a) Adjustment [7 USCIS-PM B] and Part F, Special Immigrant-Based Adjustment, Chapter 7, Special Immigrant Juveniles, Section C, Eligibility Requirements, Subsection 4, Admissibility and Waiver Requirements [7 USCIS-PM F.7(C)(4)].

[^ 67] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, the BIA found that a record of immigration violations standing alone does not conclusively support a finding of lack of good moral character. Further, how recent the deportation was can only be considered when there is a finding of a poor moral character based on moral turpitude in the conduct and attitude of an alien which evinces a callous conscience. In such circumstances, there must be a measurable reformation of character over a period of time in order to properly assess an alien's ability to assimilate into society. In all other instances, when the cause for deportation has been removed and the alien now appears eligible for issuance of a visa, the time factor should not be considered. See *Matter of Lee (PDF)*, 17 I&N Dec. 275 (Comm. 1978).

[^ 68] USCIS uses the definitions at INA 313(a) when identifying and determining anti-American organizations, views, activities, and ideologies.

Historical Version

[^ 69] This includes compliance with any requirements announced by DHS for any parole program or process, including whether the alien had knowledge of any false or fraudulent information. For example, in certain circumstances, DHS required a financial sponsor to submit an approvable Declaration of Financial Support (Form I-134) or Online Request to Be a Supporter and Declaration of Financial Support (Form I-134A) as a condition of an alien being authorized parole. An officer adjudicating an alien's pending immigration benefit request involving discretion may determine that the alien's prior application for parole was not in accordance with the policies in place at the time if the Form I-134 or Form I-134A relied upon by DHS to authorize parole contained false information or was accompanied by supporting evidence that contained false or fraudulent information.

[^ 70] Insufficient vetting and screening information may involve insufficient identity documents or inability to rely on documentation or information provided by the specified countries for identity purposes or determining criminal history or ties to criminal or terrorist organizations. For more information, see Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (PDF) (June 4, 2025).

[^ 71] Although this factor could lead to a statutory denial under INA 204(c).

[^ 72] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 73] See INA 212(f) ("Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."). See 90 FR 24497 (PDF) (June 4, 2025).

[^ 74] For a list of exceptions, see Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (PDF) (June 4, 2025).

[^ 75] For additional reciprocity information by country, see U.S. Department of State's U.S. Visa: Reciprocity and Civil Documents by Country webpage.

[^ 76] USCIS acknowledges that the President has issued other proclamations exercising authority under INA 212(f), and that this Proclamation may also be amended or reissued. To the extent that this Proclamation is amended or reissued, or the President further exercises his authority under INA 212(f), USCIS will consider any country-specific facts and circumstances outlined therein when making discretionary determinations for immigration benefit requests.

[^ 77] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales*

Historical Version

*(PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). For example, USCIS generally does not favorably exercise discretion in certain cases involving violent or dangerous crimes except in extraordinary circumstances. See 8 CFR 212.7(d). For more information, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion, Section C, Cases Involving Violent or Dangerous Crimes [9 USCIS-PM A.5(C)]. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)]. Another example relates to applicants seeking adjustment based on U nonimmigrant status: Depending on the nature of the adverse factors, applicants may be required to clearly demonstrate that denial of adjustment would result in exceptional and extremely unusual hardship. Even if the applicant makes such a showing, however, USCIS may still find favorable exercise of discretion is not warranted in certain cases. See 8 CFR 245.24(d)(11).

[^ 78] See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 200 (BIA 1990) (concurring opinion).

[^ 79] See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 473-74 (BIA 1987).

[^ 80] See, for example, 8 CFR 212.7(d) (In adjudicating an application for a waiver of a criminal ground of inadmissibility involving a violent or dangerous crime, "depending on the gravity of the alien's underlying criminal offense, a showing of extraordinary circumstances might still be insufficient to warrant a favorable exercise of discretion . . . .") For more information on discretion in the context of waivers of inadmissibility, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5].

[^ 81] See 8 CFR 103.3(a).

[^ 82] Supervisory review is required in certain situations. The law provides for outcomes that may be extraordinarily favorable for the applicant but uphold principles of fairness and equity. See *Munoz v. Ashcroft*, 339 F.3d 950 (9th Cir. 2003) (stating, "It is true that equitable tolling is available in INA cases, as there is a 'presumption, read into every federal statute of limitation, that filing deadlines are subject to equitable tolling [and that] the same rebuttable presumption of equitable tolling . . . applies in suits against private defendants and . . . in suits against the United States'", but concluding that the April 1, 1990 (asylum application deadline to qualify under the Nicaraguan Adjustment and Central American Relief Act, Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160 (November 19, 1997)) is a statute of repose that cannot be subject to equitable tolling). See *Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153, 160 (D.C. Cir. 1967) ("Conceptions of equity are not a special province of the courts but may properly be invoked by administrative agencies seeking to achieve 'the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice.'").

[^ 83] These analytical steps amplify guidance concerning denial notices, and do not replace them.

[^ 84] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants

Historical Version

for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

[^ 85] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

## Chapter 9 - Rendering a Decision

### A. Approvals

If the requestor properly filed the benefit request and the officer determines that the requestor meets all eligibility requirements, then the officer may approve the request. Upon approval, the officer updates all relevant electronic systems to reflect the approval.

### B. Denials[1]

If, after evaluating all evidence submitted (including in response to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID), if applicable), the officer determines the requestor is ineligible for the benefit sought, the officer denies the benefit request.[2] Upon denial of a request, the officer updates all relevant electronic systems and issues a written decision informing the requestor of the reason(s) for denial.[3]

If the denial notice is returned as undeliverable, USCIS verifies the mailing address and places the notice, including the original mailing envelope, in the appropriate file as evidence of service of the decision.[4]

Written decisions should use plain language that the requestor can understand. When applicable, the decision includes guidance on the procedures for filing appeals and motions, including instructions for where to find the appropriate forms.[5]

#### 1. Denials Based on Lack of Legal Basis

Generally, if a benefit request does not have a legal basis for approval, and the officer determines there is no possibility additional evidence could establish a legal basis for approval, the officer should issue a denial without first issuing an RFE or NOID.

This includes any filing in which the benefit requestor has no legal basis for the benefit sought or submits a request for an inactive or terminated program. For example, this includes family-based petitions filed for family members based on claimed relationships under categories not provided by statute (such as a grandparent filing a petition for a grandchild).

#### 2. Abandonment Denials[6]

Historical Version

# Ex. 3

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
JOHN L. WOLLMAN (CABN 197362)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7031
Fax: (415) 436-6748
john.wollman@usdoj.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KAYHAN BEHDIN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services,<br><br>Defendant. | Case No. 5:26-cv-00566-SVK |

**CERTIFIED ADMINISTRATIVE RECORD**

**USCIS POLICY MEMORANDUM PM-602-0194**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

KAYHAN BEHDIN, et al.,

Plaintiffs,

v.

JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services,

Defendant.

Case No. 5:26-CV-00566

**INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD**

| PM-602-0194 records (in chronological order) | | | |
|---|---|---|---|
| **Document Number** | **Document Title** | **Beginning Bates Number** | **Ending Bates Number** |
| 1 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000001 | 000003 |
| 2 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | 000004 | 000025 |
| 3 | USCIS Policy Manual, Volume 11, Part B, Chapter 2 - Replacement of Permanent Resident Card | 000026 | 000034 |
| 4 | Delegation to the Bureau of Citizenship and Immigration Services | 000035 | 000040 |

| | | | |
|---|---|---|---|
| 5 | Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000041 | 000044 |
| 6 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000045 | 000049 |
| 7 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000050 | 000055 |
| 8 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000056 | 000064 |
| 9 | Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States | 000065 | 000077 |

I, James Kernochan, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the Northern District of California. I hereby certify that:

1. I am the Deputy Director of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since December 22, 2025. Previously, I served as Chief of Staff at the U.S. Customs and Border Protection from January 20, 2025.
2. I assist the Director in the overall administration and supervision of the agency. I provide executive oversight of USCIS operations, including the adjudication of immigration benefit applications and petitions; support the implementation of immigration laws, regulations, and policies; oversee operational components such as service centers and field offices; ensure compliance with applicable statutory and regulatory requirements; and exercise delegated authority on behalf of the Director.
3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing USCIS Policy Memorandum 602-0194 (PM-602-0194) (Jan. 1, 2026).

I certify under penalty of perjury that the foregoing is true and correct.

[signature] 2/20/26

James Kernochan
Deputy Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

Date

**INDEX**

| Document No. | Date | Name | Document Title | Bates No. |
|---|---|---|---|---|
| 01 | 2025-01-20 | 2025-02009 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000001 |
| 02 | 2025-12-22 | 20251222-PM-internal_PM01E.8_unredacted | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | 000004 |
| 03 | 2025-12-22 | 20251222-PM-internal_PM11B.2_unredacted | USCIS Policy Manual, Volume 11, Part B, Chapter 2 - Replacement of Permanent Resident Card | 000026 |
| 04 | 2003-06-05 | DHS Delegation of Authority | Delegation to the Bureau of Citizenship and Immigration Services | 000035 |
| 05 | 2025-12-02 | PM 602-0192-PendingApplicationsHighRiskCountries-2025-12-2 | Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000041 |
| 06 | 2026-01-01 | PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000045 |
| 07 | 2026-01-01 | Policy Memo_HoldReviewNewHRCountries_D1 Signed | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000050 |
| 08 | 2025-06-04 | Proclamation 10949 of June 4, 2025 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000056 |
| 09 | 2025-12-16 | Proclamation 10998 of December 16, 2025 | Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States | 000065 |

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

January 1, 2026 PM-602-0194

# Policy Memorandum

**SUBJECT:** Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries[1]

## Purpose

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

1. Place a hold[2] on all pending benefit applications, for aliens[3] listed[4] in Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*,[5] pending a comprehensive review, regardless of entry date;[6]
2. Conduct a comprehensive review of all policies, procedures, and screening and vetting processes for benefit requests for aliens from countries listed in PP 10998; and
3. Conduct a comprehensive re-review of approved benefit requests implicated in PP 10998 that were approved on or after January 20, 2021.

---

[1] On December 16, 2025, the President issued Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*. Exercising authority under INA 212(f), the proclamation continues the full restrictions and entry limitations of nationals from the original high-risk countries established under PP 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats* (June 4, 2025), and imposes restrictions, limitations, and exceptions on additional high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests.

[2] A "hold" allows a case to proceed through processing, up to final adjudication. A "final adjudication" refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal.

[3] The term "alien" means any person not a citizen or national of the United States. See INA 101(a)(3) and 8 U.S.C. 1101(a)(3).

[4] This refers to aliens with a nationality, country of birth, or aliens who have acquired Citizenship by Investment (CBI) listed in PP 10998. "As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country." Further, this includes aliens with varying nationalities but are traveling on a Palestinian-Authority-issued document.

[5] This applies to aliens who list one of the high-risk countries as their Country of Birth or Country of Citizenship.

[6] Immigrant visas for family members of individuals in the United States will no longer be automatically or broadly exempt from PP 10949 and PP 10998 restrictions or requirements. Family-based immigrant visa applications are now subject to the same review, restrictions, or additional scrutiny as other benefit requests.

This memorandum specifies which cases are subject to the adjudicative hold, identifies exemptions, and outlines the factors to consider when assessing benefit eligibility during the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

This memorandum does not supersede the guidance in Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* on December 1, 2025[7] except as specified under the "Exceptions to the Adjudication Hold" outlined in this memorandum.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats*. This order aimed to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Accordingly, through PP 10949 and PP 10998, the President restricted the entry of foreign nationals from countries lacking adequate screening and vetting information to safeguard the national security and public safety of the United States and its citizens. The proclamations also instructed the United States Government to promptly engage with the countries identified, outlining the necessary steps to meet U.S. screening, vetting, immigration, and security standards. However, despite those efforts, most of the countries named in PP 10949 and PP 10998 – and others – continue to demonstrate significant deficiencies in screening, vetting, and information sharing. In addition to PP 10949, PP 10998 emphasizes that "it is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes."

Following the continued review since the issuance of PP 10949, as well as the responses of foreign countries to that proclamation, the United States Government has identified additional countries that are unable to meet basic criteria for identifying their nationals and residents who may pose national security and public safety risks, or for sharing necessary information with the United States. It is paramount that the United States Government ensure aliens in the United States do not intend to threaten its citizens or undermine or destabilize its culture, government, institutions, or

[7] USCIS issued a public-facing version on December 2, 2025. See Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries,* December 2, 2025 (PM-602-0192).

founding principles. Entry will not be granted to aliens who advocate for, aid, or support designated foreign terrorists or other threats to our national security or public safety.

As a result of these reviews and considerations, the President has determined to maintain and adjust the restrictions outlined in sections 2 and 3 of PP 10949 regarding the entry of certain classes of foreign nationals into the United States. Additionally, further limitations have been imposed on the entry of aliens from additional high-risk countries in PP 10998.

Considering identified concerns and the threat to the American people, USCIS has determined a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021, is necessary.[8]

USCIS remains dedicated to ensuring aliens from high-risk countries of concern who have entered the United States do not pose risks to national security or public safety. To faithfully uphold United States immigration law, the flow of aliens from countries with high overstay rates, significant fraud, or both must stop. To address potential vulnerabilities, USCIS will place an adjudicative hold on all pending benefit requests submitted by or for aliens from the high-risk countries identified in PP 10998, allowing for a thorough case-by-case review. This hold will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum or memorandum attachment. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.

**Guidance**

USCIS has determined the operational necessity to ensure all aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures USCIS exercises its full authority to investigate immigration benefit requests filed by or for aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist under Tier 1 or Tier 2 classifications or is included in Tier 3 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).

[8] Additionally, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

4. The alien is unable to establish their identity as outlined in PP 10949 and PP 10998.[9]

Many of these restricted high-risk countries experience widespread corruption, unreliable or fraudulent civil documents and criminal records, and lack effective birth registration systems, which systematically hinder accurate vetting and identity verification. Officers must consider these country-specific factors when conducting security and background checks, and when reviewing civil documents such as passports, marriage and divorce certificates, and birth certificates, as well as criminal history information. Officers must follow established policies to ensure proper screening and vetting procedures are conducted, and that any derogatory information is thoroughly evaluated and appropriately resolved.

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that aliens are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined the burden of processing delays which will fall on some aliens is necessary and appropriate, when weighed against the agency's obligation to protect and preserve our national security.

*Exceptions to the Adjudication Hold*[10]

Exceptions to the adjudication hold for cases with identified national security, public safety, or fraud-related derogatory information still require the adjudicative directorate or program office to coordinate with U.S. Immigration and Customs Enforcement (ICE) in accordance with current policies and procedures before final adjudication. The following are exceptions to the adjudication hold:

1. Form I-90, Application to Replace Permanent Resident Card (Green Card);[11]
2. Form N-565, Application for Replacement Naturalization/Citizenship Document;
3. Form N-600, Application for Certificate of Citizenship;[12]

---

[9] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].
[10] Any request for an exemption to the adjudicative hold must be coordinated with the USCIS Office of Policy and Strategy (OP&S). OP&S will track and record all the hold lifts. OP&S will issue additional guidance within 7 days of issuing this memorandum.
[11] Lawful permanent residents are entitled to evidence of status in the United States. Lawful permanent residents are eligible for replacement of their Permanent Resident Card if they meet certain requirements. See USCIS Policy Manual, Volume 11, Travel and Identity Documents, Part B, Permanent Resident Cards, Chapter 2, Replacement of Permanent Resident Card [11 USCIS-PM B.2].
[12] Except Yemen and Somalia. Yemen and Somalia are not included in this particular exception due to security and documentary concerns specific to those countries as documented on the Department of State Visa Reciprocity Schedules for these countries.

4. Form I-765, Application for Employment Authorization filed under the (c)(8),[13] limited (c)(11),[14] and limited (c)(14)[15] categories;
5. Form I-910, Application for Civil Surgeon Designation (only for physicians that are citizens or nationals of the United States);
6. Benefit requests filed by any alien who is an athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives for the purpose of participating in the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;
7. Benefit requests that are a priority for law enforcement and where ICE has requested USCIS take adjudicative action to uphold public safety or national security;
8. Benefit requests filed by aliens whose entry would serve a United States national interest;[16]
9. Benefit requests, as well as the associated underlying benefits, for any programs that are terminated or discontinued as a result of an Executive Order, Proclamation, Federal Register Notice, or Directive issued by the President, the Secretary of Homeland Security, or the USCIS Director; and
10. Automatic termination decisions for ancillary or related benefit requests when an alien is granted Legal Permanent Resident status or becomes a naturalized citizen.[17]

Within 90 days of this memorandum issuance, and in consultation with OP&S and the Fraud Detection and National Security Directorate, USCIS will prioritize a list for review, interview, and re-interview, and issue operational guidance.

**Use**

This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions. It may not be relied upon to create any right or benefit, substantive or procedural, enforceable under law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

[13] See 8 CFR 274a.12(c)(8). Only applies to *initial* (c)(8) filings. *Asylumworks v. Mayorkas* requires USCIS to process all initial Form I-765 filed under the (c)(8) category within 30 days.
[14] See 8 CFR 274a.12(c)(11). Form I-765 filed under the (c)(11) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.
[15] See 8 CFR 274a.12(c)(14). Form I-765 filed under the (c)(14) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.
[16] For example, a benefit request filed by an alien whose entry into the United States would provide significant benefit to the United States may include, but is not limited to, a scientist or medical researcher working on a critical public health project, an engineer with specialized skills needed for a key infrastructure initiative, or someone with unique expertise supporting U.S. national security or economic interests. This is a case-by-case determination and requires approval from the headquarters of the adjudicative directorate or program office.
[17] For example, when USCIS approves an individual's Form I-485, any associated or underlying applications, such as Form I-765, will be automatically terminated, as the benefit provided by the ancillary form is no longer necessary.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

January 1, 2026

# Memorandum

TO: Sarah M. Kendall, Associate Director
Field Operations Directorate

Ted Kim, Associate Director
Refugee, Asylum and International Operations Directorate

Carrie Selby, Acting Associate Director
Service Center Operations Directorate

Andrew J. Davidson, Acting Associate Director
Fraud Detection and National Security Directorate

Susan Dibbins, Chief
Administrative Appeals Office

Andrew Good, Chief
Office of Policy and Strategy

FROM: Joseph B. Edlow
Director

SUBJECT: **Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries**[1]

**Purpose:** Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

[1] On December 16, 2025, the President issued Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*. Exercising authority under INA 212(f), the proclamation continues the full restrictions and entry limitations of nationals from the original high-risk countries established under PP 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats* (June 4, 2025), and imposes restrictions, limitations, and exceptions on additional high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests.

1. Place a hold[2] on all pending benefit applications, for aliens[3] listed[4] in *Presidential Proclamation (PP) 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*,[5] pending a comprehensive review, regardless of entry date[6];
2. Conduct a comprehensive review of all policies, procedures, and screening and vetting processes for benefit requests for aliens from countries listed in PP 10998; and
3. Conduct a comprehensive re-review of approved benefit requests implicated in PP 10998 that were approved on or after January 20, 2021.

This directive specifies which cases are subject to the adjudicative hold, identifies exemptions, and outlines the factors to consider when assessing benefit eligibility during the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

This memorandum does not supersede the guidance in Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* on December 1, 2025[7] except as specified under the "Exceptions to the Adjudicative Hold" outlined in this directive.

**Background:** On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aimed to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance

---

[2] A "hold" allows a case to proceed through processing, up to final adjudication. A "final adjudication" refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal.
[3] The term "alien" means any person not a citizen or national of the United States. See INA § 101(a)(3) and 8 U.S.C. § 1101(a)(3).
[4] This refers to aliens with a nationality, country of birth, or aliens who have acquired Citizenship by Investment (CBI) listed in PP 10998. "As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country." Further, this includes aliens with varying nationalities but are traveling on a Palestinian-Authority-issued document.
[5] This applies to aliens who list one of the high-risk countries as their Country of Birth or Country of Citizenship.
[6] Immigrant visas for family members of individuals in the United States will no longer be automatically or broadly exempt from PP 10949 and PP 10998 restrictions or requirements. Family-based immigrant visa applications are now subject to the same review, restrictions, or additional scrutiny as other benefit requests.
[7] USCIS issued a public-facing version on December 2, 2025. See Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries,* December 2, 2025 (PM-602-0192).

during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Accordingly, through PP 10949 and PP 10998, the President restricted the entry of foreign nationals from countries lacking adequate screening and vetting information to safeguard the national security and public safety of the United States and its citizens. The proclamations also instructed the United States Government to promptly engage with the countries identified, outlining the necessary steps to meet U.S. screening, vetting, immigration, and security standards. However, despite those efforts, most of the countries named in PP 10949 and PP 10998—and others—continue to demonstrate significant deficiencies in screening, vetting, and information sharing. In addition to PP 10949, PP 10998 emphasizes that "it is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes."

Following the continued review since the issuance of PP 10949, as well as the responses of foreign countries to that proclamation, the United States Government has identified additional countries that are unable to meet basic criteria for identifying their nationals and residents who may pose national security and public safety risks, or for sharing necessary information with the United States. It is paramount that the United States Government ensure aliens in the United States do not intend to threaten its citizens or undermine or destabilize its culture, government, institutions, or founding principles. Entry will not be granted to aliens who advocate for, aid, or support designated foreign terrorists or other threats to our national security or public safety.

As a result of these reviews and considerations, the President has determined to maintain and adjust the restrictions outlined in sections 2 and 3 of PP 10949 regarding the entry of certain classes of foreign nationals into the United States. Additionally, further limitations have been imposed on the entry of aliens from additional high-risk countries in PP 10998.

Considering identified concerns and the threat to the American people, USCIS has determined a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021, is necessary.[8] USCIS remains dedicated to ensuring aliens from high-risk countries of concern who have entered the United States do not pose risks to national security or public safety. To faithfully uphold United States immigration law, the flow of aliens from countries with high overstay rates, significant fraud, or both must stop. To address potential vulnerabilities, USCIS will place an adjudicative hold on all pending benefit requests submitted by or for aliens from the high-risk countries identified in PP 10998, allowing for a thorough case-by-case review. This hold will remain in effect until lifted or modified by the USCIS Director through a subsequent

---

[8] Additionally, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

memorandum or memorandum attachment. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.

**Discussion:** USCIS has determined the operational necessity to ensure all aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures USCIS exercises its full authority to investigate immigration benefit requests filed by or for aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist under Tier 1 or Tier 2 classifications or is included in Tier 3 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949 and PP 10998.[9]

Many of these restricted high-risk countries experience widespread corruption, unreliable or fraudulent civil documents and criminal records, and lack effective birth registration systems, which systematically hinder accurate vetting and identity verification. Officers must consider these country-specific factors when conducting security and background checks, and when reviewing civil documents such as passports, marriage and divorce certificates, and birth certificates, as well as criminal history information. Officers must follow established policies to ensure proper screening and vetting procedures are conducted, and that any derogatory information is thoroughly evaluated and appropriately resolved.

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that aliens are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined the burden of processing delays which will fall on some aliens is necessary and

[9] See USCIS Policy Manual, Volume 1,General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

FOR OFFICIAL USE ONLY



appropriate, when weighed against the agency's obligation to protect and preserve our national security.

*Exceptions to the Adjudication Hold*[10]

Exceptions to the adjudication hold for cases with identified national security, public safety, or fraud-related derogatory information still require the adjudicative directorate or program office to coordinate with U.S. Immigration and Customs Enforcement (ICE) in accordance with current policies and procedures before final adjudication. The following are exceptions to the adjudication hold:

1. Form I-90, Application to Replace Permanent Resident Card (Green Card)[11];
2. Form N-565, Application for Replacement Naturalization/Citizenship Document;
3. Form N-600, Application for Certificate of Citizenship[12];
4. Form I-765, Application for Employment Authorization filed under the (c)(8),[13] limited (c)(11),[14] and limited (c)(14)[15] categories;
5. Form I-910, Application for Civil Surgeon Designation (only for physicians that are citizens or nationals of the United States);
6. Benefit requests filed by any alien who is an athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives for the purpose of participating in the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;
7. Benefit requests that are a priority for law enforcement and where ICE has requested USCIS take adjudicative action to uphold public safety or national security;

---

[10] Any request for an exemption to the adjudicative hold must be coordinated with the USCIS Office of Policy and Strategy (OP&S). OP&S will track and record all the hold lifts. OP&S will issue additional guidance within 7 days of issuing this memorandum.
[11] Lawful permanent residents are entitled to evidence of status in the United States. Lawful permanent residents are eligible for replacement of their Permanent Resident Card if they meet certain requirements. See USCIS Policy Manual, Volume 11, Travel and Identity Documents, Part B, Permanent Resident Cards, Chapter 2, Replacement of Permanent Resident Card [11 USCIS-PM B.2].
[12] Except Yemen and Somalia. Yemen and Somalia are not included in this particular exception due to security and documentary concerns specific to those countries as documented on the Department of State Visa Reciprocity Schedules for these countries.
[13] See 8 CFR 274a.12(c)(8). Only applies to *initial* (c)(8) filings. *Asylumworks v. Mayorkas* requires USCIS to process all initial Form I-765 filed under the (c)(8) category within 30 days.
[14] See 8 CFR 274a.12(c)(11). Form I-765 filed under the (c)(11) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.
[15] See 8 CFR 274a.12(c)(14). Form I-765 filed under the (c)(14) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.

8. Benefit requests filed by aliens whose entry would serve a United States national interest[16];
9. Benefit requests, as well as the associated underlying benefits, for any programs that are terminated or discontinued as a result of an Executive Order, Proclamation, Federal Register Notice, or Directive issued by the President, the Secretary of Homeland Security, or the USCIS Director; and
10. Automatic termination decisions for ancillary or related benefit requests when an alien is granted Legal Permanent Resident status or becomes a naturalized citizen.[17]

Within 90 days of this memorandum issuance, and in consultation with OP&S and the Fraud Detection and National Security Directorate, USCIS will prioritize a list for review, interview, and re-interview, and issue operational guidance.

cc:
Randolph N. Blair, Jr., Acting Chief Counsel, Office of the Chief Counsel

---

[16] For example, a benefit request filed by an alien whose entry into the United States would provide significant benefit to the United States may include, but is not limited to, a scientist or medical researcher working on a critical public health project, an engineer with specialized skills needed for a key infrastructure initiative, or someone with unique expertise supporting U.S. national security or economic interests. This is a case-by-case determination and requires approval from the headquarters of the adjudicative directorate or program office.
[17] For example, when USCIS approves an individual's Form I-485, any associated or underlying applications, such as Form I-765, will be automatically terminated, as the benefit provided by the ancillary form is no longer necessary.

Case 1:26-cv-00566-SDK Document 23-1 Filed 03/25/26 Page 71 of 80 PageID #: 357



# Presidential Documents

**Proclamation 10998 of December 16, 2025**

## Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of certain foreign nationals into the United States to prevent national security and public safety threats from reaching our borders. The Supreme Court upheld these restrictions. I reinstated these successful policies in Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), and Proclamation 10949 of June 4, 2025 (Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats).

It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes.

The United States must exercise extreme vigilance during the visa-issuance and immigration processes to identify, prior to their admission or entry into the United States, foreign nationals who intend to harm Americans or our national interests. The United States Government must ensure that admitted aliens do not intend to threaten its citizens; undermine or destabilize its culture, government, institutions, or founding principles; or advocate for, aid, or support designated foreign terrorists or other threats to our national security.

In order to protect our Nation, as directed in Executive Order 14161, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, identified countries throughout the world for which screening and vetting information was so deficient as to warrant a full or partial suspension of the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). Accordingly, in Proclamation 10949, I restricted the entry of foreign nationals into the United States from countries with deficient screening and vetting information to protect the national security and public safety of the United States and its people. The proclamation also directed the United States Government to immediately engage countries identified in the proclamation on measures that must be taken to comply with the screening, vetting, immigration, and security requirements of the United States.

Despite those engagements, most of the countries identified in Proclamation 10949, as well as others, continue to exhibit woeful inadequacies in screening, vetting, and provision of information. At least one country lacks mechanisms in hospitals to ensure births are reported, and widespread corruption, combined with a general lack of vetting and poor recordkeeping, result in any non-citizen being able to obtain any civil document from that country, particularly if that person is willing to pay a fee or engage an individual that specializes in assisting in such fraud. In that same country, law enforcement records are not maintained with the accuracy or consistency necessary to provide representations of individuals' criminal histories to the United

States Government. In another country, civil documents like marriage licenses and birth certificates are handwritten and stamped on regular paper, making them highly susceptible to alteration, and there is a fraudulent document market that produces all types of falsified records, making written corroboration of any visa application practically impossible. In yet another country, criminal records are widely unreliable and inaccessible. And in another, United States visas are used as a tool for illicit transborder movement of assets by corrupt government officials and organized criminal groups. Corruption in another country even extends to the national school system, which has provided falsified diplomas and grade information in the past to fraudsters who have tried to obtain student visas and eligibility for large athletic scholarships. The government of another country refuses to provide passport exemplars, undermining the United States Government's ability to detect fraudulent documents. In another country, the population, for the most part, does not formally document life events. This makes effective verification of basic biographical data such as birthdates, marriages, and parentage exceedingly difficult, if not impossible. Such countries warrant continued or new travel restrictions.

Further, after continuing their review, and in light of the experience gained since the issuance of Proclamation 10949 and the reaction of foreign countries to the issuance of that proclamation, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence have identified additional countries that cannot meet basic criteria for identifying their nationals and residents who pose national security and public safety threats and for sharing information with the United States. For example, only 40 percent of one country's territory is under complete government control, and officials there have noted that their ability to securely process, house, or monitor non citizens is constrained. In another country, corruption in various forms is pervasive. Other countries have been subject to successful efforts to overthrow or undermine their governments, with the result that radical terrorist groups operate with minimal, if any, interference from law enforcement, engaging in forced labor, sex trafficking, illegal drug manufacturing and distribution, and other activities that destabilize such countries. And, because of the poor documentation practices and corrupt governments in these countries, there can be little assurance that the foreign nationals from these countries who seek to come to America on immigrant or nonimmigrant visas are not bringing these criminal enterprises with them to the United States.

According to United States law enforcement reporting, foreign nationals from countries named in this proclamation have been involved with crimes that include murder, terrorism, embezzling public funds, human smuggling, human trafficking, and other criminal activity. Many of these countries are ranked in the top third of countries for criminality, and widely unreliable foreign civil documents and lack of authoritative criminal information make it extremely difficult for United States screening and vetting authorities to assess prior criminal activity and other grounds of inadmissibility.

Finally, some of these countries have offered Citizenship by Investment (CBI) without residency, which poses challenges for screening and vetting purposes. As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country. Additionally, United States law enforcement and the Department of State have found that, historically, CBI programs have been susceptible to several risks. These risks include allowing an individual to conceal his or her identity and assets to circumvent travel restrictions or financial or banking restrictions.

Foreign nationals from the countries described above have also exploited the historic generosity of the United States and violated our Nation's immigration laws by not adhering to the terms of their nonimmigrant or immigrant visas. As cited in the Department of Homeland Security (DHS) Entry/Exit Overstay Report, foreign nationals from many countries have high nonimmigrant visa overstay rates. These visa overstays and other abuses flagrantly violate United States immigration laws, despite generous incentives offered by my Administration—for example, the ability to self-deport using the CBP Home app. To faithfully uphold United States immigration law, the flow of foreigners from countries with high overstay rates or significant fraud must stop.

In addition, the implementation of Proclamation 10949 counsels narrowing the categorical exceptions described in that proclamation to prevent exploitation by foreign nationals. For example, immigrant visas for family members of individuals in the United States will no longer be a broad categorical exception. As described above, the countries to which this proclamation applies have persistent, chronic vetting deficiencies that impede conclusive admissibility determinations and that are readily exploitable to threaten United States national security and public safety. These deficiencies include poor civil documentation and recordkeeping practices, widespread corruption and fraud, unreliable or inaccessible criminal records, and unreliable government travel documents. These pervasive risks concerning nationals from the covered countries apply with at least equal force to family-based visa applications—which comprise most of the immigrant visa applications from such countries—and potentially with even greater force. Familial ties can serve—and, in the past, have in fact served, based on concrete information provided by United States law enforcement and the Department of State—as unique vectors for fraudulent, criminal, or even terrorist activity through means such as the domestic or international financing of such activity. Broadly excepting most immigrant visa applicants from the countries whose risks and deficiencies most gravely threaten America is inconsistent with protecting our national security and with the purpose of driving greater cooperation and vetting improvements by these specific countries. This is particularly true in light of the large numbers of individuals granted United States immigration status during the prior administration without sufficient documentation and vetting mechanisms in place, whose family members might take advantage of such an exception, just as criminals have taken advantage of family-based visas in the past. Accordingly, I have determined that the risks from the classes of aliens covered by this proclamation cannot be satisfactorily mitigated absent resolution of the predominating country-specific concerns, and any extraordinary cases can be appropriately addressed through the national-interest exceptions provided for in this proclamation and Proclamation 10949.

As a result of these reviews and considerations, I have decided—as described in sections 2 and 3 of this proclamation—to continue to impose and modify the limitations set forth in sections 2 and 3 of Proclamation 10949 on the entry into the United States by certain classes of foreign nationals. Also, I have decided—as described in sections 4 and 5 of this proclamation—to impose the limitations set forth below on the entry into the United States by certain other classes of foreign nationals.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2, 3, 4, and 5 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security and public safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols and procedures enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such foreign nationals from entering the United States.

(b) Identity-management and information-sharing standards and practices of foreign governments impact the effectiveness of the screening and vetting protocols and procedures of the United States. Foreign governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals and residents to other governments, including information about known and suspected terrorists and criminals.

It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their identity-management and information-sharing protocols and procedures and to regularly share their identity and threat information with the screening and vetting systems of the United States.

(c) Proclamation 10949 directed the United States Government to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. The proclamation directed the United States Government to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. Additionally, the proclamation directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to immediately engage each of the countries identified in the proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(d) Proclamation 10949 directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by the proclamation should be continued, terminated, modified, or supplemented.

(e) The Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (d) of this section, recommending that entry restrictions and limitations continue to apply to foreign nationals of several countries. The report also identified additional countries for which vetting and screening information is so deficient as to warrant a full or partial suspension of admission. These recommendations follow the engagement with foreign countries that I directed in Proclamation 10949.

(f) In evaluating the recommendations from the Secretary of State and determining whether and to what extent to impose, or continue to impose, restrictions for each country, I consulted with the Secretary of State, the Secretary of War, the Attorney General, the Secretary of Homeland Security, the Director of National Intelligence, appropriate Assistants to the President, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. I further considered various factors, including each country's screening and vetting capabilities, information-sharing policies, and country-specific risk factors, including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals. Each of these factors, including visa-overstay rates, was just one of the factors considered in making the determinations in this proclamation, and the determinations in this proclamation are based on the totality of

the circumstances with respect to each country after a review of all relevant factors.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas are, or can become, lawful permanent residents of the United States. Such persons admitted on immigrant visas may present national security or public safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security or public safety concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security or public safety of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the relevant countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary: to garner cooperation from foreign governments, including as to reducing overstay rates of their nationals; enforce our immigration laws; and advance other important foreign policy, national security, and counterterrorism objectives. Under the current circumstances, without the restrictions and limitations imposed in this proclamation, the entry or admission of such foreign nationals is detrimental to the national interest.

(g) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of 7 additional countries: Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants. I have also determined to fully restrict and limit the entry of individuals using travel documents issued or endorsed by the Palestinian Authority (PA).

(i) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to partially restrict and limit the entry of nationals of the following 4 countries: Burundi, Cuba, Togo, and Venezuela. I have also decided to modify the partial restriction and limitation on the entry of nationals of Turkmenistan. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(j) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to partially restrict and limit the entry of nationals of the following 15 countries: Angola, Antigua and Barbuda, Benin, Cote d 'Ivoire, Dominica, Gabon, The Gambia,

Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(k) Sections 4 and 5 of this proclamation describe some of the identity-management and information-sharing inadequacies that led me to impose, or continue to impose, the restrictions described in this proclamation. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Continued Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Afghanistan;

(b) Burma;

(c) Chad;

(d) Republic of the Congo;

(e) Equatorial Guinea;

(f) Eritrea;

(g) Haiti;

(h) Iran;

(i) Libya;

(j) Somalia;

(k) Sudan; and

(l) Yemen.

**Sec. 3**. *Continued Partial Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Burundi;

(b) Cuba;

(c) Togo; and

(d) Venezuela.

**Sec. 4**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Burkina Faso

(i) According to the Department of State, terrorist organizations continue to plan and conduct terrorist activities throughout Burkina Faso. According to the Fiscal Year 2024, Department of Homeland Security (DHS) Entry/Exit Overstay Report (''Overstay Report''), Burkina Faso had a B–1/B–2 visa overstay rate of 9.16 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 22.95 percent. Additionally, Burkina Faso has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Burkina Faso as immigrants and as nonimmigrants is hereby fully suspended.

(b) Laos

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 28.34 percent and an F, M, and J visa overstay rate of 11.41 percent. According to the Fiscal Year 2023, Department of Homeland Security (DHS) Entry/Exit Overstay Report (''2023 Overstay Report''), Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Additionally, Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants and as nonimmigrants is hereby fully suspended.

(c) Mali

(i) According to the Department of State, armed conflict between the Malian government and armed groups is common throughout the country. Terrorist organizations operate freely in certain areas of Mali.

(ii) The entry into the United States of nationals of Mali as immigrants and as nonimmigrants is hereby fully suspended.

(d) Niger

(i) According to the Department of State, terrorists and their supporters are active in planning kidnappings in Niger, and they may attack anywhere in the country. According to the Overstay Report, Niger had a B–1/B–2 visa overstay rate of 13.41 percent and an F, M, and J visa overstay rate of 16.46 percent.

(ii) The entry into the United States of nationals of Niger as immigrants and as nonimmigrants is hereby fully suspended.

(e) Sierra Leone

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 16.48 percent and an F, M, and J visa overstay rate of 35.83 percent. According to the 2023 Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Additionally, Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants and as nonimmigrants is hereby fully suspended.

(f) South Sudan

(i) According to the Overstay Report, South Sudan had a B–1/B–2 visa overstay rate of 6.99 percent and an F, M, and J visa overstay rate of 26.09 percent. Additionally, South Sudan has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of South Sudan as immigrants and as nonimmigrants is hereby fully suspended.

(g) Syria

(i) Syria is emerging from a protracted period of civil unrest and internal strife. While the country is working to address its security challenges in close coordination with the United States, Syria still lacks an adequate central authority for issuing passports or civil documents and does not have appropriate screening and vetting measures. According to the Overstay Report, Syria had a B–1/B–2 visa overstay rate of 7.09 percent and a F, M, and J visa overstay rate of 9.34 percent.

(ii) The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby fully suspended.

(h) Palestinian Authority Documents

(i) Several United States-designated terrorist groups operate actively in the West Bank or Gaza Strip and have murdered American citizens. Also, the recent war in these areas likely resulted in compromised vetting and screening abilities. In light of these factors, and considering the weak or nonexistent control exercised over these areas by the PA, individuals attempting to travel on PA-issued or endorsed travel documents cannot currently be properly vetted and approved for entry into the United States.

(ii) The entry into the United States of foreign nationals who seek to travel on any travel documents issued or endorsed by the PA, as immigrants and nonimmigrants, is hereby fully suspended.

**Sec. 5**. *Partial Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Angola

(i) According to the Overstay Report, Angola had a B–1/B–2 visa overstay rate of 14.43 percent and an F, M, and J visa overstay rate of 21.92 percent.

(ii) The entry into the United States of nationals of Angola as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Angola to the extent permitted by law.

(b) Antigua and Barbuda

(i) Antigua and Barbuda has historically had CBI without residency.

(ii) The entry into the United States of nationals of Antigua and Barbuda as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Antigua and Barbuda to the extent permitted by law.

(c) Benin

(i) According to the Overstay Report, Benin had a B–1/B–2 overstay rate of 12.34 percent and an F, M, and J visa overstay rate of 36.77 percent.

(ii) The entry into the United States of nationals of Benin as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Benin to the extent permitted by law.

(d) Cote d 'Ivoire

(i) According to the Overstay Report, Cote d'Ivoire had a B–1/B–2 visa overstay rate of 8.47 percent and an F, M, and J visa overstay rate of 19.09 percent.

(ii) The entry into the United States of nationals of Cote d 'Ivoire as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cote d 'Ivoire to the extent permitted by law.

(e) Dominica

(i) Dominica has historically had CBI without residency.

(ii) The entry into the United States of nationals of Dominica as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Dominica to the extent permitted by law.

(f) Gabon

(i) According to the Overstay Report, Gabon had a B–1/B–2 visa overstay rate of 13.72 percent and an F, M, and J visa overstay rate of 17.77 percent.

(ii) The entry into the United States of nationals of Gabon as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Gabon to the extent permitted by law.

(g) The Gambia

(i) According to the Overstay Report, The Gambia had a B–1/B–2 visa overstay rate of 12.70 percent and an F, M, and J visa overstay rate of 38.79 percent. Additionally, The Gambia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of The Gambia as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of The Gambia to the extent permitted by law.

(h) Malawi

(i) According to the Overstay Report, Malawi had a B–1/B–2 visa overstay rate of 22.45 percent and an F, M, and J visa overstay rate of 31.99 percent.

(ii) The entry into the United States of nationals of Malawi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Malawi to the extent permitted by law.

(i) Mauritania

(i) According to the Overstay Report, Mauritania had a B–1/B–2 visa overstay rate of 9.49 percent. According to the Department of State, the Government of Mauritania has little presence in certain parts of the country, which creates substantial screening and vetting difficulties.

(ii) The entry into the United States of nationals of Mauritania as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Mauritania to the extent permitted by law.

(j) Nigeria

(i) Radical Islamic terrorist groups such as Boko Haram and the Islamic State operate freely in certain parts of Nigeria, which creates substantial screening and vetting difficulties. According to the Overstay Report, Nigeria had a B–1/B–2 visa overstay rate of 5.56 percent and an F, M, and J visa overstay rate of 11.90 percent.

(ii) The entry into the United States of nationals of Nigeria as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Nigeria to the extent permitted by law.

(k) Senegal

(i) According to the Overstay Report, Senegal had a B–1/B–2 visa overstay rate of 4.30 percent and an F, M, and J visa overstay rate of 13.07 percent.

(ii) The entry into the United States of nationals of Senegal as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Senegal to the extent permitted by law.

(l) Tanzania

(i) According to the Overstay Report, Tanzania had a B–1/B–2 visa overstay rate of 8.30 percent and an F, M, and J visa overstay rate of 13.97 percent.

(ii) The entry into the United States of nationals of Tanzania as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tanzania to the extent permitted by law.

(m) Tonga

(i) According to the Overstay Report, Tonga had a B–1/B–2 visa overstay rate of 6.45 percent and an F, M, and J visa overstay rate of 14.44 percent.

(ii) The entry into the United States of nationals of Tonga as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tonga to the extent permitted by law.

(n) Turkmenistan

(i) Since the issuance of Proclamation 10949, Turkmenistan has engaged productively with the United States and demonstrated significant progress in improving its identity-management and information-sharing procedures. As a result, the restrictions imposed on Turkmenistan in this proclamation modify and supersede those set forth in section 3(f) of Proclamation 10949.

(ii) The suspension of entry into the United States of nationals of Turkmenistan as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is lifted. Because some concerns remain, the entry into the United States of nationals of Turkmenistan as immigrants remains suspended.

(o) Zambia

(i) According to the Overstay Report, Zambia had a B–1/B–2 visa overstay rate of 10.73 percent and an F, M, and J visa overstay rate of 21.02 percent.

(ii) The entry into the United States of nationals of Zambia as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zambia to the extent permitted by law.

(p) Zimbabwe

(i) According to the Overstay Report, Zimbabwe had a B–1/B–2 visa overstay rate of 7.89 percent and an F, M, and J visa overstay rate of 15.15 percent.

(ii) The entry into the United States of nationals of Zimbabwe as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zimbabwe to the extent permitted by law.

**Sec. 6**. *Scope and Implementation of Suspensions and Limitations.* (a) Scope. Subject to the exceptions set forth in subsection (b) of this section and any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) Exceptions. The suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2, 3, 4, or 5 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) Special Immigrant Visas for United States Government employees under 8 U.S.C. 1101(a)(27)(D); and

(vi) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) The exceptions in subsection (b) of this section amend and supersede the exceptions set forth in section 4(b) of Proclamation 10949 with respect to any countries listed in section 2 or 3 of Proclamation 10949 from and after the date of this proclamation.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(e) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

(f) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of Homeland Security finds, in her discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of Homeland Security or her designee, in coordination with the Secretary of State or his designee.

**Sec. 7**. *Adjustments to and Removal of Suspensions and Limitations.* (a) Within 180 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, recommending whether any suspensions and limitations imposed by sections 2, 3, 4, and 5 of this proclamation should be continued, terminated, modified, or supplemented.

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall continue to engage each of the countries identified in sections 2 and 3 of this proclamation—and shall immediately engage each of the countries identified in sections 4 and 5 of this proclamation—on measures that must be taken to comply with screening, vetting, immigration, and security requirements of the United States.

Case: 26-1706 Document: 23-1 Filed: 03/25/2026 Page: 82 of 189 PageID: 359861
#: 368


**Sec. 8**. *Enforcement.* (a) The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 9**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch official shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 10**. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern standard time on January 1, 2026.

**Sec. 11**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this proclamation shall be borne by the Department of State.

IN WITNESS WHEREOF, I have hereunto set my hand this sixteenth day of December, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

[FR Doc. 2025–23570
Filed 12–18–25; 11:15 am]
Billing code 4710–05–P

# Ex. 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **AKMURAT O. DOE,** ***et al.,*** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.** |
| | ) | |
| **v.** | ) | **1:25-cv-13946-JEK** |
| | ) | |
| **DONALD J. TRUMP, et al.;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF ANDREW GOOD

I, Andrew Good, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the District of Massachusetts. I hereby certify:

1. I am the Chief of U.S. Citizenship and Immigration Services (USCIS) Office of Policy and Strategy, a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since August 4, 2025.
2. The statements contained in this declaration are based upon my personal knowledge and upon information provided to me in my official capacity.
3. I am familiar with Policy Memorandum 602-192 (PM-602-192), issued December 2, 2025, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries,[1] in response to Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety

---

[1] Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries, (Dec. 2, 2025), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf

Threats. PM-602-0192 required that, within 90 days of the memorandum's issuance, USCIS issue operational guidance.

4. I am also familiar with Policy Memorandum 602-0194 (PM-602-0194), issued January 1, 2026, Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries, in response to Presidential Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States expanding in part on PM-602-0192 but also providing a list of benefit requests and individuals exempted from PM-602-0192. PM-602-0194 required that, within 90 days of the memorandum's issuance, USCIS issue operational guidance.

5. In response to the Policy Memoranda, USCIS placed a hold on all benefit requests for aliens from the countries listed in the Presidential Proclamations (and aliens traveling on documents issued by the Palestinian Authority), pending review and rescreening.

6. Over the past 90 days, USCIS has implemented and reviewed several changes to screening and vetting practices.

7. Office of Policy and Strategy (OP&S), and the Fraud Detection and National Security (FDNS) Directorate have collaborated in order to implement and issue the following improvements and operational guidance:

   a. On December 4, 2025, USCIS issued policy guidance to update the maximum validity periods for initial and renewal Employment Authorization Documents (EADs, Form I-766)[2] for certain EAD categories to enhance its screening and vetting efforts, enable detection of aliens with potentially harmful intent, deter fraud, and place removable aliens into proceedings. Reducing the validity period for certain EAD categories will result in more frequent vetting for public safety and national security risks of aliens applying under these EAD categories.

---

[2] Updating Certain Employment Authorization Documents Validity Periods, (Dec. 4, 2025) chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251204-EmploymentAuthorizationValidity.pdf.

b. On December 12, 2025, USCIS issued new guidance on Photograph Reuse for Identity Documents.[3] USCIS updated its photograph reuse guidance to only allow USCIS to reuse previously collected photographs if, at the time of filing, no more than 36 months have passed since the date the photograph was collected at a biometric services appointment. The new guidance provides that USCIS will not use or reuse self-submitted photographs. On January 1, 2026, USCIS also implemented biometric identity verification when reusing fingerprints.

c. On January 9, 2026, USCIS initiated additional background checks, re-interviews, and merit reviews of refugee claims under Operation PARRIS (Post-Admission Refugee Reverification and Integrity Strengthening)[4] led by the USCIS Vetting Center[5] to strengthen the ability of America's immigration system to screen out terrorists, criminal aliens, and other foreign nationals who pose potential threats to public safety or who have committed fraud or other crimes.

d. USCIS began developing system connectivity for automatic notifications of biometric matches and new criminal information.

e. USCIS has implemented a policy requiring a final arrest encounter review to verify criminal history and arrest record before final adjudication.

f. USCIS has developed a policy requiring a final Department of State Consular Consolidated Database (CCD) check for identity verification, visa/travel history, employment history, and other relevant information related to national security, public safety, and fraud.

8. USCIS has established an internal process for Program Offices and Directorates to request lifting holds on individual or group cases, requiring review by OP&S, Office of Chief Counsel, FDNS, and Director's Office. Holds have been lifted for aliens

---

[3] Policy Alert, Photograph Reuse for Identity Documents (Dec. 12, 2025) chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251212-PhotographReuse.pdf

[4] DHS Launches Landmark USCIS Fraud Investigation in Minnesota, (Jan. 09, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-launches-landmark-uscis-fraud-investigation-in-minnesota.

[5] U.S. Citizenship and Immigration Services Establishes New Center to Strengthen Immigration Screening and Target Bad Actors, (Dec. 5, 2025) https://www.uscis.gov/newsroom/news-releases/us-citizenship-and-immigration-services-establishes-new-center-to-strengthen-immigration-screening

vetted through Operation PARRIS; Forms I-129F (Petition for Alien (Fiancé(e)) and Forms I-130 (Petition for Alien Relative) filed by U.S. citizens; intercountry adoption forms; and Forms I-590 (Registration for Classification as Refugee) filed by South African citizens/nationals.

9. USCIS has compiled available information on each country listed within the two travel ban proclamations. USCIS will work with the Department of State to identify risk factors within each country—including indicators of fraud, public safety, or national security risk—and compared these to existing agency screening and vetting practices to recommend needed improvements.

10. USCIS is analyzing risk factors it has identified within each of the listed countries and has actively engaged to outline an enhanced vetting plan which layers different types of vetting, including new sources of information, to increase the fidelity of its vetting. The USCIS vetting plan layers classified, unclassified, and expanded criminal history record checks, along with identity verification and other ad hoc security checks to close security gaps. Discussion, technical development and planning are underway for implementing this plan.

11. USCIS is developing guidance to assist adjudicators in aligning interview resources to the specific risks identified for each country. These resources provide lines of inquiry related to those risks, including document reliability concerns and designated Foreign Terrorist Organizations (FTOs) operating within a country.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of March, 2026, in Camp Springs, Maryland.

Andrew Good
Chief of Policy
U.S. Citizenship and Immigration Services
Department of Homeland Security

# Ex. 2

U.S. Citizenship and Immigration Services

MENU

Home > Newsroom > All News > Alerts > Update on USCIS' Strengthened Screening and Vetting

# Update on USCIS' Strengthened Screening and Vetting

Release Date : 03/30/2026

Since taking office, President Trump has prioritized national security and public safety by implementing a series of executive orders and proclamations that mandate strict screening and vetting of foreign nationals seeking entry or immigration benefits.

Executive Order 14161, *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*, directed agencies to vet and screen aliens to the maximum degree possible – particularly those aliens coming from regions or nations with identified security risks. Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, and Presidential Proclamation 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, together restricted entry from 39 countries lacking adequate screening and vetting information. Collectively, these actions represent a renewed commitment to the national interest in immigration.

U.S. Citizenship and Immigration Services (USCIS) is committed to the integrity of the immigration system, national security, and public safety. Our top priority is ensuring that all individuals seeking immigration benefits are properly vetted, particularly those from identified high-risk countries. This alert provides the public with a detailed account of what we have found, what we are doing, and what we will continue to do to protect national security, public safety, and root out fraud.

**What We Found**

Through an ongoing comprehensive review of pending workloads and benefit applications, USCIS ascertained that prior screening and vetting measures were wholly inadequate. Many applicants for naturalization and lawful permanent residence were not sufficiently vetted. As a result, applications were approved and individuals were naturalized who should not have been. These gaps expose the United States to significant national security and public safety risks and compromise the integrity of the immigration system.

**What We Are Doing**

In accordance with relevant executive orders and presidential proclamations, USCIS issued Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Be[...]* *Aliens from High-Risk Countries* (PM-602-0192); Policy Memorandum, *Hold and Revi[...]*

Need Help? Chat with Emma™

*Adjustment of Status Applications Filed by Aliens Under the Diversity Immigrant Visa Program* (PM-602-0193); and Policy Memorandum, *Hold and Review of USCIS Benefit Application Filed by Aliens from Additional High-Risk Countries* (PM-602-0194). These memoranda placed on hold asylum applications, benefit requests from high-risk countries, and diversity visa adjustment of status applications, among other provisions.

USCIS has implemented a series of robust actions after issuance of those policy memoranda:

- **Enhanced Screening and Vetting Practices**
  Over the past several months, USCIS has reviewed and updated screening and vetting practices, including:
  - Shortening validity periods for certain Employment Authorization Documents to require more frequent security checks;
  - Updating photograph reuse policies to strengthen identity verification, including biometric identity verification when reusing fingerprints;
  - Increasing social media and financial vetting and community interviews;
  - Launching Operation PARRIS to conduct additional background checks, re-interviews, and merit reviews of refugee claims, led by the USCIS Vetting Center;
  - Developing system connectivity for automatic notifications of biometric matches and new criminal information; and
  - Requiring final arrest encounter reviews and Department of State Consular Consolidated Database checks before final adjudication.
- **Internal Review Process**
  USCIS established an internal process for lifting holds on individual or group cases, requiring comprehensive review by multiple offices. Holds have been lifted for aliens vetted through Operation PARRIS, certain petitions filed by U.S. citizens, intercountry adoption forms, certain rescheduled oath ceremonies, statutory and regulatory decision issuance, refugee registrations for South African citizens/nationals, certain special immigrant visa petitions, certain employment authorization documents, and asylum applications from non high-risk countries. We continue to review all application types and lift holds for both individual and group cases as appropriate.
- **Country-Specific Risk Analysis**
  USCIS compiled information on each country listed in the travel ban proclamations and is working with the Department of State to identify risk factors, including indicators of fraud, public safety, or national security risks. USCIS is comparing these to existing screening practices to recommend improvements.
- **Enhanced Vetting Plan Development**
  USCIS is developing a layered vetting plan, incorporating classified and unclassified information, as well as expanded criminal history checks, identity verification, and ad hoc security checks to close security gaps.

- **Guidance for Adjudicators**
  USCIS is developing guidance to help adjudicators align interview resources to specific risks identified for each country, including document reliability concerns and designated Foreign Terrorist Organizations (FTOs).

**What We Will Continue to Do**

USCIS will continue to strengthen our screening and vetting procedures to ensure maximum protection for national security and public safety, and to root out fraud in the immigration system. Our ongoing efforts are designed to ensure that only eligible and vetted individuals are granted immigration benefits.

**Our Commitment**

These actions reflect the Trump administration’s commitment to making America safe again. USCIS will remain vigilant and proactive in protecting the United States from foreign terrorists, criminal aliens, those who commit fraud, and other threats. We are dedicated to maintaining the integrity of America’s immigration system and keeping the public informed about our progress.

Last Reviewed/Updated: 03/30/2026

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

DORCAS INT'L INST. OF R.I., *et al.*,

Plaintiffs,

v.

U.S. CITIZENSHIP AND IMMIGRATION SERVS., *et al.*,

Defendants.

Civil Action No. 26cv132-JJM-PAS

**DEFENDANTS' NOTICE**

In support of their cross-motion for summary judgment, Defendants file this notice to alert the Court and the Plaintiffs that as a result of USCIS' internal review process for lifting holds on individual or group cases, USCIS has lifted the hold on applications associated with medical physicians. USCIS, Update on USCIS' Strengthened Screening and Vetting (last updated Apr. 30, 2026), https://www.uscis.gov/ newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting

Dated: May 15, 2026

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

CHARLES C. CALENDA
First Assistant U.S. Attorney

*/s/ Kevin Bolan*

KEVIN BOLAN
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
401.709.5000
kevin.bolan@usdoj.gov

**Certificate of Service**

I hereby certify that, on May 15, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Kevin Bolan*
KEVIN BOLAN
Assistant United States Attorney

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| DORCAS INTERNATIONAL INSTITUTE OF RHODE ISLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ET AL.<br><br>Defendants. | ) | C.A. No. 1:26-cv-132-JJM-PAS |

**<u>JUDGMENT</u>**

This action came to be heard before the Court and a decision has been rendered. Upon consideration whereof, it is now hereby ordered, adjudged, and decreed as follows:

Pursuant to this Court's Order entered on June 11, 2026, and in accordance with Fed. R. Civ. P. 58, partial final judgment is hereby entered in favor of Plaintiffs and against the Defendants on Counts I and II of Plaintiffs' Complaint.

<u>It is so ordered</u>.

June 11, 2026

By the Court:

<u>/s/ Hanorah Tyer-Witek</u>
Clerk of Court

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2026, I caused to be electronically filed the foregoing Appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be adequately served by that system.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2026, I caused to be electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be adequately served by that system.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2026, I caused to be electronically refiled the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be adequately served by that system.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2026, I caused to be electronically filed the appendix (filed October 5, 2026) with the addition of appendix page 302, with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and will be adequately served by that system.

/s/ *Marie V. Robinson*
MARIE V. ROBINSON
1st Circuit Bar No. 1198125
Attorney, Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044